# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| **STATE OF NEVADA, *et al.*,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO.: 4:16-CV-731-ALM** |
| | § | |
| **UNITED STATES DEPARTMENT** | § | |
| **OF LABOR, *et al.*,** | § | |
| **Defendants.** | § | |

## NOTICE OF ATTORNEY APPEARANCE

I hereby enter an appearance as counsel of record for Petitioners Chipotle Mexican Grill, Inc. and Chipotle Services LLC (collectively "Chipotle") in the above captioned case and certify that I am authorized to receive service of all pleadings, notices, orders, and other papers on behalf of Petitioners.

<div style="margin-left:40%">

Laura Hallmon
State Bar No. 24004312
CANTEY HANGER L.L.P.
600 West 6th Street, Suite 300
Fort Worth, Texas 76102
Telephone: 817-877-2800
Facsimile: 817-877-2807
Email: lhallmon@canteyhanger.com

</div>

1

Respectfully submitted,

CANTEY HANGER L.L.P.
600 West 6th Street, Suite 300
Fort Worth, Texas 76102
Telephone: 817-877-2800
Facsimile: 817-877-2807

By: /s/ Laura Hallmon
Brian C. Newby
State Bar No. 14947320
Email: bnewby@canteyhanger.com

Laura Hallmon
State Bar No. 24004312
Email: lhallmon@canteyhanger.com

John K. Shunk
Colo. Bar No. 16204
Kendra N. Beckwith
Colo. Bar No. 40154
Messner Reeves LLP
1430 Wykoop Street, Suite 300
Denver, Colorado 80202
*Pro Hac Vice Pending*

ATTORNEYS FOR PETITIONERS
CHIPOTLE MEXICAN GRILL, INC. AND
CHIPOTLE SERVICES, LLC

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel certifies that on August 1, 2017, the foregoing Notice of Appearance was filed electronically with the Clerk of the Court for the U.S. District Court, Eastern District of Texas, by submission through the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all counsel of record who have consented to accept said Notice as service of this document by electronic means.


<u>/s/ Laura Hallmon</u>
Laura Hallmon

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| **STATE OF NEVADA,** *et al.*, | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO.: 4:16-CV-731-ALM** |
| | § | |
| **UNITED STATES DEPARTMENT** | § | |
| **OF LABOR,** *et al.*, | § | |
| **Defendants.** | § | |

## PETITIONERS CHIPOTLE MEXICAN GRILL, INC.'S AND CHIPOTLE SERVICES, LLC'S MOTION FOR CONTEMPT

### INTRODUCTION

Respondent Carmen Alvarez and her counsel have intentionally disregarded this Court's November 22, 2016 order ("Order") by filing a lawsuit in the United States District Court for the District of New Jersey against Petitioners Chipotle Mexican Grill, Inc. and Chipotle Services, LLC (together, "Petitioners") to enforce the very regulations that Order enjoined from becoming effective. (*See generally* N.J. Compl., attached as Exhibit 1.) Specifically, that Order enjoined the nationwide implementation and enforcement of proposed revisions to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* ("Final Rule") concerning threshold salary guidelines for overtime exemptions. Ms. Alvarez and her counsel contend that the Order simply does not apply to her because it solely limited the United States Department of Labor ("DOL") from implementing and enforcing the Final Rule, and "did not stay the effective date of the Rule or otherwise prevent the Rule from going into effect" as between employers and private litigants. (Ex. 1, ¶ 32.)

Ms. Alvarez and her counsels' interpretation of the Order is wrong. The Order binds not only the parties to it, but "other persons who are in active concert or participation" with a party to

it. Fed. R. Civ. P. 65(d)(2)(C). "This is derived from the commonlaw [sic] doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control." *Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 14 (1945) (quotations in original). Ms. Alvarez and Chipotle are both covered by and subject to the FLSA. *See* 29 U.S.C. § 203(d), (e), (s) (defining employee and employer under FLSA). And the DOL represented Ms. Alvarez's interests before this Court. They are accordingly bound by the Order.

This Court possesses the inherent authority to enforce its own injunctive decree and to punish those who disobey it. *Waffenschmidt v. MacKay*, 763 F.2d 711, 716 (5th Cir. 1985). And Rule 71 of the Federal Rules of Civil Procedure provides that "[w]hen an order grants relief for a nonparty or may be enforced against a nonparty, the procedure for enforcing the order is the same as for a party." Fed. R. Civ. P. 71. Ms. Alvarez and her counsels' dismissive attitude towards this Court and disregard for the sanctity of its Order—at Chipotle's expense—cannot be condoned. The Order's purpose in enforcing a nationwide injunction was to protect both employees and employers from being subject to differing standards determinative of FLSA exemptions. Ms. Alvarez and her counsels' conduct is directly contrary to that purpose and will cost Chipotle untold amounts in fees and expenses in defending against a rule that never became effective. Chipotle therefore respectfully requests that this Court issue an order finding Ms. Alvarez and her counsel in contempt of the Order, enjoining them from attempting to enforce the Final Rule, and awarding Chipotle its reasonable attorneys' fees and costs incurred in connection with these contempt proceedings.

## STATEMENT OF THE ISSUES

I.　　Does this Court's injunction enjoining the nationwide implementation and enforcement of the Final Rule enjoin Ms. Alvarez and her counsel from enforcing the Final Rule against Chipotle?

II.　　Are Ms. Alvarez and her counsel, by virtue of filing the New Jersey lawsuit, attempting to enforce the Final Rule against Chipotle, in contempt of this Court's Order?

III.　　As a result of Ms. Alvarez's and her counsels' contempt, should this Court enter an order preventing them from further pursuing enforcement of the Final Rule and awarding Chipotle its reasonable attorney's fees and costs incurred in connection with their contempt?

## PERTINENT FACTUAL BACKGROUND

### A.　　President Obama's Attempt to Modify the Salary Test

The FLSA requires employers (like Chipotle) to compensate certain employees who work in excess of 40 hours a week "at a rate not less than one and one-half times the regular rate at which [they] are employed." 29 U.S.C. § 207(a)(1). Exempt from this requirement is "any employee employed in a bona fide executive, administrative, or professional capacity," as defined by the DOL. 29 U.S.C. § 213(a)(1). At all times relevant, the DOL has defined these exemptions by reference to whether: (a) the employee was paid a salary of at least $455 per workweek; and (b) the employee performed certain types of duties as their "primary" duties. *See* 29 C.F.R. § 541.100 et seq.; 69 Fed. Reg. 22122, 22261-62 (April 23, 2004).

In March 2014, President Obama issued a memorandum directing the Secretary of Labor to "modernize and streamline the existing overtime regulations for executive, administrative, and professional employees." *Nevada v. U.S. Dep't of Labor*, 218 F. Supp. 3d 520, 524 (E.D. Tex. 2016), appeal docketed, 16-41606 (5th Cir.). In response, the DOL published a Notice of Proposed Rulemaking to revise 29 C.F.R. Part 541, to which it received more than 293,000 comments. *Id.*

at 525. In May 2016, it published the final version of those revisions, i.e., the Final Rule. Under

the Final Rule, the minimum salary level for exempt employees would increase from $455 per

week to $921 per week. *Id*. The Final Rule also included an "automatic updating mechanism" to

adjust that minimum salary level every three years based upon certain regional benchmarks. *Id*.

This Court enjoined the Final Rule from becoming effective on November 22, 2016. *See generally*

*Nevada*, 218 F. Supp. 3d. at 533-34. In its 19-page, well-reasoned Order concluding that the

*Nevada* Plaintiffs had established a *prima facie* case that the Final Rule lacked statutory authority,

this Court ruled as follows:

> Finally, the Court has authority to enjoin the Final Rule on a nationwide basis and
> decides that it is appropriate in this case, and therefore GRANTS the State
> Plaintiffs' Emergency Motion for Preliminary Injunction (Dkt. #10).
>
> Therefore, the Department's Final Rule described at 81 Fed. Reg. 32,391 is hereby
> enjoined. Specifically, Defendants are enjoined from implementing and enforcing
> the following regulations as amended by 91 Fed. Reg. 32,391; 29 C.F.R. §§
> 541.100, 541.200, 541.204, 541.300, 541.400, 541.600, 541.602, 541.604, 541.605,
> and 541.607 pending further order of this Court.

*Id*. at 534. The case was subsequently appealed, and is pending before the Fifth Circuit, but this

Court's Order remains intact. *See Nevada v. U.S. Dep't of Labor*, Fifth Circuit Case No. 16-41606.

Notably, in its June 30, 2017 reply brief to the Fifth Circuit, the DOL abandoned the Final

Rule as presently drafted. (Reply Br. at 17, attached as Exhibit 2 (stating DOL "has decided not to

advocate for the specific salary level ($921 per week) set in the final rule at this time and intends

to undertake further rulemaking to determine what the salary level should be.").) Instead, the DOL

left open the ability to revisit the rule pending further comment. (*Id*.)

**B.     Ms. Alvarez Sues Chipotle for Its Purported Failure to Implement and Comply with the Final Rule**

Over six months after the Order, and in flagrant disregard of its unambiguous language precluding the Final Rule from taking effect, Ms. Alvarez—a former Chipotle Apprentice[1]—filed a lawsuit alleging that Chipotle violated the FLSA and New Jersey State Wage and Hour Law ("NJWHL")[2] by, as pertinent here, failing to abide by the Final Rule and pay her overtime to which she was allegedly entitled. Ms. Alvarez purports to bring her claims on behalf of herself and others "similarly situated" and seeks certification of an FLSA collective and Fed. R. Civ. P. 23(a) and (b)(3) class action. (Ex. 1, ¶ 3.)

In her lawsuit, Ms. Alvarez acknowledges this Court's Order. (*See Id.*, ¶ 31 (citing Order).) However, she disclaims its applicability to her. Specifically, she alleges:

> 32.     Although it preliminarily enjoined the Department of Labor from implementing and enforcing the Overtime Rule, the Eastern District of Texas did not stay the effective date of the Rule or otherwise prevent the Rule from going into effect. Therefore, as a rule duly promulgated pursuant to the requirements of the APA, the Rule went into effect on December 1, 2016.

> 33.     Because the Eastern District of Texas's preliminary injunction was limited to implementation and enforcement of the Overtime Rule by the Department of Labor and its officials, it did not affect the ability of persons not party to the *Nevada* case, including Plaintiff and similarly situated employees, to bring private lawsuits pursuant to the FLSA's private cause of action, 29 U.S.C. § 216(b), to enforce their right to overtime pay under the Rule, nor did it prevent non-parties from bringing lawsuits under state law.

(*Id.*, ¶¶ 32-33.) Ms. Alvarez therefore claims that Chipotle's election not to classify and pay her in accordance with the Final Rule provides a basis for FLSA and NJWHL liability, even though she

---

[1] Chipotle has a category of employees it refers to as Apprentices. (Ex. 1, ¶ 25.) Chipotle classifies its Apprentices outside of California and New York as executive and/or administrative employees exempt from FLSA and NJWHL overtime requirements based upon their significant salaries and the nature of their primary duties. (*Id.*, ¶ 26.)

[2] The NJWHL is analogous in all substantive respects to the FLSA.

concedes that the very agency tasked with implementing and enforcing the Final Rule—the DOL—is enjoined from doing so. (*Id.*, ¶¶ 34-37.)

Notably, this is the second lawsuit in which Ms. Alvarez's counsel, Cohen Millstein Sellers & Toll PLLC (Joseph Sellers and Miriam R. Nemeth) and Outten & Golden LLP (Justin M. Swartz) have made similar arguments in an attempt to evade this Court's Order. (*See* Motion to Amend and Docket in *Krokos v. The Fresh Market, Inc.*, Dist. of Mass. Case No. 1:16-cv-12082-IT, attached as Exhibit 3, at 35.)

## <u>LEGAL STANDARD AND JURISDICTION</u>

It is well-established that federal courts possess the "inherent authority to enforce their own injunctive decrees" and to punish those who disobey them. *Waffenschmidt*, 763 F.2d at 716; *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (internal quotations and citations omitted) ("[I]t is firmly established that the power to punish for contempts [sic] is inherent in all courts. This power reaches both conduct before and that beyond the court's confines, for the underlying concern that gave rise to the contempt power was not . . . merely the disruption of court proceedings. Rather, it was disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of trial.").

> Courts do not sit for the idle ceremony of making orders and pronouncing judgments, the enforcement of which may be flouted, obstructed, and violated with impunity, with no power in the tribunal to punish the offender. [Federal] courts, equally with those of the state, are possessed of ample power to protect the administration of justice from being thus hampered or interfered with.

*Waffenschmidt*, 763 F.2d at 716 (bracket in original) (quoting *Berry v. Midtown Serv. Corp.*, 104 F.2d 107, 110 (2d Cir. 1939)); *see also In re Bradley*, 588 F.3d 254, 265 (5th Cir. 2009) (brackets in original) (quotations and citations omitted) ("[The Supreme Court] has described civil contempt in broad terms, encompassing sanctions that prevent experimentation with disobedience of the law,

and remedial powers determined by the requirements of full remedial relief, as necessary to effect compliance with [the court's] decree.").[3]

"It is elementary that the court against which a contempt is committed has exclusive jurisdiction to punish for such contempt." *Texas Capital Bank v. Dallas Rodester, Ltd.*, 2015 WL 12910774, *1 (June 5, 2015 E.D. Tex.) (quoting *United States v. Barnett*, 330 F.3d 369, 385 (5th Cir. 1963)). "Enforcement of an injunction through a contempt proceeding must occur in the issuing jurisdiction because contempt is an affront to the court issuing the order." *Waffenschmidt*, 763 F.2d at 716; *see also Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 452 (1932) (holding enforcement of injunction through contempt proceeding must occur in issuing jurisdiction because contempt is an affront to the court issuing the order). The reason is plain: the court's power to "make an order carries with it the equal power to punish for disobedience of that order." *Waffenschmidt*, 763 F.2d at 716 (quoting *In re Debbs*, 158 U.S. 564, 594-95 (1895)) (observing further that submitting the question to another tribunal would "operate to deprive the proceeding of half its efficiency"). Accordingly, "violation of an injunctive order is cognizable in the court which issued the injunction regardless of where the violation occurred" and a "court may therefore hold an enjoined party in contempt, regardless of the state in which the person violates the court's orders." *Id.* (brackets and citations omitted).

Importantly, the Federal Rules of Civil Procedure and Fifth Circuit precedent make clear that the contempt power of an issuing court extends over nonparties who violate an injunction outside that court's territorial jurisdiction. Rule 71 of the Federal Rules of Civil Procedure provides

---

[3] Courts have also rested civil contempt power upon 18 U.S.C. § 401. *See also S.E.C. v. Pinez*, 52 F. Supp. 2d 205, 209 (D. Mass. 1999) (internal quotations omitted) (citing cases) ("Although 18 U.S.C. § 401 is a criminal statute, and, by its terms, gives federal courts the power to punish, many courts have relied upon the statute as authority for civil contempt as well.").

that "[w]hen an order grants relief for a nonparty or may be enforced against a nonparty, the procedure for enforcing the order is the same as for a party." Fed. R. Civ. P. 71. As the Second Circuit observed, "[i]t seems clear that Rule 71 was intended to assure that process be made available to enforce court orders in favor of and against persons who are properly affected by them, even if they are not parties to the action." *Lasky v. Quinlan*, 558 F.2d 1133, 1137 (2d Cir. 1977) (under prior version of Rule 71); *see* Fed. R. Civ. P. 71 cmts. (observing that amendments to rule since 1937 adoption were nonsubstantive). And, as the Ninth Circuit more recently observed, "Rule 71 was designed to memorialize the common sense rule that courts can enforce their orders against both parties and non-parties." *Westlake N. Prop. Owners Ass'n v. City of Thousand Oaks*, 915 F.2d 1301, 1304 (9th Cir. 1990) (citing *Lasky* for same proposition) (under prior version of Rule 71); *see also* Fed. R. Civ. P. 71 cmts.

Because the "nationwide scope of an injunction carries with it the concomitant power of the court to reach out to nonparties who knowingly violate its orders," *Waffenschmidt*, 763 F.2d at 717 (citing cases), it necessarily follows that the issuing court enjoys personal jurisdiction over nonparties that act in violation of that order. This includes nonparties residing outside the territorial jurisdiction of the court who, with actual notice of the court's order, actively aid and abet another in violating the order. *Waffenschmidt*, 763 F.2d at 714; *Gemco Latinoamerica, Inc. v. Seiko Time Corp.*, 61 F.3d 94, 98 (1st Cir. 1995) ("A nonparty, although not directly bound by the order, may be held in civil contempt if it knowingly aids or abets a party in violating the court order."). To conclude otherwise would allow a nationwide injunction's purpose to "easily be thwarted." *Waffenschmidt*, 763 F.2d at 717 (articulating principle that knowing violation of injunction subjects nonparty violators to jurisdiction of issuing court).

## ARGUMENT

I. **THE ORDER ENJOINS MS. ALVAREZ FROM ENFORCING THE FINAL RULE AGAINST CHIPOTLE**

This Court's Order enjoined the Final Rule's implementation and enforcement without limitation. Because the Order enjoined the implementation or enforcement of the Final Rule, there is no basis for Ms. Alvarez or her counsel to seek enforcement of it as against Chipotle. As such, Ms. Alvarez and her counsel should be prohibited from violating this Court's Order and held in contempt for the same.

### A. The Order Prevents Nationwide Implementation and Enforcement of the Final Rule

The mandate of an injunction issued by a federal district court runs nationwide. *Waffenschmidt*, 763 F.2d at 716; *see also Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) (internal quotations omitted) ("[T]he Constitution vests the District Court with the judicial Power of the United States. That power is not limited to the district wherein the court sits but extends across the country. It is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction."); *Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987) ("[T]here is no bar against class-wide, and nationwide relief in federal district or circuit court when it is appropriate.").

Federal district courts are vested with the authority to issue nationwide injunctions with respect to agency actions. *See Earth Island v. Ruthenbeck*, 490 F.3d 687, 699 (9th Cir. 2007) ("The nationwide injunction, as applied to our decision to affirm the district court's invalidation of [an agency regulation] is compelled by the text of the Administrative Procedure Act . . . . The district court did not abuse its discretion in issuing a nationwide injunction."). As this Court is aware, it had the authority to set aside an agency rule under the Administrative Procedure Act ("APA") and did so in its Order. 5 U.S.C. § 706(2)(C) ("the reviewing court shall . . . hold unlawful and set

aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."); *see* 5 U.S.C. § 551(13) ("'agency action' includes the whole or a part of an agency rule . . . ."). This authority has been repeatedly recognized as it relates to the subject matter here. *See Texas v. United States*, No. 7:16-cv-54, 2016 WL 4426495, at *17 (N.D. Tex. Aug. 21, 2016) (issuing a nationwide injunction to ban enforcement of a Department of Education rule related to transgender bathroom policies); *Nat'l Fed. of Indep. Bus. v. Perez*, No. 5:16-cv-66, 2016 WL 3766121, at *46 (N.D. Tex. June 21, 2016) (issuing a nationwide injunction to bar implementation of the Department's "Advice Exemption Interpretation").

Here, the Order plainly enjoins the Final Rule "on a nationwide basis" and determined that a "nationwide injunction protects both employees and employers from being subject to different EAP exemptions based on location." *Nevada*, 218 F. Supp. 3d at 534. Further, the Order specifically enjoined the DOL from "implementing and enforcing" the Final Rule. *Id.* (emphasis added). Stated differently, the Order stopped the Final Rule from taking effect and all persons or entities are therefore bound.

**B.  The Order Relieves Chipotle from Any Compliance Obligations with the Final Rule**

This Court's Order enjoining implementation and enforcement of the Final Rule directly affects Chipotle as an employer subject to FLSA regulations.

Contrary to Ms. Alvarez's complaint, § 216(b)'s private right of action does not remove Chipotle from the purview of the Order's injunction. Ms. Alvarez's theory is premised on the assumption that an unidentified corollary set of regulations exist—separate and apart from those the Order enjoined—that apply solely to regulate "private" employment relationships that she may sue to enforce under § 216(b). The FLSA's plain language refutes that assumption.

Specifically, Chipotle is an employer, as defined in the FLSA, and therefore subject to the FLSA's provision.[4] 29 U.S.C. § 203(d), (s) (defining employee and employer under FLSA). Section 216(b)'s private cause of action is limited to enforcing one of two scenarios identified in that subsection's first two sentences: first, where an employer does not compensate an employee at the minimum wage or for overtime, and second, where an employer discharges or discriminates against an employee who has instituted an FLSA complaint. 29 U.S.C. § 216(b) (emphasis added) ("An action to recover the <u>liability prescribed in either of the preceding sentences</u> may be maintained against <u>any employer</u>"). Ms. Alvarez's complaint here seeks relief under the first; that is, that she was not paid overtime to which she was allegedly entitled under 29 U.S.C. § 207. (Ex. 1, ¶ 20.)

Section 207 sets forth the FLSA's overtime regulations. And § 213(a)(1) expressly states that "section 207 of this title shall not apply with respect to any employee employed in a bona fide executive, administrative, or professional capacity." Congress delegated to the Secretary of Labor the power to define those terms through regulations interpreting this exemption. Those regulations—found in 29 C.F.R. § 541—are the precise regulations the Final Rule sought to modify and that the Order enjoined, but that Ms. Alvarez now seeks to enforce. (Ex. 1, ¶¶ 23-43.) Her allegation that some other, undefined regulations exist outside the scope of 29 C.F.R. § 541 that this Court did not enjoin lacks credibility, is unsupported by the statute, and should be rejected.

Rather, because the Order enjoined implementation and enforcement of the Final Rule, which would have modified 29 C.F.R. § 541, and Chipotle must comply with 29 C.F.R. § 541 in

---

[4] This statement is made without waiver or prejudice to Chipotle Mexican Grill, Inc.'s affirmative defense in the New Jersey action that Ms. Alvarez has asserted her FLSA claims against the wrong entity.

employing Ms. Alvarez and determining whether she is exempt from § 207's overtime provisions, the Order grants relief to Chipotle and any other employer.

## C. The Order Prevents Ms. Alvarez and Her Counsel from Seeking to Enforce the Enjoined Final Rule

The Order binds Ms. Alvarez and prohibits her from enforcing the Final Rule against Chipotle through her lawsuit. Her bold statements that the Order "did not affect the ability of persons not party to the *Nevada* case, including [Alvarez] and similarly situated employees, to bring private lawsuits pursuant to the FLSA's private cause of action, 29 U.S.C. § 216(b), to enforce their right to overtime pay under the Rule, nor did it prevent non-parties from bringing lawsuits under state law," is wrong.

The effect of a nationwide injunction enjoining an agency rule is to award nationwide relief to all parties affected by the rule, not merely the parties prevailing in the lawsuit. *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("We have made clear that '[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'") (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495, n.21 (D.C. Cir. 1989)); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890, n.2 (1990) ("If there is in fact some specific order or regulation. . .and if that order or regulation is final, and has become ripe for review. . . it can of course be challenged under the APA by a person adversely affected—and the entire [order or regulation], insofar as the content of that particular action is concerned, would thereby be affected.").

That injunction binds not only the parties, but "other persons who are in active concert or participation" with a party. Fed. R. Civ. P. 65(d)(2)(C). "This is derived from the commonlaw [sic] doctrine that a decree of injunction not only binds the parties defendant but also those identified

with them in interest, in 'privity' with them, represented by them or subject to their control." *Regal Knitwear Co.*, 324 U.S. at 14 (quotations in original).

In some circumstances, a representative body's participation in a case binds not only itself, but its constituents. For example, "citizens of a State who claim rights pursuant to state law may be deemed 'in privity' with a State and be bound by an injunction or decree to which only the State is a party." *Dolman v. United States*, 439 U.S. 1395, 1396 (1978); *cf. United States v. Baker*, 641 F.2d 1311, 1314, n.5 (9th Cir. 1981) ("[N]onparties who interfere with the implementation of court orders establishing public rights may be enjoined . . . ."). The rationale is plain: the State represents the public rights of its citizens in the proceedings, and, like the State, the individuals are bound by its judgment. *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 340-41 (1958) (citing cases and cited with approval in *Dolman*, 439 U.S. at 1396). The rule has been applied to bind nonparties to a judgment where the nonparties are individuals and groups represented by a State, which was a party to the relevant proceedings, and "they, in their common public rights as citizens of the State, were represented by the State in those proceedings." *City of Tacoma*, 357 U.S. at 340-41.

That rationale—that the representative body binds itself and its constituents—applies here to bind Ms. Alvarez and her counsel to the Order. As set forth above, the right to be compensated for overtime is a public right derived solely from § 207 (and analogous state provisions), the statute under which she brings her complaint. *See* 29 U.S.C. § 207(a)(1) (establishing overtime compensation requirements for employees engaged in commerce). Indeed, by asserting a claim under the FLSA she concedes she is subject to its provisions. *See* 29 U.S.C. § 203(e) (defining employee); 29 U.S.C. § 216(b) (permitting "employee" to sue). It therefore cannot be reasonably disputed that Ms. Alvarez "identifies with" the DOL's interests in enforcing the Final Rule, and that the Department correspondingly represented her interests before this Court. Indeed:

> The purpose of the Department of Labor is to foster, promote, and develop the welfare of the wage earners, job seekers, and retirees of the United States; improve working conditions; advance opportunities for profitable employment; and assure work-related benefits and rights.

Dep't of Labor Mission Statement, https://www.dol.gov/general/aboutdol/mission (last accessed 6/26/2017), attached as Exhibit 4; *see also* 29 U.S.C. § 204 (creating Wage and Hour Division to administer FLSA).

In opposing the injunction, the DOL devoted nearly two pages to explaining the "profoundly harmful impact" enjoining the Final Rule would have on the public. (Dkt. No. 37, Opp'n to Emergency Mot. for Stay, at 46.) The DOL—in great depth and at great length—argued that denying the injunction was necessary to protect low wage workers who would otherwise "be denied additional pay" and forced to work long hours. (*Id*. at 47.) And, the DOL argued, "[s]taying the Final Rule is likely to adversely impact some employees now entitled to overtime protection"—the core allegation of Ms. Alvarez's complaint. (*Id.*; *see* Ex. 1, ¶¶ 39-46 (seeking overtime compensation).) Stated differently, the DOL represented Ms. Alvarez's interests in the *Nevada* lawsuit. Accordingly, the DOL and Ms. Alvarez are in privity for purposes of this contempt motion, and the order is enforceable against Ms. Alvarez, and by extension, her counsel. *See* Fed. R. Civ. P. 65(d)(2)(B) (binding attorneys to injunctive relief).

## II.     MS. ALVAREZ AND HER COUNSEL ARE IN CONTEMPT OF THIS COURT'S ORDER

To succeed on a motion for contempt, the movant need only establish by clear and convincing evidence that: (1) a court order was in effect; (2) the order required or prohibited certain conduct by the respondent; and (3) the respondent failed to comply with the court's order. *United States v. City of Jackson, Miss.*, 359 F.3d 727, 731 (5th Cir. 2004); *Piggly Wiggly Clarksville, Inc. v. Mrs. Baird's Bakeries*, 177 F.3d 380, 382 (5th Cir. 1999). In the contempt context, "clear and convincing evidence" is "that weight of proof which produces in the mind of the trier of fact a firm

belief or conviction as to truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (internal quotation marks omitted) (quoting *In re Medrano*, 956 F.2d 101, 102 (5th Cir. 1992)) (adopting in contempt context definition of clear and convincing evidence used in attorney disbarment proceeding). The aggrieved party institutes the proceeding and controls the litigation in a civil contempt motion. *La. Ed. Ass'n v. Richland Parish Sch. Bd.*, 421 F. Supp. 973, 975 (W.D. La. 1976) (citing 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2960 at 587-88 (1973)), aff'd, 585 F.2d 518 (5th Cir. 1978).

"In civil contempt proceedings the question is not one of intent but whether the alleged contemnors have complied with the court's order." *Jim Walter Resources, Inc. v. Intern'l Union, United Mine Workers of America*, 609 F.2d 165, 168 (5th Cir. 1980) (internal quotations omitted). "Good faith is not a defense to civil contempt; the question is whether the alleged contemnor complied with the court's order." *Chao v. Transocean Offshore, Inc.*, 276 F.3d 725, 728 (5th Cir. 2002). Chipotle has made this showing here as to both Ms. Alvarez and her counsel.

### A. Chipotle Has Demonstrated by Clear and Convincing Evidence that Ms. Alvarez is in Contempt of the Order

As the first element, the Order was indisputably in effect at the time Ms. Alvarez filed her lawsuit. While that Order was appealed to the Fifth Circuit Court of Appeals on December 1, 2016, that Order remains in full effect during the pendency of that appeal. *See* Fed. R. Civ. P. 62(c); Fed. R. App. P. 8(a)(1)-(2); *see also Hovey v. McDonald*, 109 U.S. 150, 161 (1883) ("[A]n appeal from a decree granting, refusing, or dissolving an injunction does not disturb its operative effect."); *Deering Milliken, Inc. v. F.T.C.*, 647 F.2d 1124, 1129 (D.C. Cir. 1978) ("[T]he vitality of [a district court] judgment is undiminished by pendency of the appeal. Unless a stay is granted either by the

court rendering the judgment or by the court to which the appeal is taken, the judgment remains operative.").

Second, the Order prohibited Ms. Alvarez and her counsel from enforcing the Final Rule, as her lawsuit attempts to do here. The Order not only unequivocally forbade enforcement of the Final Rule, but enjoined it from even taking effect. *Nevada*, 218 F. Supp. 3d at 534. Its nationwide scope was deliberate: "[T]he Court has authority to enjoin the Final Rule on a nationwide basis and decides that it is appropriate in this case." *Id.* And, as stated above, when a federal district court issues a nationwide injunction on an agency rule, that injunction sets aside the rule itself and precludes the rule from having legal effect. *Nat'l Mining Ass'n*, 145 F.3d at 1409; *Lujan*, 497 U.S. at 890, n.2.

Furthermore, even if the Order did not expressly prohibit a third party from bringing suit under the enjoined Final Rule, this Court's directive that the Final Rule "is hereby enjoined" is sufficient to be reasonably understood as prohibiting Ms. Alvarez's lawsuit. *See Test Masters Educ. Servs., Inc. v. Robin Singh Educ.l Servs., Inc.*, 799 F.3d 437, 454 (5th Cir. 2015) (quotations omitted) (in entering injunctions, a court "enjoys a degree of flexibility in vindicating its authority against actions that, while not expressly prohibited, nonetheless violate the reasonably understood terms of the order."). This is particularly true given this Court's purpose in ordering a nationwide injunction was to protect both employees and employers from being subject to differing FLSA exemptions. *Nevada*, 218 F. Supp. 3d at 534. Chipotle has therefore satisfied the second element of contempt.

Third, Ms. Alvarez failed to abide by the Order. By filing suit trying to enforce the unimplemented Final Rule against Chipotle, Ms. Alvarez has attempted to give legal effect to an agency rule that this Court held in abeyance. *See Maples v. Thomas*, 565 U.S. 266, 280 (2012)

(citing *Coleman v. Thompson*, 501 U.S. 722, 753-55 (1991)) ("[T]he attorney is the prisoner's agent, and under 'well-settled' principles of agency law, the principal bears the risk of negligent conduct on the part of his agent."); *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 92 (1990) ("Under our system of representative litigation, 'each party is deemed bound by the acts of his lawyer-agent. . . ."). Her attempt to justify her actions by redefining the injunction's scope to apply solely to the DOL is contrary to the Order's plain language and intent, demonstrates a disregard for the Order, and is grounds for contempt. *See Howat v. Kansas*, 258 U.S. 181, 190 (1922) ("It is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected, and disobedience of them is contempt of its lawful authority, to be punished.); *Locke v. United States*, 75 F.2d 157, 159 (5th Cir. 1935) ("Willful disobedience of an injunction, however erroneous, issued by a court having jurisdiction while such injunction is in force unreversed constitutes contempt of court."). Her attempt to circumvent this Court's injunction and enforce an agency rule that this Court plainly prevented from becoming effective should not be permitted. *Nevada*, F. Supp. 3d at 534. Chipotle has therefore satisfied the third element.

### B.     Ms. Alvarez's Counsel Are Also in Contempt of the Order

Under the circumstances here, Ms. Alvarez's counsel are equally responsible for her contemptuous actions.

A court's order binds not only the parties—or, as the case is here, an individual clearly enjoined by the order—but also binds anyone acting in concert with the enjoined individual to violate the court's order. *See Waffenschmidt*, 763 F.2d at 717-18 (holding that order "binds not only the parties subject thereto, but also nonparties who act with the enjoined party" and that nonparty with notice of the court's order may be held in contempt once shown to be in "active

concert or participation" with enjoined party). Furthermore, attorneys with actual notice of the order who represent such an individual are equally bound by the order. *See also* Fed. R. Civ. P. 65(d)(2)(B) (emphasis added) ("The order binds only the following who receive actual notice of it by personal service or otherwise: the parties' officers, agents, servants, employees, and <u>attorneys</u>;").

Moreover, lawyers must not knowingly disobey court orders unless it is by an open refusal premised on one of two exceptions: either an assertion that no valid obligation exists, or the client's willingness to accept any sanctions arising from such disobedience. Tex. Discipl. R. Prof'l Conduct 3.04(d) (a lawyer shall not "knowingly disobey, or advise the client to disobey, an obligation under the standing rules of or a ruling by a tribunal except for an open refusal based either on an assertion that no valid obligation exists or on the client's willingness to accept any sanctions arising from such disobedience."); N.J. Rules Prof'l Conduct R. 3.4(c) ("A lawyer shall not knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists;").

Here, the first exception is not applicable for all the reasons set forth above. The Order prohibits implementation and enforcement of the Final Rule on a nationwide basis. And, if the second exception applies (and Ms. Alvarez has acquiesced to sanctions for disobeying the Order), then she has accepted the consequences of her actions and contempt is appropriate.

Rather, Ms. Alvarez's counsels' actions demonstrate a clear and purposeful decision to actively bring her lawsuit—seeking to enforce the Final Rule—in violation of the Order. The lengths taken to avoid the Order in the complaint indisputably demonstrate that Ms. Alvarez's counsel are aware of it. (*See* Ex. 1, ¶¶ 31-34.) Indeed, this is the second lawsuit in which Outten & Golden LLP (Mr. Swartz) and Cohen Millstein Sellers & Toll PLLC (Joseph Sellers and Miriam

R. Nemeth) have alleged the Order simply does not apply to private employer and employee relationships. (*See* Ex. 3 at 4-7 (May 8, 2017 motion to amend) (asserting identical allegations concerning Order's applicability).) And the same firm has—on at least ten separate occasions—touted Ms. Alvarez's lawsuit on its website and in national media. *See* http://www.outtengolden.com/class-action-news?page=1 (last accessed 7/24/2017, also attached as Exhibit 5). Under these circumstances, it is hard to envision a more concrete example of lawyers actively assisting a client to violate a court order.

Because: (1) an order of this Court was in effect at the time Ms. Alvarez and her counsel filed the Lawsuit; (2) the Order prohibited their conduct; and (3) Ms. Alvarez and her counsel failed to comply with the Order, Ms. Alvarez and her counsel should be found in contempt.

## III. AS A RESULT OF MS. ALVAREZ'S AND HER COUNSELS' ACTIONS, THIS COURT SHOULD ENTER AN ORDER PREVENTING THEM FROM FURTHER PURSUING ENFORCEMENT OF THE FINAL RULE AND AWARDING CHIPOTLE ITS REASONABLE ATTORNEYS' FEES AND COSTS INCURRED IN CONNECTION WITH THEIR CONTEMPT

This Court enjoys "broad discretion" in fashioning the appropriate remedy for civil contempt. *In re Gen. Motors Corp.*, 61 F.3d 256, 259 (4th Cir. 1995). Civil contempt can serve two purposes. The first is to serve as a coercive sanction to enforce compliance with an order of the court. *United States v. McMillan*, 53 F. Supp. 2d 895, 907 (S.D. Miss. 1999) (citing Supreme Court precedent); *see also Lance v. Plummer*, 353 F.2d 585, 592 (5th Cir. 1965) ("[R]emedial or coercive sanctions may be imposed in civil contempt proceedings, such as are designed to compensate the complainant for losses sustained and coerce obedience for the benefit of the complainant."). The second is to compensate the injured party for losses or damages sustained as a result of the contemnor's noncompliance. *McMillan*, 53 F. Supp. 2d at 907; *see also Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 827 (5th Cir. 1976) (Compensatory civil contempt

"includes losses flowing from noncompliance and expenses reasonably and necessarily incurred in the attempt to enforce compliance."). This includes the "cost of bringing the violation to the attention of the court" *Cook v. Ochsner Found. Hosp.*, 559 F.2d 270, 272 (5th Cir.1977), and "may include an award of attorneys' fees," including "costs, expenses, and attorneys' fees incurred by [the injured party] in any activity related to the civil contempt phase of [the] case, including but not limited to the motion, hearing, and post-hearing suggestions." *City of Jackson, Miss.* 318 F. Supp. 2d 395, 409 (S.D. Miss. 2002), *aff'd sub nom*, *United States v. City of Jackson, Miss.*, 359 F.3d 727 (5th Cir. 2004). Here, sanctions to both coerce obedience and compensate Chipotle are appropriate.

The circumstances here plainly demonstrate that absent additional formal restraint, Ms. Alvarez and her counsel will continue pursuing enforcement of the Final Rule against Chipotle. An order setting forth the following is therefore warranted: (a) affirming that the Order applies to Ms. Alvarez, and all proposed plaintiffs similarly situated to her; (b) precluding her from enforcing the Final Rule on behalf of herself and all others similarly situated to her; and (c) directing Ms. Alvarez and her counsel to withdraw their allegations, both individual and representative, concerning the Final Rule against Chipotle within seven days of this Court's order.

A sanction compensating Chipotle for the fees and expenses it has incurred in connection with this contempt proceeding is also appropriate. Given the context of these proceedings, the lack of support for enforcement of the Final Rule against Chipotle, and that Ms. Alvarez's allegations concerning the Final Rule are in all probability driven by her counsel, awarding those sanctions solely and personally against her counsel is appropriate. *See* 28 U.S.C. § 1927 ("Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by

the court to satisfy personally the costs, expenses, and attorneys' fees reasonably incurred because of such conduct."). Indeed, Ms. Alvarez's complaint, to the extent it seeks enforcement of the Final Rule, is both "unreasonable" and reckless such that sanctions against her counsel are appropriate. *See Edwards v. Gen Motors Corp.*, 153 F.3d 242, 246 (5th Cir. 1998) (holding there must be "evidence of bad faith, improper motive, or reckless disregard of duty owed to the court" to show behavior was both unreasonable and vexatious); *In re Osborne*, 375 B.R. 216, 224-25 (M.D. La. 2007) (citing *Cruz v. Savage*, 896 F.2d 626, 631-32 (1st Cir. 1990)) ("Unreasonable and vexatious conduct is harassing or annoying, or evinces the intentional or reckless pursuit of a claim, defense or position that is or should be known by the lawyer to be unwarranted in fact or law.").

## **<u>CONCLUSION</u>**

Wherefore, for the reasons set forth above, Chipotle respectfully requests that this Court enter an order finding Ms. Alvarez and her counsel in contempt of the Order, preventing them from, individually and collectively, pursuing enforcement of the Final Rule in the New Jersey action, and awarding monetary sanctions solely and personally against Ms. Alvarez's counsel for their reckless disregard of the Order.

Dated: August 1, 2017.

Respectfully submitted,

CANTEY HANGER L.L.P.
600 West 6th Street, Suite 300
Fort Worth, Texas 76102
Telephone: 817-877-2800
Facsimile: 817-877-2807

By: /s/ Laura Hallmon
Brian C. Newby
State Bar No. 14947320
Email: bnewby@canteyhanger.com

Laura Hallmon
State Bar No. 24004312
Email: lhallmon@canteyhanger.com

John K. Shunk
Colo. Bar No. 16204
Kendra N. Beckwith
Colo. Bar No. 40154
Messner Reeves LLP
1430 Wynkoop Street, Suite 300
Denver, Colorado 80202
*Pro Hac Vice Pending*

ATTORNEYS FOR PETITIONERS
CHIPOTLE MEXICAN GRILL, INC. AND
CHIPOTLE SERVICES, LLC

## CERTIFICATE OF CONFERENCE

Undersigned counsel certifies compliance with the meet and confer requirement of LOCAL RULE CV-7(h). On July 28, 2017, Petitioner's Texas local counsel Laura Hallmon, and lead attorney Kendra Beckwith (pro hac vice pending in New Jersey and Texas) participated in a telephone conference with Petitioner's New Jersey local counsel Abigail Nitka, and Brian Murphy (who will serve as Petitioner's New Jersey local counsel upon admission pro hac vice), conferring with Respondent Carmen Alvarez' lead counsel Joseph M. Sellers and Justin M. Swartz regarding the filing and merits of Petitioner's motion. The participants expressed their views concerning the dispute. No agreement could be reached because Respondent Carmen Alvarez' counsel have indicated they are not subject to the preliminary injunction by this Court and, pursuit of the New Jersey action is not contempt of the ruling of this Court, and discussions have conclusively ended in an impasse, leaving an open issue for this Court to resolve.

/s/ Laura Hallmon
Laura Hallmon

## <u>CERTIFICATE OF SERVICE</u>

Undersigned counsel certifies that on August 1, 2017, the foregoing Motion for Contempt, was filed electronically with the Clerk of the Court for the U.S. District Court, Eastern District of Texas, by submission through the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all counsel of record, each of whom have consented to accept said Notice as service of this document by electronic means. Counsel for Respondent Carmen Alvarez will be served by electronic mail as follows:

COHEN MILSTEIN SELLERS & TOLL PLLC
Joseph M. Sellers
Miriam R. Nemeth
1100 New York Avenue, NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
jsellers@cohenmilstein.com
mnemeth@cohenmilstein.com

GREEN SAVITS LLC
Glen D. Savits
25B Vreeland Road, Suite 207
Florham Park, NJ 07932
Telephone: (973) 695-7777
gsavits@greensavits.com

OUTTEN & GOLDEN LLP
Justin M. Swartz
Melissa Lardo Stewart
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone: (212) 245-1000
jms@outtengolden.com
mstewart@outtengolden.com

/s/ Laura Hallmon
Laura Hallmon

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| **STATE OF NEVADA**, *et al.*, | § | |
| **Plaintiffs**, | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO.: 4:16-CV-731-ALM** |
| | § | |
| **UNITED STATES DEPARTMENT** | § | |
| **OF LABOR**, *et al.*, | § | |
| **Defendants.** | § | |

## EXHIBITS TO PETITIONERS CHIPOTLE MEXICAN GRILL, INC.'S AND CHIPOTLE SERVICES, LLC'S MOTION FOR CONTEMPT

Chipotle Mexican Grill, Inc. and Chipotle Services LLC (collectively "Chipotle") hereby provides five exhibits to its Motion for Contempt

### Exhibit 1 – Carmen Alvarez's District of New Jersey Complaint

Chipotle has attached to its Motion a file-stamped copy of Ms. Alvarez's complaint in the matter captioned *Carmen Alvarez v. Chipotle Mexican Grill, Inc. et al.*, United States District Court for the District of New Jersey, Case No. 2:17-cv-04095-KM-JBC.

### Exhibit 2 – Department of Labor's Reply Brief in the *Nevada* Appeal

Chipotle has attached to its Motion a file-stamped copy of the Department of Labor's reply brief in the Fifth Circuit appeal concerning this Court's November 22, 2016 order presently pending in the Fifth Circuit.

### Exhibit 3 – Ms. Alvarez's Counsels' Motion to Amend in the District of Massachusetts Action

Chipotle has attached to its Motion a file-stamped copy of Ms. Alvarez's counsels' filing on behalf of Plaintiffs in the matter captioned *Krokos v. The Fresh Market, Inc.*, United States District Court for the District of Massachusetts Case No. 1:16-cv-12082-IT.

1

**Exhibit 4 – Department of Labor's Mission Statement**

Chipotle has attached a copy of the Department of Labor's mission statement, which appears on its website.

**Exhibit 5 – Ms. Alvarez's Counsel's Website**

Chipotle has attached to its Motion a print-out demonstrating as of July 27, 2017, the website of Mr. Swartz's law firm, publicizing Ms. Alvarez's lawsuit against Chipotle.

Respectfully submitted,

CANTEY HANGER L.L.P.
600 West 6th Street, Suite 300
Fort Worth, Texas 76102
Telephone: 817-877-2800
Facsimile: 817-877-2807

By: /s/ Laura Hallmon
Brian C. Newby
State Bar No. 14947320
Email: bnewby@canteyhanger.com

Laura Hallmon
State Bar No. 24004312
Email: lhallmon@canteyhanger.com

John K. Shunk
Colo. Bar No. 16204
Kendra N. Beckwith
Colo. Bar No. 40154
Messner Reeves LLP
1430 Wykoop Street, Suite 300
Denver, Colorado 80202
*Pro Hac Vice Pending*

ATTORNEYS FOR PETITIONERS
CHIPOTLE MEXICAN GRILL, INC. AND
CHIPOTLE SERVICES, LLC

2

## CERTIFICATE OF SERVICE

Undersigned counsel certifies that on August 1, 2017, the foregoing Exhibits to Petitioners Chipotle Mexican Grill, Inc. and Chipotle Services, LLC's Motion for Contempt was filed electronically with the Clerk of the Court for the U.S. District Court, Eastern District of Texas, by submission through the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all counsel of record, each of whom have consented to accept said Notice as service of this document by electronic means. Counsel for Respondent Carmen Alvarez will be served by electronic mail as follows:

COHEN MILSTEIN SELLERS & TOLL PLLC
Joseph M. Sellers
Miriam R. Nemeth
1100 New York Avenue, NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
jsellers@cohenmilstein.com
mnemeth@cohenmilstein.com

GREEN SAVITS LLC
Glen D. Savits
25B Vreeland Road, Suite 207
Florham Park, NJ 07932
Telephone: (973) 695-7777
gsavits@greensavits.com

OUTTEN & GOLDEN LLP
Justin M. Swartz
Melissa Lardo Stewart
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone: (212) 245-1000
jms@outtengolden.com
mstewart@outtengolden.com

/s/ Laura Hallmon
Laura Hallmon

3

# Exhibit 1

COHEN MILSTEIN SELLERS & TOLL PLLC
Joseph M. Sellers*
Miriam R. Nemeth*
1100 New York Avenue, NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
jsellers@cohenmilstein.com
mnemeth@cohenmilstein.com

GREEN SAVITS LLC
Glen D. Savits
25B Vreeland Road, Suite 207
Florham Park, NJ 07932
Telephone: (973) 695-7777
gsavits@greensavits.com

OUTTEN & GOLDEN LLP
Justin M. Swartz*
Melissa Lardo Stewart*
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone: (212) 245-1000
jms@outtengolden.com
mstewart@outtengolden.com

*Attorneys for Plaintiff and the Putative
Class and Collective*

**pro hac vice* applications forthcoming

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CARMEN ALVAREZ, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> CHIPOTLE MEXICAN GRILL, INC., and CHIPOTLE SERVICES, LLC, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No. _____

Electronically Filed

**CLASS AND COLLECTIVE
ACTION COMPLAINT**

Plaintiff Carmen Alvarez ("Plaintiff"), by and through the undersigned attorneys, brings this action against Defendants Chipotle Mexican Grill, Inc. and Chipotle Services, LLC (formerly known as Chipotle Mexican Grill, Co., LLC) (collectively, "Chipotle" or "Defendants") for failing to pay her overtime as required by the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, and New Jersey's State Wage and Hour Law ("NJWHL"), N.J. Stat. § 34:11-56a1, *et seq.* Plaintiff alleges as follows:

1.     Plaintiff is an adult resident of Essex County, New Jersey, residing at 14 Glenroy Road South, Fairfield, New Jersey 07004.

2.     Upon information and belief, the principal executive offices of Chipotle Mexican Grill, Inc., and Chipotle Services, LLC are located at 1401 Wynkoop Street, Suite 500, Denver, Colorado, 80202.

3.     This case arises out of Chipotle's misclassification of Plaintiff and other similarly situated employees as exempt from the overtime protections of the FLSA and the NJWHL and its resulting failure to pay Apprentices statutorily required overtime pay.

4.     In particular, Plaintiff and other similarly situated Apprentices regularly work or worked more than forty hours per week, but have not been compensated for that overtime at the statutory rate.

2

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over Plaintiff's FLSA claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b).

6.      The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in the United States District Court for the District of New Jersey because Plaintiff resides in this District, Chipotle conducts business in this District, and the majority of the events or omissions giving rise to Plaintiff's claims occurred in this District. *See* 28 U.S.C. § 1391.

## PARTIES

8.      Plaintiff was an employee of Chipotle, as defined by the FLSA, 29 U.S.C. § 203(e)(1) and (g), and she worked as an Apprentice at several Chipotle restaurants in New Jersey from in or around December 2013 through March 2017, including, as relevant to this case:

a.      From in or around March 2014 to in or around November 2015, Plaintiff worked as an Apprentice at restaurant #2011, located at 235 Prospect Avenue, West Orange, NJ;

b.      From in or around November 2015 to in or around August 2016, Plaintiff worked as an Apprentice at restaurant #817, located at 380 State Route 3, Clifton, NJ;

3

       c.     From in or around August 2016 to in or around October 2016, Plaintiff worked as an Apprentice at restaurant #1706, located at 1255 Route 17 South, Unit 3, Ramsey, NJ; and

       d.     From in or around October 2016 to in or around March 2017, Plaintiff worked as an Apprentice at restaurant #123, located at 368 State Route 10 West, East Hanover, NJ.

9.     A written consent form for Plaintiff is attached hereto as **Exhibit A**.

10.    Chipotle Mexican Grill, Inc. is a foreign corporation organized and existing under the laws of Delaware, with a principal executive office in Colorado.

11.    Chipotle Mexican Grill, Inc. owns and operates 53 restaurants in New Jersey and 2,227 restaurants throughout the United States and abroad, which serve Mexican-style food in a "fast-casual" environment.

12.    Chipotle Services, LLC (formerly known as Chipotle Mexican Grill, Co., LLC), a limited liability company organized under the laws of Colorado, is a wholly owned subsidiary of Chipotle Mexican Grill, Inc., with a principle executive office in Colorado.

13.    Defendants jointly employed Plaintiff and other similarly situated current and former Apprentices.

14.     Upon information and belief, each Defendant was an employer or an agent of an employer of Plaintiff and other similarly situated current and former Apprentices.

15.     To the extent they are separate entities, Defendants operate in concert as a common enterprise and as joint employers of Plaintiff and other similarly situated Apprentices.

16.     Upon information and belief, Defendants jointly maintain control, oversight, and direction over Plaintiff and similarly situated Apprentices at all relevant times, including timekeeping, payroll, and other terms and conditions of their employment.

17.     Defendants apply the same employment policies, practices, and procedures to Apprentices at all Chipotle restaurants in New Jersey, including policies, practices, and procedures with respect to the payment of overtime compensation.

18.     At all relevant times, Chipotle Services, LLC has been the corporate entity listed on Plaintiff's and other Apprentices' paychecks and W-2 tax forms.

19.     Chipotle's gross annual sales made or business done has been $500,000 or greater per year at all times relevant to this lawsuit.

5

# FACTUAL ALLEGATIONS

## A.   BACKGROUND

20.    The FLSA provides that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).

21.    The FLSA exempts from this overtime pay requirement "any employee employed in a bona fide executive, administrative, or professional capacity . . . as such terms are defined and delimited from time to time by regulations of the Secretary."  29 U.S.C. § 213(a)(1).

22.    Prior to December 1, 2016, the Department of Labor defined this exemption to include only those employees who were paid on a salary basis of at least $455 per workweek ($23,660 per year) and who were engaged in certain types of duties.  *See* Defining and Delimiting the Exemption for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22122, 22261-62 (April 23, 2004).

23.    On May 23, 2016, following notice and an opportunity for public comment as required by the Administrative Procedure Act (APA), the Department of Labor promulgated a final regulation ("the Overtime Rule"), which  provided

that, as of December 1, 2016, "bona fide, executive, administrative, or professional capacity" would include only those employees who are paid on a salary basis of at least $913 per week ($47,476 per year), and who are engaged in certain duties, as described below. *See* 29 C.F.R. §§ 541.100 - 541.300, 541.600.

        a.      An "Executive" employee is an employee (1) "Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;" (2) "Who customarily and regularly directs the work of two or more other employees; and," (3) "Who has the authority to hire and fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(1)-(4).

        b.      An "Administrative" employee is an employee (1) "Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (2) "Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(A)(1)-(3).

        c.      A "Professional" employees is an employee "Whose primary duty is performance of work: (i) Requiring knowledge of an advance type in

7

a field of science or learning customarily acquired by a prolonged course of specialize intellectual instruction; or (ii) Requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor." 29 C.F.R. § 541.300(2).

24.     New Jersey Wage and Hour Law (NJWHL) contains the same overtime requirements as the FLSA and has identical exemptions for "bona fide executive, administrative, or professional" employees. *See* N.J. Stat. § 34:11-56a4. The New Jersey Administrative Code provision defining and delimiting those terms adopts the federal definition in 29 C.F.R. §541 by reference. *See* N.J.A.C. 12:56-7.2.

## B.     GENERAL FACTUAL ALLEGATIONS

25.     Chipotle's Apprentices are employees who are training to become general managers of a Chipotle restaurant.

26.     Chipotle classifies its Apprentices as "executive" and/or "administrative" employees and thus considers them exempt from the overtime requirements of the FLSA and New Jersey law.

27.     Consistent with this classification, until on or about November 14, 2016, Chipotle paid Apprentices in New Jersey a salary and did not pay overtime premiums for hours worked over 40 per workweek.

2250963.2

28.     Pursuant to this policy or practice, Chipotle did not pay Plaintiff any overtime premium for hours worked in excess of 40 in a workweek, as required by the FLSA and New Jersey law, from the beginning of her employment through on or around November 14, 2016.

29.     Prior to on or around November 14, 2016, Plaintiff was paid approximately $820 per week ($1,640 per biweekly pay period). This equated to an annual salary of approximately $42,640, excluding bonuses of less than $2,500.

30.     On or around November 14, 2016, as a result of the Overtime Rule, Chipotle converted its Apprentices, including Plaintiff, to hourly employees and began paying a premium for hours worked in excess of 40 per week.

31.     On November 22, 2016, the United States District Court for the Eastern District of Texas preliminarily enjoined the Department of Labor and its officials from "implementing and enforcing" the Overtime Rule. *See Nevada v. United States Dep't of Labor*, No. 16 Civ. 731, 2016 WL 6879615, at *9 (E.D. Tex. Nov. 22, 2016).

32.     Although it preliminarily enjoined the Department of Labor from implementing and enforcing the Overtime Rule, the Eastern District of Texas did not stay the effective date of the Rule or otherwise prevent the Rule from going into effect. Therefore, as a rule duly promulgated pursuant to the requirements of the APA, the Rule went into effect on December 1, 2016.

9

33.     Because the Eastern District of Texas's preliminary injunction was limited to implementation and enforcement of the Overtime Rule by the Department of Labor and its officials, it did not affect the ability of persons not party to the *Nevada* case, including Plaintiff and similarly situated employees, to bring private lawsuits pursuant to the FLSA's private cause of action, 29 U.S.C. § 216(b), to enforce their right to overtime pay under the Rule, nor did it prevent non-parties from bringing lawsuits under state law.

34.     Notwithstanding the fact that the *Nevada* preliminary injunction did not prevent the Rule from going into effect on December 1, 2016, or limit its enforcement by non-parties, Chipotle chose to change its payment practices for Apprentices in New Jersey based on the preliminary injunction, and it stopped paying overtime premiums to Plaintiff and other similarly situated employees.

35.     On or around December 12, 2016, Chipotle sent an email to all restaurants stating that, "[b]ecause of" the *Nevada* decision, it was converting all its Apprentices, with the exception of Apprentices in New York and California, back to salaried employees who would be exempt from the overtime provisions of the FLSA.

36.     The email stated: "In mid-November, we converted Apprentices to hourly in order to comply with the FLSA changes, which were due to take effect on December 1. Since the court blocked the anticipated changes from taking

10

effect, we will convert Apprentices back to salaried exempt effective Monday, 12/12."

37.    The email further stated: "This means Apprentices outside CA and NY [w]ill no longer be required to clock-in or out for shifts" and "[s]hould be scheduled according to the needs of the restaurant, which is expected to result in a 50-hour week on average."

38.    From December 12, 2016 through her last date of employment with Chipotle in or around March 2017, Plaintiff was paid approximately $829 per week ($1,657 per biweekly pay period).    This equated to an annual salary of approximately $43,082, excluding bonuses of approximately $750.    Because this amount was less than $913 per week, Plaintiff was entitled to overtime compensation for all hours worked over forty per workweek.

39.    For the period from on or around December 12, 2016, through the end of Plaintiff's employment at Chipotle in or around March 2017, Chipotle did not pay Plaintiff the overtime premiums provided for by the FLSA and New Jersey state law.

40.    Upon information and belief, other Apprentices who have worked at Chipotle restaurants in New Jersey from December 12, 2016, to the present have also been denied compensation at overtime rates for all time worked in excess of forty hours per week, in violation of the FLSA and New Jersey state law.

11

41.     As of at least November 2016, Chipotle was aware that the Overtime Rule set the salary threshold for the executive, administrative, and professional employee exemption at $913 per week and that the Overtime Rule had an effective date of December 1, 2016.

42.     Chipotle was and is aware that Plaintiff and other Apprentices are or were paid less than $913 per week after December 1, 2016.

43.     Nonetheless, Chipotle willfully denied Plaintiff and other Apprentices overtime compensation for hours worked in excess of forty per week.

44.     Chipotle requires Apprentices in New Jersey to work a minimum of approximately 50 hours per week.

45.     Plaintiff regularly worked more than 40 hours per week, with an average of 50 to 52 hours per week.

46.     For example, during the week of February 20-26, 2017, Plaintiff recalls working at least 50 hours.

47.     Having continued to treat Plaintiff and other Apprentices as exempt after December 1, 2016, Chipotle failed to record or have Plaintiff and other Apprentices record the actual number of hours they worked, and therefore Chipotle did not keep records of the time for which Plaintiff and other Apprentices were eligible to be paid overtime premiums.

12

48.     At all times that Chipotle classified Plaintiff as an exempt employee, the hours worked by Plaintiff were not recorded on her pay stubs.

49.     Plaintiff and the other Apprentices at Chipotle restaurants in New Jersey have been improperly classified as exempt under the FLSA.

50.     In addition to failing the salary basis test, at all times relevant to this lawsuit, Plaintiff and other Apprentices in New Jersey have not met the duties test that could have rendered them exempt from overtime compensation under the FLSA and New Jersey law.

51.     Chipotle's restaurants use an open kitchen, where employees are constantly engaging customers and preparing meals in front of customers in an assembly line production.

52.     Plaintiff and other Apprentices are required to provide customer service during the majority of their shifts.

53.     Plaintiff and other Apprentices spend the majority of their shifts working the assembly line, filling orders for customers, preparing food, operating the cash register, and preparing items for the assembly line, including salsa, guacamole, chopped vegetables, and other food items.

54.     The primary duties of Plaintiff and other Apprentices—food preparation and customer service—are similar to the duties performed by hourly

2250963.2

employees, including hourly crew members, service managers, and kitchen managers.

55. As an Apprentice, Plaintiff frequently performed the functions of an hourly employee, such as filling orders for customers on the assembly line, operating the cash register, and grilling and preparing food.

56. Plaintiff and other Apprentices primarily performed duties that were manual in nature, and manual labor—including cooking, preparing, and serving food—occupied the majority of Plaintiff's working hours.

57. Plaintiff's and other Apprentices' primary duties did not include hiring and firing other employees or making recommendations for hiring, firing, or other employment decisions; scheduling other employees; or disciplining other employees.

58. Plaintiff's and other Apprentices' primary duties did not involve management of the business operations of Chipotle or its customers.

59. Plaintiff and other Apprentices were not involved in planning Chipotle's long or short term business objectives; could not formulate, affect, implement or interpret Chipotle's management policies or operating practices; did not carry out major assignments that affected Chipotle's business operations; did not have the authority to commit Chipotle in matters that have significant financial

14

impact; and could not waive or deviate from Chipotle's established policies or procedures without prior approval.

## FLSA COLLECTIVE ACTION ALLEGATIONS

60.     Chipotle willfully failed to pay its Apprentices in New Jersey overtime pay for hours over forty per workweek, as required by the FLSA, 29 U.S.C. § 201, *et seq*.

61.     Plaintiff brings Count I below individually and on behalf of all Apprentices in New Jersey who were employed by Chipotle between June 7, 2014, and until the date of final judgment in this matter (the proposed FLSA Collective).

62.     Members of the proposed FLSA Collective are similarly situated.

63.     Members of the proposed FLSA Collective have had substantially similar job requirements and pay provisions, and they were all subject to a common policy or practice that required or permitted them to perform work in excess of forty hours per workweek for the benefit of Chipotle, without an overtime premium for the hours worked over forty.

64.     Plaintiff estimates that there are hundreds of similarly situated current and former Apprentices in New Jersey whose FLSA rights to overtime payments were violated by Chipotle.

65.     These similarly situated employees are known to Chipotle, are readily identifiable, and can be located through Chipotle's records.

15

66. These individuals would benefit from the issuance of court-supervised Notice and the opportunity to join this lawsuit.

67. Plaintiff and members of the proposed FLSA Collective should therefore be permitted to pursue their claims collectively, pursuant to 29 U.S.C. § 216(b).

68. A collective action will provide the most efficient mechanism for adjudicating the claims of Plaintiff and the FLSA Collective members.

69. Plaintiff requests that she be permitted to serve as a representative for those who consent to participate in this action and that the action be granted collective action status pursuant to 29 U.S.C. § 216(b).

## NEW JERSEY CLASS ACTION ALLEGATIONS

70. Pursuant to Federal Rule of Civil Procedure 23 and New Jersey Rule 4:32, Plaintiff brings a claim for relief to remedy Chipotle's violations of New Jersey's state-law overtime protections, N.J.A.C. § 12:56-7.2.

71. Plaintiff seeks to bring Count II below on behalf of all Apprentices in New Jersey who have been or will be employed by Chipotle at any time between June 7, 2015, and the date of final judgment in this matter (the Rule 23 Class).

72. The proposed class is easily ascertainable. The number and identity of class members may be determined from Chipotle's payroll records.

73. The proposed class also meets all the requirements of Fed. R. Civ. P.

16

23(a) and (b)(3):

      a.     Numerosity: Upon information and belief, the proposed class is several hundred individuals. This class size is so numerous that joinder of all class members is impracticable. In addition, the disposition of these individuals' claims as a class will benefit both the parties and the Court.

      b.     Commonality: Plaintiff and all members of the proposed class have been harmed by Chipotle's failure to compensate Apprentices for all hours worked, including overtime premium pay for hours in excess of forty per week. Therefore, there is a well-defined commonality of interest in the questions of law and fact applicable to Plaintiff and the putative class. Those common questions include, but are not limited to, the following:

      i.     Whether Chipotle failed or refused to pay Plaintiff and members of the proposed class overtime wages for hours worked in excess of forty per week; and

      ii.     Whether Chipotle's refusal to pay such compensation is in violation of New Jersey state overtime protections, N.J.A.C. § 12:56-7.2.

      c.     Typicality: Plaintiff and members of the proposed class were subject to the same unlawful policies, practices, and procedures and sustained similar losses, injuries, and damages. All class members were

2250963.2

subject to the same compensation policies and practices, through which they were not paid all earned wages, including time-and-a-half for hours worked over forty per week. Chipotle's compensation policies and practices affected all class members similarly, and Chipotle benefited from the same type of wrongful acts against each class member. Plaintiff's claims are therefore typical of the claims that could be brought by any member of the class, and the relief sought is typical of the relief that could be sought by each member of the class in separate actions.

d.      Adequacy of Representation: Plaintiff is able to fairly and adequately protect the interests of all members of the class, as she is challenging the same practices as the class as a whole, and there are no known conflicts of interest between Plaintiff and members of the proposed class. Plaintiff has retained counsel who are experienced and competent in both wage and hour law and complex class action litigation.

e.      Predominance and Superiority: The common questions identified above predominate over any individual issues, which would relate solely to the amount of relief due to each class member. A class action is superior to other means available for the fair and efficient adjudication of this controversy. Individual joinder of all class members is impracticable. Class action treatment will permit a large number of similarly situated

persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the necessary duplication of effort and expense that numerous individual actions engender. Because the losses, injuries, and damages suffered by each of the individual class members are small in the sense pertinent to class action analysis, the expense and burden of individual litigation would make it extremely difficult or impossible for the individual class members to redress the wrongs done to them.

f. On the other hand, the public interest will be served by addressing the matter as a class action. The cost to the court system and the public for the individual adjudication of the claims of members of the class would be substantial and significantly less economical than if the claims are treated as a class action. Prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the class, establishing incompatible standards of conduct for Chipotle and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can and is empowered to fashion methods to efficiently manage this action as a class action.

2250963.2

g. Pursuit of this action collectively will provide the most efficient mechanism for adjudicating the claims of Plaintiff and members of the proposed class.

## COUNT ONE
**Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*.**
*On behalf of Plaintiff and the FLSA Collective*

74. Plaintiff incorporates by reference the allegations asserted above as if fully set forth herein.

75. Chipotle Mexican Grill, Inc. and Chipotle Services, LLC are covered employers within the meaning of the FLSA.

76. At all times relevant to this case, Chipotle Mexican Grill, Inc. and Chipotle Services, LLC were engaged in commerce within the meaning of the FLSA, 29 U.S.C. § 203(b), (s)(1).

77. Plaintiff's employment does not fall under any of the exemptions to the overtime requirements of the FLSA. *See* 29 U.S.C. § 213.

78. The FLSA requires covered employers like Chipotle to pay non-exempt employees like Plaintiff and the putative FLSA Collective no less than one-and-a-half times their regular rate of pay for all hours worked in excess of forty in a workweek. *See* 29 U.S.C. § 207.

20

79.     Plaintiff and the putative FLSA Collective regularly worked more than forty hours per week for Chipotle, but Chipotle did not properly compensate them for their overtime hours as required by the FLSA.

80.     Chipotle knew that Plaintiff and the putative FLSA Collective worked overtime without proper compensation, and it willfully failed and refused to pay Plaintiff and the putative FLSA Collective members wages at the required overtime rates. *See* 29 U.S.C. § 255.

81.     Chipotle's willful failure and refusal to pay Plaintiff and the putative FLSA Collective overtime wages for time worked violates the FLSA.  *See* 29 U.S.C. § 207.

82.     As a direct and proximate result of these unlawful practices, Plaintiff and the putative FLSA Collective suffered and continue to suffer wage loss and are therefore entitled to recover unpaid overtime wages for up to three years prior to the filing of their claims, liquidated damages, prejudgment interest, attorneys' fees and costs, and such other legal and equitable relief as the Court deems just and proper.

## COUNT TWO
**New Jersey State Wage and Hour Law, N.J. Stat. § 34:11-56a1 *et seq.***
*On behalf of Plaintiff and the Rule 23 Class Members*

83.     Plaintiff incorporates by reference the allegations asserted above as if fully set forth herein.

21

84. At all times relevant to this action, Plaintiff and the Rule 23 Class were employees and Defendants have been employers within the meaning of the NJWHL. *See* N.J. Stat. § 34:11-56a1(g)-(h).

85. The overtime-wage provisions of the NJWHL, N.J. Stat. § 34:11-56a4, and its supporting regulations, N.J.A.C. § 12:56-7.2, apply to Chipotle's employment of Plaintiff and the proposed class.

86. Chipotle has failed to pay Plaintiff and the Rule 23 Class the overtime wages to which they are entitled under the NJWHL, N.J. Stat. § 34:11-56a4.

87. Due to Chipotle's violations of the NJWHL, Plaintiff and the Rule 23 Class members are entitled to recover from Chipotle their unpaid overtime wages, reasonable attorneys' fees and costs of the action, pre-judgment and post-judgment interest, and liquidated damages. *See* N.J. Stat. § 34:11-56a25.

## **PRAYER FOR RELIEF**

Plaintiff requests that this Honorable Court:

1. Issue an Order certifying this action as a Collective Action under the FLSA and designating Plaintiff as the representative of all those similarly situated, 29 U.S.C. § 216(b).

2. Authorize that Notice of this Collective Action be issued by the Court or Plaintiff to all persons who have been employed by Defendants as Apprentices at any time from June 7, 2014, through and including the date Notice is issued.

Such Notice shall inform these persons that this civil action has been filed, the nature of the action, and their right to join this lawsuit if they believe they were denied proper wages.

3.      Grant leave to add additional plaintiffs or claims by motion, the filing of written consent forms, or any other method approved by the Court.

4.      Issue an Order certifying a Class of New Jersey Apprentices pursuant to Federal Rule of Civil Procedure 23 and designate Plaintiff as a class representative and Plaintiff's counsel as Class Counsel.

5.      Award Plaintiff and all other similarly situated employees actual damages for unpaid wages and liquidated damages equal to the unpaid wages found due to Plaintiff and the Collective as provided by the FLSA, 29 U.S.C. § 216(b).

6.      Award Plaintiff and the Rule 23 Class members actual damages for unpaid wages found due to Plaintiff and the Class as provided by the New Jersey State Wage and Hour Law, N.J. Stat. § 34:11-56a4, and its implementing regulations, N.J.A.C. § 12:56-7.2.

7.      Award Plaintiff and all those similarly situated pre- and post-judgment interest at the statutory rate as provided by the FLSA, 29 U.S.C. § 216(b), and the New Jersey State Wage and Hour Law, N.J. Stat. § 34:11-56a4.

<div align="center">23</div>

8.      Award Plaintiff's counsel reasonable attorneys' fees, costs, and disbursements as provided by the FLSA, 29 U.S.C. § 216(b), and the New Jersey State Wage and Hour Law, N.J. Stat. § 34:11-56a4.

9.      Award Plaintiff a reasonable incentive award to compensate her for the time and effort she has spent and will spend protecting the interests of other Apprentices, and for the risks she took in doing so.

10.     Award Plaintiff and all those similarly situated further legal and equitable relief as this Court deems necessary, just, and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

24

Dated:  June 7, 2017               Respectfully submitted,


_____
Glen D. Savits
GREEN SAVITS LLC
25B Vreeland Road, Suite 207
Florham Park, NJ 07932
Telephone: (973) 695-7777
gsavits@greensavits.com

Joseph M. Sellers*
Miriam R. Nemeth*
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, NW, Suite 500
Washington, DC 20005
Telephone:  (202) 408-4600
jsellers@cohenmilstein.com
mnemeth@cohenmilstein.com

Justin M. Swartz*
Melissa Lardo Stewart*
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone:  (212) 245-1000
jms@outtengolden.com
mstewart@outtengolden.com

*Attorneys for Plaintiff and the Putative Class
and Collective*

**pro hac vice* applications forthcoming*

25

# Exhibit A

DocuSign Envelope ID: 272830D7-3BCA-442A-8AFE-8B4F6D41DAA6

## CONSENT TO BE A PARTY PLAINTIFF

1. I consent to be a party plaintiff in a lawsuit against Chipotle Mexican Grill, Inc., and Chipotle Services, LLC, and/or related entities and individuals in order to seek redress for violations of the Fair Labor Standards Act, pursuant to 29 U.S.C. § 216(b).

2. By signing and returning this consent form, I hereby designate Outten & Golden LLP, Cohen Milstein Sellers & Toll PLLC, and Green Savits, LLC to represent me in such lawsuit and to make decisions on my behalf concerning the litigation and any settlement. I agree to be bound by any adjudication of this action by a court, whether it is favorable or unfavorable.

3. I also consent to join any separate or subsequent action to assert my claims against Chipotle Mexican Grill, Inc., and Chipotle Services, LLC, and/or any related entities or persons potentially liable.

Dated: May 5/18/2017, 2017

Carmen Alvarez

JS 44 (Rev. 07/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Carmen Alvarez, on behalf of herself and all others similarly situated

**DEFENDANTS**
Chipotle Mexican Grill, Inc., and Chipotle Services, LLC

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, Email and Telephone Number)*
Glen D. Savits, Esq. / GREEN SAVITS, LLC
25B Vreeland Rd., Suite 207, Florham Park, New Jersey 07932
(973) 695-7777 / gsavits@greensavits.com

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government Plaintiff
- ☐ 2   U.S. Government Defendant
- ☒ 3   Federal Question *(U.S. Government Not a Party)*
- ☐ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & / ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander / Pharmaceutical Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' / Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability / ☐ 368 Asbestos Personal | | ☐ 840 Trademark | ☐ 460 Deportation |
| | ☐ 340 Marine / Injury Product | | | ☐ 470 Racketeer Influenced and |
| | ☐ 345 Marine Product / Liability | **LABOR** | **SOCIAL SECURITY** | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | Liability / **PERSONAL PROPERTY** | ☒ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | ☐ 720 Labor/Management | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle / ☐ 371 Truth in Lending | Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ |
| ☐ 195 Contract Product Liability | Product Liability / ☐ 380 Other Personal | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | Exchange |
| ☐ 196 Franchise | ☐ 360 Other Personal / Property Damage | ☐ 751 Family and Medical | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| | Injury / ☐ 385 Property Damage | Leave Act | | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - / Product Liability | ☐ 790 Other Labor Litigation | | ☐ 893 Environmental Matters |
| | Medical Malpractice | ☐ 791 Employee Retirement | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | Income Security Act | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee | | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment / ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ / Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations / ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - / ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment / **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - / ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other / ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education / ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - | | | |
| | Conditions of | | | |
| | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 U.S.C. 201 et seq.
Brief description of cause:
Failure to pay overtime

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE
06/07/2017

SIGNATURE OF ATTORNEY OF RECORD
*(signature)*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

Exhibit 2

No. 16-41606

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

STATE OF NEVADA; STATE OF TEXAS; STATE OF ALABAMA; STATE OF ARIZONA; STATE OF ARKANSAS; STATE OF GEORGIA; STATE OF INDIANA; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF NEBRASKA; STATE OF OHIO; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF UTAH; STATE OF WISCONSIN; COMMONWEALTH OF KENTUCKY, by and through Governor Matthew G. Bevin; TERRY E. BRANSTAD, Governor of the State of Iowa; PAUL LEPAGE, Governor of the State of Maine; SUSANA MARTINEZ, Governor of the State of New Mexico; PHIL BRYANT, Governor of the State of Mississippi; ATTORNEY GENERAL BILL SCHUETTE, on behalf of the people of Michigan,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF LABOR; EDWARD C. HUGLER, ACTING SECRETARY, DEPARTMENT OF LABOR, In his official capacity as Secretary of Labor; WAGE AND HOUR DIVISION OF THE DEPARTMENT OF LABOR; MARY ZIEGLER, in her official capacity as Assistant Administrator for Policy of the Wage and Hour Division; DOCTOR DAVID WEIL, in his official capacity as Administrator of the Wage and Hour Division,

Defendants-Appellants.

On Appeal from the United States District Court
for the Eastern District of Texas

## REPLY BRIEF FOR APPELLANTS

*Of Counsel:*
NICHOLAS C. GEALE
*Acting Solicitor*

JENNIFER S. BRAND
*Associate Solicitor*

PAUL L. FRIEDEN
*Counsel for Appellate Litigation*

STEVEN W. GARDINER
*Senior Attorney*

ERIN M. MOHAN
*Attorney*
*U.S. Department of Labor*

CHAD A. READLER
*Acting Assistant Attorney General*

BRIT FEATHERSTON
*Acting United States Attorney*

MICHAEL S. RAAB
ALISA B. KLEIN
*Attorneys, Appellate Staff*
*Civil Division, Room 7235*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-1597*
*Alisa.klein@usdoj.gov*

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION AND SUMMARY .......................................................................... 1

ARGUMENT .......................................................................................................... 4

   I.   Plaintiffs Provide No Basis To Overturn The Regulatory Test
      That Has Been Used Since The Inception Of The FLSA ................................... 4

       A.    Plaintiffs' Statutory Argument Is Foreclosed by This
           Court's Decision in *Wirtz v. Mississippi Publishers Corp.*,
           364 F.2d 603 (5th Cir. 1966) ........................................................ 4

       B.    Plaintiffs Also Misunderstand the Way the EAP Regulations
           Work .......................................................................................... 12

  II.   Plaintiffs' Constitutional Claims Are Meritless ..................................... 18

       A.    Plaintiffs' Tenth Amendment Argument Is Foreclosed by
           the Supreme Court's Decision in *Garcia v. San Antonio
           Metropolitan Transit Authority*, 469 U.S. 528 (1985). ................... 18

       B.    Plaintiffs' Nondelegation Claim Rests on the Incorrect
           Assumption That the Department's Power to Define and
           Delimit the EAP Exemption Is Unconstrained ....................... 20

CONCLUSION .................................................................................................... 23

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                              **Page(s)**

*A.L.A. Schechter Poultry Corp. v. United States,*
   295 U.S. 495 (1935) .......................................................................... 21

*American Power & Light Co. v. SEC,*
   329 U.S. 90 (1946) ............................................................................ 22

*Auer v. Robbins,*
   519 U.S. 452 (1997) ............................................................ 11, 12, 17, 19, 20

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) ..................................................................... 6, 10, 11

*Devoe v. Atlanta Paper Co.,*
   40 F. Supp. 284 (N.D. Ga. 1941) ........................................................ 6

*Fanelli v. U.S. Gypsum Co.,*
   141 F.2d 216 (2d Cir. 1944) ........................................................... 10, 20

*Garcia v. San Antonio Metro. Transit Auth.,*
   469 U.S. 528 (1985) ....................................................................... 3, 18

*Home Care Ass'n of Am. v. Weil,*
   799 F.3d 1084 (D.C. Cir. 2015) ......................................................... 17

*Long Island Care at Home, Ltd. v. Coke,*
   551 U.S. 158 (2007) ..................................................................... 16, 17

*Loving v. United States,*
   517 U.S. 748 (1996) ......................................................................... 21

*Mistretta v. United States,*
   488 U.S. 361 (1989) ..................................................................... 21, 22

*National Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
   545 U.S. 967 (2005) ......................................................................... 6

*New York v. United States,*
 505 U.S. 144 (1992) ........................................................................... 19

*Panama Refining Co. v. Ryan,*
 293 U.S. 388 (1935) ........................................................................... 21

*Printz v. United States,*
 521 U.S. 898 (1997) ........................................................................... 19

*Reno v. Condon,*
 528 U.S. 141 (2000) ........................................................................... 19

*South Carolina v. Baker,*
 485 U.S. 505 (1988) ........................................................................... 19

*Walling v. Morris,*
 155 F.2d 832 (6th Cir. 1946),
 *vacated on other grounds,* 332 U.S. 422 (1947) .................................. 10

*Walling v. Yeakley,*
 140 F.2d 830 (10th Cir. 1944) ....................................................... 10, 20

*Whitman v. American Trucking Ass'ns.,*
 531 U.S. 457 (2001) ........................................................................... 21

*Wirtz v. Mississippi Publishers Corp.,*
 364 F.2d 603 (5th Cir. 1966) ............................... 1, 2, 4, 5, 7, 13, 15

**Statutes:**

29 U.S.C. § 213(a)(1) .............................................................1, 2, 4, 10

**Regulations:**

29 C.F.R. pt. 541 ................................................................................ 1

69 Fed. Reg. 22122 (Apr. 23, 2004).............................2, 13, 14, 15, 16

81 Fed. Reg. 32391 (May 23, 2016) ...............................................14, 16

iii

**Other Authorities:**

Report of the Minimum Wage Study Commission, vol. I (June 1981),
    http://rsickles.rice.edu/files/2015/11/Minimum-Wage-Study-1983-Carter-
    Administration-1hkd1cv.pdf ........................................................................... 8

## INTRODUCTION AND SUMMARY

**I.**  For more than 75 years, regulations issued by the Department of Labor have

used a three-part test to identify workers who are employed in a "bona fide executive,

administrative, or professional capacity" and thus exempt from the minimum wage

and overtime pay protections of the Fair Labor Standards Act ("FLSA").  *See* 29

U.S.C. § 213(a)(1).  To be subject to this "EAP" exemption, a worker must (1) be paid

on a salary basis; (2) earn a specified salary level; and (3) satisfy a duties test.  *See* 29

C.F.R. pt. 541.

In enjoining the 2016 rule, the district court reasoned that the salary-level

component of this three-part test is unlawful.  It concluded that "Congress defined

the EAP exemption with regard to duties, which does not include a minimum salary

level," ROA.3817, and that the statute "does not grant the Department the authority

to utilize a salary-level test," ROA.3825.  As our opening brief explained (at 19), that

reasoning would apply to *all* prior versions of the salary-level test, including the salary

level set by the 2004 regulations that the 2016 rule replaced.

Although plaintiffs defend the district court's broad reasoning, they offer no

basis to call into question a regulatory test that has been in place since the FLSA's

inception.  Their argument is foreclosed by this Court's decision in *Wirtz v. Mississippi

Publishers Corp.*, 364 F.2d 603 (5th Cir. 1966), which expressly upheld the

Department's use of a salary-level test.  Contrary to plaintiffs' suggestion, this Court

in *Wirtz* did not ignore the statutory text. Writing for this Court, then-Judge Warren Burger rejected the textual argument that plaintiffs make here. Whereas plaintiffs argue that an employee's salary level *is not* "a natural and admissible attribute of the term 'bona fide executive and administrative * * * capacity,'" Pl. Br. 30, Judge Burger concluded that an employee's salary level *is* "rationally related to the determination of whether an employee is employed in a 'bona fide executive * * * capacity,'" and that the salary-level test is thus a permissible exercise of the Department's "broad latitude to 'define and delimit'" the exemption's terms. *Wirtz*, 364 F.2d at 608 (quoting 29 U.S.C. § 213(a)(1)). As our opening brief explained (at 21-29), that holding has ample support in the text, purpose, and history of the EAP exemption, and Congress acquiesced in the Department's approach by amending the EAP exemption without altering the Department's regulations.

Plaintiffs incorrectly state that before 2016, the salary level was "set so low as to be inconsequential." Pl. Br. 4. *Wirtz* itself involved employees who met the duties test then in place, but whose salaries were below the level that was in effect at the time. 364 F.2d at 607. And in the 2004 regulations, the Department made "the largest increase of the salary levels in the 65-year history of the FLSA." 69 Fed. Reg. 22122 (Apr. 23, 2004). As a result of that 2004 increase, 1.3 million white-collar workers who were exempt under the previous regulations gained FLSA protection, *id.* at 22123, a result that was not inconsequential.

2

The amicus brief filed by business associations rejects plaintiffs' broad contention that the FLSA precludes use of *any* salary-level test in the EAP regulations. *See* Business Assoc. Amicus Brief 10-11. In the 2016 rulemaking, most business groups supported an increase in the salary level that had been in place since 2004. *See, e.g.*, Small Business Association ("SBA") Comment at 10 (Add. 10) (indicating that "small businesses support a modest increase in the salary threshold under the 'white collar' FLSA exemption"); National Restaurant Association ("NRA") Comment at 9 (Add. 19) ("To be clear, we do support raising the salary threshold.").[1] The business associations object to the particular salary level ($913 per week) set by the 2016 regulations and to the particular methodology used to arrive at that amount. The district court did not address those specific objections, however, and this Court likewise should not do so. This Court should simply lift the cloud created by the district court's broad reasoning, which would call into question *any* salary-level test adopted by the Department.

**II.** The district court correctly held that plaintiffs' Tenth Amendment claim is foreclosed by *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985), which held that the FLSA is constitutional as applied to state and local government employers. Plaintiffs' alternative contention that the FLSA unconstitutionally delegates legislative power to the Department rests on the incorrect premise that the

---

[1] For the convenience of the Court, excerpts from the rulemaking comments cited in this reply brief are reproduced in the Addendum to this brief.

Department claimed "unconstrained" power to define and delimit the EAP exemption's scope. Pl. Br. 44. The Department made no such claim; instead, it determined that salary level is a relevant consideration in determining whether a worker is employed in a "bona fide executive, administrative, or professional capacity." The historical record demonstrates "surprisingly wide agreement" on that point among employers and employees alike. 1940 Stein Report 19 (ROA.1567).

## ARGUMENT

## I. Plaintiffs Provide No Basis To Overturn The Regulatory Test That Has Been Used Since The Inception Of The FLSA.

### A. Plaintiffs' Statutory Argument Is Foreclosed by This Court's Decision in *Wirtz v. Mississippi Publishers Corp.*, 364 F.2d 603 (5th Cir. 1966).

**1.** Section 13(a) of the FLSA exempts from the Act's minimum wage and overtime pay requirements "any employee employed in a bona fide executive, administrative, or professional capacity * * * (as such terms are defined and delimited from time to time by regulations of the Secretary [of Labor])." 29 U.S.C. § 213(a)(1). Since 1938, the Department's implementing regulations have relied in part on a salary-level test to identify workers who are "employed in a bona fide executive, administrative, or professional capacity."

In enjoining the 2016 rule, the district court reasoned that a salary-level test is unlawful. It concluded that "Congress defined the EAP exemption with regard to duties, which does not include a minimum salary level," ROA.3817, and that the

4

FLSA "does not grant the Department the authority to utilize a salary-level test" in the EAP regulations.  ROA.3825.[2]  Defending that broad reasoning, plaintiffs likewise argue that the salary-level test has "always been an unauthorized DOL invention," Pl. Br. 3, and they declare that "[t]he longevity of an unlawful rule makes no difference," Pl. Br. 35.

Although longevity would not save an unlawful rule, this Court expressly rejected the claim that the salary-level test is unlawful.  In *Wirtz v. Mississippi Publishers Corp.*, 364 F.2d 603 (5th Cir. 1966), the employers argued that "the minimum salary requirement is not a justifiable regulation under Section 13(a)(1) of the Act because not rationally related to the determination of whether an employee is employed in a 'bona fide executive * * * capacity.'"  *Id.* at 608.  This Court concluded that "[t]hese contentions lack merit."  *Id.*  Writing for this Court, then-Judge Warren Burger (sitting by designation) reasoned that "[t]he statute gives the Secretary broad latitude to 'define and delimit' the meaning of the term 'bona fide executive * * * capacity," and he rejected the contention that "the minimum salary requirement is arbitrary or capricious."  *Id.*

Plaintiffs provide no basis to disregard this Circuit precedent.  *Wirtz* does not cease to bind this panel merely because it is "pre-*Chevron* case law."  Pl. Br. 27.  The interpretive principle on which the district court here relied—that the Judiciary "must

---

[2] The district court invalidated the final rule's indexing mechanism for the same reason.  *See* ROA.3821; *see also* Pl. Br. 36.

give effect to the unambiguously expressed intent of Congress," ROA.3787 (quoting

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984))—was

established long before *Chevron*, and it governed the analysis in *Wirtz*. Moreover,

*Chevron* increased (rather than diminished) the deference that courts give to an

agency's interpretation of the statute it is charged with administering.

Nor is the Supreme Court's decision in *National Cable & Telecommunications

Association v. Brand X Internet Services*, 545 U.S. 967 (2005), license for courts to

disregard circuit precedents predating *Chevron*. The *Brand X* decision addressed the

relationship between judicial decisions and *agency* prerogatives: "[a] court's prior

judicial construction of a statute trumps an agency construction otherwise entitled to

*Chevron* deference only if the prior court decision holds that its construction follows

from the unambiguous terms of the statute and thus leaves no room for agency

discretion." 545 U.S. at 982. That holding has no relevance here.

Far from ignoring the statutory text as plaintiffs suggest, Pl. Br. 28, this Court

in *Wirtz* rejected the textual argument that plaintiffs make here. Plaintiffs contend

that a 1941 district court decision correctly held that salary level is *not* "a natural and

admissible attribute of the term 'bona fide executive and administrative * * *

capacity.'" Pl. Br. 30 (quoting *Devoe v. Atlanta Paper Co.*, 40 F. Supp. 284, 286 (N.D.

Ga. 1941)). But this Court reached the opposite conclusion in *Wirtz* and held that

salary level *is* "rationally related to the determination of whether an employee is employed in a 'bona fide executive * * * capacity.'" 364 F.2d at 608.

 As our opening brief explained (at 21-29), *Wirtz*'s holding has ample support in the text, history, and purpose of the EAP exemption. Indeed, there was widespread support for the Department's conclusion that salary level is a relevant consideration in determining whether a worker is employed in a bona fide executive, administrative, or professional capacity. Although plaintiffs assert that "the salary-level test was controversial when first implemented and remained so," Pl. Br. 8, the reports on which they rely actually demonstrate that the salary-level test was endorsed by employer and employee representatives alike. Plaintiffs emphasize a sentence in the 1940 Stein Report stating that "[i]t was asserted by some that the Administrator has no authority to include a salary qualification." Pl. Br. 9 (quoting ROA.1567). But the Stein Report went on to explain that "[t]his view had little support," and "[t]here was indeed surprisingly wide agreement that a salary qualification in the definition of the term 'executive' is a valuable and easily applied index to the 'bona fide' character of the employment for which exemption is claimed and which must be of a 'bona fide' executive character by the terms of the statute itself." ROA.1567. The report noted that thirty-two employer representatives expressed approval of the salary-level test, while only four employer representatives expressed disapproval. ROA.1567 n.65.

7

Similarly, the 1949 Weiss Report explained that witnesses for both employers and employees testified to the "usefulness and propriety" of the salary-level test. 1949 Weiss Report 8 (ROA.1652). The "use of a salary test was supported by a very substantial number of management witnesses in addition to the almost universal support it had from labor representatives." *Id.* at 9 (ROA.1653). And "[t]here was testimony that, generally speaking, salary is the best single indicator of the degree of importance involved in a particular employee's job." *Id.*

Contrary to plaintiffs' assertion, the Minimum Wage Study Commission did not "admit[] in 1981 that the salary-level test impermissibly acts as a minimum wage contrary to Congressional intent." Pl. Br. 4 (citing ROA.1291). The statement in the staff paper on which plaintiffs rely did not represent the conclusion of the Commission, *see* ROA.1057, which recommended that the salary level be increased. *See* Report of the Minimum Wage Study Commission, vol. I, at 137-38 (June 1981)[3] ("The Commission recommends that this exemption be retained and that salary test levels used as a partial criterion to determine eligibility for this exemption *be raised* to the historical level prevailing during the period 1950 to 1975 *and adjusted upward* as needed to maintain this historical relationship.") (emphasis added; other emphasis omitted).

---

[3] Available at http://rsickles.rice.edu/files/2015/11/Minimum-Wage-Study-1983-Carter-Administration-1hkd1cv.pdf.

Likewise, in comments submitted during the 2016 rulemaking, many business groups supported an increase in the salary level (although they opposed the particular increase that the Department proposed). For example, the National Restaurant Association "agree[d] that the 2004 salary threshold for exempt status is now too low and should be raised." NRA Comment at 2 (Add. 12). The SBA Office of Advocacy explained that "small businesses support a modest increase in the salary threshold under the 'white collar' FLSA exemption." SBA Comment at 10 (Add. 10). The International Franchise Association ("IFA") indicated that it would not oppose a "modest increase to the standard salary level." IFA Comment at 22 (Add. 52). Other business groups, including several amici, asked the Department to consider a small increase to the salary level. *See, e.g.*, American Hotel & Lodging Association Comment at 2 (Add. 55) (urging the Department to "utilize the methodology it used in 2004 in setting the standard salary level for exempt employees"); Independent Insurance Agents and Brokers of America ("IIABA") Comment at 1 (Add. 68) ("IIABA recognizes that the salary levels have not been altered since 2004 and agrees that a modification of some form is warranted[.]"); National Retail Federation Comment at 4 (Add. 75) (urging the Department to maintain the methodology used in 2004 "with adjustments for inflation"); U.S. Chamber of Commerce Comment at 20 (Add. 108) (explaining that "[t]he application of other measures and methodologies results in salary levels thousands of dollars below the $50,440 proposed by the Department").

9

**2.**  As our opening brief explained (at 21-29), the district court's broad reasoning would fail even if *Wirtz* were not binding precedent.  Every circuit to consider the issue has upheld the salary-level test as a permissible component of the EAP regulations.  *See Walling v. Yeakley*, 140 F.2d 830, 833 (10th Cir. 1944) ("in most cases, salary is a pertinent criterion and we cannot say that it is irrational or unreasonable to include it in the definition and delimitation"); *see also Fanelli v. U.S. Gypsum Co.*, 141 F.2d 216, 218 (2d Cir. 1944); *Walling v. Morris*, 155 F.2d 832, 836 (6th Cir. 1946), *vacated on other grounds*, 332 U.S. 422 (1947).

Although plaintiffs and their amici give short shrift to this aspect of the statute's text, Section 213(a)(1) explicitly grants the Department authority to "defin[e] and delimi[t]" the scope of the exemption.  29 U.S.C. § 213(a)(1).  Thus, the phrase "bona fide executive, administrative, or professional capacity" is necessarily ambiguous, as Congress "explicitly left a gap for the agency to fill," and the Department's interpretation must be "given controlling weight" unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843-44.  And that ambiguous phrase can be reasonably read to connote a status not attained by low-paid workers.  Moreover, the Department's longstanding interpretation of Section 213(a)(1) to require a salary level is reinforced by the statute's inclusion of the term "bona fide."  The Department has found that such good faith is best demonstrated through the salary the employer pays.

The breadth of the Department's authority to define and delimit the scope of the EAP exemption was underscored by the Supreme Court in *Auer v. Robbins*, 519 U.S. 452 (1997).  Plaintiffs make no attempt to reconcile their position with the Supreme Court's decision, which rejected a challenge to an application of the salary-basis test.  In *Auer*, the Supreme Court explained that under the EAP regulations, "one requirement for exempt status under § 213(a)(1) is that the employee *earn a specified minimum amount on a 'salary basis.'*" 519 U.S. at 455 (emphasis added).  The Court noted that "[u]nder the Secretary's chosen approach, exempt status requires that the employee be paid on a salary basis, which in turn requires that his compensation not be subject to reduction because of variations in the quality or quantity of the work performed."  *Id.* at 456 (quotation marks omitted).  And the Court concluded that the Secretary's approach was "based on a permissible construction of the statute."  *Id.* at 457 (quoting *Chevron*, 467 U.S. at 843).

Plaintiffs do not dispute that their position, if adopted, would invalidate the salary-basis test upheld in *Auer* as well as the salary-level test upheld in *Wirtz*.  Instead, they quote the Supreme Court's observation that the respondents did "not raise any general challenge to the Secretary's reliance on the salary-basis test," Pl. Br. 31 (quoting *Auer*, 519 U.S. at 456-57), and they declare that "some have read the Court's statement pointing out respondents' concessions as a subtle invitation to challenge" the salary-basis test, Pl. Br. 32.  Plaintiffs do not cite any support for the assertion that *Auer* was a "subtle invitation" to challenge the salary-basis test, *id.*, and nothing in the

11

Supreme Court's reasoning called that longstanding test into question. To the contrary, the unanimous Supreme Court emphasized that the "FLSA grants the Secretary broad authority to 'defin[e] and delimi[t]' the scope of the exemption for executive, administrative, and professional employees," *Auer*, 519 U.S. at 456, and it upheld the Secretary's approach because it was "based on a permissible construction of the statute," *id.* at 457.

> ### B.     Plaintiffs Also Misunderstand the Way the EAP Regulations Work.

Plaintiffs' various subsidiary arguments also reveal a basic misunderstanding of the way the EAP regulations work.

First, plaintiffs note that the Department of Labor "is not authorized to set wages or salaries for executive, administrative, and professional employees," Pl. Br. 2 (quoting ROA.1655), and they argue that the salary-level test is "a battering-ram to force a species of minimum wage through the backdoor," *id.* But the salary-level test does not alter the minimum wage set by Congress. The salary-level test does not require any employer to pay its employees the salary level it sets. Rather, the EAP regulations use the salary-level test, together with the salary-basis and duties tests, to identify those workers who are *exempt* from the statutory requirement to pay the minimum wage and overtime. Workers who are not exempt must be paid in accordance with Congress's directives as set forth in the FLSA, including the minimum wage (currently $7.25 per hour) set by Congress.

12

Second, plaintiffs incorrectly state that before 2016, the salary level was "set so low as to be inconsequential." Pl. Br. 4. That assertion is refuted by *Wirtz* itself, where employees who met the duties test nonetheless did not qualify for the EAP exemption because their salaries were below the salary level then in effect. *See Wirtz*, 364 F.2d at 607.

Nor was there anything inconsequential about the salary level set by the 2004 regulations. As a result of the 2004 salary-level increase, 1.3 million white-collar workers who were exempt under the previous regulations gained FLSA protection. *See* 69 Fed. Reg. 22123. Plaintiffs note that "by 2004," the long test salary level had fallen "below the minimum wage." Pl. Br. 10 (citing 69 Fed. Reg. 22164). But as the cited Federal Register notice explained, that erosion of the salary level was a catalyst for the 2004 salary-level increase. The preamble to the 2004 rule explained that "[b]ecause the salary levels have not been increased since 1975, the existing salary levels are outdated and no longer useful in distinguishing between exempt and nonexempt employees." *Id.* at 22164. The preamble emphasized that "[t]he minimum wage and overtime pay requirements of the Fair Labor Standards Act (FLSA) are among the nation's most important worker protections." *Id.* at 22122. And the preamble explained that "[r]evisions to both the salary tests and the duties

tests [were] necessary to restore the overtime protections intended by the FLSA which have eroded over the decades." *Id.*[4]

Third, plaintiffs note that "employees earning less than the new level 'will not qualify for the EAP exemption * * * *irrespective of their job duties and responsibilities*." Pl. Br. 6 (quoting 81 Fed. Reg. 32391, 32405 (May 23, 2016)). That result is not unique to the 2016 update; it flows from the longstanding requirement that an employee meet all three tests—salary basis, salary level, and duties—to be subject to the EAP exemption. Indeed, the language that plaintiffs emphasize appeared verbatim in the preamble to the 2004 rule. *See* 69 Fed. Reg. 22164 ("Employees paid below the minimum salary level are not exempt, *irrespective of their job duties and responsibilities*.") (emphasis added).

Contrary to plaintiffs' understanding, the fact that salary level will be dispositive of exempt status in some cases does not transform the Department's three-part regulations into a "salary only" test. As our opening brief explained (at 29-30), the Department has long recognized that it cannot establish a "salary only" test that would exempt from the FLSA employees who do *not* perform EAP duties—such as mechanics and carpenters—merely because they are well paid. *See* 1949 Weiss Report

---

[4] Plaintiffs also quote language from the 1949 Weiss Report stating that the salary level was historically set low to screen out obviously nonexempt employees. *See*, *e.g.*, Pl. Br. 9, 11, 15. But as our opening brief explained (at 31), those statements referred to the salary level that was paired with the more rigorous long duties test, rather than to the higher salary level paired with the less rigorous short duties test.

23 (ROA.1667); *see also* 69 Fed. Reg. 22173 (rejecting requests from commenters that the Department eliminate the duties test entirely for highly compensated employees). By contrast, the Department has never suggested that it lacks authority to set a salary-level test for employees who *do* perform EAP duties. As noted above, this Court's *Wirtz* decision itself involved employees who met the duties test in place at that time, but whose salaries were below the level then in effect. 364 F.2d at 607.

Fourth, plaintiffs argue that instead of relying in part on a salary-level test, the Department should impose "a more accurate and rigorous duties test." Pl. Br. 13. Plaintiffs are correct to note that the Department has historically paired a lower salary level with a more rigorous duties test (just as it has historically paired a higher salary level with a less rigorous duties test). *See* Opening Br. 6-7. But as our opening brief explained (at 8, 11, 32-33), employer representatives strongly opposed a more rigorous duties test. Indeed, concerns raised by employers prompted the Department to eliminate the more rigorous long duties test in 2004. That test was more rigorous because it imposed a bright-line, twenty percent cap on the amount of time an employee could spend performing nonexempt work (such as manual labor or clerical work) and still be treated as exempt. But the percentage cap required employers to time-test managers for the duties they performed, hour-by-hour in a typical workweek, even though employers are generally not required to maintain any records of daily or weekly hours worked by exempt employees. 69 Fed. Reg. 22126. The cap was opposed by the U.S. Chamber of Commerce and the National Small Business

Association, which argued that a move away from a percentage cap on nonexempt

work would alleviate the burden on small business owners.  *Id.* at 22127.

In the 2016 rulemaking, employer representatives again opposed a percentage

cap on the amount of time an employee could spend on nonexempt work and still be

treated as exempt.  81 Fed. Reg. 32446.  Many employer representatives argued that

such a cap would prevent exempt employees from "pitching in" during staff shortages

or busy periods, thus increasing labor costs or negatively affecting business efficiency

and customer service.  *Id.*  They explained that a cap on nonexempt work would

impose significant recordkeeping burdens on employers.  *Id.*  And they predicted that

resurrecting a quantitative cap on nonexempt work would increase FLSA litigation

because of the administrative difficulties associated with tracking the hours of exempt

employees, and result in the upheaval of the past decade of case law and agency

opinions.  *Id.*

Without acknowledging the concerns raised by employer representatives,

plaintiffs suggest that it would not be "difficult" to make the current duties test "more

rigorous."  Pl. Br. 15.  But judgments of this sort "turn upon the kind of thorough

knowledge of the subject matter and ability to consult at length with affected parties

that an agency, such as the DOL, possesses."  *Long Island Care at Home, Ltd. v. Coke*,

551 U.S. 158, 167-68 (2007).  And as the Supreme Court explained in addressing a

parallel FLSA exemption that authorized the Department to define and delimit its

terms, "Congress intended its broad grant of definitional authority to the Department

<div align="center">16</div>

to include the authority to answer these kinds of questions." *Id.* at 168; *see also Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084, 1091 (D.C. Cir. 2015) (concluding that the FLSA's exemptions for companionship services and live-in domestic services "invite further specification, the details of which 'turn upon the kind of thorough knowledge of the subject matter and ability to consult at length with affected parties that an agency, such as the DOL, possesses.'") (quoting *Coke*, 551 U.S. at 165, 167-68).[5]

The district court did not determine whether the salary level set by the 2016 final rule is arbitrary and capricious or unsupported by the administrative record. Because the preliminary injunction rested on the legal conclusion that the Department lacks authority to set a salary level, it may be reversed on the ground that that legal ruling was erroneous. The Department has decided not to advocate for the specific salary level ($913 per week) set in the final rule at this time and intends to undertake further rulemaking to determine what the salary level should be. Accordingly, the Department requests that this Court address only the threshold legal question of the Department's statutory authority to set a salary level, without addressing the specific

---

[5] Plaintiffs note that in *Home Care*, the D.C. Circuit relied in part on the Department's general rulemaking authority. *See* Pl. Br. 33. That general authority mattered in *Home Care* because one of the two exemptions at issue there did not contain language authorizing the Department to "define and delimit" its terms. *See Home Care*, 799 F.3d at 1091 ("Appellees also stress that the companionship-services exemption provides for the Secretary to 'define[ ] and delimit[ ]' its terms, while the live-in worker exemption contains no similar supplement."). By contrast, the FLSA grants the Department "broad authority to 'defin[e] and delimi[t]' the scope of the [EAP] exemption." *Auer*, 519 U.S. at 456.

17

salary level set by the 2016 final rule.  In light of this litigation contesting the

Department's authority to establish any salary level test, the Department has decided

not to proceed immediately with issuance of a notice of proposed rulemaking to

address the appropriate salary level.  The rulemaking process imposes significant

burdens on both the promulgating agency and the public, and the Department is

reluctant to issue a proposal predicated on its authority to establish a salary level test

while this litigation remains pending.  Instead, the Department soon will publish a

request for information seeking public input on several questions that will aid in the

development of a proposal.

## II.    Plaintiffs' Constitutional Claims Are Meritless.

### A.    Plaintiffs' Tenth Amendment Argument Is Foreclosed by the Supreme Court's Decision in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985).

Plaintiffs' constitutional claims are likewise unavailing.  They first contend that

the FLSA and its implementing regulations are unconstitutional as applied to state and

local government employers.  The district court correctly recognized that this claim is

foreclosed by the Supreme Court's decision in *Garcia v. San Antonio Metropolitan Transit

Authority*, 469 U.S. 528 (1985), which "established that Congress had authority under

the Commerce Clause to impose the FLSA's minimum wage and overtime

requirements on state and local employees."  ROA.3813 (citing 469 U.S. at 554).

Although plaintiffs assert that "*Garcia* has been—or should be—overruled,"

Pl. Br. 36, the Supreme Court has not overruled *Garcia*.  To the contrary, in *Auer*, the

Supreme Court reiterated *Garcia*'s holding that the extension of "FLSA coverage to virtually all public-sector employees * * * was consistent with the Tenth Amendment." 519 U.S. at 457. And in *Reno v. Condon*, 528 U.S. 141, 151 (2000), the Court reaffirmed that "generally applicable" laws regulating private as well as governmental entities present no Tenth Amendment issue.

The commandeering decisions on which plaintiffs rely—*Printz v. United States*, 521 U.S. 898 (1997), and *New York v. United States*, 505 U.S. 144 (1992)—are inapposite because the FLSA does not commandeer state and local governments. Instead, the FLSA regulates state and local governments in their capacity as employers and in the same manner as private employers. The Supreme Court has repeatedly held that Congress does not "commandeer" state and local governments when it regulates them directly, rather than requiring them to enact or enforce a federal regulatory scheme. *See Condon*, 528 U.S. at 150-151 (citing *South Carolina v. Baker*, 485 U.S. 505 (1988)). Indeed, in the *New York* decision, the Supreme Court emphasized that "this is not a case in which Congress has subjected a State to the same legislation applicable to private parties."

As the district court further explained, plaintiffs' "clear statement" argument does not advance their position because the FLSA clearly applies to state and local governments. ROA.3814; *see also*, *e.g.*, *Auer*, 519 U.S. at 457 ("In 1974 Congress extended FLSA coverage to virtually all public-sector employees."). Contrary to plaintiffs' suggestion, no additional clear statement from Congress is needed to make

19

state and local governments subject to the FLSA's implementing regulations.  Indeed,

in *Auer*, the Supreme Court unanimously held that "the Secretary of Labor's 'salary-

basis' test for determining an employee's exempt status reflects a permissible reading

of the statute *as it applies to public-sector employees*."  519 U.S. at 454 (emphasis added).[6]

### B.    Plaintiffs' Nondelegation Claim Rests on the Incorrect Assumption That the Department's Power to Define and Delimit the EAP Exemption Is Unconstrained.

Plaintiffs also allege that the FLSA's EAP exemption unlawfully delegates

legislative power to the Department of Labor, but no precedent supports that claim.

To the contrary, courts have long upheld that delegation of rulemaking authority.  *See,*

*e.g.*, *Walling v. Yeakley*, 140 F.2d 830, 832 (10th Cir. 1944) ("We think there can be no

question that the power" to "define and delimit" the EAP exemption "was lawfully

delegated."); *Fanelli v. U.S. Gypsum Co.*, 141 F.2d 216, 218 (2d Cir. 1944) ("In

conferring such authority upon the Administrator" to "define and delimit" the terms

in the EAP exemption, "Congress acted in accordance with a long established

tradition (frequently sanctioned by the Supreme Court), and did not unconstitutionally

delegate powers vested in the legislative branch.").

---

[6] Plaintiffs' irreparable harm argument rests on the premise that the FLSA is an unconstitutional "intrusion into the States' sovereign authority to structure employment relationships and provide integral governmental services."  Pl. Br. 45. For the reasons discussed in the text, that argument is foreclosed by *Garcia*.  Plaintiffs' claims of monetary harm are unsubstantiated for reasons discussed in our opening brief (at 36-39).

20

The nondelegation doctrine requires that Congress "lay down by legislative act an intelligible principle to which the person or body authorized [to exercise the delegated authority] is directed to conform." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 472 (2001). Rooted in "common sense and the inherent necessities of the government co-ordination," this minimal requirement stems from the "practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta v. United States*, 488 U.S. 361, 372 (1989); *see also Loving v. United States*, 517 U.S. 748, 773 (1996) ("Separation-of-powers principles are vindicated, not disserved, by measured cooperation between the two political branches of the Government, each contributing to a lawful objective through its own processes.").

The Supreme Court has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law," *Whitman*, 531 U.S. at 474-75, and has "found the requisite 'intelligible principle' lacking in only two statutes"—both from cases in 1935—"one of which provided literally no guidance for the exercise of discretion, and the other of which conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition,'" *id.* at 474 (citing *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)).

21

To set forth a constitutionally permissible "intelligible principle" while delegating authority to one of its coordinate Branches, Congress needs only to "'clearly delineate[] the general policy, the public agency which is to apply it, and the boundaries of this delegated authority.'" *Mistretta*, 488 U.S. at 372-73 (quoting *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)). The FLSA's overtime exemption easily meets that standard. Plaintiffs' contrary argument rests entirely on the premise that the Department has claimed "unconstrained" power to define and delimit the terms of the EAP exemption. Pl. Br. 44. But the Department has never claimed that its power to define and delimit the exemption's scope is unconstrained by the exemption's text, history or purpose. Instead, the Department concluded that salary level is a relevant consideration in determining whether a worker is employed in a "bona fide executive, administrative, or professional capacity," and this Court upheld that conclusion in *Wirtz*.

# CONCLUSION

For the foregoing reasons, the Department requests that this Court reverse the judgment of the district court because it was premised on an erroneous legal conclusion, and reaffirm the Department's statutory authority to establish a salary level test.  The Department requests that this Court not address the validity of the specific salary level set by the 2016 final rule ($913 per week), which the Department intends to revisit through new rulemaking.

Respectfully submitted,

*Of Counsel:*

NICHOLAS C. GEALE
   *Acting Solicitor*

JENNIFER S. BRAND
   *Associate Solicitor*

PAUL L. FRIEDEN
   *Counsel for Appellate Litigation*

STEVEN W. GARDINER
   *Senior Attorney*

ERIN M. MOHAN
   *Attorney*
   *U.S. Department of Labor*

June 2017

CHAD A. READLER
   *Acting Assistant Attorney General*

BRIT FEATHERSTON
   *Acting United States Attorney*

MICHAEL S. RAAB

 *s/ Alisa B. Klein*
ALISA B. KLEIN
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7235*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, D.C. 20530*
   *(202) 514-1597*
   *Alisa.klein@usdoj.gov*

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2017, I electronically filed the foregoing reply brief with the Clerk of this Court by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*s/ Alisa B. Klein*
Alisa B. Klein

A1

# CERTIFICATE OF COMPLIANCE

I hereby certify that this reply brief complies with the requirements of Federal

Rule of Appellate Procedure 32(a).  The reply brief contains 5,562 words.


*s/ Alisa B. Klein*
Alisa B. Klein

A2

No. 16-41606

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

STATE OF NEVADA; STATE OF TEXAS; STATE OF ALABAMA; STATE OF ARIZONA; STATE OF ARKANSAS; STATE OF GEORGIA; STATE OF INDIANA; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF NEBRASKA; STATE OF OHIO; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF UTAH; STATE OF WISCONSIN; COMMONWEALTH OF KENTUCKY, by and through Governor Matthew G. Bevin; TERRY E. BRANSTAD, Governor of the State of Iowa; PAUL LEPAGE, Governor of the State of Maine; SUSANA MARTINEZ, Governor of the State of New Mexico; PHIL BRYANT, Governor of the State of Mississippi; ATTORNEY GENERAL BILL SCHUETTE, on behalf of the people of Michigan,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF LABOR; EDWARD C. HUGLER, ACTING SECRETARY, DEPARTMENT OF LABOR, In his official capacity as Secretary of Labor; WAGE AND HOUR DIVISION OF THE DEPARTMENT OF LABOR; MARY ZIEGLER, in her official capacity as Assistant Administrator for Policy of the Wage and Hour Division; DOCTOR DAVID WEIL, in his official capacity as Administrator of the Wage and Hour Division,

Defendants-Appellants.

On Appeal from the United States District Court
for the Eastern District of Texas

## ADDENDUM TO REPLY BRIEF

*Of Counsel:*
KATHERINE E. BISSELL
*Deputy Solicitor for Regional Enforcement*

JENNIFER S. BRAND
*Associate Solicitor*

PAUL L. FRIEDEN
*Counsel for Appellate Litigation*

STEVEN W. GARDINER
*Senior Attorney*

ERIN M. MOHAN
*Attorney*
*U.S. Department of Labor*

CHAD A. READLER
*Acting Assistant Attorney General*

BRIT FEATHERSTON
*Acting United States Attorney*

MICHAEL S. RAAB
ALISA B. KLEIN
*Attorneys, Appellate Staff*
*Civil Division, Room 7235*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-1597*
*Alisa.klein@usdoj.gov*



*Advocacy: the voice of small business in government*

September 4, 2015

**VIA E-MAIL**

The Honorable Thomas E. Perez
Secretary, Department of Labor
Frances Perkins Building
200 Constitution Avenue, NW
Washington, DC 20210

The Honorable Dr. David Weil
Administrator, Wage and Hour Division
Department of Labor
Frances Perkins Building
200 Constitution Avenue, NW
Washington, DC 20210

**_Re: Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees; Proposed Rule_**

Dear Secretary Perez and Administrator Weil:

The Office of Advocacy of the U.S. Small Business Administration respectfully submits these comments to the Department of Labor (DOL) for this proposed rule, which amends the regulations under the Fair Labor Standards Act (FLSA) governing the "white collar" exemption from overtime pay for executive, administrative and professional employees.[1] The proposed rule implements a 2014 Presidential Memorandum that directed DOL to update and modernize these overtime regulations.[2]  Advocacy held a number of small business listening sessions and roundtables across the country, and this letter will outline small business comments, concerns and recommendations regarding this proposal.

**The Office of Advocacy**

Congress established Advocacy under Pub. L. 94-305 to represent the views of small entities before Federal agencies and Congress.  Advocacy is an independent office within the U.S. Small Business Administration (SBA); as such the views expressed by Advocacy do not necessarily reflect the views of the SBA or the Administration. The Regulatory Flexibility Act (RFA), as amended by the Small Business Regulatory Enforcement Fairness Act

---

[1] *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees; Proposed Rule,* Department of Labor, Wage and Hour Division, 80 Fed. Reg. 38516 (July 6, 2015).
[2] Presidential Memorandum, *Updating and Modernizing Overtime Regulations* (March 13, 2014).

(SBREFA), gives small entities a voice in the Federal rulemaking process.[3]  For all rules that are expected to have a significant economic impact on a substantial number of small entities, Federal agencies are required by the RFA to assess the impact of the proposed rule on small business and to consider less burdensome alternatives.

The Small Business Jobs Act of 2010 requires agencies to give every appropriate consideration to comments provided by Advocacy.   The agency must include, in any explanation or discussion accompanying the final rule's publication in the Federal Register, the agency's response to these written comments submitted by Advocacy on the proposed rule, unless the agency certifies that the public interest is not served by doing so.

**Background**

The Fair Labor Standards Act (FLSA) guarantees a minimum wage and overtime pay of time and a half for work over 40 hours a week.  While these protections extend to most workers, the FLSA does provide a number of exemptions.  In March 2014, President Obama released a Memorandum directing DOL to modernize and streamline the existing overtime regulations, particularly the exemption from minimum wage and overtime pay for executive, administrative, professional, outside sales and computer employees.[4] This is often referred to as the "EAP" or "white collar exemption."  To be considered exempt, employees must meet certain minimum tests related to their primary job duties and be paid on a salary basis at not less than a specified minimum amount or threshold. The salary threshold for this exemption was last changed in 2004.[5]

In this proposed rule, DOL would change the salary threshold for employees who are eligible to receive overtime pay from $23,660 to $50,440, making 4.7 million workers newly eligible for overtime pay.[6]  DOL estimates that 211,000 small establishments and an estimated 1.8 million of their workers will be affected by this rule.[7]  DOL is also proposing to include in the regulations a mechanism to automatically update the salary thresholds on an annual basis using either a fixed percentile of wages or the Consumer Price Index for Urban Consumers (CPI-U).  DOL does not propose regulatory changes to the "duties" tests, which require employees to perform certain primary duties to qualify for an overtime exemption.  However, DOL is seeking feedback on whether these duties tests should be revised.[8]

Advocacy thanks DOL for attending our small business listening sessions and roundtables to obtain feedback from small entities during all stages of this important rulemaking process.  After the release of the Presidential Memorandum in 2014, Advocacy held two small business listening sessions with DOL to gain initial feedback on this broad directive.   Since the publication of the proposed rule, Advocacy held small business roundtables attended by DOL staff in the District of Columbia, Kentucky and Louisiana.  Advocacy has also heard feedback from small entities across the country from our outreach, our Regional Advocates and from small

---

[3] Regulatory Flexibility Act, Pub. L. No. 96-354, 94 Stat. 1164 (codified at 5 U.S.C. §601).
[4] Presidential Memorandum, *Updating and Modernizing Overtime Regulations* (March 13, 2014).
[5] *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*; 69 Fed. Reg. 22122 (April 23, 2004).
[6] *Initial Regulatory Flexibility Analysis,* 80 Fed. Reg. at 38605.
[7] *Id*. at 38604.
[8] *Id.*

business representatives.  Small businesses have told Advocacy that this increase of the salary threshold and the numbers of workers eligible for overtime pay will add significant compliance costs and paperwork burdens on small entities, particularly to businesses in low wage regions and in industries that operate with low profit margins.   Small businesses have commented that the high costs of this rule may also lead to unintended negative consequences for their employees that are counter to the goals of this rule.   Based on feedback from these roundtables, Advocacy submitted a public comment letter seeking a 90-day extension of the comment period on August 20, 2015.[9]

### DOL's IRFA Undercounts the Number of Small Businesses, Underestimates the Costs of the Salary Threshold, and Does Not Examine Less Burdensome Alternatives

Under the RFA, an IRFA must contain: (1) a description of the reasons why the regulatory action is being taken; (2) the objectives and legal basis for the proposed regulation; (3) a description and estimated number of regulated small entities (based on the North American Industry Classification System (NAICS)); (4) a description and estimate of compliance requirements, including any differential for different categories of small entities; (5) identification of duplication, overlap, and conflict with other rules and regulations; and (6) a description of significant alternatives to the rule. [10]

Advocacy believes that DOL's Initial Regulatory Flexibility Analysis does not properly inform the public about the impact of this rule on small entities.   Advocacy questions DOL's analysis because it relies on multiple unsupported assumptions regarding the numbers of affected small businesses and workers and by extension the regulatory impact of this proposal.  DOL's IRFA analyzes small entities very broadly, not fully considering how the economic impact affects various categories of small entities differently. Specifically, DOL's analysis does not appreciate the difference between many small entities in industry sub-sectors, regions, and revenue sizes.  DOL's IRFA does not analyze the impact of this rule on small entities as required by the RFA that are non-profit organizations and governmental entities serving a population of less than 50,000.

Small businesses have told Advocacy that DOL's estimates for human and financial resources costs that result from this rule are extremely underestimated.  Due to the problems with the IRFA, DOL cannot fully consider significant and less burdensome regulatory alternatives to the proposed rule that would meet the agency's objectives.  Advocacy recommends that DOL publish a Supplemental IRFA providing additional analysis on the economic impact of this rule on small entities and consider recommended small business alternatives.

---

[9] Comment letter from the Office of Advocacy to the U.S. Department of Labor (August 21, 2015), available at: https://www.sba.gov/advocacy/82115-defining-and-delimiting-exemptions-executive-administrative-professional-outside.
[10] 5 U.S.C. § 603.

- 3 -

### A. DOL's IRFA Does Not Adequately Analyze the Numbers of Small Businesses Affected by Rule

(1) Key assumptions unnecessarily obscure the numbers of affected small businesses in industry subsectors and revenue size categories.

DOL's IRFA applies multiple assumptions to the Census' Survey of U.S. Businesses (SUSB) data to determine the number of affected businesses and workers and by extension the regulatory impact of the proposal. Advocacy is concerned that DOL made assumptions to create hypothetical data points that were otherwise easily available in the SUSB data. For example, DOL chooses to analyze all industries by general 2- or 3- digit North American Industry Classification System (NAICS) industry codes when more specific data are readily available. This can be important because substantially different types of companies can be classified under the same general NAICS code (e.g., plumbing companies and civil engineering companies are both under the same 2-digit NAICS code).

Consequently, DOL may be obscuring the impact of this rule on an industry-subsector basis by only looking at small businesses in the aggregate in terms of very general industry definitions. This broad view of small business makes it difficult to determine which subsectors may face a more significant regulatory burden. Furthermore, in its economic analysis DOL asserts data points around the number of establishments belonging to an industry as well as the number of employees on a per-establishment-basis when it could find direct estimates of that information by firm-size and industry-subsector in the SUSB data. Advocacy recommends that DOL utilize these data points over general assertions to improve the transparency and accuracy of its economic analysis.

(2) DOL's IRFA Should Analyze Small Business Data to Reflect Regional Differences in the Regulatory Impact of the Proposal

DOL's proposal states that the current salary threshold is outdated, and proposes to base it on a national salary threshold of the 40th percentile of earnings for full-time salaried workers (estimated to be $50,440 or $970/week). According to DOL, this threshold should be representative of the wage for generally exempt employees. Small businesses at Advocacy's roundtables expressed concern that this salary threshold was too high to be representative of employees because DOL did not fully appreciate regional differences in wages. More specifically, DOL seemed to not fully consider the difference in purchasing power of its proposed threshold in higher- and lower-wage states and regions. In contrast, DOL's 2004 final rule adjusted this salary slightly lower than indicated by the national data because of the impact on lower wage industries such as the retail industry and in lower wages regions in the South.[11] For example, a study by the National Retail Federation and Oxford Economics utilized data from the Current Population Survey (CPS) to explore differences between states in the 40th percentile of salary full-time wages.[12] The study found wide differences in what constitutes the 40th

---

[11] *Defining and limiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees; Final Rule*, 69 Fed. Reg. 22122, 22168 (April 23, 2004).
[12] Oxford Economics for the National Retail Federation, *State Differences in Overtime Thresholds*, Addendum to *Rethinking Overtime Exemption Thresholds Will Affect the Retail and Restaurant Industries* (August 31, 2015),

percentile in the three states that Advocacy held roundtables: Kentucky ($882/week), Louisiana ($784/week), and the District of Columbia ($1,070/week).

DOL could have also analyzed this state data by other factors, such as the impact on industry sub-sectors. The National Association of Home Builders (NAHB) completed a state-by-state breakdown of the impact of this rule to first-line supervisors in the construction industry (as defined by multiple NAICS codes), and the analysis showed a large variation in the percentage of workers who would be overtime eligible making under $50,440 depending on the state and the subsector.[13] It is clear from these examples that this proposal will have vastly different impacts in terms of the number of small entities affected and the extent of their regulatory burden. DOL should analyze these regional and industry subsector differences as well as consider them when constructing regulatory alternatives.

## B.  DOL's IRFA Does Not Consider Key Small Entities Affected by the Rule

Advocacy is concerned that DOL did not analyze the numbers of small entities and the economic impact of this rule on small entities required under the RFA including non-profit organizations and small governmental jurisdictions serving a population of less than 50,000.[14] Representatives from these key small entity groups who attended Advocacy's roundtables sought compliance materials to help them understand whether they were covered by this regulation. These entities expressed concern that their operations would have a difficult time complying with these regulations because they do not have the discretionary resources to pay for these extra costs.

At Advocacy's New Orleans roundtable, a small non-profit organization operating Head Start programs in southeast Louisiana stated that this proposal would result in $74,000 in first year costs. Since 80 percent of its operating budget is from federal programs, which cannot be used to pay for management costs like labor, it may have to cut critical community services to reduce labor costs. Community services may also become prohibitively costly for small local jurisdictions with limited budgets.

## C.  DOL's IRFA Underestimates Small Business Compliance Costs Due to Changes to the Salary Threshold

Small businesses have told Advocacy that the Department has greatly underestimated the human resource- and financial management costs that will result from this proposal.  DOL estimates that on average, an affected small "establishment" is expected to incur $100 to

---

available at: https://nrf.com/sites/default/files/Documents/retail%20library/OE%20Addendum%202%20-%20State%20level%20overtime%20threshold%20analysis.pdf.
[13] National Association of Home Builders, *State by State Breakdown of First Line Supervisors of Construction Trades Workers Impacted by Changing Overtime Threshold From $23,660 to $50,440* (August 2015), available at: http://www.nahb.org/~/media/Sites/NAHB/Research/Priorities/Overtime-Wages-State-by-State-Analysis.ashx?la=en.
[14] 5 U.S.C. § 601(4) and (5). The RFA defines a "small organization" as any not-for-profit enterprise that is independently owned and operated and not dominant in its field (for example, private hospitals and educational institutions). The RFA defines a "small governmental jurisdiction" as governments of cities, counties, towns, townships, villages, school districts, or special districts, or special districts, with a population of less than fifty thousand.

- 5 -

$600 in direct management costs; a one hour burden for regulatory familiarization (reading and implementing the rule), a one hour burden per each affected worker in adjustment costs and a five minute burden per week scheduling and monitoring each affected worker.[15]

Advocacy is concerned that these asserted estimates of management costs may not reflect the actual experiences of small entities. Small businesses have told Advocacy that it will take them many hours and several weeks to understand and implement this rule for their small businesses. Many small businesses spend a disproportionately higher amount of time and money on compliance because they have limited to no human resources personnel, legal counsel or financial advisory or management personnel on staff. Many small businesses may adjust to these increases in time by hiring outside advisors to help them comply with these types of regulations which can cost thousands of dollars. DOL should take this disproportionate regulatory burden into account when considering the cost of this proposal on small entities.

DOL estimates that the average establishment will have $320 to $2,700 in additional payroll costs to employees in the first year of the proposed rule, which is an increase of $6.16 per week per affected worker.[16] Small businesses are concerned that DOL's estimate is neither transparent nor accurate. Small businesses have told Advocacy that their payroll costs will be in the thousands of dollars.

Small businesses have stated that one of their options is to convert salaried employees making under $50,440 to hourly employees. However, small businesses have stated that under this scenario, employers would either decrease hourly rates by an equal amount or reduce hours to avoid overtime pay. Employers could spend many hours a week scheduling and keeping track of employee work to avoid these extra costs. Employers in this scenario would also be understaffed, and may be required to hire and train new workers, creating extra costs. Under another scenario, small businesses could increase their workers' pay to over the $50,440 threshold to allow them to remain as salaried employees. These employers could then try to raise prices or reduce costs; some small businesses have stated that they may cut back on management staff or reduce benefits and bonuses. DOL should consider the costs and benefits associated with these changes in behavior when evaluating the impact of this rule on small entities.

Small businesses at Advocacy's roundtables stated that this rule will have a disproportionate impact on certain occupations with low profit margins and wages. For example, multiple small grocery stores who attended our Kentucky roundtable stated their profit margins were under one percent and they could not pass on these extra costs to their customers. An owner of a small restaurant in Louisville calculated that this overtime rule will cost his business $50,000, or 8 percent of the business' payroll. DOL should consider the differential impacts of this rule on lower wage industries and geographic areas.

**D. DOL Does Not Account for Non-Financial Costs to Small Entities**

Small employers have told Advocacy that their employees may lose flexibility in their work schedules if they are transferred to an hourly position, and that they may lose their employees

---

[15] 79 Fed. Reg. at 38605.
[16] 79 Fed. Reg. at 38605.

like millennials who expect a flexible work schedule. Employers have also stated that salaried workers often work flexible schedules by utilizing cell phones and logging onto work at computers from home; these employers could be more likely to stop allowing workers to have this type of work arrangement. Similarly, employers stated that they would try to limit travel for work and development reasons. Many roundtable participants stated that salaried employees not tied to a clock have flexibility in their work schedules, and therefore they can take off a few hours for a child's soccer game or medical appointment. After this rule is adopted, these now hourly workers would have to log in and out and would not be paid for hours "off the clock."

Small businesses at Advocacy's roundtables were also concerned that this rule may lead to lower worker morale and by extension productivity, because many employees may believe that transferring from a salaried position to an hourly position is a demotion in their career advancement. Small businesses have commented that they may not be able to hire as many entry-level management positions, and their senior managers would absorb many of these job responsibilities.

Advocacy is also concerned that DOL does not consider the costs and disruption of this proposal on non-traditional businesses that operate with non-traditional work schedules. For example, a small home builder stated that they complete 10 custom homes a year and must from time to time work long hours due to weather constraints; this rule would result in extra costs and delays in building a home. Advocacy has heard from small businesses such as banks and medical facilities that may have to cut back on their hours of service. A representative from the Outdoors Industry Association stated that this rule is particularly costly for seasonal businesses as they do not have consistent work hours for employees over the work year.

Small businesses at Advocacy's roundtable asked DOL representatives about the application of compensation time, part-time arrangements (for example for professors and college staff) and flexible work arrangements under this regulation. Small businesses are also concerned that the proposed rule does not count worker bonuses or commissions as part of the salary computation. Advocacy heard from many companies such as automobile dealerships, staffing agencies and golf courses whose employees are paid in commission or bonuses; these entities have suggested that these incentives should be added to their base salary under this rule or they may otherwise be reduced or ended, limiting their ability.

### E. DOL Does Not Consider Less Burdensome Alternatives that Would Still Accomplish the Agency's Objectives

Under the RFA, the IRFA must contain a description of any significant regulatory alternatives to the proposed rule which accomplish the stated objectives of the applicable statutes and which minimize any significant economic impact of the proposed rule on small entities.[17] DOL's IRFA is deficient because it does not analyze any regulatory alternatives that would minimize the economic impact of this rule for small businesses.

DOL states that it does not provide any differing compliance or reporting requirements for

---

[17] 5 U.S.C. § 603(c).

small businesses because "it appears to not be necessary given the small annualized cost of the rule, estimated to range from a minimum of $400 to a maximum of $3,300."[18]  Based on feedback from small businesses as outlined in this letter, Advocacy believes that DOL's numbers of small businesses affected and cost estimates are extremely low.   Advocacy recommends that DOL reassess the impact of this rule on small businesses in a Supplemental Initial Regulatory Flexibility Analysis. With more accurate information about the numbers of small businesses affected and the economic impacts of this rule to small businesses, DOL can better analyze less burdensome significant regulatory alternatives that would also meet the agency's objectives.

DOL states that the "FLSA creates a level playing field for businesses by setting a floor below which employers may not pay their employees" and therefore setting differing compliance standards would "undermine this important purpose of the FLSA."[19] Advocacy believes that small businesses are disproportionately affected by this proposal, and suggests that DOL consider the significant alternatives put forward by small businesses to both better meet its regulatory goals and reduce the burden on small entities.

1.  Small businesses recommend that DOL consider a salary threshold for the EAP exemption in the FLSA of the 40th percentile of earnings that is adjusted to reflect regional wages and wages in certain occupations such as the retail sector.   This is similar to the methodology that DOL utilized in its 2004 rulemaking when it updated these regulations. Some small businesses have also recommended different salary thresholds by state, depending on the 40th percentile in each state.

2. Small businesses request a longer time to implement this final rule as they believe that it is unrealistic for management to comply with this regulation in four months, which is the implementation date that DOL provided employers after the agency last updated its salary threshold in 2004. Small businesses must understand this rule, evaluate and reclassify their workforce, and plan their budget and raise funding to pay for the compliance costs of this regulation.  Advocacy recommends that DOL provide small businesses at least a year or 18 months to comply with this regulation.

3. Small businesses have also recommended a gradual increase in the salary threshold, similar to the implementation schedules given when a minimum wage rule comes into place so it is not such a sudden cost increase.

**Recommendations**

### 1. DOL Should Publish a Supplemental IRFA to Reanalyze Small Business Impacts

DOL's IRFA does not properly analyze the economic impact of this rule on small businesses. The Supplemental IRFA should provide a more accurate estimate of the small entities impacted by this proposal, and should include an analysis of industry sub-sectors, regional differences and revenue sizes.  Additionally, this IRFA should analyze the number of small non-profit organizations and small governmental jurisdictions serving a population under 50,000 that are affected by this rule, and the economic impact of this rule on these entities.

---

[18] 79 Fed. Reg. at 38607.
[19] 79 Fed. Reg. at 38607.

DOL should be more transparent in its compliance cost data and utilize data provided in the comment process to accurately estimate the human resources and financial management costs of this regulation.  With this important information regarding the numbers of small businesses affected by this regulation and the economic impact on small entities, DOL can effectively analyze less burdensome significant regulatory alternatives that would minimize the impact on small businesses that would also meet the agency objectives.

## 2.  DOL Is Required to Publish a Small Business Compliance Guide

DOL is required to publish a Small Business Compliance Guide for this regulation.  For each rule requiring a final regulatory flexibility analysis, section 212 of SBREFA requires the agency to publish one or more small entity compliance guides.[20]  Agencies are required to publish the guides with publication of the final rule, post them to websites, distribute them to industry contacts, and report annually to Congress.[21]  Advocacy is available to help DOL in the writing and dissemination of this guide.

## 3.  DOL Should Publish a Separate NPRM for Any Specific Duties Test Revisions

DOL should issue a separate NPRM and IRFA if the agency seeks to adopt any changes to the duties tests, as the agency has not provided adequate notice to small businesses on the proposed revisions or any analysis of the economic impact of these changes in the IRFA to allow for meaningful public comment.   DOL preamble states that "it is not making specific proposals to modify the standard duties tests," which require certain that workers perform primary duties to qualify for an overtime exemption. [22]  The preamble lists five general questions about the duties tests, mentioning California's duties test (50 percent primary duty requirement) and the concurrent duties regulations (which allow the performance of both exempt and nonexempt duties concurrently). In its preamble, DOL suggests that adopting this proposed rule would make future revision unnecessary.  When Advocacy held a Small Business Listening Session in 2014 after the Presidential Memorandum was released, small businesses cited potential changes to the duties test to be the most costly and problematic aspect of an update to the FLSA EAP exemption.   Small businesses are concerned that quantification of exempt managers' duties will be extremely burdensome for operations because every task must be tracked and classified either an exempt or non-exempt action. Small operations will be disproportionately impacted by a change to the duties test because they have less staff and managers are constantly multi-tasking throughout the day.

## 4.  DOL Should Analyze the Impact of Annual Salary Updates on Small Businesses

DOL is proposing to include in the regulations a mechanism to automatically update the salary and compensation thresholds on an annual basis using either a fixed percentile of wages or the CPI-U.  Advocacy recommends that DOL assess the economic impact of these automatic updates on small businesses.  According to a forecast by NRF and Oxford Economics, if the overtime threshold were set at $970/week in 2016 and indexed to CPI-U inflation, the 40th percentile of wages for full-time non-hourly wages would be $1,013/week

---

[20] Small Business Regulatory Enforcement Fairness Act, Pub. Law 104-121 § 212.
[21] The Small Business and Work Opportunity Act of 2007 added these additional requirements for agency compliance to SBREFA.
[22] 79 Fed. Reg. at 38518.

in 2018 and $1,081/week in 2021.[23]   Small businesses at Advocacy's roundtable were
concerned about this unprecedented requirement, and stated that it would add compliance
costs every year to comply with these updates. Many businesses were concerned about
missing these updates in the Federal Register and being subject to enforcement actions.

**Conclusion**

While small businesses support a modest increase in the salary threshold under the "white
collar" FLSA exemption, DOL's proposal more than doubles this salary threshold. Based on
small business feedback, Advocacy believes that these changes will add significant
compliance costs and paperwork burdens on small entities, particularly businesses in low
wage regions and in industries that operate with low profit margins.  Small businesses at our
roundtables have told Advocacy that the high costs of this rule may also lead to unintended
negative consequences for their employees that are counter to the goals of this rule.
Advocacy is concerned that the Initial Regulatory Flexibility Analysis (IRFA) contained in
the proposed rule does not properly analyze the numbers of small businesses affected by this
regulation and underestimates their compliance costs.  Advocacy recommends that DOL
publish a Supplemental IRFA providing additional analysis on the economic impact of this
rule on small entities and consider recommended small business alternatives.  DOL must also
publish a small entity compliance guide with the publication of the final rule, as required by
the Regulatory Flexibility Act (RFA).

Advocacy reiterates its thanks to DOL for participating in five Advocacy listening sessions
and roundtables on this regulation. For additional information or assistance please contact me
or Janis Reyes at (202) 619-0312 or Janis.Reyes@sba.gov.


Sincerely,


Claudia R. Rodgers
Acting Chief Counsel for Advocacy


Janis C. Reyes
Assistant Chief Counsel

Copy to:      The Honorable Howard Shelanski, Administrator, Office of Information and
              Regulatory Affairs, Office of Management and Budget

---

[23] Oxford Economics for the National Retail Federation, *Updated Impacts of Raising the Overtime Exemption
Threshold, Addendum to Rethinking Overtime Exemption Thresholds Will Affect the Retail and Restaurant
Industries*, Page 5 (July 17, 2015), available at:
https://nrf.com/sites/default/files/Documents/retail%20library/Rethinking-Overtime-threshold-update_MEMO.pdf.

- 10 -



September 4, 2015


*VIA ELECTRONIC SUBMISSION:*   *www.regulations.gov*

Mary Ziegler, Director
Division of Regulations, Legislation and Interpretation
Wage and Hour Division
U.S. Department of Labor
200 Constitution Avenue, N.W.
Room S-3502
Washington, DC 20210

**Re:  Notice of Proposed Rulemaking (NPRM): Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees, 80 Fed. Reg. 38515 (July 6, 2015), RIN: 1235-AA11**

Dear Director Ziegler:

It would have been helpful for the regulated community to better assist the Department in gathering substantive information on the impact the proposed revisions would have on the nation's employers for the Department to have granted a longer comment period to allow for the data to be gathered and analyzed. Listening sessions on general ideas are no substitute for the robust notice and comment requirements mandated by law, particularly when the proposed regulation shows little indication that the Department listened to our main concerns.

Our Association is the leading business representative for the restaurant and foodservice industry.  The industry is comprised of one million restaurant and foodservice outlets employing 14 million

people—about ten percent of the U.S. workforce.[1]   Restaurants are job creators and the nation's second-largest private-sector employer. Despite its size, small businesses dominate the industry; even larger chains are often collections of smaller franchised businesses.

The Department states that its goal in revamping federal overtime rules is to set a standard salary level for full-time salaried employees that "adequately distinguishes between employees who may meet the duties requirements of the [executive, administrative, and professional (EAP)] exemption and those who likely do not, **without necessitating a return to the more detailed long duties test**."[2]   We strongly agree that the Department should not return to the more detailed long duties test, which was effectively abandoned decades ago.

Imposing a long duties test, particularly one similar to what is found in California, would lead to less clarity and more litigation, which the Department states it would like to avoid.[3]   We also agree that the 2004 salary threshold for exempt status is now too low and should be raised.   However, the Department's proposed salary level is not the appropriate level for our diverse industry, especially given regional and local variations in salaries paid due to sharp differences in the cost of living in the United States.

Below, we address in more detail several of the questions raised in the NPRM, specifically:

1. Whether adjustments to the duties test are necessary;
2. Whether the Department should modify the standard exemption for executive, administrative, and professional

---

[1] *2015 Restaurant Industry Forecast*, National Restaurant Association (2015). The 2015 employment projections are based on historical data from the Bureau of Labor Statistics (BLS).

[2] Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees; Proposed Rule, 80 Fed. Reg. 38515, 38517 (July 6, 2015) (emphasis added).

[3] 80 Fed. Reg. 38515. The Department even alleges that a "potential impact" of the proposed rule "is a reduction in litigation costs." 80 Fed. Reg. at 38518.

employees to permit nondiscretionary bonuses and incentive payments to count toward satisfaction of the salary level test;

3. Whether the Department's proposed salary level is adequate and, if not, what would be an appropriate alternative salary level amount; and,

4. Whether the standard salary level should automatically go up and, if so, which method is better, CPI–U or the 40th percentile of full-time non-hourly employees approach.

## Adjustments to the duties test are not necessary and should be avoided.

It is clear to us that any reduction in litigation that the Department seeks to obtain with the proposed rule's increase in the salary threshold would be lost if the changes being considered to the duties test became final. In particular, we are extremely troubled by the notion that the Department is even looking at California's over-50% quantitative requirement for an exempt employee's primary duty.

In meetings with the Secretary of Labor and others, our members have emphasized that this has resulted in considerably higher levels of litigation in California, as plaintiff's lawyers and employers fight over the percentage of time spent on various tasks and whether those tasks are appropriately classified as exempt or nonexempt.[4] Furthermore, as I personally stated at one of the several U.S. Small Business Administration Office of Advocacy hearing sessions with representatives from the Department of Labor, any changes to the duties test, particularly the substantial changes being considered, should be done only

---

[4] Representatives from our board and our Association's executive team met with the Secretary and his team on May 1, 2014, less than two months after the President's announcement and a year before any specifics were known on the proposal.

through a true notice and comment process in accordance with the Administrative Procedure Act (APA).[5]

Moreover, if the Department enacted changes to the duties test based only on answers to the general questions asked in the NPRM, rather than on the basis of comments on any specific proposal, the requirements of the APA, the Regulatory Flexibility Act, and the various Executive Orders related to regulatory activity would not have been followed.  Seeking input this way is no substitute for an actual regulatory proposal that the regulated community can consider, evaluate, and comment upon.  Likewise, adding new major regulatory text to a final regulation with no opportunity to see it beforehand directly contradicts the goal of the APA.

This is particularly true because the changes being contemplated by the Department are significant, and deserve a full regulatory vetting.  The changes suggested by the Department's questions would result in massive changes in employer processes, including having to monitor and track if and how often exempt employees perform non-managerial, or nonexempt, work for the business.  These changes would dramatically impact the cost of implementing the proposal. These costly compliance requirements are not addressed in the economic analysis of the current NPRM.

Moreover, the Department optimized the duties test in 2004 to reflect the realities of the modern economy, a move that recognized the unique roles and responsibilities restaurant managers have.  In our industry, managers need to have a "hands-on" approach to ensure that operations run smoothly.

Performing hands-on work at the manager's own discretion to ensure that operations are successfully run in no way compromises the fact that the manager's primary responsibility is performing exempt work.  In addition, restaurant managers are

---

[5] Roundtable on DOL's Overtime Regulations: Small Business Administration Office of Advocacy (July 22, 2015).

expected to develop their teams and the role of a "Coach" best exemplifies this. Most workers, younger workers in particular, can be motivated to reach their full potential faster when they learn from someone with a Coach's mentality. Jumping in to help out the team with their "nonexempt" duties personifies leadership qualities and is the best way to inspire, motivate and teach workers how to deliver the best service to the customer.

It also shows that the whole restaurant is a team and everyone should come to work prepared to do whatever it takes to make sure each customer has a great experience and will want to return in the future. The hospitality industry in this country would not be as successful as it is if managers were not free to lead, train, and inspire by example. Who would want to dine at a restaurant where every employee took a "Not My Job" attitude?

As you can see, any attempt to artificially cap the amount of time exempt managers can spend on nonexempt work would place significant administrative burdens on restaurant owners, increase labor costs, cause customer service to suffer and result in an increase in wage-and-hour litigation.

We are also extremely concerned that the Department expresses throughout the NPRM its belief that any amount below its proposed salary level would necessitate a more rigorous and restrictive long duties test. The realities associated with a more rigorous and restrictive long duties test exist regardless of the salary level chosen by the Department. Even if the salary level did not increase at all, a more rigorous and restrictive long duties test would still place significant administrative burdens on restaurant owners, increase labor costs, cause customer service to suffer and result in an increase in wage-and-hour litigation.

Furthermore, regardless of the particular work being done at any given time, managers neither lose nor put on hold their managerial duties. They have responsibility for the operation at all times. The pre-2004 regulations included a "sole-charge" test that

allowed employers to classify one manager as exempt during each shift, acknowledging that someone in the restaurant must be in charge at all times. Even if a manager performs a manual task at any given point in time, she retains responsibility for the staff, physical plant, and other assets of the restaurant.

Thus, the Department should leave the concurrent duties rule in place and untouched. The concurrent duties test rule recognizes that front-line managers in restaurants play a multi-faceted role in which they often perform nonexempt tasks at the same time as they carry out their exempt, managerial function. It recognizes that exempt and nonexempt work are not mutually exclusive.

The Department's own Field Operations Handbook highlights that "performing work such as serving customers or cooking food during peak customer periods" does not preclude exempt status. (See § 22b04.) Exempt supervisors make these decisions while remaining responsible for the success or failure of business operations under their management and can both supervise subordinate employees and serve customers at the same time. (*Id.*)

Because of how drastic and costly changes in the duties test could become, we urge the Department to provide the public an opportunity to review and comment on a specific proposal and, simultaneously, conduct the necessary cost estimates before any changes are finalized.

### Bonuses and other nondiscretionary incentives should count toward the salary level test.

In the restaurant industry, bonuses are critical components of our employees' total compensation packages and should be counted toward meeting the salary level threshold under the executive, administrative, and professional exemption. In a nationwide survey of the restaurant industry published last year, 71 percent of salaried restaurant managers said that they received a bonus within

*Mary Ziegler, Director*
*RIN: 1235-AA11*
*September 4, 2015*

the past 12 months.[6]  Among salaried shift and crew supervisors, half reported receiving a bonus, while 47 percent of salaried chefs and cooks reported earning a bonus in the past 12 months.[7]

Thus, we support the Department's suggestion of considering nondiscretionary bonuses and incentive payments, such as "nondiscretionary incentive bonuses tied to productivity and profitability," toward meeting the salary level.[8]  However, we disagree with the Department's suggested limitation that would allow such bonuses to satisfy no more than 10% of the weekly salary level.[9]

It should make no difference to an exemption analysis whether someone earns $40,000 per year in base salary with $10,000 in bonus versus $45,000 per year in base salary with $5,000 in bonus. As far as the employee is concerned, at the end of the year, the total compensation is the same.  In addition, employers value the ability to look at compensation in terms of total compensation, rather than the individual components. The regulation should support flexibility.

We are glad that the Department envisions allowing bonus payments paid monthly.[10]  Some of our members already pay bonuses based on monthly results.  In fact, I know of at least one company that has done it this way since its inception and currently pays over 2,000 field manager's monthly bonuses.

However, the Department should also seriously consider the inclusion of bonuses paid quarterly, semi-annually, or annually, to

---

[6] Who Works in the Restaurant Industry: A Nationwide Survey of the Restaurant Workforce, National Restaurant Association Educational Foundation (2014), 19. Figures are based on salaried employees who have worked for their current employer for at least one year.
[7] *Id.*
[8] 80 Fed. Reg. 38535.
[9] *Id.*
[10] *Id.* at 38536.

*Mary Ziegler, Director*
*RIN: 1235-AA11*
*September 4, 2015*

reflect how these incentive payments are made by other employers in the restaurant industry.

Most bonus payments are typically made less often than monthly because they are tied to larger business results (such as profitability) that fluctuate significantly in our industry on a month-to-month basis.  The Department's suggested preference for allowing bonuses to count toward salary levels only if payment intervals are monthly or more frequently undoes for most of our members much of what its original suggestion seems to put into place.

The Department also does not favor allowing "catch-up" payments at the end of the year in the event that the metrics for a bonus payment were not met for a given employee.[11]   However, we encourage the Department to reconsider this position, and allow employers to make a yearly catch-up payment as the department allows under the Highly Compensated Employees exemption.

In the alternative to annual catch-up payments, we urge the Department to permit employers to make catch-up payments based on when they pay the bonuses, i.e., monthly, semi-annually, or quarterly.  The monthly, semi-annual or quarterly bonus structure should address the Department's concern of ensuring that exempt workers receive a minimum level of compensation on a consistent basis.  Likewise, not allowing for catch-up payments at all could make an exempt employee retroactively nonexempt during slow business periods, diluting the "ownership mindset" that bonuses encourage.

In our opinion, allowing for catch-up payments makes more logical sense.  It guarantees that the employee would always meet the salary level, regardless of the potential for high and low business cycles.  Catch-up payments also increase the potential for bonuses

---

[11] 80 Fed. Reg. at 38536.

that would take the employee's total compensation above the minimum salary threshold when the business is doing well.

**The Department's proposed minimum salary level for the EAP exemption is inadequate for our industry and makes the exemption inoperative in many parts of the country.**

We want to start our comments on the salary level by re-emphasizing that we disagree with the Department's suggestion that the only way to compensate for a lower salary level than the one proposed is by re-imposing the outdated long duties test or something similar.  The reasons for our deep opposition towards a long duties test and all of its negative consequences are outlined above.

The Department believes its proposed salary level does not exclude from exemption an unacceptably high number of employees who meet the duties test.[12]  However, when applied to our industry, the contrary is true.  To be clear, we do support raising the salary threshold.  None of the many National Restaurant Association members that provided feedback to us employ exempt salaried staff at the current $455 per week level.

Conversely, even before adjusting for regional economic and market differences, most managers and crew supervisors in our industry do not meet the proposed salary level of $970 per week.  Some of these employees would qualify as exempt under the new proposed salary level only if the Department allowed bonuses to be used to calculate the employee's salary level.

The purpose of setting a salary level, historically, has been to "provid[e] a ready method of screening out the obviously nonexempt employees."[13]  In other words, the salary level should

---

[12] 80 Fed. Reg. at 38556.
[13] Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22122, 22165 (April 23, 2004).

*Mary Ziegler, Director*
*RIN: 1235-AA11*
*September 4, 2015*

be set at a level at which the employees below it would clearly not meet any duties test.  With its proposed changes, however, the Department is upending this historic rationale and setting the salary level at a point at which all employees above the line would be exempt.  This would greatly limit employers in the restaurant industry from availing themselves of the EAP exemption.

For example, the median annual base salary paid to crew and shift supervisors in our industry is $38,000.[14] Even those in the upper quartile at $47,000 would not qualify as exempt under the Department's proposed $50,440 salary level for 2016.[15]  Likewise, the median base salary for restaurant managers is $47,000, while the lower quartile stands at $39,000.[16]

These are employees who would meet the duties test but who would become non-exempt under the proposed salary level.  It is then clear that, at least in reference to the restaurant industry— the nation's second-largest private-sector employer—the proposed salary level does exclude from exemption an unacceptably high number of employees who meet the duties test.  The impact would be magnified in many regions of the country.

### A) Better Alternatives Considered by the Department

The Department considered several alternatives that we believe are better options.  We would support "Alternative 1," which calculates the new salary level by adjusting the 2004 salary level of $455 for inflation from 2004 to 2013, as measured by the CPI–U, and results in a salary level of $561 per week.[17]  Likewise, we would also support "Alternative 2," which uses the 2004 method to set the salary level at $577 per week.[18]

---

[14] Who Works in the Restaurant Industry: A Nationwide Survey, p. 19.
[15] *Id.*
[16] *Id.*
[17] 80 Fed. Reg. at 385561.
[18] *Id.*

*Mary Ziegler, Director*
*RIN: 1235-AA11*
*September 4, 2015*

Understanding that the Department now finds the salary level it set in 2004 as too low, we could also support "Alternative 3," which would set the salary level at $657 per week.[19]

Alternative 3 truly minimizes the number of employees who would pass a duties test but be denied the EAP exemption under the proposed salary level. It does so by taking into account employees in lower-wage regions and industries, in order to prevent "disqualifying any substantial number of such employees" from the EAP exemption.[20] The current proposal claims to do this, but fails to achieve this goal. Once again, when discussing this alternative, the Department feels unwilling to accept it without bringing back the long duties test.[21] This would go against the President's memorandum instructing the Department to look for ways to modernize and simplify the regulations.[22]

It is also important to look at the impact these regulations would have on the majority of the employees who will now become "overtime protected." The Department estimates that 75 percent of newly overtime-protected employees would see no change in compensation and no change in hours worked.[23]

However, in the restaurant industry, salaried employees enjoy a number of benefits not available to hourly employees. Thus, in addition to getting paid a salary regardless of the fact that they are not working over 40 hours a week, these newly overtime-protected employees could lose flexibility as well as benefits, including substantive bonuses, paid vacation, flex time, paid holidays, 401K with employer match, and health insurance.

Finally, throughout the NPRM, the Department creates the impression that salaried employees feel they are being taken

---

[19] 80 Fed. Reg. at 385561.
[20] *Id.* at 385558.
[21] *Id.*
[22] *Id.* at 385517, 385521.
[23] *Id.* at 385573, 385574.

*Mary Ziegler, Director*
*RIN: 1235-AA11*
*September 4, 2015*

advantage of by virtue of their exempt status.  In reality, employees often view reclassifications to non-exempt status as demotions, particularly where other employees within the same restaurant continue to be exempt.  Most employees view their exempt status as a symbol of their success within the company. Far from being enthusiastic, National Restaurant Association members have described reclassified employees as feeling like they were being disciplined and distraught over being reclassified.

Don Fox, CEO of Firehouse of America, LLC, in his own comments to this NPRM, attested that he has promoted dozens of managers to salaried positions in his professional lifetime and "without exception," not one believed it to be anything other than a significant milestone in their professional life.

For the reasons stated above, the Department should reconsider its salary level proposal and set it in the final rule at no more than $657 per week to avoid disqualifying a substantial number of employees in our industry from continuing to enjoy the benefits of being salaried exempt employees.

## B) Additional Alternatives Not Considered by the Department

There are two additional alternatives that could also work better than the current proposal that deserve further exploration:

    1) Salary levels determined using sector/industry specific data; and,
    2) Salary levels determined on a regional basis.

As explained above, the proposed methodology of setting the threshold at the 40th percentile of all exempt employees regardless of industry ends up creating extreme industry disparities on who would qualify.  While a supervisor in high tech would qualify, a supervisor with similar duties at a non-profit or a restaurant would not because they would not pass the high salary level threshold being proposed.

*Mary Ziegler, Director*
*RIN: 1235-AA11*
*September 4, 2015*

From our perspective, it is very unfair to include high tech, finance, medical device and other businesses with high sales and high profits per employee in the same metric with retail and restaurant companies where the sales and profits per employee are comparatively very low.  It would be more reasonable to have several threshold salary levels using sector/industry specific calculations.

Similarly, the proposed salary level could be determined on a regional basis to take into account cost-of-living differences.  The federal government considers geographic variations when setting the compensation level for its own employees.  For example, the federal government sets some of its highest compensation levels for its employees in California and New York.

Analogously, setting a salary level for the EAP exemption that exceeds the minimum level determined by those two states' own legislatures to be appropriate highlights the significant impact the proposed salary level would have in Oklahoma and Mississippi.

Substantial pay differences exist even for employees in the same restaurant company, based on their geographical region or even a metro area within a state.  These pay differences are unlikely to be related to differences in job duties.  For example, the median pay of "First-line supervisors/managers of food preparation and serving workers" is 51 percent higher in New York City than in Little Rock, Arkansas.[24]

For multi-state restaurant employers, a high proposed salary level would result in employees in the same job classification being treated differently based on where they live.  Without lowering the proposed salary level or, in the alternative, allowing regional salary-level determinations, even when positions meet the duties test, employers in our industry would likely have to reclassify positions

---

[24] Based on BLS data.

*Mary Ziegler, Director*
*RIN: 1235-AA11*
*September 4, 2015*

where the nature of the industry or the regional economy cannot justify a salary increase.

For example, as noted in a recent article on the issue, "the DOL placed the occupation 'First Line Supervisors/Managers of Office and Administrative Support Workers' in the category corresponding to 90 to 100 percent of employees with sufficient managerial and professional duties to pass the duties test, yet 51 percent of employees in this occupation will likely fail the new salary test."[25]

In some parts of the country, restaurant employers are likely to find that almost 100 percent of their employees who have sufficient managerial and professional duties to pass the duties test—even including restaurant managers—would fall below the Department's proposed salary level and would need to be reclassified as a result.

In these situations the proposed salary level would not operate as a gatekeeper. It would instead serve as an absolute elimination of the exemption in our industry in large portions of the country. Clearly, Congress cannot possibly have intended to create an exemption to benefit only employees and employers in certain regions of the country.

Yet this is precisely what the Department would be doing by proposing a salary level at such a high level, based on a national survey that does not account for sector/industry differences or regional differences in any meaningful way.

The restaurant industry as well as the entire South and Midwest regions will be placed at a competitive disadvantage. Employers in urban areas or with high profits will be able to maintain exempt employees at a rate that far exceeds rural areas and the restaurant industry.

---

[25] Flawed Logic in DOL's Proposed White Collar Salary Test, S. Bronars, D. Foster, and N. Woods, Employment Law 360 (Aug. 25, 2015).

### The Department does not have the authority to mandate an automatic salary level increase.

According to the NPRM, the Department seeks "to 'modernize' the EAP exemptions by establishing a mechanism for automatically updating the standard salary test."[26]  The Department believes that this would "promote government efficiency by removing the need to continually revisit the issue through resource-intensive notice and comment rulemaking."[27]

However, it is unclear how the Department can avoid its obligations to engage in notice-and-comment rulemaking simply because notice-and-comment rulemaking takes resources.  Many would say that it is precisely that reason why notice-and-comment rulemaking is appropriate here: to ensure that a federal agency cannot exceed the limits of its authority or otherwise "exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law'" no matter how difficult an issue it seeks to address.[28]

When Congress authorized the Department to issue regulations under the Federal Labor Standards Act (FLSA), Congress did not, either in 1938 or at any time since, grant the Department the authority to index its salary test.  Congress could have expressly provided such authority if it desired the Department to have it; Congress expressly permitted indexing in other statutes, including the Social Security Act and the Patient Protection and Affordable Care Act.

Congress, despite full knowledge of the fact that the Department has increased the salary level required for exemption on an irregular schedule, has never amended the FLSA to permit the Department to index the salary level.  Moreover, when Congress has

---

[26] 80 Fed. Reg. at 38537.
[27] *Id.*
[28] See *FDA v. Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 125 (2000) (internal citations omitted).

---

amended the FLSA to increase the minimum wage, it similarly has not indexed that amount.  Congress has demonstrated a clear intent that the salary level be revisited as conditions warrant, allowing the Department, and the regulated community, the opportunity to provide input into the appropriate level.

The Department recognized its lack of authority to index the salary test in the 2004 rulemaking.  And, it acknowledges as much in the current NPRM, noting that it determined "nothing in the legislative or regulatory history…would support indexing or automatic increases."[29]  The Department was correct in 2004, and nothing has occurred in the interim to justify the opposite conclusion.

Putting aside our legal objections to the Department's attempt to permanently index the salary level, between two bad options— neither of which would properly account for changes in economic conditions—we would prefer indexing tied to the CPI-U over indexing based on the 40th percentile of full-time non-hourly employees.  However, for CPI-U indexing to be considered reasonable, the salary level itself needs to be reasonable.

As we explained above, our research shows that, with a salary level set at $970 per week, a yearly increase tied to CPI-U would make the EAP exemption perpetually unusable for large portions of our industry.  Thus, we take this opportunity to recommend, once again, that the Department establish a minimum salary rate at a more reasonable level, such as "Alternative 3" at $657 per week, before indexing based on CPI-U.

The Department's other proposed alternative of indexing the salary level to the 40th percentile of non-hourly employees is a non-starter. Preliminary research points to it resulting in a death spiral that would render the EAP exemption obsolete in just a few years.  The relevant data used to determine the 40th percentile of full-time salaried workers is found in the Current Population Survey from the

---

[29] 80 Fed. Reg. at 38537.

*Mary Ziegler, Director*
*RIN: 1235-AA11*
*September 4, 2015*

Bureau of Labor Statistics (BLS).  The data consists of the total weekly earnings for all full-time non-hourly paid employees.[30] According to BLS, "total weekly earnings" includes overtime pay, commissions, and tips.[31]

As the new salary level becomes effective, the number of workers who report to the BLS that they are paid on a non-hourly basis will decrease as workers who fail the salary test in year one (and subsequent years) are reclassified as non-exempt.  This will result in a dramatic upward skewing of compensation levels for non-hourly employees.  If the 40th percentile test is adopted, in the years following the proposal, the salary level required for exempt status would be so high as to effectively eradicate the availability of the exemptions in our industry.

For example, the Department predicts that the initial salary level increase will impact 4.6 million currently exempt workers. Employers must then choose to:

1) Reclassify such workers as nonexempt and convert them to an hourly rate of pay;
2) Reclassify such workers as nonexempt and continue to pay them a salary plus overtime compensation for any overtime hours worked; or,
3) Increase the salaries of such workers to the new salary threshold to maintain their exempt status.

The Department estimates that only 67,000 of currently EAP exempt workers will see an increase in their salaries to bring them up to the new salary threshold in order to maintain their exempt status.[32] The overwhelming majority of affected employees would be reclassified as non-exempt.[33]  In our industry, particularly under the

---

[30] 80 Fed. Reg. at 38527, n. 20.
[31] See http://www.bls.gov/cps/research_series_earnings_nonhourly_workers.htm.
[32] 80 Fed. Reg. at 38573, 38574.
[33] *Id.*

proposed $970 per week salary level, most of these employees will be converted to an hourly method of payment.

As Mr. Fox pointed out in his comments, a "[Restaurant Manager] will not be the beneficiary of an overnight raise from $38,584 to $50,440 per week (in fact, a raise of that magnitude is the least likely scenario)." In turn, for purposes of the 40th percentile test, these workers would no longer be included in the BLS's calculation because they would become "hourly" employees. This sentiment was echoed by others in the industry. Joseph Kadow, Executive Vice President and Chief Legal Officer of Bloomin' Brands, in his comments, also highlighted that keeping the salary threshold at the proposed level would lead businesses like his to "move currently exempt employees to hourly payment."

One economic analysis that we were able to review states that if just one quarter of the full-time, non-hourly workers earning less than the proposed 40th percentile were reclassified as hourly workers each year, in five years the new 40th percentile salary level would be $1,393 per week ($72,436 per year).[34] The more likely scenario is that an even greater percentage of employees would be reclassified from salaried to hourly. If just half of full-time, non-hourly employees are converted to hourly positions, the 40th percentile salary level would increase to $1,843 per week ($95,836 per year) by 2020.[35]

It is clear under analysis that the choice between indexing to CPI-U or the 40th percentile is really a non-choice because the alternative to CPI-U is not workable. This is yet another reason why the Department should adjust the salary level only in accordance with the Administrative Procedure Act's required notice-and-comment rulemaking process, following the Regulatory Flexibility Act, and undertaking a detailed economic and cost analysis.

---

[34] See http://www.edgewortheconomics.com/experience-and-news/edgewords-blogs/edgewords-business-analytics-and-regulation/article:08-27-2015-12-00am-indexing-the-white-collar-salary-test-a-look-at-the-dol-s-proposal/
[35] *Id.*

In the current rulemaking, however, the Department proposes to announce a new salary level each year in the Federal Register without notice-and-comment, without a Regulatory Flexibility Act analysis, and without any of the other regulatory requirements established by various Executive Orders. If the Department decides to ignore these requirements, we urge you not to include automatic increases to the salary level based on indexing tied to the 40th percentile of all full-time non-hourly-paid employees and, instead, tie the increases to CPI-U—after lowering the salary threshold to $657 per week.

## Conclusion

In conclusion, the Department should have granted at least as much time as it did in 2004 for the regulated community to comment on the NPRM, particularly given the proposal's complexity and unusual new theories and mandates.

Above all, the restaurant industry would find a return to the long duties test to be the wrong approach. The Department says it is attempting to "modernize" and "simplify" the applicability of the EAP exemption.  A return to a long duties test would absolutely nullify any efforts to modify and simplify the rules. However, if the Department is inclined to mandate a new duties test, it should comply with all regulatory requirements and allow for notice and comment on any specific new duties test proposal.

Bonuses are also an integral part of the restaurant industry's total compensation package that promotes a manager's sense of "ownership" in the restaurant.  The final rule should encourage, not discourage, the use of nondiscretionary bonuses to meet the salary level.  Meanwhile, the proposed salary level is too high for our industry and certain regions of the country, so we urge you to use a salary level of $657 per week without going back to the discarded long duties test.

Finally, we do not think the Department has the legal authority to automatically increase the salary level, but between the two choices provided, we oppose the use of the 40th percentile of full-time non-hourly employees in favor of the CPI-U.

On behalf of the National Restaurant Association and its members, I thank you for this opportunity to submit our comments and look forward to working with you on this important provision of the FLSA.

Sincerely,

Angelo I. Amador, Esq.
Regulatory Counsel &
Senior Vice President of Labor & Workforce Policy

September 4, 2015

**VIA ELECTRONIC FILING: www.regulations.gov**

Dr. David Weil
Administrator
Wage and Hour Division
U.S. Department of Labor
200 Constitution Avenue N.W.
Washington, DC 20210

> **RE:**   **RIN 1235-AA11, Proposed Rule,** *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*

Dear Dr. Weil:

The International Franchise Association ("IFA") and the undersigned franchisee organizations submit these comments in response to the Notice of Proposed Rulemaking ("NPRM") the Department of Labor (the "Department" or "DOL") published in the *Federal Register* on July 6, 2015, to revise the regulations at 29 C.F.R. Part 541, defining and delimiting the exemptions for executive, administrative, professional, outside sales and computer employees in Section 13(a)(1) of the Fair Labor Standards Act ("FLSA" or the "Act"), 29 U.S.C. § 213(a)(1).

The IFA's members include franchise companies in over 300 different business format categories, individual franchisees, and companies that support the industry in marketing, law, technology, and business development. The IFA's mission is to protect, enhance, and promote franchising. The IFA works through its government relations and public policy, media relations, and educational programs to further the interests of over 780,000 franchise establishments that support nearly 8.9 million direct jobs, $890 billion of economic output for the U.S. economy, and 3 percent of the Gross Domestic Product. The IFA's members operate in all 50 states and in all facets of industry. Most franchisees are small businesses, without human resources departments or in-house legal counsel. They rely upon information and support provided by the IFA and other resources.

The American Pizza Community is a coalition of the nation's largest pizza companies, regional chains, local pizzerias, small franchise operators, supplier partners and other entities that make up the American pizza industry.

The Asian American Hotel Owners Association (AAHOA) is the voice of owners in the hospitality industry. Founded in 1989, AAHOA is now one of the fastest-growing organizations in the industry, with more than 14,000 members owning more than 20,000 hotels that total $128 billion in property value. AAHOA members employ 578,600 full- and part-time workers with a $9.4 billion payroll. AAHOA is dedicated to promoting and protecting the interests of its members by inspiring excellence through programs and initiatives in advocacy, industry leadership, professional development, and community involvement.

The Association of Kentucky Fried Chicken Franchisees, Inc. was formed in 1974 and was erected to protect the franchisees and give franchisees a voice in the future development of the KFC concept. "The Association of Kentucky Fried Chicken Franchisees, Inc. is united to protect, promote and advance the mutual interests of all member franchisees and the Kentucky Fried Chicken system".

The Coalition of Franchisee Associations is the largest franchisee-only association in the country, exclusively comprised of franchisee associations and franchisee members and whose purpose is to leverage the collective strengths of franchisee associations for the benefit of the franchisee community.

DD Independent Franchise Owners Inc. (DDIFO) is the largest independent organization dedicated to representing and protecting the business interests of Dunkin' Donuts franchise owners throughout the United States.  Founded in 1989, DDIFO, Inc. currently represents thousands of the Dunkin' Donuts shops across the country.

Franchise Business Services (FBS) is an organization that serves its community of Buffalo Wild Wings® franchisees by focusing on providing education and training, advocacy and member services and programs.

The Franchise Management Advisory Council (FRANMAC) supports and represents the Taco Bell franchise community.  FRANMAC is comprised of nearly 400 franchise owners who independently own and operate over 5,000 Taco Bell restaurants nationwide and employ over 130,000 employees.

International Pizza Hut Franchise Holders Association (IPHFHA) operates as a trade association. The Trade Association is comprised of the owners of Pizza Hut franchises. IPHFHA works to promote the interests of Pizza Hut franchise owners. IPHFHA is headquartered in the state of Kansas.

The Jimmy John's Franchisee Association's mission is to create unity among the franchisees and have a platform that will maximize our investment, create a credible voice and ensure the well-being of all members.

KF Franchisee Association, Inc. is a cohesive network of single and multiple-unit Krystal Restaurant franchisees advocating one voice for the success and value of the overall Krystal Brand. KFFA's foundation encourages the insightful exchange of information between our members and The Krystal Company. Efforts include issues relating to profitability, marketing, operations and supply chain, and keeping the best interests of members on the forefront of all we do to ensure continued success.

The National Franchisee Association represents independent BURGER KING® restaurant entrepreneurs in the United States and Canada who operate more than 7,000 franchised restaurants and employ almost 200,000 individuals across North America.

North American Association of Subway® Franchisees is the official advocate of Subway franchisees in North America, one that is representative, autonomous, and accountable to the Subway franchisee community. NAASF endeavors to maximize franchisee profitability, and to strengthen the franchisees' collective investment in the brand.

The Old Fashioned Franchise Association is a rapidly-growing, independent association of Wendy's Franchisees. The association's purpose is to give Wendy's Franchisees a voice in the Wendy's system while preserving the values Dave Thomas instilled in us and enhancing our members' investment and profitability. Old Fashioned Franchise Association is the steward of Dave's Legacy.

Papa Murphy's Franchise Association is the franchise association of Papa Murphy's Take 'n Bake Pizzas.

PIFA is an association, whose members are the franchisees of Popeyes Louisiana Kitchen. The purposes of the Corporation are to improve, enhance, protect and promote the economic and business interests of franchisees of the Popeyes Louisiana Kitchen Franchise System (the Popeyes Franchise System).

The members of the IFA and the undersigned organizations have grave concerns regarding the catastrophic impact the Department of Labor's proposed changes to the regulations at 29 C.F.R. Part 541 ("white collar" regulations) increasing the minimum required salary level, if finalized, will have upon business. The undersigned also object to any effort to make modifications to the current white collar duties tests as such changes are not only procedurally barred, but would dramatically disrupt the operations of our members and businesses across the country. Our concerns with the NPRM are set forth below.

## I.    SALARY LEVELS

### A.    The Proposed "White Collar" Minimum Salary Threshold Is Set at an Unprecedented Level

In the NPRM, the DOL proposes to increase both the minimum salary level for the "white collar" exemptions and for highly compensated employees. Additionally, the DOL proposes to adopt a mechanism for automatic annual increases to these salary levels. Using data from the Bureau of Labor Statistics (BLS), the DOL proposes to set the minimum salary threshold for the "white collar" exemption at the 40th percentile for all non-hourly paid employees.[1] Currently, according to the DOL, this methodology would result in a minimum salary level of $921 per week or $47,892 annually.[2] When a Final Rule is published in 2016, the DOL expects that the minimum salary level based at the 40th percentile will increase to $970 per week or $50,440 annually[3] – an astounding ***113% increase*** from the current requirement of $455 per week or $23,660 per year set just a decade ago.[4]

The proposed increase and the DOL's methodology are unprecedented and unsupported. Bucking 77 years of regulatory tradition, the DOL used information regarding employee salaries to benchmark the salary level at the extraordinary 40th percentile. While the Department in prior rulemakings has utilized salary information in setting the minimum salary level, it has never come close to the 40th percentile. For example, in 1958, the DOL used data on actual salary levels of employees which wage and hour investigators found to be exempt during investigations conducted over an eight-month period.[5] Based on this data, the DOL set the minimum salary required for the white collar exemption at a level that would exclude the lowest 10th percentile of employees in the lowest wage region, the lowest wage industries, the smallest businesses, and the smallest size city.[6] If the 1958 methodology were applied today, the resulting minimum salary level would be $657 per week or $34,167 annually. Similarly, in 2004, using BLS data, the DOL set the minimum salary level to exclude the lowest 20th percentile of employees in the lowest wage region (South) and industry (Retail).[7] The DOL doubled the percentile used,

---

[1] 80 Fed. Reg. 38516, 38517 (July 6, 2015) (hereinafter "2015 NPRM").

[2] *Id*.

[3] *Id*. at n.1.

[4] 2015 NPRM at 38517.

[5] Report and Recommendations on Proposed Revision of Regulations, Part 541, Under the Fair Labor Standards Act, by Harry S. Kantor, Presiding Officer, Wage and Hour and Public Contracts Divisions, U.S. Department of Labor (Mar. 3, 1958) (hereinafter, the "Kantor Report") at 6.

[6] *Id*. at 7-8.

[7] Final Rule, *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*, 69 Fed. Reg. 22122, 22167 & Table 2 (Apr. 23, 2004) (hereinafter "2004 Final Rule).

from 10% to 20%, to account for changes to the duties test made in the 2004 Final Rule. According to the NPRM, if the 2004 methodology were applied today, the resulting minimum salary level would be $577 per week or $30,004 annually.[8]

The current 40th percentile proposal results in a salary level that is 47% higher than applying the 1958 methodology and 68% higher than applying the 2004 methodology. Further, even applying the 40th percentile, the DOL has not explained its failure to use salary levels in the lowest wage regions, the lowest wage industries, the smallest businesses and the smallest cities – or to include earnings data of lawyers, doctors and sales employees who are not subject to the Part 541 salary requirements. Historically, with only a few exceptions, the DOL has increased the salary levels at a rate of between 2.8% and 5.5% per year.[9] The DOL's proposed increase to $50,440[10] represents an increase of 10.29% per year. Over the last decade, salaries did not increase by over 10% annually. The DOL has never before doubled the salary levels for the white collar exemptions in a single rulemaking, let alone more than doubled the salary levels as has been proposed here.

Staggeringly, the NPRM's proposal wholly discounts the significant impact increasing the salary level at the proposed rate will have upon the majority of the country, particularly in regions and in industries where the identified 40% threshold is entirely disproportionate to actual average salaries. Indeed, the proposed salary level for the exemption is well above the current California and New York minimum salary thresholds for their state exemption tests ($37,440[11] and $34,124[12] respectively), two jurisdictions with some of the highest cost of living areas in the country and – correspondingly – the highest per household earnings. Similar to the 2004 methodology, consideration needs to be paid to regional and industry averages.

The proposed salary level will have a disproportionate impact on many industries – and in particular small businesses. Millions of employees who work for smaller employers will clearly meet the white collar duties requirements but earn below $50,000 a year. IFA respectfully requests that the Department significantly reduce its proposed standard salary level for exemption. The DOL's proposal further undermines the purpose of the salary threshold. For over 65 years (since 1949) through to the current NPRM:

> The Department has long recognized that the salary paid to an employee is the "best single test" of exempt status (Stein Report at 19) and that setting a minimum salary threshold provides a "ready method of screening out the obviously

---

[8] 2015 NPRM at 38558-38559.

[9] *Id*. at 38524-38527.

[10] *Id*. at 38517, n. 1.

[11] *See* Cal. Lab. Code § 515(a).

[12] 12 NYCRR §142- 2.14.

nonexempt employees'' while furnishing a ''completely objective and precise measure which is not subject to differences of opinion or variations in judgment.'' Weiss Report at 8–9. The Department reaffirmed this position in the 2004 Final Rule, explaining that the ''salary level test is intended to help distinguish bona fide executive, administrative, and professional employees from those who were not intended by Congress to come within these exempt categories[,]'' and reiterating that any increase in the salary level must "have as its primary objective the drawing of a line separating exempt from nonexempt employees."[13]

Thus, to implement Congress' intent, the DOL should not set the minimum salary threshold at a level that excludes a significant number of employees who obviously meet the duties tests for exemption. The salary level must be appropriate across the "many thousands of different situations throughout the country."[14] As the Department stated in 1949: "To be sure, salaries vary, industry by industry, and in different parts of the country, and it undoubtedly occurs that an employee may have a high order of responsibility without a commensurate salary."[15] Thus, to avoid excluding millions of employees from the exemption who do perform exempt job duties, the Department has recognized that "the same salary cannot operate with equal effect as a test in high-wage and low-wage industries and regions, and in metropolitan and rural areas, in an economy as complex and diversified as that of the United States. Despite the variation in effect, however, it is clear that the objectives of the salary tests will be accomplished if the levels selected are set at points near the lower end of the current range of salaries"[16] of exempt employees "in the lowest-wage region, or in the smallest size establishment group, or in the smallest-sized city group, or in the lowest-wage industry."[17]

Indexing based upon the 40th percentile is unworkable and will render the duties test superfluous – particularly over time if annual indexing is utilized. The DOL should not set the level so high that it expands the number of employees eligible for overtime beyond what Congress envisioned when it created the exemptions. Yet, this is exactly what the DOL proposes in this rulemaking. This is particularly true for many of our members' businesses who operate in regions where the 40th percentile is far below the

---

[13] 2015 NPRM at 38524 (citing 69 Fed. Reg. 22165).

[14] *Report and Recommendations on Proposed Revisions of Regulations, Part 541*, at 9, Harry Weiss, Presiding Officer, Wage and Hour and Public Contracts Divisions, U.S. Department of Labor (June 30, 1949).

[15] *Id.* at 11.

[16] 1958 Kantor Report at 5.

[17] *Id.* at 6-7.

estimated $50,440 salary and who have employees who clearly meet the duties tests.

### B.    Salaries Should Not Be Indexed Annually

Our members are particularly concerned with the Department's proposal to annually adjust the salary level tied to either: (a) the applicable 40th percentile (for white collar exempt employees) or 90th percentile (for highly compensated employees); or (2) at the same rate as the CPI-U.[18]

The IFA strongly urges that annual increases should not be utilized. As a threshold matter, adjusting the minimum salary level annually creates an unsustainable floor and results in instability within businesses that will be required to revisit base level salaries on a year-by-year basis to ensure compliance. Employers operate on varying fiscal calendars. Preparing for annual increases presents challenges in terms of budgeting and implementation. Potential annual reclassification puts an undue burden upon employers who must comply with state notice requirements, reprogram compensation systems and conduct additional training. Additionally, employers must contend not only with the costs of increased wage rates, but also must incur the additional expense of routine classification analysis, decision-making, and implementation of changes in response to the new salary level when it is announced each year.

At no time has Congress granted the Department the authority to index its salary test. While the issue has been raised by stakeholders during several prior rulemakings, as far back as 1949 the DOL has rejected the imposition of automatic annual increases. Most recently, in 2004, the Department summarily rejected the concept of automatic increases to the minimal salary level.[19]   At the time, the DOL contended that such an action is contrary to congressional intent and disproportionately impacted lower-wage geographic regions and industries:

> [S]ome commenters ask the Department to provide for future automatic increases of the salary levels tied to some inflationary measure, the minimum wage or prevailing wages. Other commenters suggest that the Department provide some mechanism for regular review or updates at a fixed interval, such as every five years. Commenters who made these suggestions are concerned that the Department will let another 29 years pass before the salary levels are again increased. The Department intends in the future to update the salary levels on a more regular basis, as it did prior to 1975, and believes that a 29-year delay is unlikely to

---

[18] 2015 NPRM at 38524, 38537-38542.

[19] *See* Preamble to 2004 Final Rule, 69 Fed. Reg. at 22167 (Apr. 23, 2004) (hereinafter, "Preamble").

reoccur. The salary levels should be adjusted when wage survey data and other policy concerns support such a change. Further, the Department finds nothing in the legislative or regulatory history that would support indexing or automatic increases. Although an automatic indexing mechanism has been adopted under some other statutes, Congress has not adopted indexing for the Fair Labor Standards Act. In 1990, Congress modified the FLSA to exempt certain computer employees paid an hourly wage of at least 6½ times the minimum wage, but this standard lasted only until the next minimum wage increase six years later. In 1996, Congress froze the minimum hourly wage for the computer exemption at $27.63 (6½ times the 1990 minimum wage of $4.25 an hour). In addition, as noted above, the Department has repeatedly rejected requests to mechanically rely on inflationary measures when setting the salary levels in the past because of concerns regarding the impact on lower wage geographic regions and industries. This reasoning applies equally when considering automatic increases to the salary levels. The Department believes that adopting such approaches in this rulemaking is both contrary to congressional intent and inappropriate.[20]

Mandating annual increases not only runs afoul of Congressional intent but also presents an issue of parity, not currently addressed by the DOL's financial impact analysis. By continuously raising the salary floor, a cascading effect necessarily occurs. Businesses must face the prospect of either continual reclassification of employees otherwise performing exempt duties or an increase to overall labor costs as, arguably, those salaries above the minimum must be equally raised or risk compensation inequity. If an employer chooses to raise the salary levels of those currently earning the minimum salary level, they will likewise need to raise the salary level of those employees working in positions that are already paid more than the minimum proposed salary level. Failing to do so will result in a disparity between the wages of those in higher level positions, with more experience and responsibility. The Department, however, has failed to address salary compression issues or related costs in the NPRM.

Moreover, should the increases be tied to the 40th percentile, the minimum salary level will quickly skyrocket, entirely destabilizing Congressional intent that the salary should not be set at a level that excludes many employees who obviously meet the white collar duties tests. By increasing the minimum salary level from $23,660 to over $50,000,

---

[20] 2004 Final Rule at 22171-72.

employers will either have to reclassify employees (thus they drop out of the BLS survey) or will increase their salaries to meet the minimum requirements. This will have the overall result of causing a significant spike in the BLS survey results – far in excess of the average of 2.6% the DOL estimates the 40th percentile has increased year over year since 2003. Continuing to raise the base salary level will cause disproportionate increases in the salary levels if increases are tied to a percentile of earnings. Carrying DOL's proposal to its logical conclusion, $970 per week – if implemented – would represent the lowest percentile of earned salaries. All of those making less than the projected minimum salary of $50,440 drop out of the calculation. Thus, the 40th percentile would be disproportionately raised, rendering a large percentage of the workforce ineligible for the white collar exemptions.

Such action drastically impacts not only employers, but also creates unavoidable consequences for employees who are reclassified from exempt to non-exempt, as they will lose the flexibility they have previously enjoyed. If employees are reclassified to hourly workers, they will only be compensated for those hours they work. Exempt employees, however, must be paid a guaranteed salary every week in which they perform any work, regardless of the number of hours worked. Yes, non-exempt employees receive overtime pay for working more than 40 hours in a workweek, but they also lose pay if they work less than 40 hours. Exempt employees do not receive overtime for working more than 40 hours in a workweek, but do not lose pay if they work less. This means that instead of being able to structure their day around child care needs, children's school meetings, doctor's appointments, and other personal needs without losing pay, non-exempt employees have to think carefully before taking time off work.

The Department – in promoting its proposal – has characterized the benefits to employees as either more money (in the form of overtime pay) or more time (in the form of reduced hours). However, these "benefits" come at a cost. One such cost is paid by the formerly exempt employee who must now decide whether to forego pay, or substitute paid time off, to attend his child's school recital. Another is the reclassified employee who is no longer permitted to telecommute because of concerns that the employer will be unable to reliably or accurately track the hours that employee worked.

The complexities associated with indexing the current salary level clearly undermines President Obama's stated goal to "modernize and streamline" the current regulations.[21] Accordingly, the IFA urges the Department to reconsider its proposal to implement annual increases in the minimum salary level upon the regulated community.

### C.     Inclusion of Additional Compensation Should Be Permitted

In the NPRM, the Department has indicated that it is considering permitting the inclusion of non-discretionary bonuses and/or commissions – up to 10% of the total

---

[21] 2015 NPRM at 38521.

required salary – to establish minimal salary levels.[22]  According to the Department, such sums must be paid at least once a month in order to be considered in meeting the salary threshold.[23]  While IFA supports the inclusion of additional compensation in calculating an employee's salary, the Department's proposal is unnecessarily limited and represents a lack of understanding of how businesses operate.

Many bonuses or incentive payments earned by exempt employees are only paid quarterly or annually.  Excluding these payments from total compensation unduly burdens employers as they are often critical components of an employee's total wages.  As the stakeholders conveyed prior to the issuance of the NPRM, "nondiscretionary bonuses and incentive payments are an important component of employee compensation in many industries" and "such compensation might be curtailed if the standard salary level was increased and employers had to shift compensation from bonuses to salary to satisfy the new standard salary level."[24]  Doing so would have a "negative impact on the workplace and would undermine managers' sense of 'ownership' in their organizations."[25]

Arbitrarily capping the amount of additional compensation that can be considered as meeting the salary threshold runs afoul of other provisions of the FLSA.  For example, recognizing the realities of compensation structures, the regulations reflect that "commissions, nondiscretionary bonuses and other nondiscretionary compensation" – in addition to a guaranteed salary – may be counted towards meeting the current $100,000 threshold required to establish the highly compensated employee exemption.[26]

In addition to permitting unrestricted incentive pay and commissions to comprise the required salary, the Department should also include a "make up" provision, similar to that provided by the regulations governing the highly compensated employee exemption.[27]

---

[22] 2015 NPRM at 38535-38536.

[23] *Id.*

[24] *Id.* at 38535.

[25] *Id.*

[26] *See* 29 C.F.R. § 541.601(b)(1) ("'Total annual compensation' must include at least $455 per week paid on a salary or fee basis. Total annual compensation may also include commissions, nondiscretionary bonuses and other nondiscretionary compensation earned during a 52-week period").

[27] 29 C.F.R. § 541.601(b)(2) provides that:

> If an employee's total annual compensation does not total at least the minimum amount established in paragraph (a) of this section by the last pay period of the 52-week period, the employer may, during the last pay period or within one month after the end of the 52-week period, make one final payment sufficient to achieve the required level. For example, an employee may earn $80,000 in base salary, and the employer may anticipate based upon past sales that the employee also will earn $20,000 in commissions. However, due to poor sales in the final quarter of the year, the employee actually only earns $10,000 in commissions. In this situation, the employer may within one month after the end of the year

In other words, employers should be given an opportunity to provide employees who otherwise meet the white collar duties tests additional compensation – on an annual basis – to ensure that they are at the minimum salary level.

### D.   Any Increases to the Salary Level Should Be Phased In and Adequate Notice Should Be Provided

Given the far-reaching impact the proposed salary increases will have, as well as the necessary measures employers will have to undertake to ensure compliance, the IFA advocates a graduated implementation phase-in period of at least three years and an initial implementation period of at least one year to effectuate salary increases.  The one-year period is less than that provided by the final companionship exemption rule, which impacted just a small subset of the employers who will be affected by the proposed Part 541 revisions.  Once the Final Rule is published, employers must commence the time-consuming process of determining the impact upon their individual organizations, which for some will undoubtedly include the reclassification of a subset of their workforce. Businesses must conduct a cost/benefit analysis with regards to all exempt employees currently earning less than the proposed minimum salary.  The resulting increases in labor costs must be planned for and included in operating budgets, the timing and frequency of which varies from organization to organization.  Moreover, many of the IFA's members are small businesses, lacking internal resources to support such analysis. Therefore, the IFA's members urge the Department to realistically assess the time by which the business community will need to implement any changes effectuated by the Final Rule.

To the extent salary increases are retained in the Final Rule, the IFA requests that they be stayed for a period of three years to allow for a phase-in of the initial increases. Requiring employers to reevaluate and reclassify employees on an annual basis is unduly burdensome to employers and disruptive to employees.  Moreover, the NPRM suggests that employers will have only a 60-day notice period before each annual adjustment to the minimum salary level.[28]  This time frame is wholly inadequate and fails to account for the necessary burdens placed upon businesses each and every time a change to the salary level is made.  Evaluating positions and establishing labor budgets cannot be turned around on a dime.  The vast majority of employers make every effort to comply with the Department's requirements.  A mere 60-day notice period is just setting businesses up to fail.  At a minimum, it puts an immense drain on business resources which will necessarily have an unintended – but unavoidable – impact upon the labor market and the marketplace as a

make a payment of at least $10,000 to the employee. Any such final payment made after the end of the 52-week period may count only toward the prior year's total annual compensation and not toward the total annual compensation in the year it was paid.

[28] 2015 NPRM at 38610.

whole.  At least one year's notice is reasonably required to effectuate any changes.

## II.     THE DEPARTMENT SHOULD NOT MODIFY THE CURRENT DUTIES TEST

Also weighing heavily on our members is the possibility of changes to the current white collar duties test.  While the Department has not proposed any changes to the current white collar duties test, it has indicated that it "seeks to determine whether, in light of our salary level proposal, changes to the duties tests are also warranted"[29] and "invites comments on whether adjustments to the duties tests are necessary, particularly in light of the proposed change in the salary level test."[30]  Without identifying any particular proposals, the Department broadly seeks comment on the following topics:

- What, if any changes, should be made to the duties test?

- Should employees be required to spend a minimum amount of time performing work that is their primary duty in order to qualify for exemption?  If so, what should that minimum amount be?

- Should the DOL look to the State of California's law (requiring that 50% of an employee's time be spent exclusively on work that is the employee's primary duty) as a model?

- Is some other threshold that is less than 50% of an employee's time worked a better indicator of the realities of the workplace today?

- Does the single standard duties test for each exemption category appropriately distinguish between exempt and nonexempt employees?

- Should the Department reconsider our decisions to eliminate the long/short duties test structure?

- Is the concurrent duties regulation for executive employees (allowing the performance of both exempt and nonexempt duties concurrently) working appropriately or does it need to be modified to avoid sweeping nonexempt employees into the exemption? Alternatively, should there be a limitation on the amount of nonexempt work? To what extent are lower-level executive employees performing nonexempt work?[31]

---

[29] 2015 NPRM at 38543.

[30] *Id.*

[31] *Id.*

## A.    Changes to the Duties Test Are Subject to Challenge

While we accept that some increase to the salary level will ultimately result from this rulemaking, IFA objects to any changes to the duties tests because the Department has failed to provide the public with adequate notice of any changes that may be made.

The expansive list of questions posed by the Department on the current duties test–which range from the very broad "[w]hat, if any, changes should be made to the duties test?,"[32] to the very specific "[s]hould the Department look to the State of California's law (requiring that 50% of an employee's time be spent exclusively on work that is the employee's primary duty) as a model?"[33] – is insufficient to allow stakeholders a meaningful opportunity to comment on proposed regulatory changes.  Simply inviting comment on a range of unspecific, unfocused questions flies in the face of the Department's obligations set forth in the Administrative Procedures Act.[34]  The public should not be left to guess at an agency's intentions, particularly on a subject that has such widespread impact upon America's workforce – such as any change to the "white collar" exemption duties requirements.[35]  Put differently, stakeholders cannot be asked to "divine" the agency's "unspoken thoughts."[36]  However, that is precisely what the Department now asks us to do.

The Department's haphazard questions and lack of corresponding regulatory text have deprived the public of its rightful and meaningful role in this rulemaking.  Any changes to the well-entrenched duties test will result in the upheaval of the past decade of case law and agency opinions and would be done without providing any substantive notice to the regulated community.[37]  While the Department may attempt to bootstrap any changes to the duties test to cherry-picked comments, this does not shield the final rule from challenge.  As the D.C. Circuit has held, the "fact that some commenters actually submitted comments" addressing the final rule "is of little significance," because "[c]ommenting parties cannot be expected to monitor all other comments submitted to an agency."[38]

---

[32] 2015 NPRM at 38543

[33] *Id.*

[34] Pub. L. No. 70-4-4.

[35] *See CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1082 (D.C. Cir. 2009) (finding that commenters could not have anticipated which "particular aspects of [the agency's] proposal [were] open for consideration.").

[36] *Arizona Public Serv. Co. v. EPA,* 211 F.3d 1280 (D.C. Cir. 2000) (citation omitted).

[37] *See, e.g., Prometheus Radio Project v. FCC*, 652 F.3d 431, 450 (3d Cir. 2011) (holding that final rule was not a logical outgrowth of "open-ended" questions that failed to describe what the agency was "considering or why").

[38] *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991) (an agency cannot "bootstrap notice from a comment") (citations omitted).

Instead, the Department must "itself provide notice of a regulatory proposal," but has failed to do so.[39]

Should any changes to the duties test result from this notice of proposed rulemaking, the final rule would fail to comply with Executive Orders 12866 and 13563. Executive Orders 12866 and 13563 require agencies, in promulgating regulations, to assess all costs and benefits of available regulatory alternatives.[40] In particular, an agency must consider the costs of enforcement and compliance prior to implementing regulations.[41] Because the Department has declined to proffer any specific proposal, the enormity of the costs that the regulated community will inevitably face have not been explored. Stakeholders are left without the opportunity to address the potential costs and benefits the Department has identified in making any changes to the white collar duties test – as no such costs and benefits have been discussed. Thus, the requirements as set forth in Executive Orders 12866 and 13563 have not been met.[42]

The undefined topics upon which the Department seeks comments through the current NPRM utterly deprive stakeholders of this meaningful opportunity to express their views. It is, therefore, IFA's view that should the Department seek to change the duties requirements contained in 29 C.F.R. Part 541, it would first be required to notice the specific proposals being considered – and costs and benefits associated with the same – and then afford the public the appropriate opportunity to comment.

The importance of allowing the public to comment on specific changes to regulatory text can be found in the regulatory history of Part 541 itself. The Department balanced concerns raised by both the employee and employer communities in finalizing the current primary duties test contained in its 2004 Final Rule. In response to the Department's proposed regulation revising the test to determine an executive exempt employee, the AFL-CIO commented, among others, that the proposed phraseology "a primary duty" weakened the test by allowing for more than one primary duty and not requiring that the most important duty be management. The Department agreed, replacing the word "a" with "whose," reinforcing its intent that an employee can only have one primary duty. Any attempt to undo the Department's fully vetted test – particularly in the absence of proposed regulatory text upon which the public can comment – may result in

---

[39] *See id.*

[40] 58 Fed. Reg. 51735 (Oct. 4, 1993); 76 Fed. Reg. 3821-23 (Jan. 21, 2011).

[41] 58 Fed. Reg. 51735 (Oct. 4, 1993).

[42] Executive Order 13563 also requires that regulations be adopted through a process that sufficiently involves public participation. 76 Fed. Reg. 3821-22 (Jan. 21, 2011). Specifically, Executive Order 13563 requires that an agency afford the public a "*meaningful opportunity* to comment through the Internet on any proposed regulation, with a comment period that should generally be at least 60 days." 76 Fed. Reg. 3821-22 (Jan. 21, 2011) (emphasis supplied). In addition, Executive Order 13563 requires an agency, before issuing a notice of proposed rulemaking, to seek the views of those who are likely to be affected by such rulemaking. *Id.* at 3822.

similarly unintended consequences.   It further undermines the professed goal of simplifying the current regulations.   Thus, as the AFL-CIO acknowledged in 2004, words matter and even minor changes to seemingly innocuous words can have a significant, even if inadvertent impact on the scope of the exemption.[43]

By adopting *any* changes to the regulatory text of the Part 541 duties tests in a Final Rule, the Department will be ignoring President Obama's directive provide the public with a "*meaningful opportunity*" to comment on proposed regulations.

### B.   The Concurrent Duties Provision Should Remain Untouched

Deeply troubling IFA is the notion that the Department may seek to eliminate or modify the current "concurrent duties" provision that lets an exempt employee perform both exempt and non-exempt tasks without jeopardizing the executive exemption.[44]   The inclusion of the concurrent duties rule in 2004 acknowledged the realities that front-line managers—particularly those working for small businesses—perform an essential managerial function even while performing many of the same job duties as their subordinates.   These realities have not changed since 2004 and the Department should not change the rule.

Currently, the regulations provide:

> Concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met. Whether an employee meets the requirements of § 541.100 when the employee performs concurrent duties is determined on a case-by-case basis and based on the factors set forth in § 541.700 [related to primary duty test]. Generally, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work.[45]

Section 541.106 allows integral exempt employees such as store or restaurant managers to perform duties that are non-exempt in nature while simultaneously acting in a managerial capacity.   If this "concurrent duties" provision is eliminated, it could mean the wholesale loss of the executive exemption for both assistant managers and managers, particularly in smaller establishments.   During the stakeholder listening sessions held in

---

[43] Preamble at 22137 (citing Comments of AFL-CIO).

[44] 2015 NPRM at 38543.

[45] 29 C.F.R. § 541.106.

advance of this proposed rule, the Department heard from employer stakeholders who advocated for the need to maintain flexibility in the duties tests.[46] These stakeholders stated "that the ability of a store or restaurant manager or assistant manager to 'pitch in' and help line employees when needed was a key part of their organizations' management culture and necessary to enhancing the customer experience."[47] They further noted that "employees in these entry-level management positions are critically important to their organizations and that the experience they gain in these positions will lead to higher level management opportunities."[48] IFA joins these stakeholders in "universally urg[ing] the Department not to consider any changes to the current duties tests" because "while the duties tests are sometimes difficult to apply and may not be perfect, employers have an understanding of the meaning and application of the current duties tests and any changes might engender costly litigation as parties try to adapt to and interpret the new rules."[49]

This issue has already been reviewed and resolved during the 2004 rulemaking:

> The Department believes that the proposed and final regulations are consistent with current case law which makes clear that the performance of both exempt and nonexempt duties concurrently or simultaneously does not preclude an employee from qualifying for the executive exemption. Numerous courts have determined that an employee can have a primary duty of management while concurrently performing nonexempt duties. See, e.g., Jones v. Virginia Oil Co., 2003 WL 21699882, at *4 (4th Cir. 2003) (assistant manager who spent 75 to 80 percent of her time performing basic line-worker tasks held exempt because she "could simultaneously perform many of her management tasks"); Murray v. Stuckey's, Inc., 939 F.2d 614, 617–20 (8th Cir. 1991) (store managers who spend 65 to 90 percent of their time on "routine non-management jobs such as pumping gas, mowing the grass, waiting on customers and stocking shelves" were exempt executives); Donovan v. Burger King Corp., 672 F.2d 221, 226 (1st Cir. 1982) ("an employee can manage while performing other work," and "this other work does not negate the conclusion that his primary duty is management"); Horne v. Crown Central Petroleum, Inc., 775 F. Supp. 189, 190 (D.S.C. 1991) (convenience store

---

[46] 2015 NPRM at 38542.
[47] 2015 NPRM at 38542.
[48] Id.
[49] Id.

manager held exempt even though she performed management duties "simultaneously with assisting the store clerks in waiting on customers"). Moreover, courts have noted that exempt executives generally remain responsible for the success or failure of business operations under their management while performing the nonexempt work.  See Jones v. Virginia Oil Co., 2003 WL 21699882, at *4 ("Jones' managerial functions were critical to the success' of the business); Donovan v. Burger King Corp., 675 F.2d 516, 521 (2d Cir. 1982) (the employees' managerial responsibilities were "most important or critical to the success of the restaurant"); Horne v. Crown Central Petroleum, Inc., 775 F. Supp. at 191 (nonexempt tasks were "not nearly as crucial to the store's success as were the management functions").[50]

In 2004, the Department reviewed the case law cited above and stated that it believed these cases accurately reflected the appropriate test of exempt executive status and was a "practical approach that could be realistically applied in the modern workforce, particularly in restaurant and retail settings."[51]  Accordingly, no changes to the concurrent duties provision are necessary or warranted.

### C.    The Inclusion of Additional Duties Tests Is Unwarranted

IFA opposes any revision to the duties test – particularly one which introduces a quantitative requirement – whether made in reversion to a long/short duties test or otherwise.  Such a change would upend the regulated community, adding substantial unjustified (and unexplored) costs and burdens on employers, and serve to increase litigation.  In its NPRM, the Department now looks to potentially nullify the established primary duties requirements contained in 29 C.F.R. Part 541 by inquiring whether employees should be required to spend a specified minimum amount of time exclusively performing their primary duty in order to qualify as exempt, citing California's 50% primary duty requirement as an example.  The Department also suggests that it may return to the more detailed long duties test should, in its estimation, the minimum salary level not sufficiently succeed in demarcating between exempt executives and nonexempt employees.

The Department's reference to California's 50% primary duty rule[52] is particularly troubling because, like other jurisdictions that have adopted such quantitative tests,

---

[50] See Preamble at 22186.

[51] Id. at 22137.

[52] 2015 NPRM at 38543.

California has realized the unintended negative effects of its so-called "bright-line" rule. Rather than decreasing litigation and uncertainty over classifications, California's rule has had the opposite effect—substantial litigation as members of the California plaintiffs' bar have come to realize (and capitalize on) the extreme difficulty employers face in proving the amount of time employees spend on exempt versus non-exempt tasks. Indeed, such a rule places an enormous burden on employers to engage in extensive analysis and time testing, wading through the hour-by-hour—and in some cases minute-by-minute—tasks of their employees in order to defend their classification decisions. Regardless of any effort to regulate around such ambiguities, the central issue will always remain what is—and what is not—exempt work.

The Department has already acknowledged that these precise concerns render quantitative testing impracticable. In 2004, responding to commenters who requested the addition of a quantitative test, the Department reasoned that such analysis unnecessarily adds complexity and burdens to exemption testing by, for example, requiring employers to "time-test managers for the duties they perform, hour-by-hour in a typical workweek."[53] Requiring employers to "distinguish[] which specific activities were inherently a part of an employee's exempt work proved to be a subjective and difficult evaluative task that prompted contentious disputes."[54] Establishing quantitative requirements needlessly muddles a process the Department asserts through its NPRM should be streamlined. As the Department noted in 2004, "[i]t serves no productive interest if a complicated regulatory structure implementing a statutory directive means that few people can arrive at a correct conclusion, or that many people arrive at different conclusions, when trying to apply the standards to widely varying and diverse employment settings."[55]

The Preamble to the 2004 Final Rule identified further concerns with requiring a strict delineation of time spent on exempt and non-exempt duties:

> For example, employers are not generally required to maintain any records of daily or weekly hours worked by exempt employees (see 29 CFR 516.3), nor are they required to perform a moment-by-moment examination of an exempt employee's specific duties to establish that that an exemption is available. Yet reactivating the former strict percentage limitations on nonexempt work in the existing 'long' duties tests could impose significant new monitoring requirements (and, indirectly, new recordkeeping burdens) and require employers to conduct a detailed analysis of the

---

[53] Preamble at 22126.

[54] *Id.* at 22137.

[55] *Id.*

substance of each particular employee's daily and weekly tasks in order to determine if an exemption applied.[56]

Rather than solve any of the perceived problems with the primary duty test, a quantitative requirement only creates tremendous recordkeeping burdens on employers and adds to employers' uncertainty over classifications.  Such a quantitative requirement merely serves to incentivize plaintiffs' attorneys to systematically attack an employee's classification.  No benefit is to be derived from now injecting a quantitative requirement to the well-settled qualitative approach.

IFA reminds the Department that, as part of its 2004 Rulemaking, the Department evaluated—and rejected—prior proposals for a quantitative "bright-line" test such as that employed in California.  Indeed, the Department warned:

> Adopting a strict 50-percent rule for the first time would not be appropriate . . . because of the difficulties of tracking the amount of time spent on exempt tasks.  An inflexible 50-percent rule has the same flaws as an inflexible 20-percent rule.  Such a rule would require employers to perform a moment-by-moment examination of an exempt employee's specific daily and weekly tasks, thus imposing significant new monitoring requirements (and, indirectly, new recordkeeping burdens).[57]

The Department's reasoned analysis conducted in 2004 still holds true in 2015.  Rather than focusing on a quantitative test, the 2004 Final Rule instead chose to focus on four nonexclusive factors for determining the primary duty of the employee:

(1)    The relative importance of the exempt duties as compared with other types of duties;

(2)    The amount of time spent performing exempt work;

(3)    The employee's relative freedom from direct supervision; and

(4)    The relationship between the employee's salary and the wages paid to other employees for the same kind of nonexempt work.[58]

Under these factors, the amount of time spent may be considered, but is not indicative alone, of an exempt status.  Indeed, the 2004 Preamble to the Final Rule

---

[56] *Id*. at 22126-22127.

[57] *See* Preamble at 22186.

[58] 29 U.S.C. § 541.700.

emphasized that:

> The time spent performing exempt work has always been, and will continue to be, just one factor for determining primary duty. Spending more than 50 percent of the time performing exempt work has been, and will continue to be, indicative of exempt status. Spending less than 50 percent of the time performing exempt work has never been, and will not be, dispositive of nonexempt status.

> . . . [T]he search for an employee's primary duty is a search for the "character of the employee's job as a whole." Thus, both the current and final regulations "call for a holistic approach to determining an employee's primary duty," not "day-by-day scrutiny of the tasks of managerial or administrative employees." Counts v. South Carolina Electric & Gas Co., 317 F.3d 453, 456 (4th Cir. 2003) ("Nothing in the FLSA compels any particular time frame for determining an employee's primary duty").[59]

Similarly, a reversion to any iteration of the previously abandoned "long/short" test would entirely undermine President Barack Obama's direction that the Secretary "modernize and streamline the existing overtime regulations for executive, administrative, and professional employees." This goal is plainly not met should the Department incorporate any form of the old quantitative prong contained in the prior long duties test. Nor is the goal furthered by returning to two tests instead of one standard test.

Complicating the duties test by creating a tiered system requiring employers to test multiple requirements under different scenarios, represents neither a modernization nor a streamlining of the analysis. Indeed, when the Department proposed merging the long/short test into a single duties test in its 2003 NPRM, the Department concluded:

> The existing duties tests are so confusing, complex and outdated that often employment lawyers, and even Wage and Hour Division investigators, have difficulty determining whether employees qualify for the exemption.[60]

In eliminating the short/long duties test in favor of the current "primary duty" tests through the 2004 Final Rule, the Department advanced its goal to reform and simplify the regulations. Two tests would make it more difficult to determine the application of the

---

[59] *See* Preamble at 22186.
[60] Preamble at 22122.

duties test and it would create instability and uncertainty amongst the regulated community.

Indeed, as the Department recognizes in its NPRM, any increase in the salary level will have the result that "more employees performing bona fide white collar duties will become entitled to overtime because they are paid a salary below the salary threshold."[61] This is particularly true in states with a lower cost of living. As one recent study indicates, in 10 states indexing the salary threshold to the national 40th percentile would make 45%, not 40%, of full-time salaried workers eligible for overtime.[62] The study concludes that in eight states, 50% of salaried workers would be overtime eligible.[63] The resulting reduction in the number of employees who will qualify for an exemption to the FLSA's overtime requirements will impact the business community substantially. Such changes will only further be complicated by adding new requirements employers must contend with – just as having to address new varying exemption tests.

IFA urges the Department to continue its application of the holistic approach developed in 2004 and summarily reject any requirement that duties must be measured or that an antiquated two test system be reinstituted.

## III.    ENFORCEMENT

If finalized, these new regulations will create tremendous uncertainty among employers. The Wage and Hour Division (WHD) must serve the critical need of ensuring its approach to enforcement is reasonable and even-handed. Of particular concern to our members is any adverse inference which may be presumed by the WHD from members providing compliance assistance to franchisees. Franchisors should be encouraged to offer general guidance on the implications of the Final Rule to those carrying their brand. Compliance benefits all. Assistance efforts should not be cloaked in a veil of apprehension of adverse inference. In other words, the WHD should not use the mere act of providing of information or other tools to aid compliance as any evidence of "direct," "potential," or "indirect" control, or any type of joint employment relationship. Such assistance entirely fails to establish that any franchisee employee is economically dependent upon the franchisor and the Department should expressly state the same in issuing its Final Rule.

Following the issuance of the Final Rule, WHD must ensure that employers are provided with meaningful compliance assistance and must support those employers who evaluate their wage and hour practices and seek to correct any mistakes with DOL supervision of any back wage payments. Given the uncertainties that will result from any increase in the minimum salary level, the IFA strongly encourages the Department to

---

[61] 2015 NPRM at 38531.

[62] *See* https://www.politicopro.com/labor/whiteboard/2015/09/nrf-overtime-threshold-too-high-for-rural-areas-059773 (last visited September 1, 2015).

[63] *Id.*

implement a year-long safe harbor, during which employers can self-correct violations without fear of litigation.  This action will also help WHD preserve their resources for those cases where they can be used most effectively.

## IV.     CONCLUSION

In summary, the IFA and the undersigned franchisee organizations object to any changes in the white collar exemption other than a modest increase to the standard salary level for exemption.  We hope that the Department will seriously consider our views and the views of others in the business community.

Sincerely,

Michael K. Layman
Vice President, Regulatory Affairs
International Franchise Association

Ashley A. Coneff
Treasurer
American Pizza Community

Edwin J. Shanahan
Executive Director
Dunkin Donuts Independent Franchise
Owners, Inc.

Chip Rogers
President & CEO
Asian-American Hotel Owners'
Association

Peg Duenow
Government Affairs Chair
Association of Kentucky Fried Chicken
Franchisees

Misty Chally
Executive Director
Coalition of Franchisee Associations

Christy Williams
Executive Director
Franchise Business Services

Lysa Little
Executive Director
Franchise Management Advisory
Council

Brad Lowry
Chairman
Jimmy John's Franchisee Association

Mary Adolf
Executive Director
International Pizza Hut Franchise
Holders' Association

Wayne Hale
President
KF Franchisee Association, Inc.

Pete Walley
Government Relations Committee
Chairman
North American Association of
Subway® Franchisees

Andy Myers
Chief Executive Officer
National Franchisee Association

Curt Staab
Chairman
Old Fashioned Franchise Association

Scottie Cahill
President
Papa Murphy's Franchisee Association

Jennifer Palmer
Executive Director
Popeye's International Franchisee
Association

*Of Counsel:*
Michael Lotito
Co-Chair Workplace Policy Institute and
Shareholder
Littler Mendelson, P.C.



September 4, 2015

Mary Ziegler, Director
Division of Regulations, Legislation and Interpretation
Wage and Hour Division
U.S. Department of Labor
200 Constitution Avenue, N.W., Room S-3502
Washington, DC  20210

Re:     Comments on Proposed Rulemaking Regarding the Exemptions for Executive,
        Administrative, Professional, Outside Sales, and Computer Employees (80 Fed. Reg.
        38,515, July 6, 2015), RIN: 1235-AA11

Dear Ms. Ziegler:

The American Hotel & Lodging Association ("AH&LA") submits these comments in response
to the above referenced Notice of Proposed Rulemaking ("Proposed Rule") published in the
Federal Register on July 6, 2015.  Serving the hospitality industry for more than a century,
AH&LA is the sole national association representing all segments of the 1.8 million-employee
U.S. lodging industry, including hotel owners, REITs, chains, franchisees, management
companies, independent properties, state hotel associations, and industry suppliers.  The lodging
industry is vital to this nation's economic health, generating $155.5 billion in annual sales from
4.9 million guest rooms.

AH&LA supports the Department of Labor's ("DOL's") stated aim of simplifying the tests for
defining exempt employees.  AH&LA believes that simplification and greater clarity regarding
the contours of the tests benefit both employers and employees by allowing them to more easily
determine whether an employee qualifies as exempt.  AH&LA also specifically supports DOL's
suggestion that incentive income counts in determining whether an employee received the
minimum salary level required to establish exemption status under 29 C.F.R. Part 541.

Nonetheless, AH&LA does have concerns regarding some of the potential changes set forth in
the Proposed Rule.  While the lodging industry supports a fair and equitable working
environment for both employees and employers, it is concerned that DOL's proposal raises the
salary threshold for the white collar exemptions too high, too fast.  The majority of jobs offered
in the lodging industry already have starting wages above the minimum wage and employers
have the flexibility to set salary parameters that foster a strong team environment, which allow
for good benefits, higher pay, and workable schedules.  Meddling in this employer-employee
balance will increase business costs and create instability.

American Hotel & Lodging Association
September 4, 2015
Page 2

As an industry that fosters long-term career opportunities for its employees, with good jobs and benefits, the lodging industry believes that if the proposed changes become final, they will greatly interfere with day-to-day business practices and restrict employee and employer flexibility. As a result, this will create unintended consequences that will ultimately harm the very employees that the rule purports to help. For example, the proposed changes will hinder the industry's ability to continue to grow and create jobs and will stymie the career advancement for many employees.

The lodging industry employs people from all walks of life: the working parent who needs a flexible schedule to pick up a child from daycare, the student who is taking night classes to receive an advanced degree or the aspiring actor who works two jobs to make ends meet. The lodging industry attracts those searching to achieve the American Dream, a dream so often realized in our industry, whether it's the front desk agent or dishwasher who easily works their way up the ladder to earn a position in management, running a property or even a chain in just a matter of years. AH&LA has grave concerns that the jobs of these hardworking employees will be devalued and opportunities lost if the changes in the Proposed Rule become final.

For these reasons, and many others, this letter addresses aspects of the Proposed Rule for which AH&LA's members have specific comments or concerns.

## I.    DOL's Proposed Salary Level Is Too High And Will Cause Significant Harm To Employees, Employers And The Economy As A Whole

AH&LA strongly opposes DOL's proposal to more than double the minimum salary level needed to qualify as exempt. This drastic increase in the salary level is unnecessary and will have severe consequences for many employees and employers in the lodging industry. In light of the negative effect the proposed changes will have on the lodging industry and, in turn, the nation's economic health, AH&LA urges DOL to reconsider its proposal.

### A.    DOL's proposed methodology for determining the salary level is arbitrary and lacks transparency.

AH&LA submits that DOL's proposal to set the minimum salary level based on the 40th percentile of all full-time salaried employees is arbitrary, lacks transparency, and is lacking in foundation. As such, AH&LA urges DOL to utilize the methodology it used in 2004 in setting the standard salary level for exempt employees.

There is no historic precedent for DOL's 40th-percentile approach. It is a completely arbitrary percentage threshold that was chosen because DOL believes that a certain number of employees should be entitled to overtime. *See* 80 Fed. Reg. 38,529 ("The proposed increase in the standard salary level would increase the number of overtime-eligible white collar salaried employees who meet the duties test and earn less than the proposed salary level to approximately 25 percent.").

American Hotel & Lodging Association
September 4, 2015
Page 3

In addition to being arbitrary, past precedent reflects that the 40th percentile is too high a level. For example, the Kantor Report from 1958 noted that the objective of setting a salary level to reflect exemption status would be met if set at points near the lower end (10%) of the current range of salaries for those in the lowest wage regions, smallest-sized establishment group, smallest-sized city group, or lowest-wage industries using data that DOL had collected at that time. DOL utilized this approach to set the level in 1958. *See* 80 Fed. Reg. 38,525. And in 2004, DOL used Current Population Survey data that included most salaried workers and set the level at the bottom 20th percentile of the salaried population in the South and the retail industry. Both of these approaches recognized that there are significant geographic and industry-specific differences such that a "one size fits all" approach set too high could have significant consequences on lower-wage geographic areas and in lower-wage industries. That is why, historically, such approaches were used and why AH&LA believes that the 2004 methodology should continue to be used.

DOL's main explanation for proposing to use the 40th percentile, and declining to use the 2004 methodology, is that the 2004 methodology did not account for the elimination of the long test and DOL needs to correct for a "mismatch." *See* 80 Fed. Reg. 38529. But the 2004 DOL rule did provide for the elimination of the long test; the threshold from the 1958 Kantor percentage approach rose from 10% to 20% under the 2004 approach.

AH&LA also requests that DOL refrain from adopting the methodology of using the 40th percentile of all full-time salaried employees to determine further increases in the salary threshold. Using this methodology will lead to exponential increases in the salary needed to qualify as exempt. For example, if the Final Rule sets the minimum salary level needed to qualify as $50,440, AH&LA anticipates there will be relatively few salaried employees making less than this amount going forward. Consequently, the next time an increase occurs (automatic or otherwise), if DOL uses the 40th percentile of full-time salaried employees to set the new level, it will be significantly higher than $50,440, because the initial increase of $50,440 for the base salary level will now serve as the "floor" of those full-time salaried workers examined to determine the increase.

Given these deficiencies, AH&LA urges DOL to abandon its proposed methodology and to instead adopt the methodology it used in 2004 when setting the appropriate salary level for exemption status.

**B.    DOL's 2004 methodology better accounts for regional difference in the economy and would cause less economic harm to businesses.**

As discussed above, AH&LA believes that the proposed salary threshold of $50,440 in 2016 does not properly consider the impact that this salary level would have on businesses in low cost of living areas of the country. It is not necessary nor does it make business sense to require the same minimum salary level for an exempt hotel manager in New York City as for a manager in rural Georgia. Indeed, the United States Government recognizes that wages for similar jobs

American Hotel & Lodging Association
September 4, 2015
Page 4

differ across the country and accounts for these differences in setting the General Schedule pay rates based on location. In contrast with the methodology DOL used in 2004, DOL's proposed methodology does not sufficiently account for these differences, and as a result will unfairly raise labor costs in rural and other areas of the country where the cost of living is low.

Setting a minimum standard salary level at $50,440 will not only be devastating to lodging operations in areas with a low cost of living, but also to thousands of small businesses that operate hotels and motels. Many small businesses in this industry operate under very low margins and cannot afford additional labor costs. They lack the pricing power to raise their prices without a loss in sales and do not have the scale to spread costs over a large infrastructure. As a result, they will be forced to cut back staff and/or raise rates. Consequently, AH&LA implores DOL to consider the consequences that the proposed salary increase will have on small businesses and the communities they serve.[1] In light of the impact on small businesses and businesses operating in low-cost areas of the country, AH&LA believes that the methodology DOL used in 2004 should again be adopted by DOL because it better accounts for regional differences and would cause less economic harm to these businesses than the proposed 40th percentile methodology.

### C.    The proposed increase in the salary level will have negative consequences on employee compensation, status, benefits, and career opportunities.

DOL's proposal to set the minimum salary level at $50,440 will simply be too high a level for the lodging industry to bear without severe repercussions for employees as well. For example, one hotel management company that operates over 30 hotels in multiple states estimates that 90% of its managers have base salaries below the proposed threshold. Other hotels indicate that at least half of all managers will be affected as a result of the salary level increase if it becomes final. That means significant adjustments will have to be made to absorb costs.

A number of AH&LA members have noted that in order to offset the increased labor costs that will result if the proposed changes become final, they will look to increase automation and off-shoring of back-office positions. For example, employers in this industry will look to more self-service options such as at check-in and check-out. This will result in a number of employees losing their jobs.

It is possible that some businesses in the lodging industry will try to pass on some of the increased costs to consumers, but raising prices to cover the artificially increased labor costs will result in a loss of sales and, in turn, a loss of jobs. In particular, as discussed above, these

---

[1] Even DOL acknowledges that setting a minimum salary level too high may prevent employers from properly classifying even senior managers as exempt. *See* 80 Fed. Reg. 38,516 at 38,532 (using too high a percentile of nationwide salary "could have a negative impact on the ability of employers in low-wage regions and industries to claim the EAP exemptions for employees who have bona fide executive, administrative, or professional duties as their primary duty").

American Hotel & Lodging Association
September 4, 2015
Page 5

increased costs will be particularly hard for small businesses. Accordingly, employers in the lodging industry, both large and small, will respond to the increased costs imposed by new regulations mirroring the Proposed Rule by cutting the wages, benefits and hours of their employees.

Some AH&LA members will undoubtedly increase the compensation level of certain managers and other employees in order to keep them properly classified as exempt. To keep labor costs neutral, however, these members have informed AH&LA that they plan on reducing the incentive compensation these employees receive.[2]

The majority of the AH&LA members who have provided feedback on the Proposed Rule stated that they will respond to the increased salary level by reclassifying employees to non-exempt status. In the lodging industry it is simply not realistic for an exempt employee's salary to go from $35,000 to $50,440 in a year's time. Particularly hard hit will be managers and assistant managers. For example, multiple members stated that they will likely reclassify at least 50% of their managers as non-exempt. One employer stated that it will eliminate all entry-level management positions. Another employer said it will likely eliminate the positions of a third of its exempt managers and give increased responsibility to the remaining two-thirds. Thus, AH&LA is confident that changes to the minimum salary level will serve to eliminate many middle-management positions in the lodging industry. This will be a great loss to the country because these middle-management positions are key steps on the ladder of professional success, especially for many individuals who do not have college degrees.

For many of these employees, reclassification to non-exempt status will mean the loss of benefits, flexibility, status and career opportunities they previously enjoyed. Below is a list of some consequences that reclassified employees will likely face.

### 1.     Impact on professional status and flexible hours

AH&LA understands that many of its members' employees view being classified as exempt as an indicia of professional status and career achievement. Being reclassified will be seen by many as a step back in their careers and as a devaluation of their roles in the organization. Additionally, many of the managers and assistant managers who will be reclassified will be demoralized because they will now have to "punch a time clock."[3]

---

[2] Several AH&LA members stated that they resent being forced to cut incentive compensation because incentive compensation is a key motivator for employees to exceed expectations. Additionally, reducing the availability of incentive compensation curtails the ability of employers to reward their star employees. AH&LA notes that if a Final Rule does allow incentive compensation to count toward the increased salary level, these concerns may be mitigated.

[3] The proposed changes may also impact the morale of employees who are not reclassified. For example, it is not fair that a front desk manager's salary is increased overnight from $35,000 to $50,440 so that he can remain exempt, when it took the general manager at the same hotel years of hard work to get to a

American Hotel & Lodging Association
September 4, 2015
Page 6

One of the many perks of exempt status is the flexibility it gives employees in work arrangements.  Many exempt employees appreciate that exempt status provides them with the flexibility of coming in late, leaving work early, determining the timing and duration of meal and break periods, and otherwise setting their own schedules to better address work-life balance issues while still receiving a minimum level of pay each week.  For example, exempt employees have the ability to respond to unexpected events like needing to pick up a sick child at school without the fear of losing pay as a result of their time away from work.  In contrast, non-exempt employees paid by the actual hours worked may still have the flexibility in their schedule, but it often comes with an associated loss of income when they are away from work.  Additionally, in an effort to effectively monitor the time non-exempt employees are working and prevent off-the-clock work, many employers do not provide non-exempt employees the same opportunity to work remotely and during non-traditional hours that exempt employees receive.  As such, reclassification may have a negative impact on employee morale.

### 2.    Impact on total compensation and benefit packages

Reclassifications caused by the increase in minimum salary level needed to qualify as exempt will result in reclassified employees receiving reduced overall compensation packages.  Exempt employees like the peace of mind of knowing that they will receive a minimum level of compensation each week.  Being reclassified to non-exempt status means a loss of this guaranteed salary.  Employers in the lodging industry may reduce employee hours to avoid overtime or lower hourly rates so that operations are able to remain generally cost neutral.

Additionally, some employees converted to non-exempt status will be ineligible for certain benefits such as increased vacation, life insurance, long-term disability insurance, and certain supplemental incentive compensation initiatives offered only to exempt employees.  Indeed, some benefits such as short-term and long-term disability are not always offered to the non-exempt population and/or result in additional employee costs for such benefits.

### 3.    Impact on training opportunities, career growth, and positions in middle management

Employees converted to non-exempt status will miss out on after-hours manager training programs and other programs that would foster career progression and greater opportunities for future increases in income.  Reduced opportunity for career growth will, in turn, affect employee morale, engagement, and lead to higher turnover in employment.  AH&LA members believe that the proposed changes will impact upward mobility and that if the changes go into effect, it will become increasingly difficult for those who are not college educated to stay in the middle class.

---

position where he is paid $55,000.  Making such arbitrary and drastic changes to the required salary level sends the wrong message to employees because it devalues the skill and hard work that many exhibited to get to their current salary level.

American Hotel & Lodging Association
September 4, 2015
Page 7

Additionally, those managers who will be reclassified as non-exempt will need to be more mindful of the hours they are spending so as not to incur undue overtime. This will mean that they will lose the ability to use their own discretion in deciding whether to work extra hours to better learn the business and analyze how to make sales grow. For many, this loss of freedom and ability to spend their time as they see fit will result in delayed career progression.

In short, if the proposed changes become final, it will impede the career growth and future prosperity of thousands of hard-working employees in the lodging industry; and will result in negative consequences in both the short and long term for this nation's economy.

### 4.     Less tolerance and time to establish satisfactory performance

To the extent that an employer decides to raise salary levels to preserve exemption status for certain employees, a significant increase to the salary threshold may reduce the opportunity for employees, especially managers, in the lodging industry to establish sufficient performance. The higher salary levels required may translate into greater demands placed on employees and reduced tolerance for anything less than meeting expected performance standards and targets. For example, employees who take a longer amount of time to learn how to effectively manage the food and beverage department of a hotel may be terminated at a quicker pace because they are not covering the higher labor costs associated with the higher salary. Additionally, many managers who remain exempt will be expected to work even harder to manage their operations if other employee positions were reduced in order to keep payroll in line.

### II.     Income, Such As Performance Bonuses And Commissions, Should Be Considered In Determining Whether An Employee Satisfies The Increased Compensation Requirement

If an employee is receiving a certain amount of income, the form of the income received, e.g., base salary, bonus or commission, should not change the exemption determination. Thus, AH&LA supports allowing incentive compensation to be counted in determining whether the minimum salary threshold is met. Allowing companies to include supplemental incentive compensation in determining whether the minimum salary level is satisfied will have the added benefit of encouraging companies to provide bonuses and other opportunities that allow exempt employees to share and potentially profit from a company's overall performance.

AH&LA does not support placing a limit on the amount of supplemental compensation that may be considered in determining whether the base salary level is satisfied. AH&LA also is opposed to DOL's suggested approach that in order to qualify for inclusion in the base salary level calculation, supplemental compensation would have to be paid on a monthly or more frequent basis. Many supplemental compensation programs in the lodging industry are not structured to be paid with such frequency and it would place a significant administrative burden on employers to calculate and pay incentive compensation on a monthly or more frequent basis. AH&LA

American Hotel & Lodging Association
September 4, 2015
Page 8

encourages DOL to consider allowing employers to count all incentive compensation that is paid during a year in determining whether the minimum salary level is met.[4]

AH&LA notes that as a practical matter, it is not clear what would happen if an employee does not earn the anticipated supplemental compensation and thus does not satisfy the minimum salary requirement for exempt status.[5]  For the proposed approach regarding the inclusion of supplemental compensation to have any practical effect, DOL must allow catch-up or true-up payments to be made.  Allowing true-up payments helps ensure that exempt employees are receiving the guaranteed income they anticipated and is consistent with the historical salary basis approach of ensuring guaranteed income.  In short, if a Final Rule prohibits true-up payments, DOL will in effect be rendering the concept of counting supplemental compensation toward the salary level of limited value. Without the ability to make a true-up payment, employers will not be able to rely on supplemental payments to employees in order to satisfy the exemption test without fear of noncompliance if incentive compensation is not actually earned.

## III.    Increases To Salary Levels Should Take Place No More Frequently Than Every Five Years

AH&LA strongly opposes annual increases to salary levels.  It would be an unprecedented and significant administrative burden to annually adjust the minimum salary level for exempt employees.  In addition, annual increases will hamper an employer's ability to budget and provide merit increases, a significant tool and motivator in the workforce, if annual increases must be automatically provided to preserve exemption status.  Moreover, any consideration given to a salary increase should be based on an individualized evaluation of economic conditions rather than an automatic arbitrary formula.  DOL should have the capacity to decide when it is appropriate to raise the salary level; it should not need to build in some automatic review process that may not be appropriate for a given economic climate.  Such an approach is inconsistent with past precedent and is a waste of government resources.  Indeed, not even Congress has mandated that an automatic review process be built into the FLSA to determine if minimum wage should be increased.

Thus, AH&LA proposes that increases to the base salary level for the white collar exemptions occur not more often than every five years.  This approach is consistent with historical precedent. Indeed, DOL acknowledges in the Proposed Rule that the shortest period of time between salary level increases was five years.  *See* 80 Fed. Reg. 38,526.  Moreover, DOL previously rejected suggestions to annually increase salary levels.  *See* 80 Fed. Reg. 38,537, 538.  Although DOL

---

[4] Considering all incentive compensation paid within a year to count toward the salary level is consistent with the time frame utilized for the current highly compensated test.  *See* 29 C.F.R. § 541.601.

[5] DOL suggests in the Proposed Rule that true-up payments would not necessarily be appropriate in this context.  *See* 80 Fed. Reg. 38,535.  AH&LA disagrees with DOL's assessment and sees no basis for distinguishing the use of true-up payments outside of the context of highly compensated employees.  *See* 29 C.F.R. § 541.601(b)(2) (discussing the permissible use of true-up payments).

American Hotel & Lodging Association
September 4, 2015
Page 9

suggests that a break with historical precedent is necessary to ensure "that the salary level does not become obsolete over time," this goal can still be achieved through increasing the minimum salary level every five years.

To the extent that a Final Rule adopts a mechanism to routinely and automatically update the salary levels, DOL should provide notice of the amount of the increase to employers at least one year in advance. AH&LA members conduct financial planning months in advance and need a year's warning to adequately prepare for changes. For example, in addition to having to determine whether the change in the minimum salary level warrants any reclassifications, employers must determine new compensation rates for affected employees, and whether there needs to be any resultant changes to benefits eligibility, incentive compensation programs, training opportunities, and the company's overall organizational structure. A cost analysis will have to be conducted to make appropriate business decisions. Timekeeping and recordkeeping practices will have to be developed and implemented for the reclassified population (which may not necessarily lend itself to a "one size fits all" approach) and training provided to both employees and managers with regard to such procedures. Employers will also need time to ensure that any changes are properly communicated to the affected employees. As such, a 60-day notice period is an unreasonably short period of time for employers to conduct necessary planning, implement any resulting changes, and ensure timely compliance. AH&LA requests that DOL consider a notice period of one year.

AH&LA also urges DOL to consider the fact that if salary levels are annually increased, there can be no certainty in exemption status, which in turn creates instability as far as an employee's overall compensation and benefit package. Employers frequently tie supplemental compensation, vacation entitlements and benefit opportunities to exemption status. If every year there is a possibility of having exemption status change, employers are likely to reduce compensation and benefit opportunities available to numerous exempt employees in order to cover the administrative cost associated with the annual changes.

Finally, if DOL includes annual rate increases in a Final Rule, DOL should do so on a calendar year basis because like many employers, AH&LA members' business operations are tied to annual calendars. Further, adjusting the salary level mid-calendar year may create issues in terms of year-end bonuses and fringe benefits. For example, if an exempt employee needs to be converted to non-exempt midyear, he or she may lose eligibility for a bonus and fringe benefits that he or she was counting on when the year began.

## IV.     The Duties Test Should Not Be Revised

AH&LA encourages DOL not to revise the standard duties test. Indeed, AH&LA believes that any changes to the duties test will not simplify the workplace for employers and workers, but rather will do just the opposite. The below comments focus on why changing the duties test and, in particular, changing the duties test for the executive exemption, would not be a productive use of the DOL's resources and would harm employers, employees, and the economy as a whole if implemented.

American Hotel & Lodging Association
September 4, 2015
Page 10

> **A.      Changing the duties test will lead to increased litigation and years of transition and uncertainty.**

As a general matter, understanding any new or different requirements that apply to the workforce, and what changes need to be implemented from a business standpoint, will impose significant administrative and compliance costs on employers.  Specifically, changes to the duties test will require employers to dedicate significant amounts of time and expert resources to review and make determinations regarding their employees.  AH&LA members are extremely concerned about the cost that would be imposed on them if the duties test changed.

AH&LA believes that revisions to the duties test will also result in an unnecessary period of transition and legal uncertainty.  Revising the duties test would diminish the value of the legal precedent regarding the duties test that has developed over the past ten years.  Revising the duties test likely will trigger an increase in litigation as employers and employees try to decipher and apply the revised test.  For all these reasons, changing the current duties test will have a significant negative effect on employers, especially for small business owners, and thus AH&LA urges DOL not to revise the current duties test.

> **B.      A duties test requiring employees to spend a strict quantitative percentage of time on exempt work is not workable as a practical matter.**

In 2004, DOL specifically eliminated the requirement that an employee not spend more than a certain percentage of his or her time on non-exempt duties not directly and closely related to exempt work.  In eliminating this percentage limitation on non-exempt duties, DOL noted that percentage time tests create complexity and impose burdens on employers, such as significant monitoring requirements.  DOL also noted that "[w]hen employers, [and] employees, as well as Wage and Hour Division investigators applied the 'long' test exemption criteria in the past, distinguishing which specific activities were inherently a part of an employee's exempt work proved to be a subjective and difficult evaluative task that prompted contentious disputes."  69 Fed. Reg. 22,122 at 22,127.  Similar concerns of complexity and burdensomeness arise with regard to California's "more than 50 percent" duties test, which, like the "long test," requires an analysis of whether more than a certain percentage of time is spent on non-exempt duties.

AH&LA strongly opposes any effort to revise the duties test that would impose any type of time percentage threshold similar to the old "long test" or California's test.  Imposing such a quantitative element would create an administrative nightmare as tracking this kind of minutiae is both inefficient and extremely difficult in the lodging industry.  For example, AH&LA members with operations in California note that rather than providing clarity, requiring employees to break down how they spend their time is very subjective.  AH&LA members with operations in California also have informed AH&LA that they have struggled to find fair, reliable methods of tracking all of the various activities their managers and assistant managers perform.  Indeed, as a practical matter, it is virtually impossible to manage and track how much

American Hotel & Lodging Association
September 4, 2015
Page 11

time managers in this industry are spending on particular duties, especially considering that exempt and non-exempt work can be intertwined in the lodging industry.[6]

Hotels and other establishments in the lodging industry are fluid, service-oriented environments. Managers/supervisors are expected to exceed the service level that guests expect. The Head of Food and Beverage should not put her exemption status at risk because she elects to take time away from her primary duty and deliver a drink to a special guest. Likewise, if several guests unexpectedly all want to check out at the same time, the hotel's manager should not have restrictions placed on him that cause him to question whether he should pitch in with the storing of bags in an effort to keep guests happy and the hotel functioning smoothly. Requiring managers to note how much time was spent on such tasks detracts from the manager's primary duty of managing the hotel's employees and would cause customer service to suffer. Moreover, there is no practical and cost-effective way for an employer to quantify a manager's time and duties at such a micro level. Managers and assistant managers typically operate independently, without immediate direct supervision. An employer cannot "police" these employees to monitor and observe compliance with a strict 50% rule. Thus, despite having a clear expectation (based, for example, upon job descriptions and training) that a manager should spend a certain amount of his or her time performing exclusively management duties, a manager could simply claim that he or she spent the majority of his or her work hours during a week performing non-exempt duties. Imposing such a strict 50% quantitative standard effectively eliminates an employer's ability to have certainty with regard to its classification decisions and negatively impacts operations and business planning. To extrapolate that threat nationwide could be devastating to employers, particularly in the hotel and lodging industry.

### C.    The elimination of the concurrent duties test would impose undue costs and administrative burden on the hotel and lodging industry.

AH&LA also strongly opposes any change to the "concurrent duties" test under the current FLSA regulations. In the hotel and lodging industry, all employees, regardless of their job title, pitch in to serve customers even though they are still maintaining their management role while doing so. Customer service is dynamic in nature and the operations ability to remain flexible so customer needs are continuously and consistently met is what generates a positive guest experience. The management role is not predominately compromised of providing such service. For example, if a Director of Front Office Operations (who oversees the entire front desk team) needs to temporarily assume a front desk role so guests can be checked in efficiently due to the absence of an associate scheduled to work who needs to leave early to care for a sick child, the Director is not being evaluated on his or her performance related to the check in of these guests; nor is it the Director's most critical function. Rather, even when checking in guests, the Director remains responsible for the overall success of the hotel's front desk operations and finding a way to provide guests with a great experience. In short, when an exempt manager makes the decision

---

[6] For example, in the course of checking out a guest, a manager may need to resolve a dispute on behalf of the company and interpret company policy in the course of resolving the dispute.

American Hotel & Lodging Association
September 4, 2015
Page 12

that he or she needs to perform non-exempt duties to help the operation run smoothly, the manager's primary duty continues to be managing his or her staff and the operations of their department.

Eliminating the concurrent duties also would hinder exempt managers in their ability to lead by example. This loss will impact the quality of the guest experience, and employee morale will be damaged. For example, non-exempt employees often need and want the assistance of their exempt managers. Indeed, both employees and guests would negatively view a manager if the manager did not step in and help when needed.

AH&LA also would like DOL to especially consider the impact of any changes to the concurrent duties test on small businesses. In small hotels the day-to-day activities of a manager and department head are even more varied and complicated. Accordingly, changing the concurrent duties test will have a disproportionate impact on small establishments and small business owners who need to maximize efficiency to remain in business.

> **D.     Any change to the duties test would need to first be vetted through formal notice and provide an opportunity for the public to comment on specific proposed changes.**

To the extent that DOL determines that it is appropriate to modify the duties test under 29 C.F.R. Part 541, DOL should not implement any changes without first proposing specific language that would give the public notice and opportunity for comment, especially given the significant economic impact such changes will have on operations. Any changes to the duties test with without providing the public with the opportunity to formally vet proposed changes would violate the spirit and purpose of the notice and comment requirements under the Administrative Procedures Act. *See Small Refiner Lead Phase-Down Task Force v. U.S. Envtl. Prot. Agency*; 705 F.2d 506, 549 (D.C. Cir. 1983) (vacating EPA's change to regulatory definition under the Clean Air Act because EPA's "general notice that it might make unspecified changes in the definition of small refinery" was "too general to be adequate. Agency notice must describe the range of alternatives being considered with reasonable specificity. Otherwise, interested parties will not know what to comment on, and notice will not lead to better-informed agency decisionmaking."); *see also Prometheus Radio Project v. FCC*, 652 F.3d 431, 450 (3d Cir. 2011) (stating that "the opportunity for comment must be a meaningful opportunity. That means enough time with enough information to comment and for the agency to consider and respond to the comments." (citation and internal quotation marks omitted)).

Without first setting forth the specific changes to the duties test in a notice of proposed rulemaking, employers will not have "fair notice" of any change or the ability to comment on the economic costs associated with changes. *See Long Island Care At Home, LTD. v. Coke*, 551 U.S. 158, 174 (2007) ("The object, in short, is one of fair notice."); *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005) (stating that purposes of APA's notice and comment requirements are "(1) to ensure that agency

American Hotel & Lodging Association
September 4, 2015
Page 13

regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review"). Thus, AH&LA believes that any change to the duties test without fair notice and opportunity to comment would violate the APA.[7]

For all of the above reasons, AH&LA believes that the duties test should remain "as is." Changes to the duties test are not necessary and will likely harm employers, employees, and the overall economy.

## V.    Implementation Costs Will Be Significantly Higher Than DOL Estimates

DOL has asked for input with regard to the implementation costs of its proposal. The employers that AH&LA has spoken to about this issue overwhelmingly believe that DOL has significantly underestimated the time and costs that will be involved to implement changes associated with the new rule, especially for employers in the hospitality industry. The changes to the white collar exemptions will require employers in the hospitality industry to engage in a comprehensive review of the affected employees' compensation, benefits, and work schedules. Employers may need to revise job descriptions and wage statements, and communicate the changes to the affected employees and their respective supervisors. These employees and supervisors will need to undergo training on recording and monitoring their time. The final rule will also require payroll adjustments and verification that all of the changes are correctly made.[8] All of this will take longer than the one hour that DOL predicts.[9] For example, one AH&LA member reported that its compensation team already spent well over six hours per affected employee assessing the potential changes to their exempt status, crafting potential communications, meeting with business partners, and making adjustments to test its payroll system. This is not an aberration. Based on feedback from its members, AH&LA estimates that the adjustment costs will be approximately four to seven hours per affected employee.

AH&LA members also believe that DOL underestimates the amount of time that management will spend per week scheduling and monitoring the amount of time each affected employee works. Rather than the additional five minutes per week that DOL predicts, AH&LA members have informed AH&LA that they estimate the additional "managerial costs" will be closer to 25 minutes to an hour a week.

---

[7] Additional laws may potentially be implicated if DOL fails to give fair notice, including but not limited to the Paperwork Reduction Act and the Unfunded Mandate Reform Act of 1995.

[8] Certain AH&LA members with smaller operations report that the new rule may cause them to need to hire more payroll and compliance staff and possibly upgrade their timekeeping system to help them manage the changes.

[9] DOL's estimate does not appear to account for large employers who operate more than one timekeeping, accounting and payroll system.

American Hotel & Lodging Association
September 4, 2015
Page 14

With regard to DOL's estimate that the regulatory familiarization costs will be approximately one hour per establishment, AH&LA members also believe that this number is too low.  One member stated, "There is not a single government regulation that can be read and fully understood in one hour."  Other AH&LA members note that there are several individuals in each of their establishments (e.g. HR employees, finance, legal, executive management) that will need to read and be familiar with the new rules.  Accordingly, AH&LA believes that it will take at least four hours per establishment to become familiar with the Final Rule.

In short, any change to the FLSA regulations will involve a large amount of resources and time to ensure that it is implemented properly.  Before issuing the Final Rule, DOL should take into account that the implementation costs will be significantly higher than it estimated.[10]

## VI.    Effective Date Of Final Rule

AH&LA urges DOL to give employers sufficient time to review the Final Rule issued and to implement it in a manner that does not unduly disrupt operations and allows for timely compliance.  AH&LA respectfully submits that one calendar year is a reasonable period to do so.

## VII.    Conclusion

AH&LA thanks DOL for the opportunity to provide comments on the Proposed Rule but respectfully requests that DOL reevaluate its proposal given the significant consequences that a final rule mirroring the proposal would have on the lodging industry.  If you have any questions with regard to AH&LA's comments, please contact Corrie Fischel Conway or Russell Bruch at Morgan, Lewis and Bockius LLP.[11]

Sincerely,

Brian C. Crawford
Vice President, Government & Political Affairs

---

[10] *Cf. Michigan v. E.P.A.*, 135 S. Ct. 2699, 2707 (2015) (finding that the E.P.A. unreasonably deemed cost irrelevant when it decided to regulate power plants).

[11] Ms. Conway and Mr. Bruch are located at 1111 Pennsylvania Ave., NW, Washington, DC.  They can be reached at 202.739.3000.

September 4, 2015


Mary Ziegler
Director of the Division of Regulations, Legislation, and Interpretation
Wage and Hour Division
United States Department of Labor
200 Constitution Avenue, NW
Room S-3502
Washington, DC  20210

Re:     Proposed Revisions to Overtime Standards and Salary Level Thresholds
        RIN 1235-AA11

Dear Ms. Ziegler:

On behalf of the Independent Insurance Agents & Brokers of America ("IIABA"), I write to
express the concerns of our association and its members regarding the proposed revisions to
regulations governing the so-called "white collar" exemptions to the minimum wage and
overtime requirements that exist under the Fair Labor Standards Act.   The Department of Labor
("Department") proposes dramatic and sweeping changes that would have detrimental effects
for workers and for the general public, and we urge you to reconsider important elements of the
proposal.

IIABA is the nation's oldest and largest trade association of independent insurance agents and
brokers, and we represent a nationwide network of more than a quarter of a million agents,
brokers, and employees.  Our members are small, medium, and large businesses that offer all
lines of insurance, including property, casualty, life, and health insurance, employee benefit
plans, and retirement products.  Unlike other insurance distribution channels, independent
insurance agencies and firms present consumers with a choice of policy options and have
access to a range of different insurance companies.

**IIABA Comments and Concerns**

The Department's proposal would dramatically, substantially, and arbitrarily increase the
amount of salary required for a person to qualify for exempt status as an executive,
administrative, or professional employee from the current level of $455 per week to
approximately $970 per week beginning next year.  Any employee earning less than this
significantly higher threshold would no longer satisfy the requirements for the exemption and
would become non-exempt or overtime-eligible.  IIABA recognizes that the salary levels have
not been altered since 2004 and agrees that a modification of some form is warranted, but an
increase of more than 113% is disproportionate and unjustifiable.  In contrast, simply adjusting
the 2004 levels for inflation between 2004 and 2014 would raise the salary thresholds to $570
per week and result in a more reasonable increase of 25.3%.  Unfortunately, the immense
magnitude of the proposed adjustment will take away the exempt status of countless employees

and have effects in the insurance marketplace and on consumers that have been underestimated and overlooked by the Department.

The challenges and problems created by imposing such a significant salary threshold increase are compounded by the fact that this adjustment will be applied on a one-size-fits-all basis in all regions of the country. This proposal ignores the sizable wage, income, and cost of living disparity that exists between affluent areas and other regions, and it will have a particularly adverse and disproportionate impact on those who reside or work in rural areas and regions with a lower cost of living. There is no need or rationale for establishing such a high salary threshold on a national basis, especially since states possess the authority to institute their own minimum salary levels for white collar employee exemptions of this nature.

IIABA is also troubled that the proposal would lock in these drastic revisions and, for the first time in the 77-year existence of the Fair Labor Standards Act, institute automatic annual increases to the salary thresholds. The notice suggests this new framework would provide "more certainty and stability for employers," but the reality is that annual adjustments of this nature (which could be instituted with as little as 60 days prior notice) would simply add to the compliance burden and compel employers to constantly assess and modify employee salaries in an effort to achieve the least disruptive and costly results possible under the rules. IIABA acknowledges that revising the salary thresholds only once in a 40-year period (which is what has occurred between 1975 and 2015) was inadequate and too infrequent, but the decision to institute annual increases at this excessive level is an unprecedented overreaction that will make it more difficult for businesses (especially small ones) to maintain compliance with the law, manage their staffs, plan for the future, and provide customers with the same degree and quality of service.

The proposed rules will have unfortunate yet predictable repercussions if implemented as drafted. Owners of independent insurance agencies and other employers will inevitably act to ensure that the impact of any rule changes have a neutral effect on their businesses, and many will take steps to maintain total compensation at existing levels. Insurance agencies operate in highly cyclical and volatile business environments and with incredibly thin margins, and many will be unable to pay overtime to those who previously qualified as exempt employees or to offer compensation increases that move those individuals above the new thresholds. Instead, they will be forced to cut base salaries, reduce or eliminate other benefits, utilize automation and outside vendors to a more significant extent, or find other ways to offset any increases in costs and overall compensation that arise as a result of the revisions. Employers will also be forced to reclassify many of their valued employees and reduce the number of exempt workers, and those affected in this manner will suffer the indignity of a perceived demotion, lose the flexibility and autonomy that comes with exempt status, and have their opportunities for advancement and promotion hindered. In addition, these changes will damage and undermine the hard-earned reputations of businesses and force employers to implement measures that are not in the best interests of the public. The promulgation of these proposed revisions will force employers to limit the working hours of valuable and senior-level employees, curtail or eliminate previously-available services, and forbid staff from responding to customer needs at critical times, and, as a result, it will be the average American consumer who is harmed and injured most by these rule changes.

In addition to the negative economic effects for employers, employees, and the public, the proposed rule also imposes significant new compliance burdens on businesses of all sizes. The Department estimates that businesses will need only one hour on average to review and familiarize themselves with the changes and only five additional minutes per week to schedule

and monitor each affected worker expected to be reclassified as non-exempt.  These projections underestimate the new compliance challenges facing businesses, as employers will be forced to spend considerable resources regularly assessing employee salary levels and restricting and tracking the work performed by employees that were previously exempt.  The significant increase in the minimum salary levels ensures that knowledgeable employers will take steps to ameliorate or eliminate the economic impact of the changes, and this will require ongoing action and oversight by businesses.  The notice of proposed rulemaking estimates that there are one million potentially affected "white collar" workers in the insurance industry, so the revisions will have a profound and especially sizable impact in our particular sector.

IIABA worries especially about the effects on our smaller members.  According to a national study of the insurance agency universe completed by IIABA last year, 72.3% of independent insurance agencies have annual revenues of under $500,000 and these small enterprises dedicate a higher percentage of their resources on staff compensation compared to their larger counterparts.  Businesses of this size already face significant economic and regulatory challenges, and they are less likely to possess the financial flexibility that bigger entities will use to work around any changes in the overtime rules.

While many of the effects of the proposed rule for independent insurance professionals are similar to the results that would arise in other industries, there are some insurance-specific considerations.  First, the highly regulated nature of the insurance business creates unique challenges for insurance agencies and makes it impossible for them to pass along the new compliance costs that this proposal would impose.  Specifically, the prices of insurance products are closely regulated by state officials, and our members are unable to charge their customers more or otherwise recover any new payroll costs from insurance buyers.  The ability of agents and brokers to charge fees to their clients is also severely limited or prohibited by law in most jurisdictions.  Second, while the proposed rule will hinder the ability of a wide range of industries to be accessible and responsive to their customers, the implications of such a result are particularly disturbing in the insurance industry.  Insurance agencies are businesses that provide individuals, families, and commercial clients with coverage that addresses their needs and protects their assets and interests.  When an insurance loss occurs (e.g. an individual is in a car crash or his/her home burns down), insureds naturally seek the assistance of their insurance providers for guidance and assistance with the claims process.  They expect their insurance agency and trusted advisors to be available.  Claims often occur at inopportune times and do not conveniently take place during the eight-hour window of the conventional business day, and independent insurance agencies take pride in the fact that they are accessible and ready to help when a disaster or loss occurs.  The ability of agents and brokers to provide such support, service, and responsiveness, however, will be directly hindered by the implementation of the proposed rule.

In addition, it should be noted that the proposed regulations also directly apply to and affect IIABA and the dozens of affiliated state and local associations that advocate on behalf of independent insurance agents and brokers.  The American Society of Association Executives and others have thoughtfully commented on the proposal and addressed the implications that these revisions will have for non-profit associations, and we share and echo that perspective.

**Other Remarks**

In addition to the substantive comments offered above, IIABA would like to address two additional related issues:

- First, the notice observes that many employers are concerned that employees who would become newly entitled to overtime compensation will lose the flexibility to check email or access electronic work files from outside of the office or to otherwise work remotely because of concerns about overtime liability.  This is a source of interest and concern for many IIABA members, and we were disappointed to read that the Department views these issues as distinct and separate from the current rulemaking.  If the Department promulgates these proposed revisions to the salary levels as proposed, employers will scramble to come into compliance with the new standards and will need to quickly assess how to utilize, classify, compensate, and monitor their various employees.  The Department's perspective concerning offsite email access and related issues is relevant to the decision-making that employers will engage in following the adoption of any adjustments, and we urge you not to delay the issuance of any guidance that could be helpful to employers in this regard.

- Second, IIABA respectfully requests that the Department extend the comment period to enable our organization and its members to have a more meaningful opportunity to review, vet, and consider these revisions.  This proposal is complex and its impact is significant, and the short comment period has not provided us with the ability to adequately collect input from our members and assess all of the likely effects of this rule.  The need for additional time is heightened because the Department proposes automatic annual increases to the salary levels that essentially make the revisions perpetual in nature.  In the past, salary level adjustments and other changes to the overtime rules have been made periodically, but the Department now proposes revisions that would likely eliminate future rulemakings of this nature (and the accompanying opportunity for public input).  The Small Business Administration's Office of Advocacy recently noted that "it will be difficult for small businesses to provide enough data or meaningful comments within the 60 days provided in this rulemaking" and requested that the comment period be extended for 90 days.  We strongly agree that an extension of some form is critically important.

We thank you for the opportunity to comment on these important issues and for your consideration of our views.

Sincerely,

Charles E. Symington, Jr.
Senior Vice President, External & Government Affairs



September 2, 2015

Mary Ziegler, Director
Division of Regulations, Legislation and Interpretation
Wage and Hour Division
U.S. Department of Labor
200 Constitution Avenue, N.W., Room S-3502
Washington, D.C.  20210

Re:     Comments on Proposed Rulemaking Regarding the Exemptions for Executive,
Administrative, Professional, Outside Sales, and Computer Employees (80 Fed. Reg. 38,515, July 6,
2015), RIN: 1235-AA11

Dear Ms. Ziegler:

The National Retail Federation ("NRF") submits these comments in response to the above referenced
Notice of Proposed Rulemaking ("Proposed Rule") published in the Federal Register on July 6,
2015.[1]  NRF is the world's largest retail trade association, representing discount and department
stores, home goods and specialty stores, Main Street merchants, grocers, wholesalers, chain
restaurants and Internet retailers from the United States and more than 45 countries.  Retail is the
nation's largest private sector employer, supporting one in four U.S. jobs – 42 million working
Americans.  Contributing $2.6 trillion to annual GDP, retail is a daily barometer for the nation's
economy.  The retail industry provides opportunities for lifelong careers, strengthens communities,
and plays a critical role in driving innovation.

NRF strongly opposes the Department of Labor's ("DOL's") proposed changes to the regulations for
the Fair Labor Standards Act ("FLSA") and is sorely disappointed in DOL's approach toward
updating the exemption tests.  NRF believes that attempting to raise employee wages by fiat ignores
economic reality and will end up having major negative consequences for employees, employers and
the economy as a whole.  If the proposed changes become final, NRF's research predicts that the
changes would result in many managers, who have enjoyed the benefits and sense of pride associated
with exemption status, becoming hourly workers.  As hourly workers, many of the affected
employees would receive reduced compensation and benefits and be diverted from career
opportunities that are a path to middle-class success.  Not surprisingly, NRF's research reveals that
retail managers largely oppose DOL's proposed changes.  Raising the minimum salary level to over
$50,000 would create a deep divide between hourly workers and management.  The change would
result in the extinction of middle management in the retail industry, creating, at a minimum, morale
issues that would translate into negative consequences for the economy as a whole.

---

[1] The firm of Morgan, Lewis & Bockius LLP assisted in drafting these comments on behalf of NRF.

National Retail Federation
September 2, 2015
Page 2

NRF also opposes DOL's proposed changes because if they become final, they would have severe consequences for small businesses and the communities they serve. The proposed minimum salary level is artificially high and breaks with DOL's past precedent in setting the minimum salary level. Given the thin profit margins under which retailers operate, the increased salary level proposed has a particularly adverse impact on retailers. NRF is especially concerned that retailers in rural locations and other low-cost areas of the country could see a disproportionate impact on their payrolls as a result of the increase in the salary level. Additionally, DOL's proposal to increase the minimum salary each year is unprecedented and divorced from economic realities. An annual increase would place undue administrative costs on retailers and cause retail employees uncertainty with regard to their status and career paths.

For these reasons, and those set forth in greater detail below, NRF urges DOL not to implement its proposed changes to the FLSA white collar regulations. Instead, DOL's approach should remain consistent with past precedent and methodologies as it considers any increase in the salary level. We urge great caution in DOL's approach, lest it cause severe harm to retail employees and employers.

## I.     DOL's Proposed Salary Level Is Too High And Would Cause Significant Harm To Employees, Employers And The Economy As A Whole

NRF strongly opposes DOL's proposal to more than double the minimum salary level needed to qualify as exempt. This extreme increase in the salary level is unnecessary and would have severe consequences for many retail and restaurant employees and their careers and their customers. It is simply a bad idea that is highly inappropriate in today's volatile economy.

### A.     The proposed minimum salary does not properly account for regional differences in the economy.

One of the reasons NRF opposes DOL's proposal to set the minimum salary level at the 40th percentile of all full-time salaried employees is because this figure does not sufficiently account for regional differences in our nation's economy. For example, NRF members who have national operations note that their employees' salaries are based on local market surveys and indexes that account for differing economic conditions across the country. The United States Government also recognizes that wages for similar jobs differ across the country and accounts for these differences in setting the General Schedule pay rates based on location. The reality is that having uniform salary thresholds for positions across the country at such an artificially high level does not make good business sense nor is it necessary.

For retailers in many parts of the country, the proposed minimum salary level of $50,440 is divorced from what the market requires. For example, for a store manager earning $50,000 after taxes in Washington, D.C., the comparable after-tax income in Oklahoma City is $31,412. If DOL sets the minimum salary threshold at $50,440 in 2016, this salary level would impose a tremendous and undue economic burden on retailers in locations like Oklahoma City, rural West Virginia, and small town North Carolina.

National Retail Federation
September 2, 2015
Page 3

In 10 states – Alabama, Georgia, Hawaii, Idaho, Kentucky, Nevada, North Dakota, South Carolina, South Dakota and Texas – that dollar figure would bring at least 45% of full-time salaried workers under overtime rules. Another eight states – Arkansas, Florida, Louisiana, Mississippi, North Carolina, Oklahoma, Tennessee and West Virginia – would see at least 50% covered. Notably, the figure works out to the intended 40th percentile in only one state, Maine.[2]

DOL acknowledges that setting a minimum salary level too high may prevent employers from properly classifying even senior managers as exempt.  *See* 80 Fed. Reg. 38,516 at 38,532 (using too high a percentile of nationwide salaries "could have a negative impact on the ability of employers in low-wage regions and industries to claim the EAP exemptions for employees who have bona fide executive, administrative, or professional duties as their primary duty").  Therefore, NRF urges DOL to account for the regional variations in the economy by adopting a salary level lower than the proposed 40th percentile.  And as discussed in more detail below, NRF believes that in setting the minimum salary level, DOL should continue to use the methodology it used in its 2004 rulemaking, where it used "earnings data of full-time salaried employees (both exempt and nonexempt) in the South and in the retail sector," *id.* at 38,526, because "[t]he South was determined to be the lowest-wage region," which would avoid the regional pay variation and cost-of-living issues, *id.* at 38,557. This methodology has a proven track record and properly accounts for the economic realities in low-cost regions of the country and the retail industry, which is the nation's largest private sector employer.[3]

> **B.    DOL's proposed methodology for determining the salary level is arbitrary     and lacks transparency.**

In an economy that is not even completely recovered from a deep recession, NRF submits that DOL's selected methodology in choosing the 40th percentile of all full-time salaried employees to determine the appropriate salary level is completely arbitrary, lacks transparency, and is completely lacking in foundation.  As stated above, NRF believes DOL should adopt the methodology used in 2004 in setting the standard salary level for exempt employees in a final rule.

There is no historic precedent for DOL's 40th percentile approach and no explanation as to why the 40th percentile was specifically selected.  It is a completely arbitrary percentage threshold that was chosen because DOL believes that a certain percentage of employees should be entitled to overtime. *See id.* at 38,529 ("The proposed increase in the standard salary level would increase the number of overtime-eligible white collar salaried employees who meet the duties test and earn less than the proposed salary level to approximately 25 percent.").

---

[2] Oxford Economics, a global leader in macroeconomic forecasting, completed a study commissioned by NRF on the state by state impacts of the salary increase, which provides the referenced data. It serves as an addendum to the Oxford Economics report titled "Rethinking Overtime – How Increasing Overtime Exemption Thresholds Will Affect the Retail and Restaurant Industries."  A copy of the addendum is attached hereto as Exhibit A.

[3] This information on retail's employment impact comes from a study from PricewaterhouseCoopers LLP titled "The Economic Impact of the Retail Industry, 2014" which is attached hereto as Exhibit B.

National Retail Federation
September 2, 2015
Page 4

Past precedent reflects that the 40th percentile is too high a level. For example, the Kantor Report from 1958 noted that the objective of setting a salary level to reflect exemption status would be met if set at points near the lower end (10%) of the current range of salaries for those in the lowest-wage regions, smallest-sized establishment group, smallest-sized city group, or lowest-wage industries using data that DOL had collected at that time. DOL utilized this approach to set the level in 1958. *See id.* at 38,525. And in 2004, as noted above, DOL used Current Population Survey data that included most salaried workers and set the level at the bottom 20th percentile of the salaried population in the South and the retail industry. Both of these approaches recognized that there are significant geographic and industry-specific differences such that a "one size fits all" approach set too high could have significant consequences on lower-wage geographic areas and in lower-wage industries. That is why, historically, such approaches were used and why NRF believes the 2004 methodology should continue to be used.

DOL's main explanation for proposing to use the 40th percentile, and declining to use the 2004 methodology, is that the 2004 methodology did not account for the elimination of the long test and DOL needs to correct for a "mismatch." *See id.* at 38,529. But the 2004 DOL rule did provide for the elimination of the long test; the threshold from the 1958 Kantor percentage approach rose from 10% to 20% under the 2004 approach.

DOL's proposed methodology also lacks sufficient detail to allow third parties to reproduce the results. As such, the validity of DOL's calculations cannot be independently confirmed. Indeed, Oxford Economics[4] was unable to replicate the exact analysis given the lack of transparency in the economic analysis provided.[5] This lack of transparency undermines the credibility of using the 40th percentile to set the minimum salary level for exemption status.

As discussed in more detail below, NRF also notes that future automatic increases to the minimum salary level would be inflated if the Final Rule uses the 40th percentile methodology. For example, if the Final Rule sets the minimum salary level needed to qualify as exempt at $50,440 in 2016 and indexes the threshold, NRF anticipates there would be relatively few salaried employees making less than $50,440 going forward. Consequently, the next increase using the 40th percentile would be significantly higher than $50,440, and this problem would only be compounded year after year.

In short, NRF urges DOL to maintain its prior 2004 FLSA-consistent approach toward setting the appropriate salary level for exemption status with adjustments for inflation. This approach is well

---

[4] Oxford Economics completed a study commissioned by NRF titled "Rethinking Overtime – How Increasing Overtime Exemption Thresholds Will Affect the Retail and Restaurant Industries." A copy of this study is attached hereto as Exhibit C. Oxford Economics updated its "Rethinking Overtime" study on July 17, 2015. A copy of this update is attached hereto as Exhibit D.

[5] Oxford Economics noted that "BLS's current description of methodology does not allow their numbers to be reproduced, and the validity of the calculations checked. This reflects that some fairly arbitrary choices have been made in constructing the series, and sensitivity checks should be run on these arbitrary choices." Ex. D at 7. Although DOL acknowledges that it may be difficult for the public to replicate the calculations (*see* 80 Fed. Reg. 38,529 n.24), it is significant that even a leading economics organization was not able to do so. NRF urges DOL to provide greater transparency so that all may assess its analysis.

National Retail Federation
September 2, 2015
Page 5

understood and transparent to all.

C.     **The proposed increase in the salary level would have negative consequences on employee compensation, status, benefits, and career opportunities.**

DOL's proposal to set the minimum salary level at $50,440 would simply be too high a level for the low profit margin retail industry to bear without severe repercussions. Oxford Economics estimates that if the minimum salary threshold was set at $50,440 annually ($970 per week), and assuming that employers do not alter workers' hours, benefits or rates of pay to compensate for their increased costs, this change would cost retail and restaurant employers $8.4 billion per year. *See* Ex. D at 5.[6]

It is possible that some NRF members would try to pass on some of these costs to consumers, but many NRF members note that their firsthand experience has shown that raising prices or reducing promotional sales to cover the artificially increased labor costs would result in a loss of sales, and, in turn, a loss of full-time jobs.[7] In particular, NRF members who are small business owners and franchisees state that the proposed increases in labor costs would be especially hard to bear because they do not have the scale to spread costs over a large infrastructure. Accordingly, NRF members may be forced to respond to the increased costs imposed by the new regulations by cutting the wages, benefits and hours of their employees. Full-time retail jobs may well be lost.

If the Final Rule sets the minimum salary level needed to be exempt at $970 per week in 2016, it is estimated that approximately 2,189,600 exempt retail and restaurant workers would be affected, roughly 64.1% of the total exempt workers in the industry. *See id.* Of these workers, approximately 798,900 work more than 40 hours per week. *See id.* Although there would be some differences in how NRF members modify their operations if DOL's proposed changes become final, NRF members are aligned in their opposition to the proposed changes, in part, because they know the changes would have a negative impact on their employees.

Some NRF members report that they would likely increase the compensation level of certain managers to keep them exempt. To keep labor costs neutral, however, they plan on reducing the incentive compensation these employees receive.[8] NRF members may also be forced to reduce merit increases and incentive compensation for nonmanagement employees. NRF members who would raise salaries for some employees report that to cover these costs they may reduce store hours and/or the number of full-time employees on staff. This is likely to result in a decline in customer service

---

[6] Evidence NRF has received from individual members also highlights the significant costs that a weekly salary of $970 would impose on employers in the low-margin industry. For example, one national retailer estimates that it has nearly 1,900 exempt employees below this salary level and it would cost $18.9 million annually to raise their salary to the proposed threshold.

[7] *See* Ex. C at 21 (noting that retail companies lack the pricing power to absorb additional labor costs and would implement strategies to reduce the labor costs created by changes to the FLSA's minimum salary level for exempt employees).

[8] Oxford Economics estimates that approximately 104,400 retail workers who are close to making the minimum salary level of $970 per week would likely see an increase in their base salaries to meet this threshold, but would also suffer an equivalent decrease in their benefits and bonuses. *See* Ex. D at 5.

National Retail Federation
September 2, 2015
Page 6

and sales, which means that more hours would be cut.  Thus, the result of mandating an increase in exempt manager salaries creates a vicious cycle that would have negative consequences for many managers and the employees they oversee.[9]

Other NRF members report that they would respond to the increased salary level by reclassifying employees as nonexempt.[10]  As such, NRF is confident that the proposed changes to the minimum salary level would serve to eliminate many middle management positions in the retail sector.  This would be a great loss to the country because these middle management positions are key steps on the ladder of professional success, especially for many individuals who do not have college degrees.

NRF members' concerns about the consequences of changes to the white collar exemptions are shared by retail managers.  Retail managers surveyed by the research firm GfK overwhelmingly disapprove of changes that would strip them of their exempt, salaried status.[11]  For many of these employees, this reclassification to nonexempt status would mean the loss of benefits, flexibility, status and career opportunities they previously enjoyed.  Below is a specific list of some consequences that reclassified employees would likely face.

## 1.    Impact on professional status

Many employees view being classified as exempt as a badge of professional status.  Being reclassified would be seen by many as a step back in their careers and as a devaluation of their roles in the organizations.  Employees do not like having to track time and fill out timesheets.  More than 8 in 10 (85%) managers in the retail industry surveyed by GfK see negative consequences in moving from exempt to nonexempt status.[12]  Nearly half (45%) of these managers report that the change would leave them feeling as though they were performing a job instead of pursuing a career.  A third of the managers reported that they would be worried about their job stability and 31% reported that the change to nonexempt status would make them feel limited in their ability to advance their careers.[13]

---

[9] NRF members also report that raising the salary level needed to qualify as exempt would cause them to increase their efforts to automate low-level positions to keep labor costs neutral.  *See* Ex. C at 4 (noting that employers would likely turn to automation).

[10] Oxford Economics estimates that approximately 463,000 retail workers would be converted from exempt to nonexempt status if the weekly salary level were raised to $970.  To the extent employees in this group work overtime, Oxford Economics predicts that these employees would see their hourly rates of pay decreased by an equal amount, leaving their total annual earnings unchanged.  Oxford Economics also predicts that an additional approximately 231,500 retail employees would be converted from exempt to nonexempt if the minimum salary level were raised to $970, but that this group of employees would have their hours reduced to 38 hours per week. This change would cost these workers approximately $2.32 billion in earnings. *See* Ex. D at 5.

[11] A copy of GfK's study titled "The Proposed Overtime Regulations' Impact on Retail and Restaurant Managers" is attached hereto as Exhibit E.

[12] *See* Ex. E.

[13] *See id.*

National Retail Federation
September 2, 2015
Page 7

### 2.     Impact on total compensation and benefit packages

Reclassifications caused by the increase in the minimum salary level needed to qualify as exempt would also result in reclassified workers receiving reduced overall compensation packages.[14] Exempt employees like the peace of mind of knowing that they will receive a minimum level of compensation each week. Being reclassified as nonexempt means a loss of this guaranteed salary. Furthermore, 41% of the retail managers surveyed believed that they would be paid less if they were reclassified as nonexempt.[15] This concern is well founded. Several NRF members stated that they may reduce employee hours to avoid overtime or lower hourly rates so that operations are able to remain generally cost neutral. NRF members also indicated that reclassified managers may no longer be eligible for performance-based bonuses, which, in turn, would reduce the reclassified employees' earnings potential.

Additionally, some employees converted to nonexempt status would be ineligible for certain benefits such as increased vacation, life insurance, long-term disability insurance, and certain supplemental incentive compensation initiatives only offered to exempt employees. Indeed, some benefits such as short-term and long-term disability are not always offered to the nonexempt population and/or result in additional employee costs for such benefits.

### 3.     Impact on training opportunities, career growth, and positions in middle management

Employees may have their future compensation affected by reclassification given the reduced opportunities for career growth that may ensue if an employer determines that the appropriate response to an increased salary level is to reclassify the employee as nonexempt. Employees converted to nonexempt status would miss out on after-hours manager training programs and other programs that foster career progression and greater opportunities for future increases in income.[16]

Additionally, those managers who would be reclassified as nonexempt would need to be more mindful of the hours they are working so as not to incur unauthorized overtime. This would mean that they would lose the ability to use their own discretion in deciding whether to work extra hours to better learn the business and analyze how to make sales in their stores grow. For many, this loss of freedom and ability to spend their time as they see fit would result in delayed career progression. NRF also believes that the net result of the proposed increase in the salary level would be an

---

[14] Oxford Economics concluded that it is unlikely that many of these reclassified workers would see their take-home pay improve simply because they gained the potential to earn overtime pay. Instead, in the wake of changing regulations, employers would likely use a variety of strategies to reduce the additional labor costs in order to remain competitive. Ex. C at 4.

[15] *See* Ex. E.

[16] GfK's study found that managers in the retail industry understand that there are numerous benefits given to exempt managers that are not provided to non-management employees. These benefits include bonuses, training opportunities, flexibility, status and management experience for their resumes. *See id.*

National Retail Federation
September 2, 2015
Page 8

accelerated hollowing out of the ranks of middle-level management, making it much more difficult for hourly workers to rise in this profession.[17]  Consequently, if the proposed changes become final, it would impede the career growth and future prosperity of hundreds of thousands of hard-working employees in the retail industry.  Such a result would create a deep divide between "management" and hourly workers, undermining collaboration and teamwork and creating morale issues.  Ultimately, this would be negative for the economy as a whole.

### 4.     Less tolerance and time to establish satisfactory performance

To the extent that an employer decides to raise salary levels to preserve exemption status for certain employees, a significant increase to the salary threshold may reduce the opportunity for employees, especially managers, in the retail industry to establish sufficient performance.  The higher salary levels required may translate into greater demands placed on employees and reduced tolerance for anything less than meeting expected performance standards and targets.  For example, managers who are having performance issues may be terminated at a quicker pace because they are not covering the higher labor costs associated with the higher salary.

## II.     There Should Be No Automatic Increase To The Minimum Salary Levels

NRF strongly opposes annual increases to the salary level or any automatic mechanism that mandates such an increase.  It would be an unprecedented[18] and significant administrative burden to annually adjust the minimum salary level for exempt employees.  Moreover, any consideration given to a salary increase should be based on an individualized evaluation of economic conditions rather than an automatic arbitrary formula.  DOL has the capacity to decide when it is appropriate to raise the salary level, and it should not abdicate that responsibility by establishing an automatic annual increase that may not be appropriate for a given economic climate.  Such an approach is inconsistent with past precedent[19] and is a waste of government resources.  Indeed, not even Congress has mandated that an automatic review process be built into the FLSA to determine if the minimum wage should be increased.

As a practical matter, annual or other automatic increases would be administratively onerous for employers, already burdened, for example, by Affordable Care Act compliance.  In addition, annual increases in the threshold would hamper an employer's ability to budget and provide merit increases, a significant tool and motivator in the workforce, if annual increases automatically must be provided

---

[17] Oxford Economics concluded that changes to the FLSA white collar exemptions would cause firms to "centralize their management structures to rely on a smaller number of genuine managers and professionals."  Ex. C at 4.  Oxford Economics also predicts that "[w]orkplaces would become more hierarchical, and inequality would increase.  Lower-level employees, currently covered by overtime law, would find it harder to rise into the professional ranks as the number of mid-level salaried positions contracts."  *Id.* at 4-5; *see also id.* at 21 (discussing how the changes in exempt status could undermine current career progression in the retail industry).

[18] NRF is unaware of any minimum wage or salary level under state or federal law that is subject to continual annual increases.

[19] Between 1938 and 1975, DOL regularly updated the salary level every five to nine years.

National Retail Federation
September 2, 2015
Page 9

to preserve exemption status.  This budgetary uncertainty would force retailers to keep their store and supply chain labor costs in pencil until they know what adjustments would need to be made each year.

NRF also submits that if salary levels were annually increased, there would be no certainty in exemption status, which in turn would create instability as far as an employee's overall compensation and benefit package.  Employers frequently tie supplemental compensation, vacation time and benefit opportunities to exemption status.  If every year there were a possibility of having exemption status change, employers would likely reduce compensation and benefit opportunities available to numerous exempt employees in order to cover the administrative costs associated with the annual changes.

In addition to significant overall concerns with the idea of an annual, automatic increase in the salary threshold, NRF and its members have grave concerns with DOL's proposed mechanisms for the increase. Both mechanisms ignore industry and regional variations in wages and would only exacerbate the negative consequences associated with DOL's use of the 40th percentile threshold in 2016. Congress created exemptions because it recognized that nonexempt status was not appropriate for all jobs; however, adoption of the 40th percentile as the mechanism for annual updates to the threshold could rapidly result in a drastic reduction in the number of exempt employees.  Indeed, according to one estimate, by 2019 only 23% of the 2015 population of full-time salaried workers would still be classified as exempt if annual increases are tied to the 40th percentile.[20]

In sum, NRF believes it would be imprudent to use a simple formula to delegate the decision of whether it makes economic sense to revise the required minimum salary level.  DOL's past practice of updating the salary level when warranted has worked well and there is no need to break with this practice.  And the practical import of annual changes would be a waste of resources for the government and employers, and have potentially significant negative consequences for employers and employees.

**III.    The Duties Test Should Not Be Revised**

NRF strongly agrees with DOL's approach not to revise the standard duties test.  Indeed, NRF believes any changes to the duties test would not simplify the workplace for employers and workers, but rather would do just the opposite.  The below comments focus on why changing the duties test, and in particular changing the concurrent duties test for the executive exemption, would not be a productive use of DOL's resources and would harm employers, employees, and the economy as a whole if implemented.

---

[20] This estimate was provided by WorldatWork. WorldatWork is a nonprofit human resources association for professionals and organizations focused on compensation, benefits, work-life effectiveness and total rewards. The organization analyzed an estimate of 1,000,000 employees currently exempt under the salary test to determine the effect of the 40th percentile over time. Their model assumes that all employees below the threshold are paid hourly, employers do not adjust pay upward of affected employees to maintain exemption, and wages increase by 2% annually.

National Retail Federation
September 2, 2015
Page 10

   **A.    Changing the duties test would lead to increased litigation and years of
          transition and uncertainty.**

As a general matter, understanding any new or different requirements that apply to the workforce,
and what changes need to be implemented from a business standpoint, would cause legal uncertainty
and take an unnecessary toll on business operations.  Since the regulations were last updated 10 years
ago, NRF members have sought to ensure in good faith that their employees are classified properly
from an exemption standpoint, which is a very time-consuming process for both large and small
employers.  In the current economic climate, NRF believes that any changes to the current duties test
would have a significant negative effect, especially for small business retailers.

Changes to the duties test would also serve to fuel unnecessary and costly litigation. As DOL is likely
aware, following the effective date of the 2004 regulations, litigation significantly increased under
the FLSA.  In fact, based on one analysis we are aware of, FLSA claims filed more than doubled
from 2004 to 2013 (3,606 in 2004 to 7,905 in 2013).  Changing the duties test again is sure to cause
another spike in litigation activity.  Moreover, in the 10 years that have passed since the duties test
was last revised, a significant body of precedent has developed that provides both employees and
employers guidance on classification standards.  Revising the duties test again would diminish the
value of this precedent and create an unnecessary period of transition and legal uncertainty.

   **B.    A duties test requiring employees to spend a strict quantitative percentage of
          time on exempt work is not workable as a practical matter.**

In 2004, after considering the 75,280 comments received during a 90-day comment period, DOL
eliminated the old "short test" vs. "long test" distinction for determining exempt status and instead
set forth a "primary duty" test.  In doing away with the old "long test," DOL specifically eliminated
the requirement that an employee not spend more than a certain percentage[21] of his or her time on
nonexempt duties not directly and closely related to exempt work.  In eliminating this percentage
limitation on nonexempt duties, DOL noted that percentage time tests create complexity and impose
burdens on employers, such as significant monitoring requirements.  DOL also noted that "[w]hen
employers, [and] employees, as well as Wage and Hour Division investigators applied the 'long' test
exemption criteria in the past, distinguishing which specific activities were inherently a part of an
employee's exempt work proved to be a subjective and difficult evaluative task that prompted
contentious disputes."  69 Fed. Reg. 22,122 at 22,127.  Similar concerns of complexity and
burdensomeness arise with regard to California's "more than 50 percent" duties test, which, like the
"long test," requires an analysis of whether more than a certain percentage of time is spent on
nonexempt duties.

Although a strict "percentage" number applicable to the duties test might appear to provide more
certainty to employers and serve to "simplify" the rules, NRF strongly believes the reverse is true,

---

[21] The old "long test" language specifically stated that an executive was exempt, in part, if he or she did not
devote more than 20%, or, in the case of an employee of a retail or service establishment, who does not devote
as much as 40%, of his hours of work in the workweek to activities that are not directly and closely related to
the performance of the exempt duties.

National Retail Federation
September 2, 2015
Page 11

especially with regard to managers and assistant managers in the retail industry. Indeed, as a practical matter, it is virtually impossible to micromanage how much time each day a manager is spending on particular duties, especially in the fluid environments of retail stores and restaurants. A percentage test also presents a practical problem in operating retail establishments. For example, if a cashier unexpectedly needs to leave early, the manager may have to run the cash register in order to keep the store functioning. NRF members with operations in California also note that a quantitative duties test has caused them to conduct expensive time studies that divert limited funds from more productive uses.

The strict quantitative standard that exists in California has led to a deluge of litigation regarding the exempt classification of managers and assistant managers. This litigation has arisen primarily as a result of the difficulty of capturing how a particular manager spends his or her time throughout the day. For example, a manager may be training an employee, but then be interrupted for 10 to 15 minutes by a customer with questions, which then may lead to the manager's needing to perform a transaction at the register. Managers and assistant managers perform numerous duties (both exempt and nonexempt) throughout a workweek; thus, there is no practical and cost-effective way for an employer to quantify a manager's time and duties at such a micro level on a week-to-week basis.

Managers and assistant managers typically operate independently at a store or restaurant level, without immediate direct supervision. An employer cannot "police" these employees to monitor and observe compliance with a strict 50% rule. Thus, despite having a clear expectation (based, for example, upon job descriptions and training) that a manager should spend a certain amount of his or her time performing exclusively management duties, a manager could simply claim that he or she spent the majority of his or her work hours during a week performing nonexempt duties. Imposing such a strict 50% quantitative standard effectively eliminates an employer's ability to have certainty with regard to its classification decisions and negatively impacts operations and business planning.

NRF members who have operations in California note that the threat and/or existence of wage and hour litigation, including exemption issues, is constant. To extrapolate that threat nationwide could be devastating to employers. It likely would cause disruption with constant attention to and fear of increased litigation without any guidance from the decades of existing caselaw interpreting the existing primary duty and/or old short duties test approach. It also may drive businesses to stop serving certain areas and/or consolidate operations to more safely meet the test, resulting in the loss of jobs at these locations.

      **C.**    **The elimination of the concurrent duties test would be unworkable in the retail and restaurant setting.**

NRF also strongly opposes any change to the "concurrent duties" test under the current FLSA regulations. NRF rejects the misconception that managers are spending too much time performing nonexempt work such as stocking shelves and cleaning floors.[22] When managers perform such

---

[22] A survey of retail managers conducted by GfK found that approximately 66% of their time is spent managing employees, while only 9% is spent on stocking activities. *See* Ex. E. This indicates that the executive exemption is properly functioning and there is no need to change the current duties test.

National Retail Federation
September 2, 2015
Page 12

duties, they are still "in charge" of the operations and are responsible for the success or failure of the operations. As one retailer explained, regardless of what a manager's hands might be doing at a given moment, a manager is always observing and directing. Indeed, managers are not evaluated based on their ability to sweep floors and stock shelves, but rather how well they manage the operations of the stores.

Those opposing the concurrent duties test ignore the realities of "management" in the retail industry. Here "management" is about making sure operations run smoothly, supervising and directing employees, and ensuring customer satisfaction. It is the essence of "people management," which is what we understand the executive exemption to be about. Management in this industry also requires store managers to be on the floor – they cannot spend the majority of their time in a back office overseeing work from afar.[23]

Creating a standard that a manager may not engage in nonexempt work while performing management duties would create two equally unattractive results:

- First, it could result in having the manager classified as nonexempt to avoid risk uncertainty. For many NRF members, this would mean they would not have any exempt employees on the establishment premises. It is nonsensical that the top person in a store is not automatically exempt, and is completely counter to the purpose of the FLSA's executive exemption. Certainly, there could be remote managers, but in a retail environment, that approach simply is not viable.

- Alternatively, it could result in a scenario where exempt managers are continuously worried about whether they are engaging in nonexempt activities, which would erode their ability to perform. It is quite common and a best practice for a store manager to be out on the sales floor leading and directing associates. For example, a manager may pitch in for a short time to help clean up a merchandise section in order to train or teach the associates how to perform. The idea that managers can simply sit in a back office is anachronistic in today's retail workplace. A restriction on concurrent duties also would impede managers' ability to manage their stores and perform tasks that they deem important from their management perspective. Shouldn't a retail store manager have the discretion to ensure customer satisfaction by choosing to assist customers in a checkout stand while he or she is concurrently managing the front end of the store?

The result of any changes to the concurrent duties test would have a disproportionate impact on small establishments and small business owners that need to maximize efficiency to remain in business. Changes also would result in harming manager morale because their flexibility and ability to manage their stores would be curtailed.

---

[23] More than 8 in 10 managers surveyed believe that a change to the duties test that would preclude managers from performing non-exempt tasks would adversely affect customers. *See id.* The managers surveyed also believe that changes to the duties test would increase inefficiency and erode a manager's ability to lead by example. *See id.*

National Retail Federation
September 2, 2015
Page 13

**D.    Any change to the duties test would need to first be vetted through formal notice and provide an opportunity for the public to comment on specific proposed changes.**

To the extent that DOL determines that it is appropriate to modify the duties test under 29 C.F.R. Part 541, DOL should not implement any changes without first proposing specific language that would give the public notice and opportunity for comment, especially given the significant economic impact such changes would have on operations.  Any failure to formally vet proposed changes with the public would violate the spirit and purpose of the notice and comment requirements.  While DOL may believe that the duties test is a "logical outgrowth" of the Proposed Rule, "fair notice" of the changes are needed for compliance with the Administrative Procedures Act ("APA").  *See Long Island Care At Home, LTD. v. Coke*,  551 U.S. 158, 174 (2007) ("The object, in short, is one of fair notice."); *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005) (stating that purposes of APA's notice and comment requirements are "(1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review").  Without first setting forth the specific changes to the duties test in a notice of proposed rulemaking, employers would not have "fair notice" of any change or the ability to comment on the economic costs associated with changes.  *See Prometheus Radio Project v. FCC*, 652 F.3d 431, 450 (3d Cir. 2011) (stating that "the opportunity for comment must be a meaningful opportunity.  That means enough time with enough information to comment and for the agency to consider and respond to the comments" (citation omitted)).  Thus, NRF believes any change to the duties test without fair notice and opportunity to comment would violate the APA.[24]

For all of the above reasons, NRF believes that the duties test should remain "as is."  Changes to the duties test are not necessary and would likely harm employers, employees, and the overall economy.

**IV.    Implementation Costs Would Be Significantly Higher Than Estimated In The Proposed Rule**

DOL has asked for input as to what the implementation costs would be based on DOL's proposal.  NRF respectfully submits that DOL has woefully underestimated the time and associated cost that would be involved to implement changes associated with the requirements of a final rule.  For example, several NRF members believe that it would take significantly more than an hour to read and become familiar with the new rule.  Indeed, NRF has heard concerns from some of its small business members that they may have to hire additional help to assist them in understanding the new regulations and implementing the resulting changes.

DOL's estimate that it would take one hour per affected employee to make applicable adjustments is also too low.  *See* 80 Fed. Reg. at 38,566.  For example, NRF has received feedback from members who estimate it would take at least three to four hours per affected employee to make applicable

---

[24] Additional laws may potentially be implicated if DOL fails to give fair notice, including but not limited to the Paperwork Reduction Act and the Unfunded Mandate Reform Act of 1995.

National Retail Federation
September 2, 2015
Page 14

adjustments.  NRF members are particularly concerned that the new regulations would require them to spend significant sums updating their timekeeping systems and developing applicable training and policies for the reclassified workforce.  Additionally, NRF believes DOL's projection that "managerial costs" would be an additional five minutes per week is a significant underestimation. *See id.* at 38,567.  NRF has received feedback from members who estimate that managerial costs would range from one to three hours per week.  Oxford Economics found that if the minimum salary were set at $970 per week in 2016, it would cost retail employers an estimated $745 million to modify their existing business operations.[25]

In short, any change to the FLSA regulations would involve a significant amount of resources and time to ensure it is implemented properly.  DOL should note that the implementation costs would be significantly higher than it estimated and should be mindful of the significant implementation costs that would be imposed on businesses when it issues the final rule.[26]

## V.    Effective Date Of Final Rule

If the Department moves forward with finalizing the rule, NRF urges DOL to give employers sufficient time to review the Final Rule issued and to implement it in a manner that does not unduly disrupt operations and allows for timely compliance.  NRF respectfully submits that one calendar year is a reasonable time period to do so.

## VI.    Conclusion

NRF thanks DOL for the opportunity to provide comments on the Proposed Rule but respectfully requests that DOL wholesale reevaluate its proposal given the significant consequences a final rule mirroring the proposal would have on the retail industry.  If you have any questions with regard to NRF's comments, please contact David French, frenchd@nrf.com.

Sincerely,

Matthew R. Shay
President and CEO
National Retail Federation

---

[25] *See* Ex. D at 6; *see also* Ex. C at 28-29.  NRF understands that Oxford Economics' $745 million estimate covers what DOL describes as adjustment costs in year one and regulatory familiarization costs.

[26] *Cf. Michigan v. E.P.A.*, 135 S. Ct. 2699, 2707 (2015) (finding that the EPA unreasonably deemed cost irrelevant when it decided to regulate power plants).

September 4, 2015


**Via Electronic Filing:  www.regulations.gov**

Dr. David Weil
Administrator
Wage and Hour Division
U.S. Department of Labor
200 Constitution Avenue N.W.
Washington, DC 20210

> **Re:     RIN 1235-AA11, Proposed Rule, *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees,* 80 FR 38516 (July 6, 2015)**

Dear Dr. Weil:

The United States Chamber of Commerce (the "Chamber") submits these comments in response to the proposal of the Department of Labor (the "Department"), as published in the *Federal Register*, 80 FR 38516, on July 6, 2015, to revise the regulations at 29 C.F.R. Part 541, defining and delimiting the exemptions for executive, administrative, professional, outside sales and computer employees in section 13(a)(1) of the Fair Labor Standards Act ("FLSA" or the "Act"), 29 U.S.C. § 213(a)(1).

# **TABLE OF CONTENTS**

STATEMENT OF INTEREST ......................................................................... 1

INTRODUCTION ........................................................................................... 2

DISCUSSION ................................................................................................ 5

I.    THE DEPARTMENT'S PROPOSAL TO SET THE MINIMUM SALARY LEVEL USING THE 40TH PERCENTILE OF WAGES EARNED BY NON-HOURLY EMPLOYEES, WILL EXCLUDE MILLIONS OF EMPLOYEES WHO MEET THE DUTIES TESTS FOR EXEMPTION, CONTRARY TO THE INTENT OF CONGRESS ...................................................................................... 10

    A.    The Department Has Long Recognized That The Purpose Of The Salary Level Test Is To Exclude Only "Obviously" Non-Exempt Employees .......................................................... 10

    B.    Setting The Minimum Salary Level At The 40th Percentile Of Earnings of All "Non-Hourly" Paid Employees Ignores 77 Years Of Legislative History, Regulatory History And Changes To The American Economy ................................ 12

    C.    The Department's 20th Percentile Methodology In 2004 Was Sufficient To Account For Changes In The Duties Tests ........ 16

    D.    The Department's Proposed Minimum Salary Level is Too High Under Any Other Methodology .......................... 20

    E.    The Department's Proposed $50,440 Salary Level Is Particularly Inappropriate for the Non-Profit, Government and Healthcare Sectors Which Cannot Increase prices to Offset Costs ........................................................................ 26

    F.    The Department's Proposal To Credit Non-Discretionary Bonuses Towards The Salary Requirement Is Nothing More Than A Ruse .................................................................. 27

    G.    Without a Pro-Rata Provision, the Department's New Salary Level Will Interfere with Part time Professional Positions ............. 28

    H.    If The Department Moves Forward With a 113 percent Increase to the Salary Level, the Department Should Provide a One-Year Effective Date and Phase in the Salary Increase Over Five Years ................................................................... 29

II.    THE DEPARTMENT SHOULD ABANDON ITS PROPOSAL TO INCREASE THE SALARY LEVEL FOR THE HIGHLY COMPENSATED TEST ....................................................................... 30

III.   THE DEPARTMENT'S PROPOSAL FOR AUTOMATIC ANNUAL SALARY LEVEL INCREASES IS CONTRARY TO CONGRESSIONAL INTENT, VIOLATES THE ADMINISTRATIVE PROCEDURE ACT, IGNORES 77 YEARS OF REGULATORY HISTORY, WILL HAVE A RATCHETING EFFECT, AND WOULD IMPOSE SIGNIFICANT ADDITONAL BURDENS ON EMPLOYERS ....................................................... 30

IV.    THE DEPARTMENT SHOULD NOT MAKE ANY CHANGES TO THE DUTIES TESTS .................................................................. 36

       A.    The Department is Precluded by the Administrative Procedure Act from Making Any Changes to the Duties Tests ......................... 36

       B.    Definition of Primary Duty .................................................. 39

       C.    Concurrent Duties Provision Should be Maintained ........................... 42

       D.    Long/Short Duties Test Structure ....................................... 44

       E.    New Job Classification Examples ....................................... 46

V.     COMPLIANCE ASSISTANCE AND ENFORCEMENT ............................. 47

VI.    THE DEPARTMENT'S FUNDAMENTLLY FLAWED ECONOMIC ANALYSIS GROSSLY UNDERESTIMATES THE COSTS OF THIS RULEMAKING ................................................................... 48

       A.    The Department's Reliance On The Current Population Survey As The Sole Source Of Salary Data Is Inappropriate ........................ 49

       B.    Because of the weaknesses in the CPS data, the Department should consider other data alternatives before setting the salary level or, in the alternative, should correct for the weakness by selecting a much lower percentile ............................... 55

       C.    The Non-hourly Workers' Data Used Was Specifically Inappropriate ........................................................................ 56

       D.    Inadequate Assessment of Compliance Costs, Transfers and Benefits .......................................................................... 58

CONCLUSION ...................................................................................... 61

119 of 145

## STATEMENT OF INTEREST

The United States Chamber of Commerce is the world's largest business federation, representing more than three million businesses and organizations of every size, sector, and region, with substantial membership in all 50 states.  The Chamber's mission is to advance human progress through an economic, political, and social system based on individual freedom, incentive, initiative, opportunity, and responsibility.  An important function of the Chamber is to represent the interests of its members in federal employment matters before the courts, Congress, the Executive Branch, and independent federal agencies.  Positions on national issues are developed by a cross-section of Chamber members serving on committees, subcommittees, and task forces.  More than 1,900 business people participate in this process.  The Chamber also represents many state and local chambers of commerce and other associations who, in turn, represent many additional businesses.

The Department of Labor's proposed changes to the regulations at 29 C.F.R. Part 541 (the "Part 541" or "white collar" regulations), if finalized, will have significant impact on our members.  We write to express our concerns with the Department's proposal and urge its withdrawal.

# **INTRODUCTION**

When Congress passed the FLSA in 1938, establishing the minimum wage and overtime requirements, they excluded executive, administrative, professional and outside sales employees from those protections.  Congress believed then that in exchange for not being eligible for overtime, such employees earned salaries well above the minimum wage, were provided above-average benefits and had better opportunities for advancement, setting them apart from the nonexempt workers entitled to overtime pay.  This is still true today.

Exempt white collar employees also enjoy more generous paid leave benefits.  They earn bonuses, commissions, profit-sharing, stock options and other incentive pay at greater rates than non-exempt employees.  Moving from a non-exempt to an exempt position is the first rung on the promotional ladder.

Perhaps most importantly, exempt employees enjoy the stability and certainty of a guaranteed salary.  Exempt white collar employees must be paid on a salary basis – that is, they must receive a "predetermined" salary that "is not subject to reduction because of variations in the quality or quantity of the work performed."[1]  Thus, while exempt employees do not receive overtime for working over 40 hours in a week, they also are not paid less if they work less than 40 hours in a week.  If an exempt employee works as little as one hour in the week, and then takes the rest of the week off because of a family emergency, that employee will still be paid her entire weekly salary.  A non-exempt employee need be paid only for the one hour he actually worked.  A non-exempt employee who takes an afternoon off to attend a parent-teacher conference will not be paid for that time, but an exempt employee will be paid her full guaranteed salary.[2]

This difference provides a level of workplace flexibility that distinguishes exempt from non-exempt employees.  Secretary Perez has often discussed the importance of such flexibility in his own professional life:

> Involvement in my kids' sports teams is something I have made time for over the years.  I've also been able to coach all three of them in baseball and basketball, something that has strengthened our bonds and given me indescribable joy.  I wouldn't trade it for anything.  I lost my own father when I was 12, and I am the same age today that he was when he died suddenly of a heart attack.  So when it comes to family time, I have a strong sense of the fierce urgency of now.

---

[1] 29 C.F.R. § 541.602(a).

[2] Subject to employer paid leave policies.

But I'm lucky.  I've had jobs that allow me the flexibility to achieve work-
life balance, to be there when one of the kids sinks a jump shot or for the
parent-teacher meetings.[3]

The Department's proposal to increase the minimum salary level for exemption to
the 40th percentile of all "non-hourly" workers – $50,440, an increase of 113 percent  –
will eliminate the workplace flexibility that Secretary Perez so values for millions of
employees who currently perform exempt executive, administrative, professional,
computer, and outside sales job duties.  These millions will be reclassified to non-exempt
and be required to start punching a time clock.  They will be paid only for hours they
actually work, but that is no guarantee of overtime pay – as many employers will limit
their work hours to fewer than 40 in a week.  Being eligible for overtime is not the same
as earning overtime, even if the employee may currently be working more than 40 hours
a week as an exempt employee.

Although the Department views being reclassified as non-exempt as an
advantage, in fact, Chamber members with vast experience managing private sector
businesses know that limiting an employee's work hours also limits opportunities for
advancement.  Exempt employees know this too, and will view the reclassification to
non-exempt necessitated by the Department's proposal as a demotion.  Employee morale
will suffer as their work hours are closely monitored, they fall out of the more generous
employee benefit plans, are no longer eligible for incentive pay, and must carefully
consider whether they can afford to leave work to attend a child's baseball game.

In addition, because of the Department's proposal to automatically increase the
salary level every year, more exempt employees will be reclassified every year and lose
flexibility, benefits and opportunities for advancement every year.

Among the employers who will be most impacted by the change in the salary
threshold will be those in the nonprofit and medical provider sectors.  These employers
are unable to increase their revenues to cover the increased costs of complying with the
higher salary threshold, either because they are charitable organizations that survive on
contributions, or their revenue is dictated by insurance rates that they have no opportunity
to influence.

President Obama directed the Department to "modernize" the white collar
regulations,[4] but the Department's proposal will return our workplaces back to the 1950s

---

[3] *See, e.g.,* Secretary of Labor Thomas E. Perez, *The Most Important Family Value*, Huffington Post (May
27, 2014), *available at* http://www.huffingtonpost.com/thomas-e-perez/the-most-important-
family_b_5397442.html.

[4] Shortly thereafter, Secretary Perez conducted "listening sessions" with representatives of the employer
community, including the U.S. Chamber. Unfortunately, there is no evidence that these sessions had any
impact on the Department's proposal.

when all but the most highly paid employees punched a time clock and managers were prevented by union contracts from pitching in and lending a hand to help supervised employees complete the job.  Forcing employees back into a time-clock punching, shift work model will not be welcome when 74 percent of workers value "being able to work flexibly and still be on track for promotion," second only after competitive pay and benefits.[5]

In addition to likely triggering large-scale reclassifications to employee detriment, this proposal has inherent flaws.  Procedurally, the Department creates an impression that changes to the duties test will be made based merely on questions posed in the preamble, without proposed regulatory text or any of the accompanying analysis, supporting data, or economic impact studies.  Doing so would mean employers and other regulated parties will never have had a chance to review and comment on the specific changes, which would be contrary to the intent and spirit of the Administrative Procedure Act, Executive Orders 12866 and 13563 on proper rulemaking procedures, and President Obama's own Open Government Initiative.

Also, the economic data relied upon by the Department to support the new salary threshold is flawed and does not provide sufficient detail to support the claims made by the Department.  Similarly, the economic impact analysis provided fails to consider many factors and severely underestimates the economic impact of the Department's proposal, even without taking into consideration transfer payments related to compliance with changing the salary threshold.

As the Chamber's comments, *infra*, will demonstrate,  the Department's proposal should be withdrawn.

---

[5] Ernst & Young Study, *Work-Life Challenges Across Generations* (2015), *available at* http://www.ey.com/US/en/About-us/Our-people-and-culture/EY-work-life-challenges-across-generations-global-study

# DISCUSSION

The Fair Labor Standards Act, enacted by Congress in 1938 during the Great Depression, generally requires covered employers to pay their employees at least the federal minimum wage (currently, $7.25 per hour) for all hours worked and overtime pay at one and one-half an employee's regular rate of pay for all hours worked over 40 in a single workweek.[6]  In addition to ensuring additional pay for working over 40 hours, Congress intended the Act's overtime pay requirement to encourage employers to spread the available work among a larger number of workers and thereby reduce unemployment:

> By this requirement, although overtime was not flatly prohibited, financial pressure was applied to spread employment to avoid the extra wage and workers were assured additional pay to compensate them for the burden of a workweek beyond the hours fixed in the act.  In a period of widespread unemployment and small profits, the economy inherent in avoiding extra pay was expected to have an appreciable effect in the distribution of available work.[7]

Although the Department has described the FLSA overtime requirements as a "cornerstone of the Act,"[8] Congress never intended the overtime requirements to be applied universally.  As enacted in 1938, and amended through the years since, the FLSA includes almost 50 partial or complete exemptions from the Act's overtime requirements. A listing of these exemptions is provided in *Appendix A.*

Congress included the white collar exemptions in section 13(a)(1) of the original 1938 act, which exempted from both the minimum wage and overtime requirements "any employee employed in a bona fide executive, administrative, professional, or local retailing capacity, or in the capacity of outside salesman (as such terms are defined and delimited by regulations of the Administrator)."[9]  Congress amended section 13(a)(1) in 1961 to remove the "local retailing capacity" exemption, but also prohibited the Department from denying the exemption to retail or service employees who spend less than 40 percent of hours worked performing non-exempt tasks.[10]  In 1966, Congress added academic administrative personnel and teachers to the exemption.[11]  Thus, today,

---

[6] 29 U.S.C. §§ 206 (minimum wage), 207 (overtime).

[7] *See Overnight Motor Transportation Co. v. Missel*, 316 U.S. 572, 577-78 (1942).

[8] Notice of Proposed Rule, *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*, 80 FR 38516, 38510 (July 6, 2015) (hereinafter "2015 NPRM").

[9] 52 Stat. 1060, 1067 (June 25, 1938).

[10] P.L. 87-30, 74 Stat. 65 (May 5, 1961).

[11] P.L. 89-601, 80 Stat. 830 (Sept. 23, 1966).

section 13(a)(1) of the FLSA provides an exemption from both the minimum wage and overtime requirements for:

> [A]ny employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools), or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary, subject to the provisions of [the Administrative Procedure Act], except that an employee of a retail or service establishment shall not be excluded from the definition of employee employed in a bona fide executive or administrative capacity because of the number of hours in his workweek which he devotes to activities not directly or closely related to the performance of executive or administrative activities, if less than 40 per centum of his hours worked in the workweek are devoted to such activities).[12]

Congress did not further define the terms "executive," "administrative," "professional" or "outside salesman" in the Act itself.  However, the legislative history indicates that Congress believed that such employees generally have little need for the FLSA protections.  As the Department stated in 2004:

> The legislative history indicates that the section 13(a)(1) exemptions were premised on the belief that the workers exempted typically earned salaries well above the minimum wage, and they were presumed to enjoy other compensatory privileges such as above average fringe benefits and better opportunities for advancement, setting them apart from the nonexempt workers entitled to overtime pay.  Further, the type of work they performed was difficult to standardize to any time frame and could not be easily spread to other workers after 40 hours in a week, making compliance with the overtime provisions difficult and generally precluding the potential job expansion intended by the FLSA's time-and-a-half overtime premium.[13]

---

[12] 29 U.S.C. § 213(a)(1).

[13] Final Rule, *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*, 69 FR 22122, 22124 (April 23, 2004) (hereinafter "2004 Final Rule"), *citing* Report of the Minimum Wage Study Commission, Volume IV at 236, 240 (June 1981) ("1981 Commission Report") ("Higher base pay, greater fringe benefits, improved promotion potential and greater job security have traditionally been considered as normal compensatory benefits received by EAP employees, which set them apart from non-EAP employees."). *See also* 1981 Commission Report at 243 ("These compensatory privileges include authority over others, opportunity for advancement, paid vacation and sick leave, and security of tenure.").

The Department first issued regulations to define and delimit the white collar exemptions on October 20, 1938, at 29 C.F.R. Part 541. The original regulations, only two columns in the Federal Register, set a minimum salary level for exemption at $30 per week and established the job duties employees must perform to qualify for the exemptions.[14] Between 1940 and 1975, the Department raised the minimum salary level for exemption six times – in 1940, 1949, 1958, 1963, 1970 and 1975 – an increase every two to nine years.[15] In 1975, the Department raised the minimum salary levels for exemption to $155 per week ($8,060 annually) for executive and administrative employees and $170 per week ($8,840 annually) for professionals under the "long" duties tests, and to $250 per week ($13,000 annually) for the "short" duties tests.[16]

The duties tests for exemption changed less frequently. In 1940, the Department adopted a separate duties test for administrative employees for the first time.[17] The Department also significantly revised Part 541 in 1949, including the addition of "special proviso[s] for high salaried" executive, administrative and professional employees (often referred to as the "short tests") and publishing an interpretive bulletin.[18] Between 1949 and 2004, the Department made other occasional revisions to Part 541, but the basic structure and substance of the duties tests for executive, administrative, professional and outside sales employees remained unchanged.[19]

The last major revisions to the Part 541 regulations were made in 2004 – 29 years after the previous increases to the salary level tests and 55 years after the last significant changes to the duties tests (apart from the addition of computer employees). After a comprehensive review of legislative and regulatory history, federal court decisions interpreting Part 541, salary data and over 75,000 public comments, the Department

---

[14] 3 FR 2518 (Oct. 20, 1938).

[15] 5 FR 4077 (Oct. 10, 1940); 14 FR 7705 (Dec. 24, 1949); 23 FR 8962 (Nov. 18, 1958); 29 FR 9505 (Aug. 30, 1963); 35 FR 883 (Jan. 22, 1970); 40 FR 7091 (Feb. 19, 1975).

[16] 40 FR 7091 (Feb. 19, 1975).

[17] 5 FR 4077 (Oct. 10, 1940). *See also "Executive, Administrative, Professional . . .Outside Salesman" Redefined,* Wage and Hour Division, U.S. Department of Labor, Report and Recommendations of the Presiding Officer (Harold Stein) at Hearings Preliminary to Redefinition (Oct. 10, 1940) ("1940 Stein Report").

[18] 14 FR 7705 (Dec. 24, 1949) (final regulations); 14 FR 7730 (Dec. 28, 1949) (interpretive bulletin published as Subpart B of Part 541). *See also Report and Recommendations on Proposed Revisions of Regulations, Part 541,* Harry Weiss, Presiding Officer, Wage and Hour and Public Contracts Divisions, U.S. Department of Labor (June 30, 1949) ("1949 Weiss Report").

[19] In 1954, the Department revised the regulatory interpretations of the "salary basis" test. 19 FR 4405 (July 17, 1954). In 1961, the Department revised Part 541 to implement FLSA amendments eliminating the exemption for employees employed in a "local retail capacity." 26 FR 8635 (Sept. 15, 1961). The Department revised Part 541 in 1967 to implement an FLSA amendment extending the exemption to academic administrative personnel and teachers. The Department revised Part 541 twice in 1992. *First,* at the direction of Congress, the Department revised the duties tests to allow certain computer employees to qualify as exempt professionals. 57 FR 46742 (Oct. 9, 1992). *Second,* the Department modified the salary basis test for public employees. 57 FR 37666 (Aug. 19, 1992).

replaced the long-inoperative "long" duties tests with new standard duties tests (with requirements intended as a middle ground between the "long" and "short" tests), and raised the minimum salary level for exemption from $155/$170 per week ($8,060/$8,840 annually) to $455 per week ($23,660 annually).[20]  In addition, the Department replaced the "special proviso[s] for high salaried" employees and its "short test" salary level of $250 per week ($13,000 annually) with a highly compensated test applicable to employees with annual compensation of at least $100,000.[21]

Since 1940, the Part 541 regulations have included three tests that employees must meet before qualifying for exemption:  *First*, employees must be paid at least the minimum salary level for exemption established in the regulations, currently $455 per week ($23,660 annually) as set in 2004.[22]  *Second*, employees must be paid on a "salary basis."  An employee is paid on a salary basis "if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed."[23]  *Third*, the employees must have a primary duty of performing the exempt executive, administrative, professional, computer or outside sales job duties.[24]  Highly compensated employees, currently defined as employees with total annual compensation of at least $100,000, are exempt if they customarily and regularly perform at least one of the exempt duties of an executive, administrative or professional employee.[25]

On the salary level tests, the Department has proposed to set the minimum salary required for exemption at the 40th percentile of weekly earnings for full-time salaried

---

[20] Although section 13(a)(1) provides exemptions from both minimum wage and overtime, as the Department recognizes, "its most significant impact is its removal of these employees from the Act's overtime protections."  2015 NPRM at 38519. In fact, because the minimum salary level for exemption of executive, administrative and professional employees has always been set well above the minimum wage, such employees *de facto* are protected by the FLSA's minimum wage requirement. *See* 1981 Commission Report at 240 ("Employees paid below the salary test level must be paid premium rates for work in excess of 40 hours per week. Since salaries of exempt employees are usually well above the minimum wage, and the employer is under no obligation to pay wages equal to the salary test level, this is, in effect, a maximum hour exemption."). However, because of the 29 years that passed between the salary level increases of 1975 and 2004, the $155/$250 salary levels for exemption under the "long" duties tests was barely above the minimum wage for a 40 hour workweek by 1980 (when minimum wage increased to $3.10 per hour) and below the minimum wage beginning in 1991 (when minimum wage increased to $4.25 per hour). Thus, in 2004, the "long" duties tests had been effectively inoperative for almost 25 years.

[21] 2004 Final Rule at 22123.

[22] 29 C.F.R. § 541.600.

[23] 29 C.F.R. § 541.602. Teacher, doctors, lawyers and outside sales employees are not subject to the salary level and salary basis tests. 29 C.F.R. § 541.303(d) (teachers); 29 C.F.R. § 541.304(d) (doctors and lawyers); 29 C.F.R. § 541.500(c) (outside sales).  In addition, exempt computer employees may be paid by the hour. 29 U.S.C. § 213(a)(17); 541.29 C.F.R. § 541.400(b).

[24] 29 C.F.R. § 541.100 (executives); 29 C.F.R. § 541.200 (administrative employees); 29 C.F.R. § 541.300 (professionals); 29 C.F.R. § 541.400 (computer); 29 C.F.R. § 541.500 (outside sales).

[25] 29 C.F.R. § 541.601.

workers.[26]  Currently, based on 2013 data from the Bureau of Labor Statistics (BLS), this would amount to a minimum salary of $921 per week or $47,892 annually.[27]  However, the Department expects that the 40th percentile will increase to $970 per week or $50,440 annually by the time a final rule is issued in 2016.[28]  The Department seeks comments on whether "to permit nondiscretionary bonuses and incentive payments to count toward partial satisfaction of the salary level test."[29]  The Department also proposes to increase the total annual compensation requirement needed to exempt highly compensated employees (HCEs) to the annualized value of the 90th percentile of weekly earnings of full-time salaried workers, which is estimated at $122,148 annually.[30]  Finally, the Department proposes to establish a mechanism for automatically updating the salary levels on an annual basis using either the 40th (standard test) and 90th (HCE test) percentiles or based on an inflationary measure (the CPI-U).[31]

Whether the Department is proposing changes to the duties tests is far from clear. In the NPRM, the Department states that it "is not proposing specific regulatory changes at this time."[32]  Rather, the DOL only "seeks to determine whether, in light of our salary level proposal, changes to the duties tests are also warranted" and "invites comments on whether adjustments to the duties tests are necessary, particularly in light of the proposed change in the salary level test."[33]  The Department then requests comments on the following issues:

A.    What, if any, changes should be made to the duties tests?

B.    Should employees be required to spend a minimum amount of time performing work that is their primary duty in order to qualify for exemption? If so, what should that minimum amount be?

C.    Should the Department look to the State of California's law (requiring that 50 percent of an employee's time be spent exclusively on work that is the employee's primary duty) as a model? Is some other threshold that is less than 50 percent of an employee's time worked a better indicator of the realities of the workplace today?

---

[26] 2015 NPRM at 38517.

[27] *Id.*

[28] *Id.*, n.1.

[29] *Id.* at 38536.

[30] *Id.* at 38537.

[31] *Id.* at 38524, 38537-42.

[32] *Id.* at 38543.

[33] *Id.*

D.     Does the single standard duties test for each exemption category appropriately distinguish between exempt and nonexempt employees? Should the Department reconsider our decision to eliminate the long/short duties tests structure?

E.     Is the concurrent duties regulation for executive employees (allowing the performance of both exempt and nonexempt duties concurrently) working appropriately or does it need to be modified to avoid sweeping nonexempt employees into the exemption? Alternatively, should there be a limitation on the amount of nonexempt work? To what extent are exempt lower-level executive employees performing nonexempt work?[34]

In addition, "the Department is also considering whether to add to the regulations examples of additional occupations to provide guidance" on "how the general executive, administrative, and professional exemption criteria may apply to specific occupations."[35] The Department also "requests comments from employer and employee stakeholders in the computer and information technology sectors as to what additional occupational titles or categories should be included as examples in the part 541 regulations."[36]

## I.    THE DEPARTMENT'S PROPOSAL TO SET THE MINIMUM SALARY LEVEL USING THE 40TH PERCENTILE OF WAGES EARNED BY NON-HOURLY EMPLOYEES, WILL EXCLUDE MILLIONS OF EMPLOYEES WHO MEET THE DUTIES TESTS FOR EXEMPTION, CONTRARY TO THE INTENT OF CONGRESS

### A.    THE DEPARTMENT HAS LONG RECOGNIZED THAT THE PURPOSE OF THE SALARY LEVEL TEST IS TO EXCLUDE ONLY "OBVIOUSLY" NON-EXEMPT EMPLOYEES

Section 13(a)(1) of the Act *exempts* executive, administrative and professional employees from the FLSA minimum wage and overtime requirements. Thus, although Congress granted the Department authority to define and delimit the white collar exemptions, the agency has long acknowledged that it "is not authorized to set wages or salaries for executive, administrative and professional employees. Consequently, *improving the conditions of such employees is not the objective of the regulations.*"[37]

---

[34] *Id.* at 38543.

[35] *Id.*

[36] *Id.*

[37] 1949 Weiss Report at 11 (emphasis added).

Rather, the purpose of the salary level test is "screening out the *obviously* nonexempt employees."[38]  "The salary tests in the regulations are essentially guides to help in distinguishing bona fide executive, administrative, and professional employees from those who were not intended by the Congress to come within these categories.  Any increase in the salary levels from those contained in the present regulations must, therefore, have as its primary objective the drawing of a line separating exempt from nonexempt employees rather than the improvement of the status of such employees."[39]

Thus, while the salary level selected may "deny exemption to a *few* employees who might not unreasonably be exempted," the Department ignores congressional intent to its peril by setting the minimum salary level for exemption so high as to exclude from the exemption millions of employees who would meet the duties requirements.[40]  *The salary level tests should not be set at a level that would result "in defeating the exemption for any substantial number of individuals who could reasonably be classified for purposes of the Act as bona fide executive, administrative, or professional employees."*[41]

In addition, regulations of such "general applicability . . .  must be drawn in general terms to apply to many thousands of different situations throughout the country."[42]  As the Department stated in 1949:  "To be sure, salaries vary, industry by industry, and in different parts of the country, and it undoubtedly occurs that an employee may have a high order of responsibility without a commensurate salary."[43]  Thus, to avoid excluding millions of employees from the exemption who do perform exempt job duties, the Department has recognized that "the same salary cannot operate with equal effect as a test in high-wage and low-wage industries and regions, and in metropolitan and rural areas, in an economy as complex and diversified as that of the United States.  Despite the variation in effect, however, it is clear that the objectives of the salary tests will be accomplished if the levels selected are set at points near the lower end of the current range of salaries"[44] of exempt employees "in the lowest-wage region, or in the smallest size establishment group, or in the smallest-sized city group, or in the lowest-wage industry."[45]

---

[38] *Id.* at 8 (emphasis added). *See also* 1958 Kantor Report at 2-3 ("Essentially, the salary tests are guides to assist in distinguishing bona fide executive, administrative, and professional employees from those who were not intended by the Congress to come within these categories. They furnish a practical guide to the investigator as well as to employers and employees in borderline cases, and simplify enforcement by providing a ready method of *screening out the obviously non-exempt employee*.").

[39] 1949 Weiss Report at 11. *See also* 1958 Kantor Report at 2-3.

[40] 1940 Stein Report at 6 (emphasis added).

[41] 1949 Weiss Report at 9 (emphasis added).

[42] *Id.*

[43] *Id.* at 11.

[44] 1958 Kantor Report at 5.

[45] *Id.* at 6-7. *See also* 1940 Stein Report at 32 ("Furthermore, these figures are averages, and the Act applies to low-wage areas and industries as well as to high-wage groups. Caution therefore dictates the adoption of

As discussed in more detail below, the Department's proposal to increase the minimum salary level for exemption based on the 40th percentile of earnings for all non-hourly workers – resulting in an estimated minimum salary of $50,440 – quotes but then ignores these accepted purposes and principals with little or no justification. In the past, the Department has used data on salaries of exempt employees. Today, the Department uses earnings data for all "non-hourly" paid employees, whether exempt or nonexempt, and including employees not covered by the Part 541 salary tests, with no reasonable basis for distinguishing salaries of exempt versus non-exempt employees. In the past, the Department has looked to salaries of exempt employees in the lowest-wage region, the smallest size establishment group, the smallest-sized city group, and the lowest-wage industry. Today, the Department uses only national data, ignoring the disproportionate impact that so doing will have for employers in these groups. In the past, the Department has looked to the 10th, 15th and 20th percentile of exempt employee salaries. Today, the Department proposes using the 40th percentile of earnings for all non-hourly paid employees based on the mistaken justification that the current standard duties tests are equivalent to the old "long" duties tests. The Department's proposed $50,440 minimum salary level, in short, is a result in search of a reasoned methodology; but, under any supportable methodology, the Department's proposal is at least $10,000 to $20,000 too high.

**B. SETTING THE MINIMUM SALARY LEVEL AT THE 40TH PERCENTILE OF EARNINGS OF ALL "NON-HOURLY" PAID EMPLOYEES IGNORES 77 YEARS OF LEGISLATIVE HISTORY, REGULATORY HISTORY AND CHANGES TO THE AMERICAN ECONOMY**

With few exceptions, historically, the Department set the minimum salary level for exemption by studying the salaries actually paid to exempt employees and setting the salary at no higher than the 20th percentile in the lowest-wage regions, the smallest size establishment groups, the smallest-sized cities and the lowest-wage industries. In 1949, for example, the Department examined data on increases in salaries for exempt employees since the 1940 increases, compared that data with the earnings of nonexempt employees, and then set a salary level lower than the data indicated to account for lower-wage industries and small businesses.[46]

To set the salary level in 1958, the Department compiled salary data for employees who had been found exempt during wage-hour investigations over an

---

a figure that is somewhat lower, though of the same general magnitude."); 1949 Weiss Report at 11-12 ("Any new figure recommended should also be somewhere near the lower end of the range of prevailing salaries for these employees."); 1949 Weiss Report at 14 ("Consideration must also be given to the fact that executives in many of the smaller establishments are not as well paid as executives employed by larger enterprises."); 1949 Weiss Report at 15 ("The salary test for bona fide executives must not be so high as to exclude large numbers of the executives of small establishments from the exemption.").

[46] 1949 Weiss Report at 12-15.

eight-month period in 1955, grouping employees "by major geographic regions, by number of employees in the establishment, by size of city, and by broad industry groups."[47] The Department's report also included published materials on how salary levels had changed since 1949 and information on starting salaries of college graduates."[48] Based on this data, the Department set the salary level so that "no more than about 10 percent of those in the lowest-wage region, or in the smallest size establishment group, or in the smallest-sized city group, or in the lowest-wage industry of each of the categories would fail to meet the tests."[49]

Again, in 1963, the Department relied on a special survey by the Wage and Hour Division ("WHD') on salaries paid to exempt employees, and increased the salary level to "bear approximately the same relationship to the minimum salaries reflected in the 1961 survey data as the tests adopted in 1958."[50]

In 1970, the Department adopted a minimum salary level for executives of $125 per week, when salary data on "executive employees who were determined to be exempt in establishments investigated by the Divisions between May and October 1968 for all regions in the United States, 20 percent received less than $130 per week, whereas only 12 percent of such executives employees in the West and 14 percent in the Northeast received salaries of less than $130 per week."[51]

The rulemaking in 1975 was anomalous: The Department based the salary increase on the Consumer Price Index, rather than a percentile, but also stated that the increase was not "to be considered a precedent."[52]

In 2004, the Department considered data "showing the salary levels of the bottom 10 percent, 15 percent and 20 percent of all salaried employees, and salaried employees in the lower wage South and retail sectors."[53] The Department set the minimum salary level at $455 per week ($23,660 annually), the 20th percentile for salaried employees in the South region and retail industry, rather than at the 10th percentile as in 1958, to account for the proposed change from the "short" and "long" test structure and because the data included nonexempt salaried employees."[54]

---

[47] 1958 Kantor Report at 6.

[48] *Id.*

[49] *Id.* at 7-8.

[50] 28 FR 7002, 7004 (July 9, 1963).

[51] 35 FR 883, 884 (Jan. 22, 1970).

[52] 40 FR 7091, 7092 (Feb. 19, 1975). During a private conversation in 2001 between incoming Wage & Hour Administrator Tammy D. McCutchen and Betty Southard Murphy, the Administrator in 1975, Ms. Murphy stated that the 1975 Final Rule was finalized before a wage survey could be completed so she could take up her new post as a Chair of the National Labor Relations Board.

[53] 2004 Final Rule at 22167 & Table 2.

[54] 2004 Final Rule at 22168-69 & Table 3.

Departing from the historical methodologies to use the 40th percentile of earnings for all non-hourly employees ignores the fact that most retail and service employees were exempt until 1961. As originally enacted, section 13(a)(1) of the FLSA exempted "any employee employed in a . . . local retailing capacity" from the minimum wage and overtime requirements, and section 13(a)(2) included an exemption for "any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce."[55] In 1949, Congress amended section 13(a)(2) to cover employees of retail establishments with more than 50 percent of sales "made within the State in which the establishment is located."[56] Because of these exemptions, during this time period, only "three percent of the retail trade workers were estimated to be subject to the wage and hour provisions of the FLSA."[57] In 1961, Congress amended the FLSA to eliminate the "local retailing capacity" exemption in section 13(a)(1) and limit the section 13(a)(2) retail exemption to establishments with less than $250,000 in annual sales.[58] After the 1961 amendments, the Department of Labor estimated that 2.2 million employees came within the scope of the Act.[59] Later amendments further restricted the retail exemption until it was repealed completely in 1989.[60]

Thus, when the Department set the salary level at the 10th percentile of exempt employee salaries in 1958, that data set did not include exempt salaries of retail employees, a lower-wage industry. Rather, the 1958 data would have included salary information in industries such as manufacturing and construction, the primary focus of the FLSA protections at the time. If data on exempt salaries in the retail industry had been included in 1958, the salary level selected certainly would have been below the 10th percentile.

In preparation for the 1963 rulemaking, the Department conducted a special survey in June 1962 to gather data "on minimum weekly salaries paid executive, administrative and professional employee in retail establishments."[61] The survey confirmed that exempt executive, administrative and professional employees in retail earned less than exempt employees in other industries: "The survey data indicate that in the type of establishment in which all employees would have qualified for the 'retail' exemption under section 13(a) (2) of the act, 29 percent of the executive and 32 percent of the administrative employees were paid less than $100 a week. Thirteen percent of the executive employees and 19 percent of the administrative employees were paid less than $80 a week." Thus, the Department established lower salary levels for the retail industry

---

[55] 29 U.S.C. § 213(a)(2), P.L. 718, 52 Stat. 1060, 1067 (June 25, 1938).

[56] P.L. 393, 63 Stat. 910, 916 (Oct. 26, 1949.

[57] 1981 Commission Report at 14,

[58] P.L. 87-30, 75 Stat. 65, 71 (May 5, 1961).

[59] 1981 Commission Report at 17.

[60] P.L. 101-157, 103 Stat. 939 (Nov. 17, 1989).

[61] 28 FR at 7002.

effective until September 1965: $80 per week for executive and administrative employees (instead of $100 for other industries); $95 per week for professionals (instead of $115), and $125 per week under the "short" duties test (instead of $150).[62]  By 1965, the Department expected retail salaries to increase as the industry adjusted to its new coverage under the FLSA.[63]  Perhaps most instructive in this regulatory history, the Department rejected salary levels for retail employees at the 29th and 32nd percentiles, instead adopting salary levels at the 13th and 19th percentile.[64]

Changes to the American economy and jobs also support a lower percentile, not a higher one.  The Department makes much of the fact that the percentage of employees eligible for overtime has allegedly eroded significantly:  "In 1975, 62 percent of full-time salaried workers were eligible for overtime pay; but today, only 8 percent of full-time salaried workers fall below the salary threshold and are automatically eligible for overtime pay."[65]  However, these statistics ignore the revolutionary changes to our economy since the 1975 salary increases and certainly since Congress passed the FLSA in 1938.  Thus, the alleged changes in the number of exempt employees cannot withstand even cursory scrutiny or provide support for the Department's proposal.

One indicator of exempt status is level of education – not only for the professional exemption, but for all of the white collar exemptions.  Possession of a Bachelors, Masters or Doctoral degree is a key indicator that an employee, using that degree in his work, is performing job duties at a sufficiently high level to qualify for the exemption.  According to U.S. Census data, in 1940, only 4.6 percent of Americans had completed four years of college, increasing to 11 percent by 1970.  Today, 34 percent of Americans hold Bachelors, Masters or Doctoral degrees.

In addition, the American economy has steadily moved away from blue collar manufacturing jobs that could be performed by unskilled and low-skilled workers to white collar jobs in service industries which require employees to perform job duties requiring more knowledge and judgment.  In 1939, the year after Congress passed the FLSA, 35.5 percent of American workers were employed in manufacturing, but by 2014, that proportion had fallen to 10.4 percent.  During the same time period, the more educated workforce in the professional and business services sector grew from 7.4 percent of all jobs in 1939 to 16.3 percent of jobs in 2014, according to the BLS Current Employment Statistics surveys.

---

[62] 28 FR at 7005; 28 FR 9505, 9506 (Aug. 30, 1963)

[63] 28 FR at 7005.

[64] *Id.*

[65] *5 Million Reasons Why We're Updating Overtime Protections*, Secretary Tom Perez (July 1, 2015), available at http://blog.dol.gov/2015/07/01/5-millions-reasons-why-were-updating-overtime-protections/.

These two incontrovertible facts can lead to only one conclusion: Today, more employees are performing exempt executive, administrative and professional work than ever before in the history of the United States. Thus, there is no justification for increasing the percentile used to set the salary level in an attempt to bring the same percentage of employees within the overtime protections as there were in 1975.

### C. THE DEPARTMENT'S 20TH PERCENTILE METHODOLOGY IN 2004 WAS SUFFICIENT TO ACCOUNT FOR CHANGES IN THE DUTIES TESTS

The Department's sole, but oft-repeated justification for proposing a salary level at the 40th percentile – quadrupling the percentile used in 1958 – is that the 2004 salary level was too low to adequately compensate for changes in the duties tests:

- "The proposed increase to the standard salary level is also intended to address the Department's conclusion that the salary level set in 2004 was too low to efficiently screen out from the exemption overtime-protected white collar employees when paired with the standard duties test."[66]

- "The Department believes that the proposed salary compensates for the absence of a long test …."[67]

- "A standard salary threshold significantly below the 40th percentile, or the absence of a mechanism for automatically updating the salary level, however, would require a more rigorous duties test than the current standard duties test …."[68]

- "The Department set the standard salary level in 2004 equivalent to the former long test salary level, thus not adjusting the salary threshold to account for the absence of the more rigorous long duties test."[69]

- "The Department in the 2004 Final Rule based the new 'standard' duties tests on the short duties tests (which did not limit the amount of nonexempt work that could be performed), and tied them to a single salary test level that was updated from the long test salary (which historically had been paired with a cap on nonexempt work)."[70]

---

[66] 2015 NPRM at 38517.
[67] *Id.*
[68] *Id.* at 38519.
[69] *Id.*
[70] *Id.* at 38526.

- "However, the higher percentile proposed here is necessary to correct for the current pairing of a salary based on the lower salary long test with a duties test based on the less rigorous short duties test, and ensure that the proposed salary is consistent with the Department's longstanding goal of finding an appropriate line of demarcation between exempt and nonexempt employees."[71]

- "The proposed percentile diverges from the percentiles adopted in both the 2004 Final Rule and the Kantor method because it more fully accounts for the Department's elimination of the long duties test."[72]

- "Based on further consideration of our analysis of the 2004 salary, the Department has now concluded that the $455 salary level did not adequately account for both the shift to a sample including all salaried workers covered by the part 541 regulations, rather than just EAP exempt workers, and the elimination of the long duties test that had historically been paired with the lower salary level.  Accordingly, this proposal is intended to correct for that error by setting a salary level that fully accounts for the fact that the standard duties test is significantly less rigorous than the long duties test and, therefore, the salary threshold must play a greater role in protecting overtime-eligible employees."[73]

- "This is the first time that the Department has needed to correct for such a mismatch between the existing salary level and the applicable duties test.  ...  The creation of a single standard test based on the less rigorous short duties test caused new uncertainty as to what salary level is sufficient to ensure that employees intended to be overtime-protected are not subject to inappropriate classification as exempt, while minimizing the number of employees disqualified from the exemption even though their primary duty is EAP exempt work."[74]

- "However, although the Department recognized the need to make an adjustment because of the elimination of the long duties test, the amount of the increase in the required salary actually only accounted for the fact that the data set used to set the salary level included

---

[71] *Id.* at 38529.

[72] *Id.*

[73] *Id.*

[74] *Id.*

nonexempt workers while the Kantor method considered only the salaries paid to exempt employees."[75]

- "Setting the standard salary level at the 40th percentile of earnings for full-time salaried workers would effectively correct for the Department's establishment in the 2004 Final Rule of a single standard duties test that was equivalent to the former short duties test without a correspondingly higher salary level."[76]

- To remedy the Department's error from 2004 of pairing the lower long test salary with the less stringent short test duties, the Department is setting the salary level within the range of the historical short test salary ratio so that it will work appropriately with the current standard duties test."[77]

Repeating the same assertion a dozen times does not make it true or justify quadrupling the Department's 10th percentile methodology from 1958 to the 40th percentile. The Department's assertion that the 2004 salary level was too low to adequately compensate for changes in the duties is problematic for several reasons.

*First*, as noted above, the 1958 data did not include retail employees, who generally earned less than the production employees who were included in that data.[78] Thus, an expanded 1958 data set that had included retail employees would have yielded a lower dollar threshold corresponding to the 10th percentile than the dollar threshold actually recommended in 1958.

*Second*, as the Department noted both in 2004 and in this rulemaking, the agency historically used salary data that included exempt employees only. The CPS data includes both exempt and non-exempt data, lumped together. As discussed more fully in section VI, the only attempt by the Department has ever made to distinguish between exempt and non-exempt employees in the CPS data was in 1998 when WHD staff attempted to assign probabilities on whether employees in a CPS job title were exempt. As every wage and hour investigator learns in her basic training class, and as stated in the Part 541 regulations, a "job title alone is insufficient to establish the exempt status of an employee."[79] In fact, more often than not, investigators find job titles misleading and also refuse to credit statements about duties in job descriptions because the "exempt or nonexempt status of any particular employee must be determined on the basis of whether

---

[75] *Id.* at 38530.

[76] *Id.* at 38531.

[77] *Id. See also id.* at 38532, 38534, 38560, and 38562.

[78] *See, e.g.,* 28 FR at 7005; 28 FR at 9506.

[79] 29 C.F.R. § 541.2.

the employee's salary and duties meet the requirements" for exemption.[80]  As investigators know, such determinations can only be made after interviewing witnesses who are familiar with the actual job duties performed.  And now, in 2015, the DOL's guesses at identifying exempt versus non-exempt employees in the CPS data set is 17 years out of date!  No apparent attempt has been made to duplicate or validate the Department's 17-year-old assumptions about job duties and exempt status.  Thus, the Department's conclusion that the 20th percentile used in 2004 only accounted for the difference in the data is highly suspicious or totally unsupported.  And, without this foundation, the superstructure built upon it collapses.

*Third*, the 2004 standard duties tests are not equivalent to the old "long" tests.  For example, the pre-2004 "short" test for the executive exemption required only that the employee have a primary or managing the enterprise (or a recognized department or subdivision thereof) and customarily and regularly direct the work of two or more other employees.[81]  The 2004 regulations added a third requirement:  "the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."[82]  This new requirement under the standard test was taken from the pre-2004 "long" test.[83]  Thus, the standard duties test for the executive exemption is more difficult to meet than the pre-2004 "short" test.[84]  The Department's methodology for increasing the salary level makes no effort to acknowledge or account for this difference.

*Fourth*, the Department's reliance on the 1975 "long" test salary levels is similarly misplaced.  The salary levels adopted in 1975 are anomalies.  The Department set these rates in a very truncated process, without the benefit of a wage survey.  The Department based the salary increase on the Consumer Price Index, rather than a percentile, but also stated that the increase was not "to be considered a precedent."[85]  Yet, here in 2015, the Department is doing exactly that – using 1975 as a precedent – to the exclusion of all other comparators.

While the current standard duties tests do not include a 20 percent restriction (40 percent in retail or services establishments) on work activities that are not directly related to an employee's exempt duty, this does not have the significance that the Department

---

[80] *Id.*

[81] 68 FR 15560 (April 23, 2003).

[82] 29 C.F.R. § 541.100.

[83] 2004 Final Rule at 22127.

[84] Should the Department review the public comments filed in response to the 2003 Notice of Proposed Rulemaking, it will find that most employer groups objected to this change.

[85] 40 FR 7091, 7092 (Feb. 19, 1975). During a private conversation in 2001 between incoming Wage and Hour Administrator Tammy D. McCutchen and Betty Southard Murphy, the Administrator in 1975, Ms. Murphy stated that the 1975 Final Rule was finalized before a wage survey could be completed so she could take up her new post as a Chair of the National Labor Relations Board.

would give it.  Because of the 29 years that passed between the salary level increases of 1975 and 2004, the $155/$170 salary levels for exemption under the "long" duties tests, on which the Department so heavily relies, were barely above the minimum wage for a 40-hour workweek by 1980 (when minimum wage increased to $3.10 per hour) and below the minimum wage beginning in 1991 (when minimum wage increased to $4.25 per hour).  Thus, in 2004, the "long" duties tests had been effectively inoperative for almost 25 years and were not functioning to distinguish between exempt and non-exempt employees.  The Department's reasons, then, for not returning to a 20 percent restriction, already dead for 25 years, are even more compelling today with the 20 percent restriction now 36 years dead.[86]

Even without these significant faults in its analysis, the Department has failed to adequately justify quadrupling the historical 10th percentile to set the salary level based on the 40th percentile.  The Department does not appear to have seriously considered less burdensome options:  some percentile greater than 10 but lower than 40; using salary levels in lower wage regions or industries; using salary levels in rural areas and small businesses.  Nor did the Department adequately explore options other than the percentile method.  As set forth in the following section, examining all the possible methodologies and measures reveals that the 40th percentile methodology is an outlier – reverse engineered to get a pre-determined, desired result.[87]

### D.  THE DEPARTMENT'S PROPOSED MINIMUM SALARY LEVEL IS TOO HIGH UNDER ANY OTHER METHODOLOGY

The application of other measures and methodologies results in salary levels thousands of dollars below the $50,440 proposed by the Department.  Although these other methodologies have not been applied as often as a percentile method, many have been considered by the Department over the years as an additional data point.  The Department should not give such short shrift to this information, particularly as the results appear consistent between and among the other methodologies.

---

[86] 2004 Final Rule at 22126-28.

[87] *See e.g., Updating Overtime Rules Could Raise the Wages for Millions*, Ross Eisenbrey (March 12, 2014) ("We are pleased that the president is directing the Department of Labor to update overtime regulations, a policy change that I have previously proposed. About 10 million workers could benefit from a rule that makes clear that anyone earning less than $50,000 a year is not exempt from overtime requirements and must be paid time-and-a-half for any work they do past 40 hours a week."), available at http://www.epi.org/publication/updating-overtime-rules-raise-wages-millions/.

### 1. Lower percentiles

If it uses the CPS data set for non-hourly paid workers,[88] the Department should use a lower percentile. A salary level at the 10th, 20th and 30th percentiles would be consistent with the history of the Part 541 regulations and better reflect the actual dividing line between exempt and non-exempt employees.[89] As shown in Table 1, the 10th percentile would result in a salary level of $26,000; over 30 percent of non-exempt hourly employees in the data set earn below that level. The 20th percentile would result in a salary level of $34,996; over 50 percent of non-exempt hourly employees earn below that level. The 30th percentile would result in a salary level of $40,820; almost 70 percent of non-exempt hourly employees earn below this level.

| Table 1 | | | | | |
|---|---|---|---|---|---|
| Weekly Earnings Deciles by Categories of Workers Workers who usually work full-time (35+ weekly hours) | | | | | |
| Decile | Non-Hourly Workers (1) | Hourly Workers (2) | Hourly and Non-Hourly (3) | Non-Hourly South + Retail (4) | Hourly and Non-Hourly South + Retail (5) |
| Min | $0 | $0 | $0 | $0 | $0 |
| 10 | $500 | $350 | $384 | $462 | $360 |
| 20 | $673 | $400 | $480 | $600 | $440 |
| 30 | $785 | $480 | $576 | $738 | $520 |
| 40 | $923 | $540 | $673 | $858 | $611 |
| 50 | $1,058 | $600 | $788 | $962 | $730 |
| 60 | $1,250 | $700 | $942 | $1,153 | $865 |
| 70 | $1,480 | $803 | $1,134 | $1,346 | $1,000 |
| 80 | $1,826 | $1,000 | $1,385 | $1,654 | $1,250 |
| 90 | $2,308 | $1,287 | $1,923 | $2,212 | $1,731 |
| Max | $2,885 | $2,885 | $2,885 | $2,885 | $2,885 |
| Mean | $1,248 | $738 | $978 | $1,162 | $909 |
| Median | $1,058 | $600 | $788 | $962 | 729.6 |
| Mode | $2,885 | $400 | $2,885 | $2,885 | 400 |
| SE Mean | 0.103 | 0.061 | 0.064 | 0.152 | 0.092338347 |
| Source: Current Population Survey, Public Use Microdata File, Merged 12 months outgoing rotations (Earner Study) supplement. | | | | | |

[88] As discussed in section VI below, the Department errs by relying solely on CPS data. However, if the Department will not use alternative (and better) data sources, we suggest that the agency should consider alternative sets of CPS data in setting the salary level.

[89] 1958 Kantor Report at 6-7 (10th percentile); 1963 Final Rule, 28 FR at 7005 (13th and 17th percentile of retail employees); 2004 Final Rule at 22168-69 & Table 3 (10th, 15th and 20th percentiles).

## 2. *Earnings in the lowest wage regions and industries and in small businesses and communities*

Since 1940, the Department has considered salaries in the lowest wage regions and industries and in small businesses or rural communities.[90]  As shown in Table 1, setting the salary level at the 10th percentile of earnings in the South and retail sectors would result in a salary level of $24,024; over 20 percent of non-exempt hourly employees in the data set earn below that level.  The 20th percentile would result in a salary level of $31,200; almost 40 percent of non-exempt hourly employees earn below that level.  The 30th percentile would result in a salary level of $38,376; over 50 percent of non-exempt hourly employees earn below this level.  The 40th percentile would result in a salary level of $44,616; almost 60 percent of non-exempt hourly workers earn below this level.

The Department's proposal to set the salary level at the 40th percentile of earnings for all non-hourly paid employees nationwide would have a disproportionate impact on businesses in states such as Arkansas, Florida, Louisiana, Mississippi, North Carolina, Oklahoma, Tennessee and West Virginia where more than 50 percent of non-hourly paid workers earn less than $970 per week ($50,440 annually).[91]  In fact, the 40th percentile of non-hourly paid employees is below $970 in 26 states.[92]  If the Department refuses to apply a lower percentile to set the salary level, the Department should consider setting the salary level based on the 40th percentile in the three states with the lowest salaries – Louisiana, Mississippi and Oklahoma – or, at $784 per week ($40,786).[93]

Because of the Department's refusal to grant an extension of the comment period,[94] the Chamber cannot provide data on salary levels of exempt employees in small businesses and communities.  However, a 2013 study found that the average annual

---

[90] 1940 Stein Report at 32; 1949 Weiss Report at 14-15; 1958 Kantor Report at 5-6; 1963 Final Rule, 28 FR at 7705; 1970 Final Rule, 35 FR at 884; 2004 Final Rule at 22168-69.

[91] *See Oxford Economics Study* (Aug. 18, 2015), attached as *Appendix B*.

[92] *Id.* (Alabama, Arkansas, Florida, Georgia, Hawaii, Idaho, Indiana, Kentucky, Louisiana, Maine, Mississippi, Missouri, Montana, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah and West Virginia)

[93] *Id.*

[94] The Chamber, as well as many others, requested an extension of the comment deadline. *See Appendix C*. The Chamber's request was specifically predicated on the need to conduct more research and do the work the Department would not. Alas, despite signals that an extension would be granted, the definitive rejection of the request was not received until Monday August 31.

salary for a small business *owner* is only $68,000.[95]  The Department should gather and examine such data itself before issuing a final rule.[96]

### 3.  Relationship to the minimum wage

The Department should also consider the relationship between the minimum wage and the Part 541 salary levels.  As shown in Table 2, in years when the Department has increased the Part 541 salary level, the ratio of the salary level to minimum wage spanned from a low of 1.85 in 1975 to a high of 6.25 in 1949.  Applying the median of 2.38 would result in a salary level of $690.20 per week ($35,890.40 annually).

| Table 2 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Year | Minimum Wage | | Part 541 Salary Levels | | | | Ratio | | | |
| | Per Hour | Weekly @ 40 | Exec | Admin | Prof | Short | Exec | Admin | Prof | Short |
| 1938 | $0.25 | $10 | $30 | $30 | $30 | | 3.00 | 3.00 | 3.00 | - |
| 1940 | $0.30 | $12 | $30 | $50 | $50 | | 2.50 | 4.17 | 4.17 | - |
| 1949 | $0.40 | $16 | $55 | $75 | $75 | $100 | 3.44 | 4.69 | 4.69 | 6.25 |
| 1958 | $1.00 | $40 | $80 | $95 | $95 | $125 | 2.00 | 2.38 | 2.38 | 3.13 |
| 1963 | $1.25 | $50 | $100 | $100 | $115 | $150 | 2.00 | 2.00 | 2.30 | 3.00 |
| 1970 | $1.60 | $64 | $125 | $125 | $140 | $200 | 1.95 | 1.95 | 2.19 | 3.13 |
| 1975 | $2.10 | $84 | $155 | $155 | $170 | $250 | 1.85 | 1.85 | 2.02 | 2.98 |
| 2004 | $5.15 | $206 | $455 | $455 | $455 | | 2.21 | 2.21 | 2.21 | - |
| 2015 | $7.25 | $290 | $455 | $455 | $455 | | 1.57 | 1.57 | 1.57 | - |

### 4.  Historical annual percentage of increases

Historically, with only two exceptions, as shown in Table 3 below, the Department has increased the salary levels at a rate of between 2.78 percent and 5.56 percent per year, with a median of 4.25 percent.  The Department's proposed increase to $50,440 represents an increase of 9.43 percent per year.[97]  Over the last decade, salaries did not increase on average by 9.43 percent annually.  Employment Cost Index data from BLS shows that for 2004 through 2014, earnings for all wage and salary workers

---

[95] "*And, the Average Entrepreneur's Salary Is . . .*", Business News Daily (Oct. 18, 2013), *available at* http://www.businessnewsdaily.com/5314-entrepreneur-salaries.html.

[96] Considering salaries paid to exempt employees in small businesses is particularly important given the $500,000 in annual gross volume of sales required for enterprise coverage under the FLSA, 29 U.S.C. § 203(s)(1)(ii), has not been amended since 1989. Today, the $500,000 standard excludes only the smallest of small business from the FLSA. The Small Business Administration, for example, defines nonmanufacturing small businesses as those with $7.5 million in average annual receipts. *See* https://www.sba.gov/content/summary-size-standards-industry-sector.

[97] This percentage rate is the average per year across the 12 year period. It is not the compound growth rate.

increased 27.1 percent cumulatively over the period – 2.7 percent average annual change
(2.2 percent per year compound rate).  For the subset of private sector workers in
management, professional and related occupations, the cumulative earnings increase for
2004 through 2014 was 32.5 percent, equivalent to a 2.6 percent average yearly percent
change.  The Department has never before doubled the salary levels for exemption in a
single rulemaking, let alone increasing the salary levels by 113 percent.  Applying the
4.25 percent annual median increase for 12 years (2004 to 2016, when the final rule is
expected to issue) results in a salary level of $687 per week ($35,727 annually).[98]

| Table 3 | | | | |
|---------|---------|---------|---------|---------|
| Year | Salary Level | | Percentage Increase | |
| | | | Total | Per Year |
| **1938** | $30 | All | | |
| **1940** | $30 | Exec | 0.00% | |
| | $50 | Admin, Prof | 66.67% | 33.33% |
| **1949** | $55 | Exec | 83.33% | 9.26% |
| | $75 | Admin, Prof | 50.00% | 5.56% |
| | $100 | Short Test | | |
| **1958** | $80 | Exec | 45.45% | 5.05% |
| | $95 | Admin, Prof | 26.67% | 2.96% |
| | $125 | Short Test | 25.00% | 2.78% |
| **1963** | $100 | Exec, Admin | 25.00% | 5.00% |
| | $115 | Prof | 21.05% | 4.21% |
| | $150 | Short Test | 20.00% | 4.00% |
| **1970** | $125 | Exec, Admin | 25.00% | 3.57% |
| | $140 | Prof | 21.74% | 3.11% |
| | $200 | Short Test | 33.33% | 4.76% |
| **1975** | $155 | Exec, Admin | 24.00% | 4.80% |
| | $170 | Prof | 21.43% | 4.29% |
| | $250 | Short Test | 25.00% | 5.00% |
| **2004** | $455 | All | 82.00% | 2.83% |
| **2016** | $970 | All | 113.19% | 9.43% |

### 5.  *Employment Cost Index*

As discussed above, the BLS Employment Cost Index data from BLS shows that
for 2004 through 2014, earnings for all wage and salary workers increased at an average
rate of 2.2 percent per year.  Earnings for private sector workers in management,
professional and related occupations increased at a 2.6 percent yearly average.  Applying

---

[98] Calculated as an average annual change, not a compound growth rate.

these average changes growth rates for each of 12 years (2004 to 2016) to the current salary level of $455 per week ($23,660 annually) would result in an updated salary level of between $590.78 per week ($30,720.30 annually) and $619.13 per week ($32,194.60).

### 6. *Comparing state law minimums*

The Department should also consider the minimum salary levels required for exemption under State law. Just like the minimum wage, States may set higher standards for exemptions from state overtime requirements. In New York, the minimum salary level for exemption is $34,124 (increasing to $35,100 in 2016).[99] In California, the minimum salary level is currently $37,440 annually (increasing to $41,600 in 2016).[100] Thus, the Department's proposed salary level of $50,440 is $8,840 higher than the salary level that will be required for exemption in California in 2016 and $15,340 higher than the salary level that will be required for exemption in New York in 2016.

### 7. *Comparing salary levels for exempt federal employees*

Historically, the Department has also looked to salaries paid to exempt employees of the federal government. In 1949, for example, the Department stated, "One important guide in determining at what point an employee should be considered an administrative employee rather than a clerk is to be found in the practice of the Government itself."[101] At that time (in the clerical, administrative and fiscal group), the federal government had reserved grades 1 to 6 for clerical employees, grades 7 to 14 for administrative employers, and grades 15 and 16 for executive employees.[102] In determining an appropriate salary level, the Department looked to average salary for grades 6 and 7.[103]

Not much seems to have changed in this regard. On its web page, the federal Office of Personnel Management explains:

> The General Schedule has 15 grades – GS-1 (lowest) to GS-15 (highest). Agencies establish (classify) the grade of each job based on the level of difficulty, responsibility, and qualifications required. Individuals with a high school diploma and no additional experience typically qualify for GS-2 positions; those with a Bachelor's degree for GS-5 positions; and those with a Master's degree for GS-9 positions.[104]

---

[99] 12 NYCRR § 142-2.14.

[100] Cal. Lab. Code § 515(a).

[101] 1940 Stein Report at 30-31.

[102] *Id.*

[103] *Id.*

[104] *See* https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/general-schedule/.

Although some employees holding Bachelor's degrees do not perform the duties required for the Part 541 exemptions, federal employees with Master's degree are unlikely to be classified as non-exempt.  Thus, the dividing line between exempt and non-exempt federal employees is most likely at GS-7, the mid-point between GS-5 where some employees may perform exempt duties and GS-9 where most federal employees likely are exempt.  As shown in *Appendix D*, the salary at GS-7, Step 1 for 2015 is $34,622; GS-7 Step 5 is $39,282; and GS-7 Step 6 is $40,437.  Federal employees with Master's degrees start in GS-9, Step 1at $42,399.

### E.  THE DEPARTMENT'S PROPOSED $50,440 SALARY LEVEL IS PARTICULARLY INAPPROPRIATE FOR THE NON-PROFIT, GOVERNMENT AND HEALTHCARE SECTORS WHICH CANNOT INCREASE PRICES TO OFFSET COSTS

Employee advocates often argue that the increased costs of a higher minimum wage or paying additional overtime can be offset by simply raising prices.  These advocates, and the Department, fail to consider the impact of a $50,440 salary level on sectors that cannot raise prices.  Non-profits, for example, primarily rely on private donations and government grants for their revenues.  State and local governments rely on taxes that can be increased only through elections or legislation (and not very easily).  Many employers in the healthcare industry depend on reimbursements from Medicaid, Medicare and private insurance – which will not increase just because the Department raises the salary level for exempt employees.  Thus, none of these sectors can raise prices to increase the revenue needed to absorb the costs of a 113 percent increase to the salary level.  The only option for non-profit, government and healthcare employers is to reduce services by decreasing headcount and hours worked.  For healthcare employers, however, reducing services often is not an option either because of laws requiring a minimum level of service.  Thus, employers in these sectors will face significant hardships and the people who rely on their operations will be forced to go without these services.

As of September 2, 2015, almost 200 commenters have posted comments at www.regulations.gov expressing concerns regarding the impact of the proposed salary level increase on non-profits.  Perhaps this was the motivation for Administrator David Weil's recent blog post, "*Non-Profits and the Proposed Overtime Rule,*" which attempts to assure non-profits organizations that they "are not covered enterprises under the FLSA, however, unless they engage in ordinary commercial activities that result in sales made or business" of $500,000 or more per year.[105]  Few non-profit organizations are likely to be fooled into believing they need not comply with the FLSA or can ignore the Department's changes to the Part 541 regulations.  As acknowledged in the blog, the FLSA minimum wage and overtime requirements also apply to any employee of a non-profit organization who makes out-of-state phone calls, mails information or conducts business via the U.S. mail, orders or receives goods from an out-of-state supplier (e.g.,

---

[105] *See* http://blog.dol.gov/2015/08/26/non-profits-and-the-proposed-overtime-rule/.

Exhibit 3

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

PANAGIOTIS KROKOS and CHARLES
TUTTLE, on behalf of themselves and all others
similarly situated,

              Plaintiffs,

    v.

THE FRESH MARKET, INC.,

              Defendant.

No. 16 Civ. 12082

## PLAINTIFFS' MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT
## AND MEMORANDUM OF LAW IN SUPPORT THEREOF

Pursuant to Federal Rule of Civil Procedure 15(a)(2), Plaintiffs respectfully request leave

to file a First Amended Complaint, attached to this motion as Exhibit 1.  The First Amended

Complaint adds allegations that, after December 1, 2016, The Fresh Market, Inc. ("Fresh

Market") classified Gregory Riddick, a new named Plaintiff, and other Assistant Managers

("AMs") as exempt executives despite paying them less than the minimum salary threshold

required by the U.S. Department of Labor ("U.S. DOL") regulations defining the executive and

administrative exemptions.  *See* 29 C.F.R. §§ 541.100, 541.200.  This amendment is timely and

will not prejudice Fresh Market, as discussed in more detail below.  Accordingly, Plaintiffs

respectfully request the Court's leave to file the attached First Amended Complaint.

## ARGUMENT

Fed. R. Civ. P. 15(a)(2) provides that "[t]he court should freely give leave [to amend the

complaint] when justice so requires . . . . In the absence of any apparent or declared reason—

such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to

1

cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be freely given." *Foman v. Davis*, 371 U.S. 178, 182 (1962) (internal quotation marks omitted). The amendment that Plaintiffs seek meets this lenient standard.

First, the amendment is timely. Plaintiffs are filing this motion by the deadline that the parties proposed and the Court adopted for amending pleadings, May 8, 2017. *See* Joint Statement, ECF Nos. 33, 37. Motions to amend filed before a court-ordered deadline are routinely granted under the "liberal default rule" in Rule 15(a). *See Steir v. Girls Scouts of the USA*, 383 F.3d 7, 12 (1st Cir. 2004).

Second, the amendment does not prejudice Fresh Market. Fresh Market agreed to the May 8, 2017 deadline, with which Plaintiffs have complied. Moreover, the allegations added in the proposed First Amended Complaint are similar and related to the allegations already in the case. The new allegations simply provide further grounds for Plaintiffs' first cause of action under the Fair Labor Standards Act, which seeks overtime pay on behalf of misclassified AMs. The First Amended Complaint alleges that, in addition to failing the duties test under the FLSA executive exemption, Fresh Market cannot satisfy the salary basis for Riddick and other AMs. Additionally, no discovery has yet been exchanged, so Fresh Market will have ample opportunity to take discovery on the new allegations. Moreover, the proposed amendment does not cause Fresh Market any additional burden because the exemptions are Fresh Market's affirmative defenses, which require Fresh Market to prove that it met the salary basis test with respect to all AMs, regardless of what Plaintiffs allege. *See Lemieux v. City of Holyoke*, 641 F. Supp. 2d 60, 63 (D. Mass. 2009) ("it is well settled that 'the application of an exemption under the Fair Labor

Standards Act is a matter of affirmative defense on which the employer has the burden of proof.'" (*citing Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974))).

Third, the proposed amendment is not futile. On May 23, 2016, the U.S. DOL issued a final rule pursuant to the Administrative Procedure Act ("APA") that amended the existing regulations that define the Executive and Administrative exemptions. *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees, 81 Fed. Reg. 32,391 (May 23, 2016) (to be codified at 29 C.F.R. pt. 541). That rule became effective on December 1, 2016. The amended rule increased the minimum salary that an employer must pay to an employee to claim the Executive or Administrative exemption. The prior rule required a salary of no less than $455 per week; the amended rule requires a minimum salary of $913 per week. *See* 29 C.F.R. 541.100, 541.200.

Although the amended rule was challenged and subsequently enjoined, the injunction – by its plain language and under longstanding constitutional principles – was limited to the U.S. DOL's actions under the rule. *See Nevada v. United States Dep't of Labor*, 2016 WL 6879615, at *9 (E.D. Tex. Nov. 22, 2016) (clarifying that, "[s]pecifically, Defendants are enjoined from implementing and enforcing [the new rule] pending further order of this Court."). This ruling had no impact on private entities' abilities to enforce the amended rule, which exist separately from the U.S. DOL's enforcement powers.

In addition, the private parties at issue in this case were not before the *Nevada* court, and the *Nevada* court's decision therefore could not bind them. *See, e.g.*, *Zepeda v. U.S. Immigration & Naturalization Serv.*, 753 F.2d 719, 727 (9th Cir. 1983) (holding that a court "may not attempt to determine the rights of persons not before the court"); *see* Fed. R. Civ. P. 65(d)(2) (stating that a preliminary injunction binds only the parties or their agents); *Gilchrist v. Gen. Elec. Capital*

*Corp.*, 262 F.3d 295, 301 (4th Cir. 2001) (stating that an injunction "may only be enforced against individuals over whom the court has personal jurisdiction").

Such a holding comports with the requirements of the Administrative Procedure Act, which limits the authority of courts to stay the effective date of a rule "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. The injury alleged in the *Nevada* case was limited to the State Plaintiffs in their status as states: that "compliance costs [would] impact government programs and services." *Nevada*, 2016 WL 6879615, at *7. Under the APA, any injunction issued to redress this remedy must be limited to those States acting as states. *See, e.g.*, *Va. Soc. for Human Life, Inc. v. FEC*, 263 F.3d 379, 392 (4th Cir. 2001) (vacating a nationwide injunction against application of an agency rule because it was "broader than necessary to afford full relief to [the plaintiff]"); *Kentuckians for Commonwealth Inc. v. Rivenburgh*, 317 F.3d 425, 436 (4th Cir. 2003) (vacating an injunction because it "was broader in scope than that 'necessary to provide complete relief to the plaintiff'" and "did not carefully address only the circumstances of the case").[1]

For all of these reasons, the *Nevada* ruling had no effect on those not party to that action nor could it excuse nonparties from complying with the new rule once it went into effect on the

---

[1] That an injunction seeks to affect an agency rule of nationwide application does not change this principle; the Supreme Court and courts of appeal have rejected nationwide injunctions against agency regulations on the grounds that the relief they would provide is broader than necessary to remedy the injury to the plaintiffs. *See, e.g.*, *U.S. Dep't of Defense v. Meinhold*, 510 U.S. 939, 939 (1993) (staying an injunction against a rule banning service by gay people in the military to the extent it granted relief to "persons other than [the plaintiff]"); *Los Angeles Haven Hospice v. Sebelius*, 638 F.3d 644, 665 (9th Cir. 2011) (vacating a nationwide injunction against agency regulation because enjoining further enforcement against the plaintiff would have provided sufficient remedy).

date provided when it was promulgated.[2] *See League of Women Voters v. Newby*, 838 F.3d 1, 15 (D.C. Cir. 2016) (a "preliminary injunction did not vacate the [agency regulations], but merely prohibits [the agency] from giving them effect").

The *Nevada* injunction also did not prevent the rule from taking effect. The final rule had already been published in the Federal Register when the *Nevada* court issued its injunction on November 22, 2016, just eight days before the rule went into effect. In order for the U.S. DOL to rescind the rule, it would be required to go through the notice-and-comment rule making process under the APA's procedures. *See Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 446 (D.C. Cir. 1982) (agency was required to go through notice and comment procedure of 5 U.S.C. § 553 to rescind published rule that had not yet gone into effect). The *Nevada* court never required the U.S. DOL to take such action or to rescind the rule, and the U.S. DOL has not done so. Therefore, while the U.S. DOL cannot enforce the rule against the litigants in the *Nevada* case, the rule remains in effect and binding on all other employers subject to it, including Fresh Market.

This case is just such a circumstance: Plaintiffs' amended complaint alleges that, even though the new rule went into effect on December 1, 2016, Fresh Market continued to pay some AMs a lower salary than the new rule required and also continued to withhold overtime, claiming that AMs were exempt employees. *See* Ex. 1 (First Amended Complaint) ¶¶ 101-05. Although Fresh Market originally announced plans to increase AM salaries to comply with the new rule, it

---

[2]     Even if the *Nevada* opinion could be read to "enjoin" the Rule itself, the court lacked the authority to grant such relief. An injunction is "a judicial process or mandate operating *in personam*"; it operates against a person, not a rule or court order. *See Nken v. Holder*, 556 U.S. 418, 428 (2009) (describing an injunction as "a means by which a court tells someone what to do or not to do"); *Suntex Dairy v. Bergland*, 591 F.2d 1063, 1068 (5th Cir. 1979) ("an injunction decree operates *in personam*").

improperly withdrew those plans after the *Nevada* court issued its injunction. Because the new overtime rule went into effect and applies to Fresh Market, the Defendant has unlawfully failed to pay overtime to AMs since December 1, 2016. Therefore, Plaintiffs' proposed amendments are meritorious and should be permitted.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion and allow them to file the First Amended Complaint attached as Exhibit 1.

Dated: May 8, 2017
New York, New York

Respectfully submitted,

By:   /s/ Justin M. Swartz

**OUTTEN & GOLDEN LLP**
Justin M. Swartz*
Michael J. Scimone*
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone:     (212) 245-1000

**FAIR WORK P.C.**
Hillary Schwab, BBO #666029
Brant Casavant, BBO #672614
192 South Street, Suite 450
Boston, Massachusetts 02111
Telephone: (617) 607-3261

**SHAVITZ LAW GROUP, P.A.**
Michael Palitz*
830 3rd Avenue, 5th Floor
New York, New York 10022
Telephone:     (800) 616-4000

Gregg I. Shavitz*
1515 S. Federal Hwy
Boca Raton, Florida 33432
Telephone:     (561) 447-8888

*Attorneys for Plaintiffs and the Putative
Class and Collective*

\* admitted *pro hac vice*.

## CERTIFICATE OF CONFERENCE

I hereby certify that, pursuant to Local Rule 7.1, I attempted to confer with defense counsel on the subject matter of this motion on May 4, 2017; however, due to time constraints, the parties were unable to confer before the court-ordered deadline to file motions to amend the pleadings.  As of this time, Defendant has not taken a position on whether or not it will oppose this motion.

 /s/ Michael J. Scimone
Michael J. Scimone, Esq.

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of this document to be served via electronic filing on all counsel of record on May 8, 2017.

 /s/ Michael J. Scimone
Michael J. Scimone, Esq.

# Exhibit 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

PANAGIOTIS KROKOS, CHARLES TUTTLE, and GREGORY RIDDICK, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

THE FRESH MARKET, INC.,

Defendants.

No. 16 Civ. 12082

**FIRST AMENDED CLASS ACTION COMPLAINT**

## CLASS AND COLLECTIVE ACTION COMPLAINT

Plaintiffs Panagiotis Krokos ("Krokos"), Charles Tuttle ("Tuttle"), and Gregory Riddick ("Riddick") (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, as class and collective representatives, upon personal knowledge as to themselves, and upon information and belief as to other matters, allege as follows:

## NATURE OF THE ACTION

1. This lawsuit seeks to recover unpaid overtime compensation for Plaintiffs and their similarly situated co-workers who worked for Defendant The Fresh Market, Inc. ("The Fresh Market" or "Defendant") in the United States as exempt-classified Assistant Managers ("AMs").

2. Plaintiffs bring this action to recover unpaid overtime compensation for themselves and similarly situated employees as a collective action under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA").

3. Plaintiff Krokos brings this action to recover unpaid overtime compensation for himself and similarly situated Massachusetts employees as a Fed. R. Civ. P. 23 class action under the Massachusetts Wage Laws ("MWL"), Mass. Gen. L. c. 151 § 1A, § 1B.

4. Plaintiff Tuttle brings this action to recover unpaid overtime compensation for himself and similarly situated New York employees as a Fed. R. Civ. P. 23 class action under the New York Labor Law ("NYLL"), Article 6, §§ 190 *et seq.*

5. Plaintiff Riddick also brings this action to recover unpaid overtime compensation for himself and a subset of the FLSA collective that worked for The Fresh Market after December 1, 2016, under the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq.; 29 C.F.R. § 541.100.

6. The Fresh Market "is a high-growth specialty retailer focused on creating an extraordinary food shopping experience for its customers." It sells "high-quality food products, with an emphasis on fresh, premium perishables and an uncompromising commitment to customer service."

7. The Fresh Market currently operates more than 170 stores in 23 states.

8. For fiscal year 2015, The Fresh Market made approximately $1.86 billion dollars in sales.

9. The Fresh Market required Plaintiffs and other AMs to work long overtime hours without paying them any overtime compensation.

10. The Fresh Market classified Plaintiffs and all of its other AMs as "executives" and treated them as exempt from the overtime requirements of federal and state laws.

11. Plaintiffs and other AMs performed substantially the same duties in all The Fresh Market stores.

12. Plaintiffs and AMs spent the majority of their time performing the same duties that hourly employees performed, including working the cash registers, merchandising, customer

- 2 -

service, stocking, unloading trucks, and cleaning.  Performing these tasks was the primary duty of the AM position.

13.     In addition, beginning on December 1, 2016 and continuing to the present, The Fresh Market failed to pay AMs at the salary basis required by 29 C.F.R. §§ 541.100, 541.200.

14.     The Fresh Market applied the same compensation and employment policies, practices, and procedures to its AMs nationwide.

## THE PARTIES

**Plaintiffs**

### *Panagiotis Krokos*

15.     Panagiotis Krokos is an adult individual who is a resident of Everett, Massachusetts.

16.     Krokos was employed by Defendant as an AM in Hingham, Massachusetts from approximately April 2009 until February 2014.

17.     Krokos frequently worked more than 40 hours per week and often worked between 50 and 55 hours per week.

18.     Pursuant to The Fresh Market's policy and pattern or practice, The Fresh Market did not pay Krokos premium overtime pay when he worked as an AM in excess of 40 hours in a workweek.

19.     Krokos is a covered employee within the meaning of the FLSA and MWL.

20.     Krokos' written consent to join this action was filed on October 18, 2017.  *See* ECF No. 1-3.

***Charles Tuttle***

21.     Charles Tuttle is an adult individual who is a resident of Westfield, Massachusetts.

22.     Tuttle was employed by Defendant as an AM in Latham, New York from approximately May 2013 to March 2014.

23.     Tuttle was employed by Defendant as an AM in Saratoga, New York from approximately March 2014 to October 2015.

24.     Tuttle performed the same primary duties at both of these locations.

25.     Tuttle frequently worked more than 40 hours per week and often worked between 50 and 70 hours per week.

26.     Pursuant to The Fresh Market's policy and pattern or practice, The Fresh Market did not pay Tuttle any overtime premium pay when he worked as an AM in excess of 40 hours in a workweek.

27.     Tuttle is a covered employee within the meaning of the FLSA and the NYLL. Tuttle's written consent to join this action was filed on October 18, 2017.  *See* ECF No. 1-3.

***Gregory Riddick***

28.     Gregory Riddick is an adult individual who is a resident of Norfolk, Virginia.

29.     Riddick has been employed by Defendant as an AM in Newport News, Virginia from approximately March 2017 to the present.  Prior to that, he was employed as an AM in Norfolk, Virginia from September 2014 until March 2017.

30.     Riddick performed the same primary duties at both of these locations.

31.     Riddick frequently worked more than 40 hours per week and often worked between 45 and 50 hours per week.

32.     Pursuant to The Fresh Market's policy and pattern or practice, The Fresh Market did not pay Riddick any overtime premium pay when he worked as an AM in excess of 40 hours in a workweek.

33.     Riddick is a covered employee within the meaning of the FLSA.

34.     Riddick's written consent to join this action was filed on April 4, 2017.  *See* ECF No. 45.

**Defendant**

*The Fresh Market Inc.*

35.     The Fresh Market, Inc. has owned and/or operated The Fresh Market stores during the relevant period, including the stores at which Plaintiffs worked.

36.     The Fresh Market is a covered employer within the meaning of the FLSA, MWL, and NYLL.

37.     At all times relevant, The Fresh Market maintained control, oversight, and direction over Plaintiffs and similarly situated employees, including with respect to the timekeeping, payroll, and other employment practices that applied to them.

38.     The Fresh Market applies the same employment policies, practices, and procedures to all AMs at all The Fresh Market stores, including policies, practices, and procedures with respect to the payment of overtime compensation.

39.     Upon information and belief, at all times relevant, The Fresh Market's annual gross volume of sales made or business done was not less than $500,000.00.

## JURISDICTION AND VENUE

40.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, diversity jurisdiction pursuant to 28 U.S.C. § 1332, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

41.     In addition, the Court has jurisdiction over Plaintiffs' claims under the FLSA pursuant to 29 U.S.C. § 216(b).

42.     The amount in controversy in this matter exceeds the sum or value of $5,000,000 exclusive of interest and costs.

43.     At least one member of the proposed class is a citizen of a state different from that of at least one Defendant.

44.     Plaintiffs' claims involve matters of national or interstate interest.  Citizenship of the members of the proposed class is dispersed among a substantial number of states.

45.     Upon information and belief, Defendant is subject to personal jurisdiction in Massachusetts.

46.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

47.     Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## COLLECTIVE ACTION ALLEGATIONS

48.     Plaintiffs bring the First Cause of Action, an FLSA claim, on behalf of themselves and all similarly situated persons who worked as AMs at The Fresh Market stores nationwide, who elect to opt in to this action (the "FLSA Collective").

49.     Defendant is liable under the FLSA for, *inter alia,* failing to properly compensate Plaintiffs and other similarly situated AMs.

50.     Consistent with Defendant's policy and pattern or practice, Plaintiffs and the members of the FLSA Collective were not paid premium overtime compensation when they worked beyond 40 hours in a workweek.

51.     All of the work that Plaintiffs and the members of the FLSA Collective have performed has been assigned by Defendant, and/or Defendant has been aware of all of the work that Plaintiffs and the FLSA Collective have performed.

52.     As part of its regular business practice, Defendant has intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the FLSA with respect to Plaintiffs and the members of FLSA Collective.  This policy and pattern or practice includes, but is not limited to:

>       (a)     willfully failing to pay its employees, including Plaintiffs and the members of the FLSA Collective, premium overtime wages for hours that they worked in excess of 40 hours per workweek;
>
>       (b)     willfully misclassifying Plaintiffs and the members of the FLSA collective as exempt from the protections of the FLSA; and
>
>       (c)     willfully failing to record all of the time that its employees, including Plaintiffs and the members of the FLSA Collective, have worked for the benefit of Defendant.

53.     Defendant is aware or should have been aware that federal law required it to pay Plaintiffs and the members of the FLSA Collective overtime premiums for hours worked in excess of 40 per workweek.

54.     Plaintiffs and the members of the FLSA Collective perform or performed the same primary duties.

55.     Defendant's unlawful conduct has been widespread, repeated, and consistent.

56.     There are many similarly situated current and former AMs who have been underpaid in violation of the FLSA who would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

57.     Notice should be sent to the FLSA Collective pursuant to 29 U.S.C. § 216(b).

58.     Similarly situated employees are known to Defendant, are readily identifiable, and can be located through Defendant's records.

## MASSACHUSETTS CLASS ACTION ALLEGATIONS

59.     Krokos brings the Second Cause of Action, the MWL claim, under Rule 23 of the Federal Rules of Civil Procedure, on behalf of himself and a class of persons consisting of:

> All persons who work or have worked as an AM at any The Fresh Market store in Massachusetts between July 27, 2016, and the date of final judgment in this matter (the "Massachusetts Rule 23 Class").

60.     Excluded from the Massachusetts Rule 23 Class are Defendant, Defendant's legal representatives, officers, directors, assigns, and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in Defendant; the Judge(s) to whom this case is assigned and any member of the Judge(s)' immediate family; and all persons who will submit timely and otherwise proper requests for exclusion from the Massachusetts Rule 23 Class.

61.     The members of the Massachusetts Rule 23 Class are so numerous that joinder of all members is impracticable.

62.     Upon information and belief, the size of the Massachusetts Rule 23 Class is at least 40 individuals.  Although the precise number of such employees is unknown, the facts on which the calculation of that number depends are presently within the sole control of Defendant.

63. Defendant has acted or has refused to act on grounds generally applicable to the Massachusetts Rule 23 Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Massachusetts Rule 23 Class as a whole.

64. Common questions of law and fact exist as to the Massachusetts Rule 23 Class that predominate over any questions only affecting them individually and include, but are not limited to, the following:

    a.     whether Defendant violated the MWL;

    b.     whether Defendant failed to compensate Krokos and the Massachusetts Rule 23 Class for hours worked in excess of 40 hours per workweek;

    c.     whether Defendant misclassified Krokos and the Massachusetts Rule 23 Class;

    d.     whether Defendant failed to keep true and accurate time and pay records for all hours worked by Krokos and the Massachusetts Rule 23 Class, and other records required by the MWL;

    e.     whether Defendant failed to furnish Krokos and the Massachusetts Rule 23 Class with an accurate statement of wages, hours worked, rates paid, and the gross wages as required by the MWL;

    f.     whether Defendant's policy of failing to pay workers was instituted willfully or with reckless disregard of the law; and

    g.     the nature and extent of class-wide injury and the measure of damages for those injuries.

65. The claims of Krokos are typical of the claims of the Massachusetts Rule 23 Class he seeks to represent.

66.     Krokos and the Massachusetts Rule 23 Class members work, or have worked, for Defendant as AMs at The Fresh Market.

67.     Krokos and the Massachusetts Rule 23 Class members enjoy the same statutory rights under the MWL, including the right to be paid overtime wages for all overtime hours worked.  Krokos and the Massachusetts Rule 23 Class members have all sustained similar types of damages as a result of Defendant's failure to comply with the MWL.  Krokos and the Massachusetts Rule 23 Class members have all been injured in that they have been under-compensated due to Defendant's common policies, practices, and patterns of conduct.

68.     Krokos will fairly and adequately represent and protect the interests of the members of the Massachusetts Rule 23 Class.  Krokos understands that, as class representative, he assumes a fiduciary responsibility to the class to represent its interests fairly and adequately.  Krokos recognizes that, as class representative, he must represent and consider the interests of the class just as he would represent and consider his own interests.  Krokos understands that, in decisions regarding the conduct of the litigation and its possible settlement, he must not favor his own interests over the class.  Krokos recognizes that any resolution of a class action must be in the best interest of the class.  Krokos understands that, in order to provide adequate representation, he must be informed of developments in litigation, cooperate with class counsel, and testify at deposition and/or trial.  Krokos has retained counsel competent and experienced in complex class actions and employment litigation.  There is no conflict between Krokos and the Massachusetts Rule 23 Class members.

69.     A class action is superior to other available methods for the fair and efficient adjudication of this litigation.  The members of the Massachusetts Rule 23 Class have been damaged and are entitled to recovery as a result of Defendant's violations of the MWL.

Although the relative damages suffered by individual Massachusetts Rule 23 Class members are not *de minimis*, such damages are small compared to the expense and burden of individual prosecution of this litigation. The individual plaintiffs lack the financial resources to conduct a thorough examination of Defendant's timekeeping and compensation practices and to prosecute vigorously a lawsuit against Defendant to recover such damages. In addition, class litigation is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendant's practices.

70.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(3).

71.     Krokos has exhausted his administrative remedies by filing a Non-Payment of Wage and Workplace Complaint Form with the Massachusetts Office of the Attorney General.

### NEW YORK CLASS ACTION ALLEGATIONS

72.     Tuttle brings the Third and Fourth Causes of Action, the NYLL claims, under Rule 23 of the Federal Rules of Civil Procedure, on behalf of himself and a class of persons consisting of:

> All persons who work or have worked as an AM at any The Fresh Market store in New York between July 27, 2010, and the date of final judgment in this matter (the "New York Rule 23 Class").

73.     Excluded from the New York Rule 23 Class are Defendant, Defendant's legal representatives, officers, directors, assigns, and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in Defendant; the Judge(s) to whom this case is assigned and any member of the Judge(s)' immediate family; and all persons who will submit timely and otherwise proper requests for exclusion from the New York Rule 23 Class.

74.     The members of the New York Rule 23 Class are so numerous that joinder of all members is impracticable.

75.     Upon information and belief, the size of the New York Rule 23 Class is at least 40 individuals.  Although the precise number of such employees is unknown, the facts on which the calculation of that number depends are presently within the sole control of Defendant.

76.     Defendant has acted or has refused to act on grounds generally applicable to the New York Rule 23 Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the New York Rule 23 Class as a whole.

77.     Common questions of law and fact exist as to the New York Rule 23 Class that predominate over any questions only affecting them individually and include, but are not limited to, the following:

> h.     whether Defendant violated NYLL, Articles 6 and 19, and the supporting New York State Department of Labor regulations;
>
> i.     whether Defendant failed to compensate Tuttle and the New York Rule 23 Class for hours worked in excess of 40 hours per workweek;
>
> j.     whether Defendant misclassified Tuttle and the New York Rule 23 Class;
>
> k.     whether Defendant failed to keep true and accurate time and pay records for all hours worked by Tuttle and the New York Rule 23 Class, and other records required by the NYLL;
>
> l.     whether Defendant failed to provide Tuttle and the New York Rule 23 Class spread-of-hours pay when the length of their workday was greater than 10 hours;
>
> m.     whether Defendant failed to furnish Tuttle and the New York Rule 23 Class with an accurate statement of wages, hours worked, rates paid, and the gross wages as required by the NYLL;
>
> n.     whether Defendant's policy of failing to pay workers was instituted willfully or with reckless disregard of the law; and
>
> o.     the nature and extent of class-wide injury and the measure of damages for

those injuries.

78.     The claims of Tuttle are typical of the claims of the New York Rule 23 Class he seeks to represent.

79.     Tuttle and the New York Rule 23 Class members work, or have worked, for Defendant as AMs at Fresh Market.

80.     Tuttle and the New York Rule 23 Class members enjoy the same statutory rights under the NYLL, including the right to be paid overtime wages for all overtime hours worked. Tuttle and the New York Rule 23 Class members have all sustained similar types of damages as a result of Defendant's failure to comply with the NYLL.  Tuttle and the New York Rule 23 Class members have all been injured in that they have been under-compensated due to Defendant's common policies, practices, and patterns of conduct.

81.     Tuttle will fairly and adequately represent and protect the interests of the members of the New York Rule 23 Class.  Tuttle understands that, as class representative, he assumes a fiduciary responsibility to the class to represent its interests fairly and adequately. Tuttle recognizes that, as class representative, he must represent and consider the interests of the class just as he would represent and consider his own interests.  Tuttle understands that, in decisions regarding the conduct of the litigation and its possible settlement, he must not favor his own interests over the class.  Tuttle recognizes that any resolution of a class action must be in the best interest of the class.  Tuttle understands that, in order to provide adequate representation, he must be informed of developments in litigation, cooperate with class counsel, and testify at deposition and/or trial.  Tuttle has retained counsel competent and experienced in complex class actions and employment litigation.  There is no conflict between Tuttle and the New York Rule 23 Class members.

82.     A class action is superior to other available methods for the fair and efficient adjudication of this litigation.  The members of the New York Rule 23 Class have been damaged and are entitled to recovery as a result of Defendant's violations of the NYLL.  Although the relative damages suffered by individual New York Rule 23 Class members are not *de minimis*, such damages are small compared to the expense and burden of individual prosecution of this litigation.  The individual plaintiffs lack the financial resources to conduct a thorough examination of Defendant's timekeeping and compensation practices and to prosecute vigorously a lawsuit against Defendant to recover such damages.  In addition, class litigation is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendant's practices.

83.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(3).

## COMMON FACTUAL ALLEGATIONS

84.     Throughout their employment with Defendant, Plaintiffs and the members of the FLSA Collective and the New York and Massachusetts Rule 23 Classes (collectively "Class Members") consistently worked more than 40 hours per week.

85.     Plaintiffs' and the Class Members' primary job duties are uniform throughout Fresh Market's stores.

86.     Defendant was aware that Plaintiffs and the Class Members worked more than 40 hours per workweek, yet Defendant failed to pay overtime compensation for hours worked over 40 in a workweek.

87.     Defendant did not keep accurate records of hours worked by Plaintiffs or the Class Members.

88.     Plaintiffs' and the Class Members' work hours are not recorded on paystubs.

89.     Defendant did not require Plaintiffs or the Class Members to clock in or out, or otherwise record their time.

90.     Plaintiffs' and the Class Members' primary duties were routine, non-exempt tasks including, but not limited to:

      a.     working the cash register;

      b.     customer service;

      c.     merchandising;

      d.     stocking;

      e.     unloading the truck; and

      f.     cleaning the store.

91.     Plaintiffs and the Class Members spent the majority of their time performing these duties that were the same as or similar to tasks performed by hourly, non-exempt employees.

92.     Plaintiffs' and the Class Members' primary duties as AMs did not differ substantially from the duties of hourly, non-exempt employees.

93.     Plaintiffs' and the Class Members' primary job duties as AMs did not include:

      a.     hiring;

      b.     firing;

      c.     making recommendations for hiring, firing, or other employment decisions;

      d.     scheduling; or

      e.     disciplining other employees.

94.     Plaintiffs' and the Class Members' primary job duties were not directly related to Defendant's management or general business operations.

95.     Plaintiffs' and the Class Members' primary job duties did not include the exercise of discretion or independent judgment regarding matters of significance.

96.     Plaintiffs and the Class Members were not involved in planning Defendant's long or short term business objectives.

97.     Plaintiffs and the Class Members did not formulate, affect, implement or interpret Defendant's management policies or operating practices.

98.     Plaintiffs and the Class Members did not carry out major assignments that affected Defendant's business operations.

99.     Plaintiffs and the Class Members did not have authority to commit Defendant in matters that had significant financial impact.

100.    Plaintiffs and the Class Members could not waive or deviate from Defendant's established policies or procedures without prior approval.

101.    The FLSA exempts from its overtime requirements "any employee employed in a bona fide executive, administrative, or professional capacity . . . as such terms are defined and delimited from time to time by regulations of the Secretary."  29 U.S.C. § 213(a)(1).  As of December 1, 2016, the Secretary of Labor has defined and delimited the terms "bona fide, executive, administrative, or professional capacity" to include only those employees who are paid on a salary basis not less than $913 per week.  29 C.F.R. § 541.600(a).

102.    In 2016, The Fresh Market paid Riddick an annual salary of $42,848.00.  In the final quarter of 2016, The Fresh Market paid Riddick bonuses totaling $1,833.49.  In that quarter, The Fresh Market paid Riddick no other compensation.

103.     In 2017, The Fresh Market paid Riddick an annual salary of $ 44,351.80.  In the first quarter of 2017, The Fresh Market paid Riddick bonuses totaling $1,369.91.  The Fresh Market has paid Riddick no other monetary compensation in 2017.

104.     From December 1, 2016 to the present, The Fresh Market has continued to pay Riddick and other AMs less than $47,476.00 annually.

105.     The Fresh Market was aware that the salary threshold for the executive employee exemption was $913 per week ($47,476.00 annually) as of December 1, 2016 and that Riddick and the Salary Basis Opt-ins were paid less than $913 per week; nonetheless, the Fresh Market it chose to classify them as exempt and to deny them overtime compensation for hours worked in excess of forty per week.

106.     Upon information and belief, shortly before December 1, 2016, when the current versions of the Department of Labor regulations defining the Executive and Administrative exemptions were scheduled to go into effect, The Fresh Market announced to some of its employees that, due to the amended regulations, AMs who were earning less than $47,476.00 annually would receive a salary increase.

107.     On November 22, 2016, the United States District Court for the Eastern District of Texas issued an injunction in *Nevada v. United States Dep't of Labor*, No. 16 Civ. 731, 2016 WL 6879615, at *9 (E.D. Tex. Nov. 22, 2016) that enjoined only the U.S. Department of Labor from "implementing and enforcing" the amended versions of, *inter alia*, 29 C.F.R. §§ 541.100 and 541.200.

108.     The Fresh Market erroneously relied on this ruling to change its position.

109.     Pursuant to its policy or practice of continuing to classify AMs as exempt after December 1, 2016, The Fresh Market improperly did not pay Riddick or other AMs the salary

- 17 -

increase they had been promised, nor did it pay them the alternate overtime premium provided for by the FLSA for hours worked in excess of forty per week for the period from on or around December 1, 2016, through the present.

**FIRST CAUSE OF ACTION**
**Fair Labor Standards Act – Overtime Wages**
**(Brought on behalf of Plaintiffs and the members of the FLSA Collective)**

110.    Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

111.    Defendant has engaged in a widespread pattern and practice of violating the FLSA, as described in this Collective and Class Action Complaint.

112.    At all relevant times, Plaintiffs and the FLSA Collective were engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

113.    At all relevant times, Defendant has employed Plaintiffs and the FLSA Collective.

114.    The overtime wage provisions set forth in §§ 201 *et seq.* of the FLSA apply to Defendant.

115.    At all relevant times, Defendant has been an employer engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

116.    At all times relevant, Plaintiffs and the FLSA Collective were employees within the meaning of 29 U.S.C. §§ 203(e) and 207(a).

117.    Defendant has failed to pay Plaintiffs and the FLSA Collective the overtime wages to which they are entitled under the FLSA.

118.    Defendant's violations of the FLSA, as described in this Class and Collective Action Complaint, have been willful and intentional.

119.    Because Defendant's violations of the FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

120.    As a result of the unlawful acts of Defendant, Plaintiffs and the FLSA Collective have been deprived of overtime compensation and other wages in amounts to be determined at trial, and are entitled to recover of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

### SECOND CAUSE OF ACTION
**Massachusetts Wage Law – Unpaid Overtime**
**(Brought on behalf of Plaintiff Krokos and the members of the Massachusetts Rule 23 Class)**

121.    Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

122.    Defendant engaged in a widespread pattern, policy, and practice of violating the MWL, as detailed in this Collective and Class Action Complaint.

123.    At all times relevant, Krokos and the members of the Massachusetts Rule 23 Class have been employees of Defendant within the meaning of the MWL.

124.    Krokos and the Massachusetts Rule 23 Class are covered by the MWL.

125.    Defendant has failed pay Krokos and the members of the Massachusetts Rule 23 Class overtime wages to which they are entitled under the MWL.

126.    Defendant failed to pay Krokos and the members of the Massachusetts Rule 23 Class overtime at a wage rate of one and one-half times their regular rate of pay.

127.    Defendant failed to keep, make, preserve, maintain, and furnish accurate records of time worked by Krokos and the members of the Massachusetts Rule 23 Class.

128.    Defendant's violations of the MWL, as described in this Collective and Class Action Complaint, have been willful and intentional.

129.    Due to Defendant's violations of the MWL, Krokos and the members of the Massachusetts Rule 23 Class are entitled to recover from Defendant unpaid overtime, reasonable attorneys' fees and costs of the action, liquidated damages as provided for by the MWL, and prejudgment and post-judgment interest.

## THIRD CAUSE OF ACTION
### New York Labor Law – Unpaid Overtime
**(Brought on behalf of Plaintiff Tuttle and the members of the New York Rule 23 Class)**

130.    Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

131.    Defendant engaged in a widespread pattern, policy, and practice of violating the NYLL, as detailed in this Collective and Class Action Complaint.

132.    At all times relevant, Tuttle and the members of the New York Rule 23 Class have been employees of Defendant within the meaning of the NYLL.

133.    Tuttle and the New York Rule 23 Class are covered by the NYLL.

134.    Defendant has failed pay Tuttle and the members of the New York Rule 23 Class overtime wages to which they are entitled under the NYLL.

135.     Defendant failed to pay Tuttle and the members of the New York Rule 23 Class overtime at a wage rate of one and one-half times their regular rates of pay.

136.     Defendant failed to keep, make, preserve, maintain, and furnish accurate records of time worked by Tuttle and the members of the New York Rule 23 Class.

137.    Defendant's violations of the NYLL, as described in this Collective and Class Action Complaint, have been willful and intentional.

138.     Due to Defendant's violations of the NYLL, Tuttle and the members of the New York Rule 23 Class are entitled to recover from Defendant unpaid overtime, reasonable attorneys' fees and costs of the action, liquidated damages as provided for by the NYLL, and prejudgment and post-judgment interest.

## FOURTH CAUSE OF ACTION
### New York Labor Law – Spread-of-Hours Pay
### (Brought on behalf of Tuttle and the members of the New York Rule 23 Class)

139.     Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

140.     Defendant willfully failed to pay Tuttle and the members of the New York Rule 23 Class additional compensation of one hour's pay at the basic minimum hourly wage rate for each day that the length of the interval between the beginning and end of their workday – including working time plus time off for meals plus intervals off duty – was greater than 10 hours.

141.     By Defendant's failure to pay Tuttle and the members of the New York Rule 23 Class spread-of-hours pay, Defendant has willfully violated the NYLL, and the supporting New York State Department of Labor regulations, 12 NYCRR 146-1.6.

142.     Due to Defendant's violations of the NYLL, Tuttle and the members of the New York Rule 23 Class are entitled to recover from Defendant their unpaid spread-of-hours wages, liquidated damages as provided for by the NYLL, reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all other similarly situated persons, respectfully request that this Court grant the following relief:

A.  That, at the earliest possible time, Plaintiffs be allowed to give notice of this collective action, or that the Court issue such notice, to all AMs and similarly situated employees who are presently, or have at any time during the three years immediately preceding the filing of this suit, up through and including the date of this Court's issuance of court-supervised notice, worked at Fresh Market.  Such notice shall inform them that this civil action has been filed, of the nature of the action, and of their right to join this lawsuit if they believe they were denied proper wages;

B.  Unpaid overtime pay and an additional and equal amount as liquidated damages pursuant to the FLSA and supporting regulations;

C.  Certification of this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

D.  Designation of Plaintiff Tuttle as representative of the New York Rule 23 Class and counsel of record as Class Counsel;

E.  Designation of Plaintiff Krokos as representative of the Massachusetts Rule 23 Class and counsel of record as Class Counsel;

F.  Issuance of a declaratory judgment that the practices complained of in this Collective and Class Action Complaint are unlawful under the NYLL and MWL;

G.  Penalty damages under the NYLL and MWL;

H.  Prejudgment and post-judgment interest;

I.   An injunction requiring Defendant to pay all statutorily required wages and cease the unlawful activity described herein pursuant to the NYLL and MWL;

J.   Reasonable incentive awards for each named Plaintiff to compensate them for the time they spent attempting to recover wages for Class Members and for the risks they took in doing so;

K.   Reasonable attorneys' fees and costs of the action; and

L.   Such other relief as this Court shall deem just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: May 8, 2017                              Respectfully submitted,
       Boston, Massachusetts.

                                  By:  /s/ Hillary Schwab
                                  Hillary Schwab, BBO #666029
                                  Brant Casavant, BBO #672614
                                  **FAIR WORK P.C.**
                                  192 South Street, Suite 450
                                  Boston, Massachusetts 02111
                                  Telephone: (617) 607-3261
                                  Fax: (617) 488-2261
                                  hillary@fairworklaw.com
                                  brant@fairworklaw.com

                                  **OUTTEN & GOLDEN LLP**
                                  Justin M. Swartz*
                                  Michael J. Scimone*
                                  685 Third Avenue, 25th Floor
                                  New York, New York 10017
                                  Telephone:    (212) 245-1000

                                  **SHAVITZ LAW GROUP, P.A.**
                                  Michael Palitz*
                                  830 3rd Avenue, 5th Floor
                                  New York, New York 10022
                                  Telephone:    (800) 616-4000

                                  Gregg I. Shavitz*
                                  1515 S. Federal Hwy

Boca Raton, Florida 33432
Telephone:      (561) 447-8888

*Attorneys for Plaintiffs and the Putative
Class and Collective*

\* admitted *pro hac vice*.

STAYED

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:16–cv–12082–IT

Krokos et al v. The Fresh Market, Inc.
Assigned to: Judge Indira Talwani
Cause: 15:2(a) Fair Labor Standards Act

Date Filed: 10/18/2016
Jury Demand: Plaintiff
Nature of Suit: 710 Labor: Fair Standards
Jurisdiction: Federal Question

**Plaintiff**

**Panagiotis Krokos**

represented by **Brant Casavant**
Fair Work P.C.
192 South Street
Suite 450
Boston, MA 02111
617–231–6777
Fax: 617–488–2261
Email: brant@fairworklaw.com
*ATTORNEY TO BE NOTICED*

**Gregg I. Shavitz**
Shavitz Law Group PA
1515 S Federal Hwy
Suite 404
Boca Raton, FL 33432–7451
561–447–8888
Fax: 561–447–8831
Email: gshavitz@shavitzlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hillary A. Schwab**
Fair Work, P.C.
450, 4th Floor
192 South Street
Boston, MA 02111
617–607–3260
Email: hillary@fairworklaw.com
*ATTORNEY TO BE NOTICED*

**Joseph M. Sellers**
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave NW #500
Washington, DC 20005
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin M. Swartz**
Outten & Golden LLP
25th Floor
685 Third Avenue
New York, NY 10017
212–245–1000
Fax: 646–509–2060
Email: JMS@outtengolden.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael J. Palitz**
Shavitz Law Group, P.A.
5th Floor
830 3rd Avenue

New York, NY 10022
800–616–4000
Email: mpalitz@shavitzlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael J. Scimone**
Outten& Golden LLP
685 3rd Avenue
25th Floor
New York, NY 10017
(212) 245–1000
Fax: (646) 509–2060
Email: mscimone@outtengolden.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Miriam R. Nemeth**
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave NW #500
Washington, DC 20005
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Charles Tuttle**                                 represented by   **Brant Casavant**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gregg I. Shavitz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hillary A. Schwab**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joseph M. Sellers**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin M. Swartz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael J. Palitz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael J. Scimone**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Miriam R. Nemeth**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Apollo Management Group, LLC**
*TERMINATED: 12/01/2016*

**Defendant**

**The Fresh Market, Inc.**               represented by   **Kevin M. McGinty**
                                                          Mintz, Levin, Cohn, Ferris, Glovsky and
                                                          Popeo, PC
                                                          42nd Floor
                                                          One Financial Center
                                                          Boston, MA 02111
                                                          617–542–6000
                                                          Fax: 617–542–2241
                                                          Email: kmcginty@mintz.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Anastasia M. Kerdock**
                                                          Akin Gump Strauss Hauer & Feld
                                                          Bank of America tower
                                                          One Bryant Park
                                                          New York, NY 10036
                                                          (212) 872–1000
                                                          Email: akerdock@akingump.com
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Esther G. Lander**
                                                          Akin Gump Strauss Hauer & Feld LLP
                                                          1333 New Hampshire Avenue, N.W.
                                                          Washington, DC 20036
                                                          (202) 887–4000
                                                          Email: elander@akingump.com
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Lavinia Weizel**
                                                          Mintz, Levin, Cohn, Ferris, Glovsky and
                                                          Popeo, PC
                                                          42nd Floor
                                                          One Financial Center
                                                          Boston, MA 02111
                                                          617–542–6000
                                                          Fax: 617–542–2241
                                                          Email: lmweizel@mintz.com
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Lawrence D. Levien**
                                                          Akin Gump Strauss Hauer & Feld
                                                          1333 New Hampshire Avenue, N.W.
                                                          Washington, DC 20036
                                                          (202) 887–4000
                                                          Email: llevien@akingump.com
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/18/2016 | 1 | COMPLAINT against The Fresh Market, Inc., Apollo Management Group, LLC Filing fee: $ 400, receipt number 0101–6337544 (Fee Status: Filing Fee paid), filed by |

| | | |
|---|---:|---|
| | | Panagiotis Krokos, Charles Tuttle. (Attachments: # 1 Civil Cover Sheet, # 2 Category Form, # 3 Consent to Join Forms)(Schwab, Hillary) (Attachment 3 replaced on 10/18/2016) (Paine, Matthew). (Entered: 10/18/2016) |
| 10/18/2016 | 2 | NOTICE of Appearance by Brant Casavant on behalf of Panagiotis Krokos, Charles Tuttle (Casavant, Brant) (Entered: 10/18/2016) |
| 10/18/2016 | 3 | ELECTRONIC NOTICE of Case Assignment. Judge Indira Talwani assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Jennifer C. Boal. (Abaid, Kimberly) (Entered: 10/18/2016) |
| 10/18/2016 | 4 | Summons Issued as to Apollo Management Group, LLC, The Fresh Market, Inc.. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (Franklin, Yvonne) (Entered: 10/18/2016) |
| 10/31/2016 | 5 | NOTICE of Scheduling Conference Scheduling Conference set for 11/21/2016 02:45 PM in Courtroom 9 before Judge Indira Talwani. Counsel for the plaintiff(s) is responsible for ensuring that all parties and/or their attorneys who have not filed an answer or appearance with the court are notified of the date of the scheduling conference. (MacDonald, Gail) (Entered: 10/31/2016) |
| 11/08/2016 | 6 | CERTIFICATION pursuant to Local Rule 16.1 *for Panagiotis Krokos*. (Casavant, Brant) (Entered: 11/08/2016) |
| 11/08/2016 | 7 | CERTIFICATION pursuant to Local Rule 16.1 *for Charles Tuttle*. (Casavant, Brant) (Entered: 11/08/2016) |
| 11/14/2016 | 8 | Joint MOTION to Continue Scheduling Conference to December 12 or 13, 2016 by Panagiotis Krokos, Charles Tuttle.(Swartz, Justin) (Entered: 11/14/2016) |
| 11/15/2016 | 9 | Judge Indira Talwani: ELECTRONIC ORDER entered granting 8 Motion to Continue. Scheduling Conference set for 11/21/16 is RESET to 12/12/2016 02:30 PM in Courtroom 9 before Judge Indira Talwani. (MacDonald, Gail) (Entered: 11/15/2016) |
| 11/16/2016 | 10 | NOTICE of Appearance by Kevin M. McGinty on behalf of The Fresh Market, Inc. (McGinty, Kevin) (Entered: 11/16/2016) |
| 11/16/2016 | 11 | NOTICE of Appearance by Lavinia Weizel on behalf of The Fresh Market, Inc. (Weizel, Lavinia) (Entered: 11/16/2016) |
| 11/16/2016 | 12 | CORPORATE DISCLOSURE STATEMENT by The Fresh Market, Inc. identifying Corporate Parent Pomegranate Holdings, Inc. for The Fresh Market, Inc... (Weizel, Lavinia) (Entered: 11/16/2016) |
| 11/16/2016 | 13 | Joint MOTION for Leave to File *an Amended Joint Motion to Continue Scheduling Conference* by The Fresh Market, Inc.. (Attachments: # 1 Exhibit A – [Proposed] Amended Joint Motion to Continue Scheduling Conference)(Weizel, Lavinia) (Entered: 11/16/2016) |
| 11/17/2016 | 14 | MOTION for Leave to Appear Pro Hac Vice for admission of Justin Swartz Filing fee: $ 100, receipt number 0101–6378091 by Panagiotis Krokos, Charles Tuttle. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Schwab, Hillary) (Entered: 11/17/2016) |
| 11/17/2016 | 15 | MOTION for Leave to Appear Pro Hac Vice for admission of Michael J. Scimone Filing fee: $ 100, receipt number 0101–6378096 by Panagiotis Krokos, Charles Tuttle. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Schwab, Hillary) (Entered: 11/17/2016) |
| 11/18/2016 | 16 | MOTION for Leave to Appear Pro Hac Vice for admission of Esther G. Lander Filing fee: $ 100, receipt number 0101–6380735 by The Fresh Market, Inc.. (Attachments: # 1 Affidavit of Esther G. Lander)(Weizel, Lavinia) (Entered: 11/18/2016) |
| 11/18/2016 | 17 | MOTION for Leave to Appear Pro Hac Vice for admission of Lawrence D. Levien Filing fee: $ 100, receipt number 0101–6380753 by The Fresh Market, Inc.. (Attachments: # 1 Affidavit of Lawrence D. Levien)(Weizel, Lavinia) (Entered: 11/18/2016) |

| 11/18/2016 | 18 | MOTION for Leave to Appear Pro Hac Vice for admission of Anastasia M. Kerdock Filing fee: $ 100, receipt number 0101−6380773 by The Fresh Market, Inc.. (Attachments: # 1 Affidavit of Anastasia M. Kerdock)(Weizel, Lavinia) (Entered: 11/18/2016) |
| 11/21/2016 | 19 | Judge Indira Talwani: ELECTRONIC ORDER entered ALLOWING 14 Motion for Leave to Appear Pro Hac Vice ; ALLOWING 15 Motion for Leave to Appear Pro Hac Vice . Added Justin Swartz and Michael J. Scimone **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (DaSilva, Carolina) (Entered: 11/21/2016) |
| 11/21/2016 | 20 | Judge Indira Talwani: ELECTRONIC ORDER entered ALLOWING 16 Motion for Leave to Appear Pro Hac Vice Added Esther G. Lander; ALLOWING 17 Motion for Leave to Appear Pro Hac Vice Added Lawrence D. Levien; ALLOWING 18 Motion for Leave to Appear Pro Hac Vice Added Anastasia M. Kerdock. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (DaSilva, Carolina) (Entered: 11/21/2016) |
| 11/21/2016 | 21 | MOTION for Leave to Appear Pro Hac Vice for admission of Gregg I. Shavitz Filing fee: $ 100, receipt number 0101−6382267 by Panagiotis Krokos, Charles Tuttle. (Attachments: # 1 Affidavit of Gregg I. Shavitz, # 2 Certificate of Good Standing)(Casavant, Brant) (Entered: 11/21/2016) |
| 11/22/2016 | 22 | Judge Indira Talwani: ELECTRONIC ORDER entered ALLOWING 21 Motion for Leave to Appear Pro Hac Vice Added Gregg I. Shavitz. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (DaSilva, Carolina) (Entered: 11/22/2016) |
| 11/22/2016 | 23 | Judge Indira Talwani: ELECTRONIC ORDER entered granting 13 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include − Leave to file granted on (date of order)− in the caption of the document. (MacDonald, Gail) (Entered: 11/22/2016) |
| 11/22/2016 | 24 | Amended MOTION to Continue Scheduling Conference to December 12, 2016 *(Joint)* by The Fresh Market, Inc..(Weizel, Lavinia) (Entered: 11/22/2016) |
| 11/23/2016 | 25 | Judge Indira Talwani: ELECTRONIC ORDER entered granting 24 Motion to Continue (MacDonald, Gail) (Entered: 11/23/2016) |
| 11/30/2016 | 26 | NOTICE of Voluntary Dismissal by All Plaintiffs (Swartz, Justin) (Entered: 11/30/2016) |
| 12/02/2016 | 27 | MOTION for Leave to Appear Pro Hac Vice for admission of Michael J. Palitz Filing fee: $ 100, receipt number 0101−6397872 by Panagiotis Krokos, Charles Tuttle. (Attachments: # 1 Affidavit of Michael J. Palitz, # 2 Certificate of Good Standing)(Casavant, Brant) (Entered: 12/02/2016) |
| 12/02/2016 | 28 | Joint MOTION to Continue *Scheduling Conference* by The Fresh Market, Inc..(Weizel, Lavinia) (Entered: 12/02/2016) |
| 12/06/2016 | 29 | Judge Indira Talwani: ELECTRONIC ORDER entered granting 28 Motion to Continue. Scheduling Conference set for 12/12/16 is RESET for 1/23/2017 03:00 PM in Courtroom 9 before Judge Indira Talwani. (MacDonald, Gail) (Entered: 12/06/2016) |
| 12/06/2016 | 30 | Judge Indira Talwani: ELECTRONIC ORDER entered ALLOWING 27 Motion for Leave to Appear Pro Hac Vice Added Michael J. Palitz. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an** |

| | | |
|---|---|---|
| | | <span style="color:red">ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.</span> (DaSilva, Carolina) (Entered: 12/06/2016) |
| 12/30/2016 | 31 | ANSWER to 1 Complaint, by The Fresh Market, Inc..(Levien, Lawrence) (Entered: 12/30/2016) |
| 01/10/2017 | 32 | CERTIFICATION pursuant to Local Rule 16.1 by The Fresh Market, Inc..(Lander, Esther) (Entered: 01/10/2017) |
| 01/13/2017 | 33 | REPORT of Rule 26(f) Planning Meeting. (Lander, Esther) (Entered: 01/13/2017) |
| 01/13/2017 | 34 | STIPULATION *Regarding Conditional Certification* by The Fresh Market, Inc.. (Lander, Esther) (Entered: 01/13/2017) |
| 01/20/2017 | 35 | Joint MOTION for Extension of Time to 1/25/2017 to Submit proposed FLSA notice by Panagiotis Krokos, Charles Tuttle.(Swartz, Justin) (Entered: 01/20/2017) |
| 01/23/2017 | 36 | Judge Indira Talwani: ELECTRONIC ORDER entered granting 35 Motion for Extension of Time to 1/25/2017 to Submit proposed FLSA notice. (MacDonald, Gail) (Entered: 01/23/2017) |
| 01/23/2017 | 37 | Electronic Clerk's Notes for proceedings held before Judge Indira Talwani: Scheduling Conference held on 1/23/2017. Case called. Court has colloquy with counsel. The court adopts the dates set forth in the joint report at document 33 . Counsel to submit agreed–upon language by Friday and may include a short explanation of each position. (Court Reporter: Cheryl Dahlstrom at cheryldahlstrom@comcast.net.) (Attorneys present: Casavant, Swartz, McGinty, Lander) (MacDonald, Gail) Modified on 1/24/2017, to edit docket entry text (MacDonald, Gail). (Entered: 01/23/2017) |
| 01/27/2017 | 38 | Proposed Document(s) submitted by Panagiotis Krokos, Charles Tuttle. Document received: Joint Submission Of Notice Of Collective Action For Court Approval. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Swartz, Justin) (Entered: 01/27/2017) |
| 01/30/2017 | 39 | Judge Indira Talwani: ELECTRONIC ORDER entered APPROVING Joint Stipulation to Conditional Certification and Notice 34 , Court Authorized Notice to Potential Collective Action Members [38–1], Reminder Postcard [38–2] and Consent to Join form [38–3]. (MacDonald, Gail) (Entered: 01/30/2017) |
| 03/07/2017 | 40 | Notice of Filing Consent to Sue. (Attachments: # 1 Exhibit A)(Swartz, Justin) (Entered: 03/07/2017) |
| 03/15/2017 | 41 | Notice of Filing Consent to Sue. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Swartz, Justin) (Entered: 03/15/2017) |
| 03/22/2017 | 42 | Notice of Filing Consent to Sue. (Attachments: # 1 Exhibit A)(Swartz, Justin) (Entered: 03/22/2017) |
| 03/23/2017 | 43 | Notice of Filing Consent to Sue (Attachments: # 1 Exhibit A)(Swartz, Justin) (Entered: 03/23/2017) |
| 03/28/2017 | 44 | Notice of Filing Consent to Sue (Attachments: # 1 Exhibit A)(Swartz, Justin) (Entered: 03/28/2017) |
| 04/04/2017 | 45 | Notice of Filing Consent to Sue (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Swartz, Justin) (Entered: 04/04/2017) |
| 04/11/2017 | 46 | Notice of Filing Consent to Sue (Attachments: # 1 Exhibit A)(Swartz, Justin) (Entered: 04/11/2017) |
| 04/19/2017 | 47 | Notice of Filing Consent to Sue (Attachments: # 1 Exhibit A)(Swartz, Justin) (Entered: 04/19/2017) |
| 04/25/2017 | 48 | Notice of Filing Consent to Sue (Attachments: # 1 Exhibit A)(Swartz, Justin) (Entered: 04/25/2017) |
| 04/27/2017 | 49 | Notice of Filing Consent to Sue (Swartz, Justin) (Entered: 04/27/2017) |

| 05/04/2017 | 50 | Notice of Filing Consent to Sue (Attachments: # 1 Exhibit A)(Swartz, Justin) (Entered: 05/04/2017) |
|---|---|---|
| 05/04/2017 | 51 | Assented to MOTION for Extension of Time to May 12, 2017 to File *Proposed Joint Discovery Plan* by Panagiotis Krokos, Charles Tuttle.(Swartz, Justin) (Entered: 05/04/2017) |
| 05/08/2017 | 52 | Judge Indira Talwani: ELECTRONIC ORDER entered ALLOWING 51 Assented to MOTION for Extension of Time to May 12, 2017 to File Proposed Joint Discovery Plan. (DaSilva, Carolina) (Entered: 05/08/2017) |
| 05/08/2017 | 53 | MOTION for Leave to File *Amended Complaint* by Panagiotis Krokos, Charles Tuttle. (Attachments: # 1 Exhibit 1)(Swartz, Justin) (Entered: 05/08/2017) |
| 05/09/2017 | 54 | Judge Indira Talwani: ELECTRONIC ORDER entered. Plaintiffs' counsel shall file an updated Rule 7.1 certificate as to Plaintiffs' 53 MOTION for Leave to File Amended Complaint no later than **5/12/17.** (DaSilva, Carolina) (Entered: 05/09/2017) |
| 05/09/2017 | 55 | Notice of Filing Consent to Sue (Attachments: # 1 Exhibit A)(Swartz, Justin) (Entered: 05/09/2017) |
| 05/12/2017 | 56 | CERTIFICATE OF CONSULTATION pursuant to LR 7.1 re 53 MOTION for Leave to File *Amended Complaint* by Justin M. Swartz on behalf of Panagiotis Krokos, Charles Tuttle. (Swartz, Justin) (Entered: 05/12/2017) |
| 05/12/2017 | 57 | MOTION for Protective Order by Panagiotis Krokos, Charles Tuttle.(Swartz, Justin) (Entered: 05/12/2017) |
| 05/12/2017 | 58 | STIPULATION *and Protective Order Regarding Protection of Confidential and Proprietary Information* by The Fresh Market, Inc.. (Lander, Esther) (Additional attachment(s) added on 5/17/2017: # 1 Exhibit A) (DaSilva, Carolina). (Entered: 05/12/2017) |
| 05/12/2017 | 59 | JOINT STATEMENT re scheduling conference *Proposing Discovery Plan*. (Attachments: **Deleted and docketed as their own separate entry**)(Lander, Esther) Modified text and deleted attachments on 5/15/2017 (DaSilva, Carolina). (Entered: 05/12/2017) |
| 05/12/2017 | 60 | MEMORANDUM in Support re: 57 MOTION for Protective Order filed by Panagiotis Krokos, Charles Tuttle. **Memorandum filed as a separate docket entry**. (DaSilva, Carolina) (Entered: 05/15/2017) |
| 05/12/2017 | 61 | MEMORANDUM in Opposition re: 57 MOTION for Protective Order filed by The Fresh Market, Inc. **Memorandum filed as a separate docket entry**. (Attachments: # 1 Exhibit A)(DaSilva, Carolina) (Entered: 05/15/2017) |
| 05/22/2017 | 62 | MOTION for Leave to Appear Pro Hac Vice for admission of Joseph M. Sellers Filing fee: $ 100, receipt number 0101−6637132 by Panagiotis Krokos, Charles Tuttle. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Schwab, Hillary) (Entered: 05/22/2017) |
| 05/22/2017 | 63 | MOTION for Leave to Appear Pro Hac Vice for admission of Miriam R. Nemeth Filing fee: $ 100, receipt number 0101−6637153 by Panagiotis Krokos, Charles Tuttle. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Schwab, Hillary) (Entered: 05/22/2017) |
| 05/22/2017 | 64 | MEMORANDUM in Opposition re 53 MOTION for Leave to File *Amended Complaint* filed by The Fresh Market, Inc.. (Lander, Esther) (Entered: 05/22/2017) |
| 05/23/2017 | 65 | Judge Indira Talwani: ELECTRONIC ORDER entered ALLOWING 62 Motion for Leave to Appear Pro Hac Vice ; ALLOWING 63 Motion for Leave to Appear Pro Hac Vice . Added Joseph M. Sellers and Miriam R. Nemeth. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (DaSilva, Carolina) (Entered: 05/23/2017) |
| 06/05/2017 | 66 | Joint MOTION to Stay *Litigation* by Panagiotis Krokos, Charles Tuttle.(Swartz, Justin) (Entered: 06/05/2017) |

| 06/06/2017 | 67 | Judge Indira Talwani: ELECTRONIC ORDER entered ALLOWING <u>66</u> Joint MOTION to Stay Litigation. The parties shall file a joint status report by **September 1, 2017.** (DaSilva, Carolina) (Entered: 06/06/2017) |
|---|---|---|
| 06/22/2017 | <u>68</u> | Notice of Filing Consent to Sue (Swartz, Justin) (Entered: 06/22/2017) |

# Exhibit 4



UNITED STATES DEPARTMENT OF LABOR

All DOL OPA Advanced Search SEARCH

A to Z | Site Map | FAQs | Forms | About DOL | Contact Us | Español

**Office of the Secretary** SHARE

DOL Home > About DOL > Our Mission

**Get Updates By Email**

**By Topic**

- Wages
- Unemployment Insurance (UI)
- Health Plans & Benefits - Continuation of Health Coverage
- View All Topics

**By Audience**

- Job Seekers / Unemployed
- Employers
- Workers
- View All Audiences

**By Location**

**Laws and Regulations**

**Budget & Performance Information**

**American Recovery and Reinvestment Act Information**

**Newsroom**

- DOL Newsletter

**Events Calendar**

**Doing Business With DOL**

**Other Resources**

- Business.USA.gov
- CareerOneStop.org
- Disaster Recovery Assistance
- GovBenefits.gov
- No Fear Act — Equal Employment Opportunity Data Posted Pursuant to the No Fear Act
- Regulations.gov
- Serve.gov
- USA.gov
- The White House
- Wirtz Labor Library

# Our Mission

To foster, promote, and develop the welfare of the wage earners, job seekers, and retirees of the United States; improve working conditions; advance opportunities for profitable employment; and assure work-related benefits and rights.

**Freedom of Information Act | Privacy & Security Statement | Disclaimers | Important Web Site Notices | Plug-ins Used by DOL**

U.S. Department of Labor | Frances Perkins Building, 200 Constitution Ave., NW, Washington, DC 20210
www.dol.gov | Telephone: 1-866-4-USA-DOL (1-866-487-2365) | TTY | Contact Us

Exhibit 5



Advocates for Workplace Fairness

🔍

home

practice areas

our team

media
- audio & visual center
- class action news
- individual case news
- press releases

resources

cases

our firm



## class action news

### Burberry Workers' 30 Minutes Off the Clock Adds Up to $2.54M Settlement

corpcounsel.com
07.20.2017

The class action lawsuit filed in federal court in the Southern District of New York in December 2015 reached a resolution this week that ... could amount to about a $2,500 payout for each of the 643 workers in the class. Partner Justin M. Swartz is quoted.

### State Dept. Restores Job Offers to Students After Diplomat Outcry

Tne New York TImes—Gardiner Harris
06.30.2017

The State Department is now quietly allowing dozens of young women and minority students to become full-fledged diplomats after threatening to rescind job offers that most of the students were given two years ago upon winning prestigious scholarships. Outten & Golden Counsel Peter Romer-Friedman is quoted.

### Media Startups Try a Lower-Cost Model: Unpaid Student Writers

Wall Street Journal—Austen Hufford
06.21.2017

Chapter-based, for-profit media companies like Spoon University and Odyssey have been popping up in college markets across the U.S. Outten & Golden LLP partner



### Why This Dad Is Fighting JPMorgan Chase For Equal Parental Leave

Huffington Post—Emily Peck

06.15.2017

The bank's policy gives new dads just two weeks off, then it's back to the office. Outten & Golden, with ACLU co-counsel, represent the plaintiff.

### JPMorgan Chase Is Biased Against Dads, ACLU Complaint Says

Bloomberg—Josh Eidelson

06.15.2017

The American Civil Liberties Union is accusing JPMorgan Chase & Co. of violating the Civil Rights Act by discriminating against fathers when they ask for parental leave. Outten & Golden, with co-counsel, represent the plaintiff.

### Lawsuit claims Chipotle owes overtime pay to thousands of workers

Washington Post—Jonnelle Marte

06.07.2017

A lawsuit filed against Chipotle on Wednesday claims that a federal rule expanding overtime pay to millions of workers is in effect, despite an injunction late last year that banned the Labor Department from enforcing the regulation.

### Chipotle Is Cheating Thousands Of Workers Out Of Overtime Pay, Lawsuit Alleges

Gothamist—Emma Whitford

06.07.2017

Thousands of Chipotle workers in New Jersey are being illegally denied overtime pay though they consistently work in excess of 40 hours per week, according to a lawsuit filed Wednesday in New Jersey Supreme Court. Outten & Golden partner Justin M. Swartz is quoted.

**1**  2  3  4  5  6  7  8  9  …  next ›  last »

---

**New York, New York**          **Chicago, Illinois**          **San Francisco, California**          **Washington, DC**

(212) 245-1000

685 Third Avenue
25th Floor
New York, NY 10017

161 North Clark Street
Suite 1600
Chicago, IL 60601

One Embarcadero Center
38th Floor
San Francisco, CA 94111

601 Massachusetts Avenue NW
Second Floor West Suite
Washington, DC 20001

© 2017 Outten & Golden LLP. Attorney Advertising  / Site Map / Disclaimer / Privacy Policy / Who We Represent



Advocates for Workplace Fairness





- home
- practice areas
- our team
- media
  - audio & visual center
  - class action news
  - individual case news
  - press releases
- resources
- cases
- our firm

## class action news

### Chipotle faces lawsuit over overtime pay dispute

USA TODAY—Sophia Tulp
06.07.2017

A lawsuit seeking class-action status was filed against Chipotle Mexican Grill alleging the fast-food chain failed to adequately compensate some employees for overtime work under a federal rule that went into effect late last year. Outten & Golden LLP represent the plaintiffs with co-counsel.

### Chipotle Not Paying Its Workers Enough?

thestreet.com—Amanda Schiavo
06.07.2017

[A] lawsuit was filed in the U.S. District Court in New Jersey against Chipotle ... claiming that a federal rule expanding overtime pay to millions of the fast-casual Mexican food restaurant chain's workers is in effect, *The [WSJ]* reports. Outten & Golden LLP represents the plaintiffs with co-counsel.

### Chipotle Workers Sue for Overtime, Testing Scope of Obama-Era Rule

National Law Journal—Erin Mulvaney
06.07.2017

Carmen Alvarez said she was crushed when her employer, Chipotle Mexican Grill Inc., reversed its decision to pay her and her fellow workers overtime late last year,

despite a... work over 40 hours. Outten & Golden LLP represents the plaintiffs with co-counsel.

### In Chipotle lawsuit, worker says overtime pay rule alive and well

Reuters—Daniel Wiessner
06.07.2017

Chipotle Mexican Grill Inc on Wednesday was hit with a proposed class action lawsuit claiming the company ...must comply with a rule extending overtime pay to millions of workers, even though it was blocked by a federal judge. Outten & Golden LLP represents the plaintiffs with co-counsel.

### Chipotle Is Exploiting Judge's Block On OT Rule, Suit Says

Law360—Dorothy Atkins
06.07.2017

Chipotle was hit with a putative class action in New Jersey federal court Wednesday alleging the fast-food chain has illegally relied on a Texas federal judge's ruling blocking the U.S. Department of Labor from expanding overtime protections to avoid paying its workers overtime. Outten & Golden LLP represents the plaintiffs with co-counsel.

### Employees Sue Chipotle, Claiming It Failed To Pay Them Overtime

Huffington Post—Kim Bellware
06.07.2017

Chipotle employees have sued the fast-casual restaurant chain for allegedly failing to pay overtime compensation, which they say they are entitled to under a recent Labor Department rule at the center of a separate court battle. Outten & Golden LLP represents the plaintiffs with co-counsel.

### Workers Say Chipotle Owes Them Overtime Pay

consumerist.com—Ashlee Kieler
06.07.2017

Outten & Golden LLP represent the plaintiffs with co-counsel.

« first   ‹ previous   1   **2**   3   4   5   6   7   8   9   …   next ›   last »

| **New York, New York** | **Chicago, Illinois** | **San Francisco, California** | **Washington, DC** |
|---|---|---|---|
| (212) 245-1000 | (312) 809-7010 | (415) 638-8800 | (202) 847-4400 |
| 685 Third Avenue | 161 North Clark Street | One Embarcadero Center | 601 Massachusetts Avenue NW |
| 25th Floor | Suite 1600 | 38th Floor | Second Floor West Suite |
| New York, NY 10017 | Chicago, IL 60601 | San Francisco, CA 94111 | Washington, DC 20001 |

© 2017 Outten & Golden LLP. Attorney Advertising   / Site Map / Disclaimer / Privacy Policy / Who We Represent



Advocates for Workplace Fairness

🔍

home

practice areas

our team

media
- audio & visual center
- class action news
- individual case news
- press releases

resources

cases

our firm



## class action news

### Chipotle owes me overtime pay, NJ worker says

Asbury Park Press—Michael L. Diamond
06.07.2017

Outten & Golden LLP represents, with co-counsel, a New Jersey woman who worked for Chipotle in a management training program says she should have been eligible for overtime pay.

### Wal-Mart Settlement in First LGBT Workers' Class Action Reflects Larger Shift

National Law Journal—Erin Mulvaney
05.19.2017

Outten & Golden represents Wal-Mart Stores Inc.'s employees who were refused benefits for same-sex partners.

### State Trooper Vets Get $15M Deal For Denied Preference

Law360—Braden Campbell
05.08.2017

The state of Washington will pay at least $13 million in cash and contribute at least $2 million in benefits to settle a class action alleging it violated federal law by denying hiring and promotion preference to military veterans, four firms representing the vets said Monday. Outten & Golden attorney Peter Romer-Friedman is quoted.



### NY Judge Signs Off on $13.5M Duane Reade OT Deal

Law360—Adam Lidgett
05.08.2017

A New York federal judge on Friday approved a $13.5 million deal to settle a class action alleging the Duane Reade drugstore chain didn't pay overtime wages to assistant store managers. The plaintiffs are represented by employment law firm Outten & Golden LLP.

### Employment lawsuit settled between State Patrol and military veterans for more than $13M

The Associated Press
05.08.2017

Lawyers for the plaintiffs say it is the largest settlement in the history of the federal veterans' employment rights law.

### Trustee, Creditors Rip Constellation Ch. 11 Deal, Cite Jevic

Law360—Jeff Montgomery
05.05.2017

The Office of the U.S. Trustee and two creditor groups called Friday for the rejection of a case dismissal deal in Constellation Enterprises LLC's Delaware Chapter 11, saying the settlement "launders" assets and runs afoul of a recent U.S. Supreme Court "structured dismissal" ruling.

### Bass Pro Denied a Second Bite in Challenging Broad Bias Lawsuit

Bloomberg BNA—Kevin McGowan
05.04.2017

Court Denies Bass Pro a Second Bite In Challenge to Scope of EEOC Power. Partner David Lopez is quoted.

« first    ‹ previous    1    2    **3**    4    5    6    7    8    9    …    next ›    last »

| New York, New York | Chicago, Illinois | San Francisco, California | Washington, DC |
|---|---|---|---|
| (212) 245-1000 | (312) 809-7010 | (415) 638-8800 | (202) 847-4400 |
| 685 Third Avenue | 161 North Clark Street | One Embarcadero Center | 601 Massachusetts Avenue NW |
| 25th Floor | Suite 1600 | 38th Floor | Second Floor West Suite |

Case 2:16-cv-00915-ALM-JBM Document 89-19 Filed 06/08/17 Page 259 of 290 PageID #: 4692

© 2017 Outten & Golden LLP. Attorney Advertising  / Site Map / Disclaimer / Privacy Policy / Who We Represent



# Advocates for Workplace Fairness

- 
- **back**

## Lawsuit claims Chipotle owes overtime pay to thousands of workers

Washington Post—Jonnelle Marte
06.07.2017

A lawsuit filed against Chipotle on Wednesday claims that a federal rule expanding overtime pay to millions of workers is in effect, despite an injunction late last year that banned the Labor Department from enforcing the regulation.

The proposed class action lawsuit, which was filed in the U.S. District Court in New Jersey, alleges that Chipotle should be paying time and a half to employees who work more than 40 hours a week and earn less than $47,476 a year —as would be required by the rule. Attorneys representing Chipotle employees in New Jersey argue that the rule still took effect as scheduled on Dec. 1 because the court that ordered the injunction has not issued a final decision or repealed the regulation. The suit also claims that the injunction applied narrowly to the Labor Department and does not block other parties, such as workers, from enforcing the rule in court.

<p style="text-align:center">*       *       *</p>

At issue is a Labor Department rule finalized under the Obama administration that would more than double the income threshold — from $23,660 a year to $47,476 a year — under which workers must be eligible for over time pay. Depending on the outcome of the case, the suit could potentially lead to significant scheduling changes and back pay for Chipotle employees. It could also have implications for millions of other workers who would become eligible for overtime pay under the rule.

<p style="text-align:center">*       *       *</p>

The Chipotle suit is questioning the scope of an injunction filed by a federal judge in November that barred the Labor Department from "implementing and enforcing" the rule roughly a

week before it was scheduled to take effect. The order was meant to give the court more time to reach a final decision on the regulation, which was challenged by 21 states and a coalition of business groups, including the Chamber of Commerce. The result was a limbo where the rule was put on hold but not permanently eliminated, according to legal experts not associated with the case.

However, the lawsuit claims that while the injunction blocked the Labor Department from enforcing the rule, it did not technically prevent the rule from going into effect. The lawyers argue that that the Labor Department does not have to take any further steps to implement the rule because it was already finalized and officially published by the time the injunction was filed.

Catherine Ruckelshaus, general counsel for the National Employment Law Project, a worker advocacy group, also believes the injunction was not enough to keep the rule from going into effect since it had already been finalized. Depending on the outcome of the case, she expects the suit could make more workers eligible for overtime pay. "It potentially has a very broad impact," she said.

\*　　\*　　\*

The Labor Department appealed the injunction last December while it was still under the Obama administration. But in February, the Trump administration asked for more time to "consider the issues" and decide how to treat the case. It has until June 30 to file a brief with the court.

During his confirmation hearing in March, Labor Secretary Alexander Acosta said it was "unfortunate" that the rule had not been updated in more than a decade, but he also said the threshold proposed by the previous administration may "create a stress on the system."

In anticipation of the rule, some employers raised workers salaried, adjusted employees' schedules and made other changes to comply with the regulation. Some companies decided to stick with their new policies but others are waiting to learn the final outcome of the case.

Some Chipotle employees in New Jersey started receiving overtime pay in mid-November for hours worked over 40 hours a week, according to the lawsuit. Carmen Alvarez, the lead plaintiff in the suit, said she regularly worked about 50 hours a week as an assistant manager at a Chipotle in East Hanover, N.J. During that time, she said it was helpful to have the additional pay. Her hours also became more predictable after the change because her bosses became less likely to ask her to come in early or stay late.

But by mid December, a few weeks after the injunction, Alvarez was switched back to a flat salary and told she would no longer receive overtime pay. "I was disappointed when they changed it back because I thought I would spend more time with my family or at least get rewarded for the time that we work," said Alvarez, who says she was fired by the company in March because of a dispute over her schedule.

The attorneys representing Chipotle workers have also handled other high profile cases against employers, such as an ongoing private class-action arbitration case accusing Sterling Jewelers of gender discrimination in pay and promotion practices.

- standard version

# New York, New York

(212) 245-1000
685 Third Avenue
25th Floor

New York, NY 10017

# Chicago, Illinois

[(312) 809-7010](#)

161 North Clark Street
Suite 1600
Chicago, IL 60601

# San Francisco, California

[(415) 638-8800](#)

One Embarcadero Center
38th Floor
San Francisco, CA 94111

# Washington, DC

[(202) 847-4400](#)

601 Massachusetts Avenue NW
Second Floor West Suite
Washington, DC 20001

© 2017 Outten & Golden LLP. Attorney Advertising

- [Site Map](#)
- [Disclaimer](#)
- [Privacy Policy](#)
- [Who We Represent](#)

search

**Search this site:** search site    Search

- [Home](#)
- [practice areas](#)
- [our team](#)
- [media](#)
- [resources](#)
- [cases](#)
- [our firm](#)

- [contact us](#)





# Advocates for Workplace Fairness

- 
- **[back](#)**

## Chipotle Is Cheating Thousands Of Workers Out Of Overtime Pay, Lawsuit Alleges

Gothamist—Emma Whitford
06.07.2017

Thousands of Chipotle workers in New Jersey are being illegally denied overtime pay though they consistently work in excess of 40 hours per week, according to a lawsuit filed Wednesday in New Jersey Supreme Court. The lawsuit challenges the company's interpretation of a Texas judge's ruling, which blocked implementation of 2016 Obama Administration overtime rules announced last spring.

The lead plaintiff on the case is Fairfield resident Carmen Alvarez, a 55-year-old mother and grandmother, who has worked as a manager-in-training at multiple Chipotle restaurants since 2013, often in excess of 40 hours per week. Last November, the suit alleges, she and other apprentices were converted from salary to wage workers and began making overtime—apparently in response to new federal guidelines. But when the Texas ruling came down, the suit alleges, Alvarez and her coworkers lost their overtime.

The lawsuit cites a December email from Chipotle stating that the workers would revert to their previous salaries and would not earn overtime "because of" of the Texas decision. Since then, Chipotle has not kept track of workers' hours, which consistently creep past 40. Meanwhile, managerial apprentices continue to do many of the same tasks as their hourly counterparts, including filling orders and preparing sides like salsa, guacamole and chopped vegetables on the assembly line.

"I was crushed when Chipotle went back on its promise to pay me and other co-workers the overtime that we worked so hard for," Alvarez stated Wednesday.

The suit requests class action status for Alvarez and thousands of other current and former New Jersey Chipotle workers.

The U.S. Department of Labor last May announced plans to raise the ceiling for mandatory overtime for salaried workers—from $23,660 to $47,476 per year. Under the rule, qualifying salaried workers would be required to earn time-and-a-half for every hour worked in excess of 40 in a given week. But Texas Judge Amos L. Mazzant III blocked the rule days before it was supposed to go into effect last November, to the relief of business interests. The Obama administration had argued that doubling the wage limit for mandatory overtime stood to benefit 4 million salaried workers.

Attorneys for the workers are alleging that the judge's preliminary injunction did not "stay the effective date of the rule or otherwise prevent the rule from going into effect," according to court documents. The lawsuit also alleges that the Texas ruling, even if it were to stand today, would apply to state government employees, not workers employed by private companies.

"The federal overtime law allows law firms like ours to help ensure that workers are fairly paid for the roles they play in boosting corporate profits," said Justin Swartz, a lawyer representing the Chipotle employees.

Some labor lawyers who advocate for workers agree with Swartz, the Washington Post reports. Catherine Ruckelshaus, general counsel for the National Employment Law Project, told the paper that because the Labor Department finalized its rules early last year, Judge Mazzant's November injunction can't permanently block it. Ruckelshaus predicted that a positive ruling in this case could have a "broad impact" nationwide.

*      *      *

The Labor Department appealed the Texas ruling in December. Now, under President Trump, the Department has asked for more time to consider the case. Trump could also undo the Obama-era overtime rules independent of the courts.

- standard version

# New York, New York

(212) 245-1000
685 Third Avenue
25th Floor
New York, NY 10017

# Chicago, Illinois

(312) 809-7010
161 North Clark Street
Suite 1600
Chicago, IL 60601

# San Francisco, California

(415) 638-8800
One Embarcadero Center
38th Floor
San Francisco, CA 94111

# Washington, DC

(202) 847-4400

601 Massachusetts Avenue NW
Second Floor West Suite
Washington, DC 20001
© 2017 Outten & Golden LLP. Attorney Advertising

Site Map

Disclaimer

Privacy Policy

Who We Represent

search

**Search this site:** search site Search

- Home
- practice areas
- our team
- media
- resources
- cases
- our firm

- contact us





# Advocates for Workplace Fairness

- 
- **back**

## Chipotle faces lawsuit over overtime pay dispute

USA TODAY—Sophia Tulp
06.07.2017

A lawsuit seeking class-action status was filed against Chipotle Mexican Grill alleging the fast-food chain failed to adequately compensate some employees for overtime work under a federal rule that went into effect late last year.

The lawsuit, filed this week in U.S. District Court in New Jersey, alleges the company failed to pay overtime to employees under the new overtime rule issued by the Labor Department last year — and that it's not the only one.

"For conscientious employers, a suit like this reminds them that the rule is in effect and that they should be paying overtime," Sellers said. "I don't fully understand the mind-set that has given rise to this broad belief that companies are not bound by this."

At the core of the suit is the rule that made more employees eligible for overtime pay. It required employers to pay overtime to any worker who earned up to $47,476. Previously, the companies only had to pay overtime to workers making $23,660 or less.

But in late November, shortly before the rule went into effect Dec. 1, a Texas court put enforcement of it on hold so employers didn't have to pay overtime to workers who had the higher salary threshold. The lawsuit says Chipotle should be required to continue to pay overtime despite the injunction of enforcement of the rule by the Texas court. It contends the Texas injunction did not apply to private employers and the overtime rule would stay in effect until the court issues its final ruling.

The lead plaintiff is a worker named Carmen Alvarez, who was training to become a general manager at a Chipotle restaurant, known as an "apprentice" within the chain. She was working about 10 overtime hours a week and was earning a total of about $43,082 a year, but was denied overtime pay when the injunction was issued.

* * *

Tim Trujillo, a human resources consultant who founded Focus HR in Tehachapi, Calif., said even if the lawsuit was to win in court, it might not be around for much longer if the Trump administration chooses to roll back the rule.

The Labor Department "will probably be reviewing and deciding whether they want to go forward with the same regulations" that came during the Obama administration, Trujillo said.

- standard version

# New York, New York

(212) 245-1000
685 Third Avenue
25th Floor
New York, NY 10017

# Chicago, Illinois

(312) 809-7010
161 North Clark Street
Suite 1600
Chicago, IL 60601

# San Francisco, California

(415) 638-8800
One Embarcadero Center
38th Floor
San Francisco, CA 94111

# Washington, DC

(202) 847-4400
601 Massachusetts Avenue NW
Second Floor West Suite
Washington, DC 20001

© 2017 Outten & Golden LLP. Attorney Advertising

search
**Search this site:** search site  Search

- Home
- practice areas
- our team
- media

- resources
- cases
- our firm

- contact us





# Advocates for Workplace Fairness

- 
- [back](back)

## Chipotle Not Paying Its Workers Enough?

thestreet.com—Amanda Schiavo
06.07.2017

On Wednesday, a lawsuit was filed in the U.S. District Court in New Jersey against Chipotle ([CMG](CMG)) claiming that a federal rule expanding overtime pay to millions of the fast-casual Mexican food restaurant chain's workers is in effect, *The Wall Street Journal* reports.

This is despite an injunction issued late last year that kept the Labor Department from enforcing the rule.

The lawsuit alleges, and the regulation requires, that Chipotle should be paying time and a half to employees that are working over 40 hours a week and earning less than $47,476 per year.

"There's been no finding that the rule is unlawful," Lawyer Joseph Sellers told the *Journal*. "We think the rule went into effect and that companies should be paying people overtime."

Chipotle stock was lower by 1.68% to $462.57 early Wednesday afternoon.

- [standard version](standard version)

# New York, New York

[(212) 245-1000](tel:2122451000)
685 Third Avenue
25th Floor
New York, NY 10017

# Chicago, Illinois

[(312) 809-7010](#)
161 North Clark Street
Suite 1600
Chicago, IL 60601

# San Francisco, California

[(415) 638-8800](#)
One Embarcadero Center
38th Floor
San Francisco, CA 94111

# Washington, DC

[(202) 847-4400](#)
601 Massachusetts Avenue NW
Second Floor West Suite
Washington, DC 20001

© 2017 Outten & Golden LLP. Attorney Advertising

- [Site Map](#)
- [Disclaimer](#)
- [Privacy Policy](#)
- [Who We Represent](#)

search

**Search this site:** search site   Search

- [Home](#)
- [practice areas](#)
- [our team](#)
- [media](#)
- [resources](#)
- [cases](#)
- [our firm](#)

- [contact us](#)





# Advocates for Workplace Fairness

- **back**

## Chipotle Workers Sue for Overtime, Testing Scope of Obama-Era Rule

National Law Journal—Erin Mulvaney
06.07.2017

Carmen Alvarez said she was crushed when her employer, Chipotle Mexican Grill Inc., reversed its decision to pay her and her fellow workers overtime late last year, despite a new federal rule that she believed enabled her to receive time-and-a-half for work over 40 hours.

The 55-year-old, who worked for the fast-food chain in New Jersey since 2013, said she finally received the boost, along with millions of other workers newly eligible for overtime pay. It was then quickly pulled away thanks to a court decision that temporarily halted the U.S. Department of Labor from enforcing the regulation, according to a lawsuit filed in the U.S. District Court of New Jersey Wednesday.

The lawsuit claims the overtime rule is still in effect, despite the injunction, and companies that decided not to comply are violating federal labor laws. In 2016, the Labor Department updated the federal salary threshold for overtime eligibility for the first time in 12 years, from $23,660 to $47,476. It made 4.2 million workers newly eligible for overtime pay.

"This case isn't just about Chipotle, though. Millions of Americans are working long hours and not getting paid the money to which they are entitled," said Alvarez, who no longer works for Chipotle, in a statement accompanying the suit. "It's time for that to stop."

The regulation came under fire in a lawsuit filed by 21 states and a coalition of business groups that argued the Labor Department's enforcement of the rule would be harmful to their bottom lines. That case is pending before the U.S. Court of Appeals for the Fifth Circuit.

Companies were expected to comply with the regulation by last Dec. 1. A Texas judge in late November blocked the rule, and the Labor Department filed an appeal in the Fifth Circuit. The case

is pending there.

The injunction inspired many companies to hedge their bets and keep the status quo for their workers as the issue was tied up in the courts, observers have said.

Yet, the lawsuit filed against Chipotle argues that private companies must still comply with the rule unless it is overturned and the appeals court ruling applies only to certain state government employees.

"Chipotle is denying overtime pay to thousands of workers that live paycheck to paycheck and rely on their weekly income to make ends meet," said Joseph Sellers, a partner at Cohen Milstein Sellers & Toll, which represents the lead plaintiff in the suit. "More broadly, Chipotle is not the only company to avoid paying overtime to its employees by illegally hiding behind a ruling that does not apply to them."

Attorneys from Cohen Milstein, **Outten & Golden** and Green Savits are representing the Chipotle workers in this case.

Chipotle spokesman Chris Arnold said the company's policy is to not comment on ongoing legal proceedings. He said all of the chain's employment practices are compliant with applicable laws. He added, "A lawsuit is nothing more than allegations, and the filling of a suit is in no way proof of any wrongdoing."

The Labor Department did not respond to a request for comment.

Peter Fox, counsel with the National Employment Law Project, said companies that did not comply with the overtime rule could have made a mistake. He said a preliminary injunction stops only the parties before the court, and in this case that would be the Department of Labor. It does not stop the private right to action to give employees the right to sue under the regulation.

"I think that would be a risky decision on their part," Fox said. "If a company consulted administrative lawyers, I think they would have said 'we don't have an order to set aside this rule.' They still risk private lawsuits."

In April, the Texas appeals court extended the deadline for the Labor Department to file its reply brief—the third and final brief in any appeal—until June 30. The Labor Department, represented in the case by the Justice Department, asked for an extension to allow "incoming leadership personnel adequate time to consider the issues."

Labor Secretary Alex Acosta, at a hearing Wednesday before a House Appropriation subcommittee, reaffirmed a comment he made during his confirmation hearing that the overtime threshold should be addressed, while acknowledging that nearly doubling it was a "shock to the system."
Some employers tried to get their compliance plans in place by Dec. 1, others implemented them before and others kept their policies in place, said Marc Freedman, executive director of labor law policy at the U.S. Chamber of Commerce. There were not any broad patterns, he said. To comply, an employer could increase exempt salaries or move them to nonexempt.

"Employers did both and there are examples of them doing both," Freedman said. "The ones who increased the salary threshold would have a harder time undoing that change."

<p align="center">*     *     *</p>

- standard version

# New York, New York

[(212) 245-1000](tel:2122451000)
685 Third Avenue
25th Floor
New York, NY 10017

## Chicago, Illinois

[(312) 809-7010](tel:3128097010)
161 North Clark Street
Suite 1600
Chicago, IL 60601

## San Francisco, California

[(415) 638-8800](tel:4156388800)
One Embarcadero Center
38th Floor
San Francisco, CA 94111

## Washington, DC

[(202) 847-4400](tel:2028474400)
601 Massachusetts Avenue NW
Second Floor West Suite
Washington, DC 20001

© 2017 Outten & Golden LLP. Attorney Advertising

- Site Map
- Disclaimer
- Privacy Policy
- Who We Represent

search

**Search this site:** [search site] [ Search ]

- Home
- practice areas
- our team
- media
- resources
- cases
- our firm

- contact us

     



# Advocates for Workplace Fairness

- 
- [back](#)

## In Chipotle lawsuit, worker says overtime pay rule alive and well

Reuters—Daniel Wiessner
06.07.2017

Chipotle Mexican Grill Inc on Wednesday was hit with a proposed class action lawsuit claiming the company - and every other private employer in the U.S. - must comply with a rule extending overtime pay to millions of workers, even though it was blocked by a federal judge.

The lawsuit filed in federal court in New Jersey by former Chipotle worker Carmen Alvarez says the Denver-based company unlawfully classified manager trainees in the state as exempt from overtime pay under the Fair Labor Standards Act because they performed some management tasks.

- [standard version](#)

# New York, New York

[(212) 245-1000](tel:2122451000)
685 Third Avenue
25th Floor
New York, NY 10017

# Chicago, Illinois

[(312) 809-7010](tel:3128097010)
161 North Clark Street
Suite 1600
Chicago, IL 60601

# San Francisco, California

(415) 638-8800
One Embarcadero Center
38th Floor
San Francisco, CA 94111

# Washington, DC

(202) 847-4400
601 Massachusetts Avenue NW
Second Floor West Suite
Washington, DC 20001

© 2017 Outten & Golden LLP. Attorney Advertising

- Site Map
- Disclaimer
- Privacy Policy
- Who We Represent

search

**Search this site:** search site | Search

- Home
- practice areas
- our team
- media
- resources
- cases
- our firm

- contact us





# Advocates for Workplace Fairness

- 
- **[back](#)**

## Chipotle Is Exploiting Judge's Block On OT Rule, Suit Says

Law360—Dorothy Atkins
06.07.2017

Chipotle was hit with a putative class action in New Jersey federal court Wednesday alleging the fast-food chain has illegally relied on a Texas federal judge's ruling blocking the U.S. Department of Labor from expanding overtime protections to avoid paying its workers overtime.

The suit argues that the DOL's 2016 extension of overtime eligibility to millions of workers earning less than $47,476 per year is in effect, despite a Texas federal court's ruling temporarily enjoining the DOL from implementing and enforcing it.

The suit claims the Texas ruling, in favor of a group of states and business groups, has no bearing on private companies' responsibility to comply with the overtime threshold, and that Chipotle Mexican Grill Inc. and other companies have been erroneously relying on the Texas decision in order to avoid paying workers overtime in violation of the Fair Labor Standards Act and New Jersey labor statutes.

"The first-of-its-kind class action lawsuit could mean that millions of workers in various industries across the country, who earn a salary of less than $47,476, are illegally being denied overtime without their knowledge," the plaintiff's attorneys said in a statement Wednesday.

Lead plaintiff Carmen Alvarez filed the putative class action after working as an apprentice training to be a manager at Chipotle restaurants in New Jersey from December 2013 through March 2017. According to the complaint, Alvarez and other apprentices regularly worked more than 40 hours per week but weren't paid time-and-a-half for overtime.

The company classifies apprentices as executive or administrative employees exempt from overtime, even though they performed the duties of nonexempt hourly employees by preparing food and working at cash registers, the suit said.

In November, Chipotle began paying Alvarez and other apprentices overtime pay following the DOL's new overtime rule, which went into effect on Dec. 1, the suit said. The rule updated the federal salary threshold for overtime eligibility for the first time in 12 years, raising it from $23,660 to $47,476, and at the time, the DOL anticipated it would impact 4.2 million workers.

But the same month the rule was to go into effect, a Texas federal judge granted a motion for preliminary injunction filed by the states, who had argued the rule would force their governments to increase their employment costs substantially. The ruling blocked the DOL from enforcing the rule, finding it improperly elevates the salary-level test over a parallel test based on the duties a worker performs. The DOL appealed the decision to the Fifth Circuit, but the appellate court stayed the appeal in April to wait for the Trump administration's labor secretary nominee to be confirmed.

Following the Texas court's ruling, Chipotle reversed course, converting Alvarez and her co-workers back to exempt status and denying them overtime pay, improperly citing the Texas ruling, the complaint says.

Alvarez's attorney Joseph M. Sellers of Cohen Milstein Sellers & Toll PLLC told Law360 on Wednesday that the preliminary injunction should only apply to state employers, because the Texas suit was brought by the states on behalf of state employers and not private companies.

The lawsuit seeks collective and class action status for Alvarez and thousands of other similarly situated current and former Chipotle employees in New Jersey, as well as damages for unpaid overtime wages and fees associated with litigation.

Sellers said Wednesday that Chipotle is denying overtime pay to thousands of workers who live paycheck to paycheck and rely on their weekly income to make ends meet. What's worse is that Chipotle isn't the only company to avoid paying overtime to its employees by illegally hiding behind a ruling that doesn't apply to them, he said.

"This case could benefit millions of hard-working Americans who are being denied money that they've earned," Sellers said in a statement.

<div align="center">*     *     *</div>

A statement from Alvarez's counsel Wednesday said that Chipotle's "cost-cutting decision" came after an outbreak of E. coli that sickened customers in 2015. In 2016, Chipotle's profits fell 95 percent from the previous year, and in the first quarter of 2017, the company's profits were down 76 percent compared with the same period last year, the statement said.

Alvarez is represented by Joseph M. Sellers and Miriam R. Nemeth of Cohen Milstein Sellers & Toll PLLC, Melissa Lardo Stewart and Justin M. Swartz of Outten & Golden LLP, and Glen D. Savits of Green Savits LLC.

<div align="center">*     *     *</div>

The case is Carmen Alvarez v. Chipotle Mexican Grill Inc. et al. in the U.S. District Court for the District of New Jersey. The case number wasn't immediately available Wednesday.

- standard version

# New York, New York

(212) 245-1000

685 Third Avenue

25th Floor

New York, NY 10017

## Chicago, Illinois

[(312) 809-7010](tel:3128097010)

161 North Clark Street
Suite 1600
Chicago, IL 60601

## San Francisco, California

[(415) 638-8800](tel:4156388800)

One Embarcadero Center
38th Floor
San Francisco, CA 94111

## Washington, DC

[(202) 847-4400](tel:2028474400)

601 Massachusetts Avenue NW
Second Floor West Suite
Washington, DC 20001

© 2017 Outten & Golden LLP. Attorney Advertising

- Site Map
- Disclaimer
- Privacy Policy
- Who We Represent

search

**Search this site:** search site    Search

- Home
- practice areas
- our team
- media
- resources
- cases
- our firm

- contact us





# Advocates for Workplace Fairness

- 
- **back**

## Employees Sue Chipotle, Claiming It Failed To Pay Them Overtime

Huffington Post—Kim Bellware
06.07.2017

*At the center of the legal battle is an Obama-era rule that vastly expanded overtime pay to salaried workers.*

Chipotle employees have sued the fast-casual restaurant chain for allegedly failing to pay overtime compensation, which they say they are entitled to under a recent Labor Department rule at the center of a separate court battle.

The lawsuit, filed Wednesday in a federal court in New Jersey, maintains that the Obama-era Labor Department rule — which vastly expands overtime pay to salaried workers — still applies, even though a federal judge in November issued a preliminary injunction to block the Labor Department from enforcing it.

The suit seeks class-action status for employees like lead plaintiff Carmen Alvarez, one of Chipotle's so-called "apprentices," or managers-in-training. Alvarez and others were not eligible for overtime under the old salary cap, but were eligible under the new one, said Joseph Sellers, a lawyer from Cohen Milstein Sellers & Toll who is among the representatives for the suit.

After the Obama administration finalized the rule change last year, Sellers said, Chipotle paid Alvarez and others for a few weeks for overtime they were newly qualified to receive. The payment stopped

when the federal injunction against the rule was issued in late
November.

"The [Fair Labor Standards Act] has two ways of enforcing overtime
rule. One is from [the] Department of Labor, and the other is
individual parties," Sellers explained. "The injunction stops the
Department of Labor, but says nothing about private enforcement."

"We contend the rule went into effect," Sellers added. As the lawsuit
notes:

> Although [the judge's order] preliminarily enjoined the
> Department of Labor from implementing and enforcing
> the Overtime Rule, the Eastern District of Texas did not
> stay the effective date of the rule or otherwise prevent the
> rule from going into effect.

\*          \*          \*

Under President Barack Obama's overhaul of the Fair Labor
Standards Act, hourly and some salaried workers are entitled to time-
and-a-half pay for any hours over 40 they work in a week. Salaried
workers qualify if their annual income is below $47,476. The
previous threshold of $23,660 had not been changed since the George
W. Bush administration.

Exemptions to salaried employees applied if they earned more than
the threshold amount, or if their duties were considered substantively
managerial, like overseeing other workers or possessing hiring and
firing power. (The Labor Department's fact sheet address the full
range of exemptions.)

The rule change had an effective date of Dec. 1, 2016. The Labor
Department is expected to file a response to the injunction later this
month.

Chipotle has yet to formally respond to the suit. Sellers said the
company will likely argue that the new rule never really went into
effect because the injunction stopped it.

"There's been a widespread misbelief about the overtime rule,"
Sellers said. "I think a careful read of the law — for people who want
to follow the law — [sees] this rule as in effect."

Sellers suggested there's been a snowball effect thanks to the rule's
ambiguity. If a business sees that other companies aren't complying
with the rule, it won't comply either.

"What I hope this case helps to address is [what] the actual state of
the law is, rather than what people's perceptions may be," he said.

Plaintiffs are seeking back overtime pay, court costs and damages.

\*          \*          \*

- [accessible version](#)

# New York, New York

[(212) 245-1000](#)
685 Third Avenue
25th Floor
New York, NY 10017

# Chicago, Illinois

[(312) 809-7010](#)
161 North Clark Street
Suite 1600
Chicago, IL 60601

# San Francisco, California

[(415) 638-8800](#)
One Embarcadero Center
38th Floor
San Francisco, CA 94111

# Washington, DC

[(202) 847-4400](tel:2028474400)

601 Massachusetts Avenue NW

Second Floor West Suite

Washington, DC 20001

© 2017 Outten & Golden LLP. Attorney Advertising

- [Site Map](#)
- [Disclaimer](#)
- [Privacy Policy](#)
- [Who We Represent](#)

search

**Search this site:** search site   Search

- [Home](#)
- [practice areas](#)
- [our team](#)
- [media](#)
- [resources](#)
- [cases](#)
- [our firm](#)

- [contact us](#)





# Advocates for Workplace Fairness

- 
- [back](back)

## Workers Say Chipotle Owes Them Overtime Pay

consumerist.com—Ashlee Kieler
06.07.2017

Last year, a federal court issued an injunctionthat put the brakes on a Department of Labor rule that would expand overtime pay to millions of workers. While the government isn't enforcing the rule because of the court order, a new lawsuit filed against Chipotle argues that that shouldn't stop employers from abiding by the terms. To that end, employees of the fast casual restaurant in New Jersey are seeking to recoup overtime pay they would have earned under the rule.

The Washington Post reports that the proposed class-action lawsuit, filed today in federal court in New Jersey, argues that while the injunction blocked the DoL from enforcing the rule, it didn't prevent the rule from actually taking effect.

Because the rule was finalized and had been published in the Federal Register, the lawsuit claims, it actually took effect on Dec. 1, meaning that employers should still have to abide by the terms.

For those unfamiliar, prior to the rule, most employers were only required to provide overtime pay for workers earning up to $23,660/year ($455/week). The new rule would raise that threshold to $47,892/year ($921/week).

Additionally, the salary threshold for overtime eligibility would be automatically updated every three years. It has been more than a decade since the last significant change in this standard.

In Sept. 2016, nearly two dozen states sued the Labor Department and asked the judge to grant an injunction preventing the rule from going into effect.

Two months later, U.S. District Court Judge Amos Mazzant granted that injunction [PDF], finding that the plaintiff states had sufficiently established that the Labor Department may have overstepped its authority in setting the new salary levels and devising an automatic update mechanism for the salary threshold.

Despite this, the new lawsuit claims that because the federal court has yet to issue a final decision or repeal the regulation, the rule took effect as planned.

This, the complaint states, means that there was noting in the injunction preventing other parties — like Chipotle — from abiding by the rule.

"There's been no finding that the rule is unlawful," Joseph Sellers, a partner at Cohen Milstein Sellers & Toll, the law firm representing the lead plaintiff, tells the Post. "We think the rule went into effect and that companies should be paying people overtime."

In fact, the lawsuit notes that Chipotle employees in New Jersey began receiving overtime pay for hours worked over 40 hours a week in mid-November. However, a few weeks after the injunction was issued, the company stopped providing the overtime pay.

Consumerist has reached out to Chipotle for comment on the lawsuit. We'll update this post if we hear back.

In the meantime, a rep for a worker advocacy group tells the Post that the case could have a "broad impact" on worker eligibility for overtime pay.

- standard version

# New York, New York

(212) 245-1000
685 Third Avenue
25th Floor
New York, NY 10017

# Chicago, Illinois

(312) 809-7010
161 North Clark Street
Suite 1600
Chicago, IL 60601

# San Francisco, California

(415) 638-8800
One Embarcadero Center
38th Floor
San Francisco, CA 94111

# Washington, DC

(202) 847-4400
601 Massachusetts Avenue NW
Second Floor West Suite
Washington, DC 20001
© 2017 Outten & Golden LLP. Attorney Advertising

- Site Map

- Disclaimer
- Privacy Policy
- Who We Represent

search

**Search this site:** search site   Search

- Home
- practice areas
- our team
- media
- resources
- cases
- our firm

- contact us





# Advocates for Workplace Fairness

- 
- [**back**](#)

## Chipotle owes me overtime pay, NJ worker says

Asbury Park Press—Michael L. Diamond
06.07.2017

A New Jersey woman who worked for Chipotle in a management training program says she should have been eligible for overtime pay, according to a lawsuit filed Wednesday.

Carmen Alvarez, 55, of Fairfield, Essex County, said the restaurant chain last December shifted her from an hourly employee to salaried, leaving her to work more than 40 hours a week filling orders and preparing food without extra pay.

"I was crushed when Chipotle went back on its promise to pay me and other co-workers the overtime that we worked so hard for," Alvarez said in a statement.

The class-action lawsuit was filed in U.S. District Court in New Jersey.

It put a spotlight on a rule by the U.S. Labor Department under former President Barack Obama to increase the salary threshold for overtime pay eligibility from $23,660 a year to $47,476.

Judge Amos Mazzant of the U.S. District Court in Texas halted the rule on Nov. 22, days before it was supposed to go into effect so that he could review the merits of a lawsuit brought by 21 states that objected to the Labor Department's decision.

The rule's future under President Donald Trump isn't clear. New Labor Secretary Alexander Acosta said at a hearing Wednesday that the department would open a request for information about it in a move that worker advocates said could delay or weaken the regulation.

Alvarez's attorneys argued that Judge Mazzant's decision meant the Labor Department couldn't enforce the rule. But it didn't keep the rule from going into effect for private companies, they say. And workers could try to enforce the rule for themselves.

* * *

Alvarez worked at Chipotle stores in West Orange, Clifton, Ramsey and East Hanover, the lawsuit said.

She was classified by the company as an apprentice — a job in which she trained to become a general manager but spent most of her time filling orders, preparing food and working the cash register. She worked upwards of 50 hours a week. She had an annual salary of about $42,640. And she was eligible for a bonus of up to $2,500, the lawsuit said.

On Nov. 14, Chipotle shifted its apprentices to hourly to comply with the new rules. Alvarez's annual pay was $43,082. She was eligible for a bonus of $750. And she was entitled to overtime pay if she worked more than 40 hours a week, the lawsuit said.

After Judge Mazzant's ruling, Chipotle moved the apprentices back to salaried workers and didn't pay overtime, according to the lawsuit.

"Chipotle is not the only company to avoid paying overtime to its employees by illegally hiding behind a ruling that does not apply to them," said Joseph M. Sellers, a partner at Cohen Milstein Sellers & Toll in Washington, D.C., and one of Alvarez's lawyers.

- standard version

## New York, New York

(212) 245-1000
685 Third Avenue
25th Floor
New York, NY 10017

## Chicago, Illinois

(312) 809-7010
161 North Clark Street
Suite 1600
Chicago, IL 60601

## San Francisco, California

(415) 638-8800
One Embarcadero Center
38th Floor
San Francisco, CA 94111

## Washington, DC

(202) 847-4400
601 Massachusetts Avenue NW
Second Floor West Suite
Washington, DC 20001
© 2017 Outten & Golden LLP. Attorney Advertising

Site Map

Disclaimer

Privacy Policy

Who We Represent

search

**Search this site:** search site   Search

- Home
- practice areas
- our team
- media
- resources
- cases
- our firm

- contact us



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **STATE OF NEVADA,** *et al.*, | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO.: 4:16-CV-731-ALM** |
| | § | |
| **UNITED STATES DEPARTMENT** | § | |
| **OF LABOR,** *et al.*, | § | |
| **Defendants.** | § | |

### ORDER GRANTING PETITIONERS CHIPOTLE MEXICAN GRILL, INC.'S AND CHIPOTLE SERVICES, LLC'S MOTION FOR CONTEMPT

The Court, having reviewed Petitioners' Motion for Contempt [Document No. 89], the authorities cited therein, and the attachments and documents referenced therein, and being fully advised on the premise, hereby GRANTS the motion. The Court affirms that its November 22, 2016 order precludes Carmen Alvarez and her counsel, including but not limited to Joseph M. Sellers and Miriam R. Nemeth (Cohen Milstein Sellers & Toll PLLC), Justin M. Swartz and Melissa Lardo Stewart (Outten & Golden LLP), and Glen D. Savits (Green Savits LLC) from enforcing the Final Rule while that order remains in effect. The Court finds that the order prohibits Ms. Alvarez and her counsel from filing her lawsuit in the United States District Court for the District of New Jersey to enforce the Final Rule against Chipotle. The Court further finds that as a result of Ms. Alvarez and her counsels' action, Petitioners have suffered damages in the form of attorney's fees and costs incurred in enforcing the order.

The Court therefore ORDERS:

That within 7 days of this Order, Ms. Alvarez and her counsel shall move to amend the complaint in the New Jersey action to remove any and all allegations concerning this Court's

November 22, 2016 order and the Final Rule, and are further enjoined from enforcing the Final Rule; and

That within 14 days of this Order, Petitioners will file a bill of costs and affidavit in support of attorney's fees.